## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE MEMBERS OF THE<br>*AD HOC* COMMITTEE OF<br>PREFERRED AND EQUITY<br>SECURITY HOLDERS,<br><br>Petitioners. | Civil Action No. _____ |
| In re:<br><br>OWENS CORNING, *et al.*,<br><br>Debtors. | Chapter 11<br>Bankruptcy Case No. 00-3837 (JKF)<br>(Jointly Administered)<br><br>United States Bankruptcy Court for the<br>District of Delaware (Fitzgerald, J., sitting<br>by designation) |

### PETITION OF THE MEMBERS OF THE *AD HOC* COMMITTEE
### OF PREFERRED AND EQUITY SECURITY HOLDERS FOR ENTRY OF
### AN ORDER PROVIDING FOR RELIEF IN THE NATURE OF MANDAMUS

| BROWN RUDNICK | BROWN RUDNICK | CONNOLLY BOVE LODGE & |
|---|---|---|
| BERLACK ISRAELS LLP | BERLACK ISRAELS LLP | HUTZ LLP |
| Edward S. Weisfelner | Anthony L. Gray | Jeffrey C. Wisler (No. 2795) |
| Robert J. Stark | John C. Elstad | Christina M. Thompson (No. 3976) |
| 7 Times Square | One Financial Center | Marc J. Phillips (No. 4445) |
| New York, NY 10036 | Boston, MA 02111 | 1007 N. Orange Street |
| (212) 209-4800 | (617) 856-8200 | Wilmington, DE 19899 |
| | | (302) 658-9141 |

Dated: February 28, 2006

## I.     INTRODUCTION AND PRELIMINARY STATEMENT

The members of the *Ad Hoc* Committee of Preferred and Equity Security Holders (the "*Ad Hoc* Committee"), who hold shares of common stock of Owens Corning ("Owens Corning," and together with its debtor subsidiaries, the "Debtors"), through undersigned counsel, hereby submit this petition (this "Petition") requesting that the Court enter an order directing the United States Bankruptcy Court for the District of Delaware, the Honorable Judith K. Fitzgerald (the "Bankruptcy Court"), to adjudicate the *Ad Hoc* Committee's motion (bankruptcy docket no. 16496) (the "Motion," a copy of which is attached hereto as Exhibit A and incorporated by reference herein) for (a) confirmation that the automatic stay imposed by Section 362 of the United States Bankruptcy Code (the "Bankruptcy Code") does not bar the exercise by Owens Corning shareholders of their right to prosecute an action in the Court of Chancery of the State of Delaware (the "Delaware Chancery Court") seeking to compel Owens Corning to hold its annual shareholders' meeting required under Delaware law and its own organizational documents that it has failed to hold for over five years, or (b) in the alternative, relief from the automatic stay to prosecute such an action.

Notwithstanding Owens Corning's pending Chapter 11 proceedings, the *Ad Hoc* Committee is entitled to prosecute a Delaware Chancery Court action to compel Owens Corning to conduct the required shareholders' meeting for the purpose of, among other things, electing a board of directors.   Nonetheless, out of deference for the Bankruptcy Court, the *Ad Hoc* Committee filed the Motion.

At the hearing on the Motion (and other matters) held on January 30, 2006 (the "January 30 Hearing"), after the *Ad Hoc* Committee, the Debtors (who opposed the Motion) and other parties completed their presentations, the Bankruptcy Court did not rule upon the Motion, but instructed the Debtors to continue it month-to-month.   The Bankruptcy Court also stated its

belief that the automatic stay applies to bar the *Ad Hoc* Committee from prosecuting the Delaware Chancery Court action. At a hearing held on February 21, 2006 (the "February 21 Hearing"), counsel for the *Ad Hoc* Committee expressly requested that the Bankruptcy Court enter an Order on its Motion. The Bankruptcy Court refused. Since the January 30 Hearing, the Bankruptcy Court has entered no order or judgment in respect of the Motion.

Under applicable legal authority governing mandamus-type relief, the Court should grant this Petition. As the Bankruptcy Court has refused to enter an order or judgment in respect of the Motion, there is nothing from which the *Ad Hoc* Committee may seek reconsideration or take an appeal. Further, the Bankruptcy Court's statements during the January 30 Hearing and February 21 Hearing that the automatic stay applies have effectively, without entry of an order or judgment, enjoined the *Ad Hoc* Committee from pursuing its state law rights for an indefinite period. As a result, the *Ad Hoc* Committee has no other adequate means to attain the relief requested in the Petition.

The *Ad Hoc* Committee has a clear and unequivocal right to the relief requested in this Petition. Based on long-established legal authority, including the decision of the United States District Court for the District of Delaware in In re Marvel Entertainment Group, 209 B.R. 832 (D. Del. 1997), the automatic stay does not bar the exercise of corporate governance rights, including the voting of shares to replace a debtors' board of directors. The Bankruptcy Court effectively ignored such legal authority by suggesting during the January 30 Hearing that the automatic stay does apply; the Bankruptcy Court then refused to enter an order or judgment adjudicating the Motion.

Even assuming *arguendo* that the automatic stay applies, Bankruptcy Code Section 362(e) requires the Bankruptcy Court either to enter an order that adjudicates the Motion

within 30 days of the January 30 Hearing or to extend such 30-day period with the consent of the parties or for a specific time which the Bankruptcy Court finds is required by compelling circumstances. The *Ad Hoc* Committee had never consented to any extension of the 30-day period. The Bankruptcy Court failed to extend the 30-day period for a specific time and failed to make any findings whatsoever that any extension is required by compelling circumstances.

In short, the Bankruptcy Court's handling of the Motion constitutes a failure to exercise its judicial power. Moreover, the Bankruptcy Court's failure to enter an order in respect of the Motion has caused and continues to cause the *Ad Hoc* Committee substantial harm by indefinitely depriving its members of their rightful corporate governance rights. Therefore, this Court should grant the Petition and direct the Bankruptcy Court to adjudicate the Motion.

## II.    BACKGROUND

### A.    The *Ad Hoc* Committee.

The *Ad Hoc* Committee is comprised of members[1] who currently hold, individually and/or through their funds and/or managed accounts, approximately 8.675 million shares in the aggregate of Owens Corning common stock, which holdings constitute approximately 16% of all outstanding shares of Owens Corning common stock.

As such, the *Ad Hoc* Committee is more than a "party in interest" entitled to be fully and fairly heard by this Court. See <u>Unofficial Comm. of Zero Coupon Noteholders v. The Grand Union Co.</u>, 179 B.R. 56, 58-59 (D. Del. 1995) (*ad hoc* committees have standing to be heard in Chapter 11 cases). It also has a substantial economic interest in the Debtors' Chapter 11 cases and reorganization. See <u>In the Matter of Marin Motor Oil</u>, 689 F.2d 445, 451 (3d Cir. 1982)

---

[1] The current members of the *Ad Hoc* Committee are (a) Catalyst Investment Management Co., LLC, (b) Deutsche Bank Securities Inc., (c) Hain Capital Group, LLC, (d) Harbinger Capital Partners Master Fund I, Ltd. f/k/a Harbert Distressed Investment Master Fund, Ltd., (e) Plainfield Asset Management LLC, and (f) Tudor Investment Corporation.

(Section 1109(b) of the Bankruptcy Code is understood in the context of long-established authority recognizing shareholders' right to be heard in a Chapter 11 case).

**B.    Owens Corning's Chapter 11 Case And Failure To Hold Annual Shareholders' Meetings.**

On October 5, 2000, Owens Corning (together with the other Debtors) commenced its bankruptcy proceedings before the Bankruptcy Court by filing a voluntary petition under Chapter 11 of the Bankruptcy Code.

For over five years Owens Corning has failed to hold annual shareholders' meetings for the purpose of, among other things, holding elections of directors, in violation of Owens Corning's obligations under its organizational documents and Delaware law under which it was incorporated. See Del. Code Ann. Tit. 8, § 211(b). Consequently, Owens Corning's purported directors (who are supposed to hold office, on a staggered basis, for three year terms) do not validly hold their board seats. Those purported directors are now touting a new reorganization plan for the Debtors that fails to maximize the value of the Debtors' estates for the benefit of all of their constituents, including Owens Corning's shareholders.

**C.    The *Ad Hoc* Committee's Motion.**

The *Ad Hoc* Committee filed the Motion out of deference to the Bankruptcy Court, despite its clear right to commence an action in Delaware Chancery Court to compel a shareholders' meeting, notwithstanding the pendency of Owens Corning's Chapter 11 case and the automatic stay imposed by Bankruptcy Code Section 362.

The failure by Owens Corning to conduct an annual shareholders' meeting is an actionable offense under Delaware law, entitling shareholders to commence a lawsuit against Owens Corning in the Delaware Chancery Court. See Del. Code Ann. Tit. 8, § 211(c) ("If there be a failure to hold the annual meeting ... for a period of 13 months ... after its last annual

meeting, the Court of Chancery may summarily order a meeting to be held upon the application of any stockholder."). As described in the Motion, the shareholders' right to compel a shareholders' meeting subsists in bankruptcy pursuant to well-established legal authority. See In re Johns-Manville Corp., 801 F.2d 60, 64 (2d Cir. 1986); In re Plankinton Bldg. Co., 138 F.2d 221, 222 (7th Cir. 1943); In re J.P. Linahan, Inc., 111 F.2d 590 (2d Cir. 1940); In re Bush Terminal Co., 78 F.2d 662, 664-65 (2d Cir. 1935). A debtor's purported insolvency does not alone nullify its shareholders' right to compel a shareholders' meeting. See Saxon Indus., Inc. v. NKFW Partners, 488 A.2d 1298, 1300 (Del. 1985). See generally 11 U.S.C. § 362 (applicability or non-applicability of the automatic stay is not dependent on whether the debtor is solvent or insolvent).

Moreover, authoritative case law from this District establishes that the automatic stay does not bar shareholders from asserting state law corporate governance rights, including the right to vote their shares to replace a debtor's board of directors. See Marvel, 209 B.R. at 838.

**D.    The Bankruptcy Court Refused To Adjudicate The Motion.**

During the January 30 Hearing, the Bankruptcy Court expressed the view that, unless asbestos reform legislation presently pending in Congress (the Fairness in Asbestos Injury Resolution Act, or the "FAIR Act") were enacted, the Debtors' purported insolvency was such that a shareholders' meeting would be unnecessary. The Bankruptcy Court instructed the Debtors' counsel to continue the Motion from month to month until the prospects for enactment of the FAIR Act become evident. Specifically, the Bankruptcy Court stated, inter alia, as follows:

> It seems to me that what I should do with this motion is simply hold it until such time as we know whether the FAIR Act does or doesn't pass because it seems to me that if in fact the FAIR Act passes then at that point in time the debtor's probably going to have to go back to the drawing boards and do something anyway

> ... So Mr. Pernick, I want this continued from month to month until I know what's going to happen with respect to the FAIR Act. With respect to whether the automatic stay applies, I believe it does apply, but because I'm going to continue this motion until I find out what the resolution with respect to the FAIR Act is, I don't think I need to address it at this point in time, but it seems to me that the automatic stay clearly prohibits entities from attempting to take control of the debtor or the debtor's property. That seems to be exactly what putting in a new board of directors would do.

See January 30, 2006 Hearing Transcript (the "January 30 Transcript," copies of the relevant pages of which are attached hereto at Exhibit B), 99-101. Although the Bankruptcy Court failed to adjudicate the Motion, it nonetheless advised that in its view the automatic stay applied to bar the *Ad Hoc* Committee from pursuing the proposed Delaware Chancery Court action or otherwise exercising corporate governance rights. See January 30 Transcript, 99-100, 103-104.

During the February 21 Hearing, after the *Ad Hoc* Committee specifically requested an adjudication of the Motion, the Bankruptcy Court refused to do so on the grounds that "there is no money for equity in this case unless the FAIR Act applies." See February 21, 2006 Hearing Transcript (the "February 21 Transcript," copies of the relevant pages of which are attached hereto as Exhibit C), 9-11. The Bankruptcy Court again continued the Motion to the March and April 2006 omnibus hearings. See February 21 Transcript, 10-11.

Since the January 30 Hearing, the Bankruptcy Court has not entered an order or a judgment in respect of the Motion.

## III.    ARGUMENT

### A.    The Standard For Mandamus-Type Relief.

The All Writs Act provides that "the Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." See 28 U.S.C. § 1651(a).

-6-

Although Fed. R. Civ. P. 81(b) abolished writs of mandamus in district court practice, mandamus-type relief may still be obtained from a district court "by appropriate action or by appropriate motion." See Fed. R. Civ. P. 81(b); Wright, Miller & Marcus, Federal Practice and Procedure Civil 2d § 3134. Indeed, courts have consistently recognized that Rule 81(b) permits a petitioner to request relief "in the nature of mandamus" in accordance with the same principles that governed former writ of mandamus practice. See Mical Communications, Inc. v. Sprint Telemedia, Inc., 1 F.3d 1031, 1036 (10th Cir. 1993) ("While a motion for injunctive relief now takes the place of a prayer for mandamus, 'it appears that the substantive rights of the parties are still governed by the principles which have formerly been applied in mandamus cases.'"); MCI Communications Corp. v. Am. Tel. and Tel. Co., 496 F.2d 214, 215 (3d Cir. 1974) ("[i]n view of the terms of F.R. Civ. P. 81(b), the parties apparently concede that pleading in relator form for mandamus is not now required"); Aladjem v. Cuomo, 1997 WL 700511, at *1 (E.D. Pa. Oct. 30, 1997) (despite Rule 81(b)'s abolition of writs of mandamus, similar relief "can still be obtained by motion or complaint provided that the court otherwise has jurisdiction in the matter").

In particular, district courts may entertain petitions for mandamus-type relief addressing bankruptcy court conduct. See, e.g. Tese-Milner v. Holland, No. 97-CV-4904(JG), 1997 WL 1048898, *2 (E.D.N.Y. November 26, 1997) (consideration of petition for mandamus-type relief in respect of refusal to recuse); Wagner v. United States Bankruptcy Court, 92 B.R. 614, 615 (E.D. Pa. 1988) (consideration of petition for mandamus-type relief in respect of dismissal of bankruptcy petition); Satter v. KDT Indus., Inc., 28 B.R. 374, 374 (S.D.N.Y. 1982) (consideration of petition for mandamus-type relief in respect of stay relief motion).

To justify the issuance of mandamus-type relief, the petitioner must show that it has: (1) no other adequate means to attain the desired relief; and (2) a clear and indisputable right to such

relief. See In re Nwanze, 242 F.3d 521, 524 (3d Cir. 2001); Haines v. Liggett Group, Inc., 975 F.2d 81, 89 (3d Cir. 1992). See also In re Sharon Steel Corp., 918 F.2d 434, 436 (3d Cir. 1990) ("[w]e may therefore issue a writ when the court below has committed a clear error of law that approaches the magnitude of a failure to use judicial power").

While mandamus is not a substitute for appeal, see In re Sch. Asbestos Litig., 977 F.2d 764, 772 (3d Cir. 1992), formal exhaustion of futile remedies is not required. See Hahnemann Univ. Hosp. v. Edgar, 74 F.3d 456, 462 (3d Cir. 1996) (granting mandamus despite petitioner's failure to make a formal application for certification of an interlocutory appeal where an informal application had been made and not granted).

**B.    This Petition Constitutes The *Ad Hoc* Committee's Only Means To Obtain Relief From The Bankruptcy Court's Refusal To Address The Motion.**

As the Bankruptcy Court has refused to enter an order or judgment adjudicating the Motion, the *Ad Hoc* Committee has no redress other than the mandamus-type relief sought in this Petition.

Motions for reconsideration may be brought pursuant to Fed. R. Civ. P. 59(e), which provides that "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." See Fed. R. Civ. P. 59(e) (made applicable to bankruptcy cases by Fed. R. Bank. P. 9023) (emphasis supplied). Motions for reconsideration or relief from judgment may also be brought pursuant to Fed. R. Civ. P. 60(b), which provides in relevant part that "[o]n motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding ... ." See Fed. R. Civ. P. 60(b) (made applicable to bankruptcy cases by Fed. R. Bank. P. 9024).

However, a key prerequisite for seeking reconsideration or other relief from a judgment or order under Rule 59 or Rule 60 is entry on the docket of the order or judgment as a separate

document. <u>See</u> Fed. R. Civ. P. 59(e) (referring to entry of the pertinent judgment); Fed. R. Civ. P. 58(a) (except for limited circumstances not applicable here, "[e]very judgment and amended judgment must be set forth on a separate document") (made applicable to bankruptcy cases by Fed. R. Bankr. P. 9021); Fed. R. Bankr. P. 9021 ("Every judgment entered in an adversary proceeding or contested matter shall be set forth on a separate document. A judgment is effective when entered as provided in Rule 5003."); Fed. R. Bankr. P. 5003(a) (requiring the bankruptcy court clerk to keep a case docket and to "enter thereon each judgment, order, and activity."). <u>See also</u> Fed. R. Bankr. P. 9022(a) (requiring the bankruptcy court clerk to serve a notice of entry of a judgment or order).

Appeals from bankruptcy court orders and judgments are governed by 28 U.S.C. § 158, which provides in relevant part as follows: "(a) The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees; . . . and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." <u>See</u> 11 U.S.C. § 158(a). Applicable rules and case law provide that to be appealable, a judgment or order must be separately entered on the docket. <u>See</u> Fed. R. Bankr. P. 8002(a) (notice of appeal shall be filed within 10 days of the date of the entry of the judgment, order, or decree appealed from); <u>Robeson Indus. Corp. v. Hartford Accident & Indemnity Co.</u>, 178 F.3d 160, 169 (3d Cir. 1999) ("The rule clearly defines the act that starts the running of the appeal period-- <i>viz.</i>, entry of the order in the bankruptcy court"); <u>In re Lashinger</u>, 1999 WL 409389, at *1 (E.D. Pa. June 15, 1999) ("the time for taking an appeal runs from the 'entry' of the Order, <i>i.e.</i>, when it is noted on the official public record, the docket"). <u>See also</u> Collier on Bankruptcy ¶ 8002.02 (" 'entry' of a judgment occurs when it is set forth in a written document separate from the court's opinion <i>and</i> when the

substance of this separate document is reflected in an appropriate notation on the docket sheet assigned to the action").

At the January 30 Hearing, the Bankruptcy Court stated that it would not adjudicate the Motion and would instead continue the hearing on the Motion month-to-month. See January 30 Transcript, 99-101. At the February 21 Hearing, the Bankruptcy Court reiterated her refusal to adjudicate the Motion. See February 21 Transcript, 9-11. The Bankruptcy Court has not entered on the docket a judgment or order in respect of the Motion, not even as to the continuance of the Motion on a month-to-month basis. Therefore, the *Ad Hoc* Committee cannot seek reconsideration of or relief from the Bankruptcy Court's failure to address the Motion and directive to continue the Motion on a month-to-month basis, or take an appeal therefrom.

Moreover, the statements made by the Bankruptcy Court expressing its view that the automatic stay applies, see January 30 Transcript, 100, 103-104, have effectively enjoined (without entry of an order or judgment and without the necessary showing for injunctive relief) the members of the *Ad Hoc* Committee from exercising their lawful corporate governance rights. In short, the members cannot exercise their rights without risking the Bankruptcy Court's sanction, even though the Bankruptcy Court has yet to enter a ruling regarding the applicability of the automatic stay as requested in the Motion.

Accordingly, no adequate means exist for the *Ad Hoc* Committee to seek relief other than the relief sought in this Petition.

C.    **The Bankruptcy Court Improperly Refused To Decide The Motion.**

As a threshold matter, the Bankruptcy Court, without entering an order or judgment, expressed its view during the January 30 Hearing that the automatic stay applies to bar the *Ad Hoc* Committee from pursuing an action in the Delaware Chancery Court to compel a shareholder meeting. But by making such statements and then refusing to adjudicate the Motion,

-10-

the Bankruptcy Court has improperly denied the *Ad Hoc* Committee its corporate governance rights that decades of established case law has protected even in the bankruptcy context. Simultaneously, the Bankruptcy Court ignored the Delaware District Court's <u>Marvel</u> decision, which expressly holds that the automatic stay does not deny a shareholder its right to vote its shares to change the board of directors of a debtor. Moreover, the Bankruptcy Court's refusal to adjudicate the Motion is premised on the proposition that a decision on the Motion is unnecessary because equity is purportedly out of the money until Congress acts on the FAIR Act. Such proposition contravenes both Bankruptcy Code Section 362 (the application of which is not dependent on the solvency or insolvency of the Debtors) and pertinent case law authority (such as the <u>Saxon</u> decision, which holds that the insolvency of a debtor does not deprive the debtor's shareholders of their right to relief under a Section 211(c) action brought in the Delaware Chancery Court).

Even assuming *arguendo* that the automatic stay applies, Bankruptcy Code Section 362(e) provides that thirty days after a request for relief from the automatic stay of any act against property of the estate, "the stay is terminated unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination." <u>See</u> 11 U.S.C. § 362(e). A hearing under Section 362(e) may be a preliminary hearing or may be consolidated with the final hearing. <u>See id.</u> If the hearing is a preliminary hearing, the final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances. <u>See id.</u>

Section 362(e) is intended to ensure that the automatic stay is not "continued indefinitely merely due to inaction of the court." See In re Wedgewood Realty Group, Ltd., 878 F.2d 693, 697 (3d Cir. 1989) ("The court must affirmatively order the stay continued pending its final decision on the stay motion, taking responsibility for such continuation, and giving the moving party an order from which, possibly, to appeal if such continuation pending a final decision is not acceptable to that party"); In re Kalmanowicz, 248 B.R. 249, 256 (M.D. Pa. 1998) (same).

At the January 30 Hearing, which was the first hearing at which the Motion was argued before the Bankruptcy Court, the Bankruptcy Court directed the Debtors to continue the Motion from month to month until the prospects for passage of the FAIR Act become more evident. See January 30 Transcript, 99-101. The Bankruptcy Court again reiterated her refusal to adjudicate the Motion during the February 21 Hearing, solely on the grounds that equity is currently out of the money and, consequently, the Bankruptcy Court would be issuing an advisory opinion if it were to adjudicate the Motion before Congress votes on the FAIR Act. See February 21 Transcript, 9-11.

Pursuant to Section 362(e) and pertinent case law authority, the *Ad Hoc* Committee has a clear and unequivocal right to an order either adjudicating the Motion or extending the required 30-day period between the preliminary and final hearings for a specific time for compelling reasons: the Bankruptcy Court has not adjudicated the Motion, has not continued the 30-day period for a specific time, and has not made any findings that an extension of the 30-day period was required by compelling circumstances. And the Bankruptcy Court's rationale for refusing to adjudicate the Motion (i.e., the purported insolvency of the Debtors) is not legally justified in light of the clear unequivocal language of Section 362 (the application of which is not dependent on the financial status of the Debtors) and applicable case law authority (e.g., Marvel, Saxon, and

the long line of cases holding that a shareholder's corporate governance rights subsist in bankruptcy). Moreover, the Bankruptcy Court's expressed concern about issuing an advisory opinion before Congress either enacts or declines to enact the FAIR Act is belied by the fact that the Bankruptcy Court effectively issued such an advisory opinion through its statements that the automatic stay applies to bar the *Ad Hoc* Committee from exercising prosecuting the proposed Delaware Chancery Court action. The Bankruptcy Court's improper advisory opinion regarding the applicability of the automatic stay constitutes an illegitimate injunction against the *Ad Hoc* Committee.[2] Further, the *Ad Hoc* Committee never consented to any extension of the 30-day period. In short, the Bankruptcy Court should have, but did not, enter an order either adjudicating the Motion or continuing the 30-day period with appropriate findings. See 11 U.S.C. § 362(e); Wedgewood, 878 F.2d at 697.

**D.    The Court Should Grant This Petition.**

The Bankruptcy Court's refusal to enter an order or a judgment in respect of the Motion must be corrected by a grant of mandamus-type relief. As described above, the *Ad Hoc* Committee has no other means to attain relief and it has a clear and unequivocal right to entry of an order or a judgment addressing the Motion.

Moreover, granting this Petition is warranted because the Bankruptcy Court has unjustifiably failed to exercise its judicial power. This situation is similar to that faced by the Third Circuit in Sharon Steel. In Sharon Steel, a litigant moved the district court to reconsider its denial of the litigant's motion to withdraw the reference to the bankruptcy court. See 918 F.2d at

---

[2] The *Ad Hoc* Committee believes that by operation of Section 362(e), the stay (assuming *arguendo* that it applies) will be automatically lifted in respect of the *Ad Hoc* Committee's prosecution of the proposed Delaware Chancery Court action by March 2, 2006 (i.e., the date following the 30-day period after the January 30 Hearing). But given the Bankruptcy Court's statements during the January 30 and February 21 Hearings regarding the applicability of the automatic stay, the *Ad Hoc* Committee will be effectively and improperly enjoined from prosecuting the proposed action on and after March 2, 2006.

426. The district court refused to rule on the motion. Instead, it stated that it would not take action on the motion unless all interested parties agreed to a grant of the motion. See id. Upon the litigant's petition for mandamus relief, the Third Circuit held that by refusing to rule on the motion, the district court had "failed to exercise its judicial power, which in turn has inhibited this Court's exercise of appellate jurisdiction." See id. In light of the district court's "unexplained abdication of judicial power," the Third Circuit ordered the district court to rule on the motion for reconsideration. See id. at 437-38. In this matter, just like the matter faced by the district court in Sharon Steel, the Bankruptcy Court has abdicated its judicial power by failing to enter an order in respect of the Ad Hoc Committee's Motion. Even more troubling, the Bankruptcy Court has effectively and improperly issued an advisory opinion that the automatic stay applies to bar the Ad Hoc Committee and its members from prosecuting the proposed Delaware Court Chancery action or exercising other corporate governance rights. Therefore, this Court, like the Third Circuit in Sharon Steel, should grant the Petition.[3]

---

[3] The Ad Hoc Committee and its members reserve all rights and remedies, including, without limitation, the rights to appeal, to seek reconsideration of and to seek other relief in respect of any order, judgment or other disposition of the Motion.

-14-

## IV.    CONCLUSION

For the foregoing reasons, this Court should (a) grant this Petition, (b) direct the Bankruptcy Court to enter an order or a judgment adjudicating the Motion within 15 days of the date that this Petition is granted, and (c) grant to the *Ad Hoc* Committee such other and further relief as is just and appropriate under the circumstances.

Dated:  February 28, 2006
       Wilmington, Delaware

CONNOLLY BOVE LODGE & HUTZ LLP

Jeffrey C. Wisler (No. 2795)
Christina M. Thompson (No. 3976)
Marc J. Phillips (No. 4445)
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
(302) 658-9141
jwisler@cblh.com
cthompson@cblh.com
mphillips@cblh.com

- and -

BROWN RUDNICK BERLACK ISRAELS LLP
Edward S. Weisfelner, Esq.
Robert J. Stark, Esq.
Seven Times Square
New York, New York 10036
(212) 209-4800

- and -

Anthony L. Gray, Esq.
John C. Elstad, Esq.
One Financial Center
Boston, Massachusetts 02111
(617) 856-8200

CO-COUNSEL TO THE *AD HOC* COMMITTEE

#449423v2

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
                                              :
In re:                                        :    Chapter 11
                                              :    Case Nos. 00-3837 (JKF)
OWENS CORNING, *et al.*,                      :    (Jointly Administered)
                                              :
            Debtors.                          :    **Objection Deadline: January 13, 2006 at 4:00 p.m.**
                                              :    **Hearing Date: January 30, 2006 at 10:00 a.m.**
                                              :             **(Wilmington, Delaware)**
                                              :
---------------------------------------------------------x

## MOTION OF THE *AD HOC* COMMITTEE OF PREFERRED AND EQUITY SECURITY HOLDERS FOR ENTRY OF AN ORDER (I) CONFIRMING THAT OWENS CORNING SHAREHOLDERS ARE ENTITLED TO PROSECUTE AN ACTION IN DELAWARE CHANCERY COURT TO COMPEL A SHAREHOLDERS' MEETING, OR (II) IN THE ALTERNATIVE, GRANTING STAY RELIEF TO PROSECUTE SUCH AN ACTION

The *Ad Hoc* Committee of Preferred and Equity Security Holders (the "Ad Hoc Committee"), by and through its undersigned counsel, respectfully submits this motion (the "Motion") for entry of an order in the form submitted herewith (1) confirming that shareholders are entitled to prosecute an action in the Court of Chancery of the State of Delaware (the "Delaware Chancery Court") to compel Owens Corning (together with its Chapter 11 debtor affiliates, the "Debtors") to immediately honor its long-ignored obligation to convene an annual shareholders' meeting, or (2) in the alternative, granting relief from the automatic stay to prosecute such an action.  In support of its Motion, the *Ad Hoc* Committee respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      This Motion is a preliminary step towards rectifying a critical post-petition omission by Owens Corning, an omission that has rendered it out of compliance with applicable corporation law.  Notwithstanding the explicit legal mandate under the Delaware General Corporation Law and its own bylaws, Owens Corning has failed to conduct an annual

shareholders' meeting <u>for more than five years</u>. The terms of each of its purported directors expired years ago. Making matters worse, three of the ten holdover directors were purportedly appointed by the board post-petition and, therefore, never once stood shareholder election. As a result, there is not one single Owens Corning director duly elected and occupying its board seat in accordance with Delaware law.

2.    The *Ad Hoc* Committee intends to ensure Owens Corning's compliance with Delaware corporation law by commencing an action in the Delaware Chancery Court. Section 211(c) of the Delaware General Corporation Law explicitly states that a shareholder may compel a corporation to hold an annual shareholders' meeting where the corporation has failed to do so, and that the proper forum to prosecute a Section 211(c) action is the Delaware Chancery Court. By this Motion, the *Ad Hoc* Committee seeks very narrow relief: an Order confirming that Owens Corning shareholders are entitled to prosecute their Section 211(c) action in the Delaware Chancery Court or, in the alternative, granting relief from the automatic stay to prosecute such an action. The *Ad Hoc* Committee submits this Motion in due deference and respect for this Court.

3.    The relief requested herein is clearly warranted for numerous reasons. First, the law clearly provides that a corporate debtor-in-possession's corporate governance obligations continue during a Chapter 11 case, and, correspondingly, that shareholders may assert their corporate governance rights post-petition (including the prosecution of a Section 211(c) action in the Delaware Chancery Court) without fear of violating the automatic stay. Second, the Delaware Chancery Court is the proper forum to adjudicate shareholders' corporate law rights, due to its specialized knowledge of Delaware corporation law and due to this Court's lack of jurisdiction to enter final findings and conclusions of law in respect of such matters. Third, as this Motion constitutes a direct challenge to each purported director's continued occupation of a board seat, the Owens Corning board is hereby de-vested of any authority to direct the Debtors to propose a

- 2 -

plan that binds the shareholders. Finally, a new and duly elected board of directors – one that would be willing to negotiate in good faith with all of its constituents, including its shareholders – is much more likely to bring these Chapter 11 cases to a fully consensual and reasonably prompt resolution.

    4.    For all of these reasons, and as more fully explained herein, the Court should grant this Motion.

## JURISDICTION

    5.    Based on the law discussed herein, the *Ad Hoc* Committee believes that the actual, underlying request to compel a shareholders' meeting is a matter outside the jurisdiction of this Court and should be brought before the Delaware Chancery Court. In other words, the *Ad Hoc* Committee does not now consent to this Court's adjudication of such a request. The *Ad Hoc* Committee consents to the jurisdiction of this Court to rule on only the narrow request made in this Motion: namely, (a) confirmation that shareholders are entitled to prosecute an action in Delaware Chancery Court to compel Owens Corning to immediately honor its long-ignored obligation to convene an annual shareholders' meeting, or (b) in the alternative, the granting of stay relief to prosecute such an action. See 28 U.S.C. §§ 1334 and 157(b) (motions seeking to terminate the automatic stay constitute core proceedings).

    6.    In fact, based on the law discussed herein, the *Ad Hoc* Committee believes it would have been well within its rights to have directly filed a Section 211(c) action in Delaware Chancery Court without first requesting the relief sought in this Motion. The *Ad Hoc* Committee, nevertheless, submits this Motion out of an abundance of caution and with due deference and respect for this Court. No waivers or consents to jurisdiction other than as explicitly stated herein should, however, be interpreted or implied.

- 3 -

## BACKGROUND

### I.    The *Ad Hoc* Committee.

7.    The *Ad Hoc* Committee is comprised of 13 institutions holding equity and/or preferred securities issued by Owens Corning or an affiliated entity. Namely, the members of the *Ad Hoc* Committee include: (a) Catalyst Investment Management Co., LLC; (b) Clinton Group, Inc.; (c) Deutsche Bank Securities Inc.; (d) GSO Capital Partners LP; (e) Hain Capital Group, LLC; (f) Harbert Distressed Investment Master Fund, Ltd.; (g) Harvest Management, LLC; (h) JPMorgan; (i) Lehman Brothers; (j) Plainfield Asset Management LLC; (k) Taconic Capital Advisors LLC; (l) Tudor Investment Corporation; and (m) Venor Capital Management LP.

8.    Members of the *Ad Hoc* Committee currently hold (among other things), individually and/or through their funds and/or managed accounts, approximately 10.8 million shares in the aggregate of Owens Corning common stock, which holdings constitute approximately 19.6% of all outstanding shares of Owens Corning common stock. On December 15, 2005, the close of business trading price of Owens Corning common stock equaled $3 per share, yielding an aggregate market capitalization for Owens Corning of approximately $166.2 million. Thus, the aggregate value of common stock held by members of the *Ad Hoc* Committee, as reflected in the market as of the December 15, 2005 close, is approximately $32.58 million.

9.    As such, the *Ad Hoc* Committee is more than a "party in interest" entitled to be fully and fairly heard by this Court, see Unofficial Comm. of Zero Coupon Noteholders v. The Grand Union Co., 179 B.R. 56, 58-59 (D. Del. 1995) (*ad hoc* committees have standing to be heard in Chapter 11 cases), it also has a substantial economic interest in these Chapter 11 cases and the manner and terms of the Debtors' reorganization, see In the Matter of Marin Motor Oil, 689 F.2d 445, 451 (3d Cir. 1982) (Section 1109(b) of the United States Bankruptcy Code is

understood in the context of long established authority recognizing shareholders' right to be heard in a Chapter 11 case).

## II.    Owens Corning's Obligation to Hold Annual Shareholders' Meetings.

10.    Owens Corning is a corporation organized under the laws of the State of Delaware. As such, it has voluntarily agreed to comply with the obligations of all Delaware corporations set forth in the Delaware General Corporation Law, and has voluntarily submitted itself to the jurisdiction and orders of the Delaware Chancery Court relating to all matters bearing on its corporate organization. See Del. Code Ann. Tit. 8, § 322.

11.    Owens Corning is obligated to hold annual shareholders' meetings to, among other things, elect directors. See Del. Code Ann. Tit. 8, § 211(b). Section 211(b) of the Delaware General Corporation Law provides that "an annual meeting of stockholders shall be held for the election of directors on a date and at a time designated by or in the manner provided in the bylaws." Id. Article I, Section 1 of the Owens Corning bylaws explicitly obligates Owens Corning to hold annual shareholders' meetings for the election of directors. True and correct copies of relevant pages of the Owens Corning bylaws are attached hereto as Exhibit A.

12.    Moreover, the failure by Owens Corning to conduct an annual shareholders' meeting is an actionable offense under Delaware law, entitling shareholders to commence a lawsuit against Owens Corning in the Delaware Chancery Court. See Del. Code Ann. Tit. 8, § 211(c). Section 211(c) provides, in pertinent part, as follows: "If there be a failure to hold the annual meeting ... for a period of 13 months ... after its last annual meeting, the Court of Chancery may summarily order a meeting to be held upon the application of any stockholder." Id.

13.    Notwithstanding the specific requirements of the Delaware General Corporation Law and its own bylaws, Owens Corning has not held an annual meeting of shareholders in more than five years.

### III.    Owens Corning's Purported Directors.

14.    Pursuant to Owens Corning's Certificate of Incorporation, Owens Corning's board of directors is comprised of ten individuals, each of whom is entitled to occupy his or her board seat for only a three year term. According to the Certificate of Incorporation (at Article Eleven), directors are supposed to be re-elected on a staggered basis in three classes. True and correct copies of relevant pages of Owens Corning's Certificate of Incorporation are attached hereto as Exhibit B.

15.    The following information is derived from the Owens Corning 10-K Statement for the fiscal year ended December 31, 2004 (at Part III, Item 10), true and correct copies of relevant pages of which are attached hereto as Exhibit C:

- Purported Directors Whose Terms Expired in 2001. Gaston Caperton, William W. Colville, Landon Hilliard and Robert B. Smith, Jr., are purported Owens Corning directors whose terms expired in 2001. Since Owens Corning did not call an annual shareholders meeting in 2001 and has not held one since, Messrs. Caperton, Colville, Hilliard, and Smith have been wrongfully occupying Owens Corning board seats (and have been drawing director fees and inappropriately making decisions for the Debtors) for at least four years.

- Purported Directors Whose Terms Expired in 2002. Ann Iverson, W. Walker Lewis and Michael H. Thaman are purported Owens Corning directors whose terms expired in 2002. Since Owens Corning did not call an annual shareholders meeting in 2002 and has not held one since, Ms. Iverson and Messrs. Lewis and Thaman have been wrongfully occupying Owens Corning board seats (and have been drawing director fees and inappropriately making decisions for the Debtors) for at least three years.

- <u>Purported Directors Whose Terms Expired in 2003</u>. Norman P. Blake, Jr., David T. Brown, and W. Ann Reynolds are purported Owens Corning directors whose terms expired in 2003. Since Owens Corning did not call an annual shareholders meeting in 2003 and has not held one since, Messrs. Blake and Brown and Ms. Reynolds have been wrongfully occupying Owens Corning board seats (and have been drawing director fees and inappropriately making decisions for the Debtors) for at least two years.

16.    Three of the above-mentioned purported directors (Messrs. Brown, Smith, and Thaman) were appointed by the other purported directors post-petition and have never once stood election by Owens Corning shareholders. <u>See id.</u>

17.    On December 15, 2005, the *Ad Hoc* Committee sent a letter to Owens Corning's Board requesting, among other things, that it convene the required annual shareholders' meeting. A true and correct copy of this letter is attached hereto as <u>Exhibit D</u>. On December 19, 2005, Owens Corning responded to the letter by refusing to convene the requested shareholders' meeting and, in addition, refusing to accept the *Ad Hoc* Committee's invitation to negotiate a consensual reorganization plan that maximizes estate value for all constituents. A true and correct copy of this response is attached hereto as <u>Exhibit E</u>.

18.    In sum, as Owens Corning has ignored its obligation to conduct an annual shareholders meeting for more than five years, there is not one single Owens Corning director duly elected and occupying its board seat in accordance with Delaware law. In other words, every single purported director has, by fiat, continued to occupy his or her board seat in contravention of law, and is drawing fees and making critical decisions about the Debtors'

- 7 -

businesses, the course of the Debtors' restructuring, and how estate value should be allocated among parties-in-interests, all without due authorization under the law.[1]

### IV.    The Purported Directors' Control Over The Chapter 11 Process.

19.    On October 5, 2000, the Debtors filed voluntary petitions under Chapter 11 relief of the United States Bankruptcy Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware. The *Ad Hoc* Committee has been informed that, since the very beginning of the Chapter 11 cases, there has been an over-arching concern among commercial creditors that the Debtors (managed by Owens Corning unauthorized directors) have always faced the Chapter 11 process with an inappropriately skewed view in favor of asbestos-related claimants. This is clearly evidenced by pending motions for the appointment of a trustee and an examiner, of which judicial notice is hereby requested.

20.    This seems also evidenced by the Debtors' mad rush to exit Chapter 11 in the face of impending federal legislation (the "Fairness in Asbestos Injury Resolution Act of 2005"or the "FAIR Act") that will create a national trust to satisfy fully asbestos-related claims and, at the same time, greatly reduce Owens Corning's financial obligation to satisfy such claims. The FAIR Act has already passed the Senate Judiciary Committee and is scheduled to hit the Senate floor as early as January 2006.[2] To Owens Corning, it should make no difference if estate value is largely allocated to asbestos-claimants pursuant to Section 524(g) of the Bankruptcy Code or to other rightful parties-in-interest under the regime to be enacted soon by Congress. Yet, Owens Corning

---

[1] Without qualifying the general reservation of rights contained herein, the *Ad Hoc* Committee expressly reserves all rights and remedies that holders of the Preferred Securities and equity securities may have against the purported members of the Owens Corning board of directors. Among other things, the *Ad Hoc* Committee makes note of the fact that, under established Third Circuit law, a plan of reorganization may not release any shareholder causes of action existing against the purported directors. See Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 212-14 (3d Cir. 2000); In re Coram Healthcare Corp., 315 B.R. 321, 337 (Bankr. D. Del. 2004).

[2] See "Help on Asbestos Sought," Roll Call (October 20, 2005); "In '06, Legislation Will Vie With Campaigning," Roll Call (December 2, 2005).

is pressing a plan on parties-in-interest that the *Ad Hoc* Committee presumes (because Owens Corning refuses to negotiate with shareholders) contemplates windfall value allocation to asbestos-related claimants. The *Ad Hoc* Committee understands that Owens Corning is aggressively pushing this plan on parties-in-interest so that it can be confirmed and consummated in advance of the FAIR Act's passage and, as a result, ensure that asbestos-related claimants keep the windfall. This, we think, speaks volumes about the purported directors' artificially skewed view towards the asbestos claimants.

21.    Accordingly, the members of the *Ad Hoc* Committee believe it necessary to exercise their legal right to petition the Delaware Chancery Court to compel Owens Corning to immediately conduct a shareholders' meeting.

## LEGAL ARGUMENT

I.    **The Relief Requested Should Be Granted Because The Delaware Chancery Court Is The Proper Forum To Enforce Shareholder Rights.**

   A.    **Shareholder Corporate Law Rights And Owens Corning's Corporate Law Obligations Continue During Chapter 11.**

22.    It is a fundamental precept of corporate bankruptcy law that a Chapter 11 debtor-in-possession remains subject to the laws of the state of its incorporation and must continue to operate post-petition in accordance with such laws. See Jacobson v. AEG Capital, 50 F.3d 1493, 1500 (9th Cir. 1995) (corporate governance matters for bankrupt debtor continue to be guided by relevant state law corporate governance principles). See also 28 U.S.C. § 959(b) ("a debtor in possession, shall manage and operate the property in his possession ... according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."); 7 Collier on Bankruptcy ¶ 1108.02[1] (15th Ed. Rev. 2003) ("insofar as the making of decisions concerning

- 9 -

the operation of the business is concerned, a corporate debtor in possession acts through its directors and officers.")

23.    As a consequence, debtors-in-possession do not shed their obligation to conduct annual shareholders' meetings with their Chapter 11 filing. See In re J.P. Linahan, Inc., 111 F.2d 590 (2d Cir. 1940) ("the right of stockholders to be represented by directors of their own choice and thus to control corporate policy is paramount and will not be disturbed unless a clear case of abuse is made out").

24.    If the debtor-in-possession ignores its post-petition obligation to conduct an annual shareholders' meeting, shareholders are not rendered powerless. Quite the contrary, it is a "well settled rule that the right to compel a shareholders' meeting for the purpose of electing a new board subsists during reorganization proceedings." Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 64 (2d Cir. 1986); see In re Plankinton Bldg. Co., 138 F.2d 221, 222 (7th Cir. 1943) (holding that a bankruptcy court "has no jurisdiction over the meetings of stockholders of a debtor in reorganization . . . unless the exercise of such corporate statutory functions interferes with the administration of the estate by the bankruptcy court"); In re Bush Terminal Co., 78 F.2d 662, 664-65 (2d Cir. 1935) (reversing stay of majority shareholder's attempt to hold a meeting to replace the board so that it would support his plan in contrast to a plan proposed by the existing board and observing "that appellant seeks to control the debtor is of no concern if he is in a position to obtain control. He obtained the right to such control by having control of more than a majority of the stock.").

25.    Indeed, as conceded by counsel to Owens Corning's pre-petition lenders, "shareholders of a debtor-in-possession retain their state law rights to control the debtor by calling shareholder meetings and voting its shares, and the bankruptcy court may not cast aside those rights lightly." Martin J. Bienenstock, Bankruptcy Reorganization, 69 (PLI 1987).

- 10 -

26. The right to a shareholders' meeting, even with regard to a Chapter 11 debtor, arises from a fundamental principle of corporate democracy - the shareholders' right to govern their corporation. See Johns-Manville, 801 F.2d at 64.[3] As the Second Circuit stated in Johns-Manville, "[i]f the right of stockholders to elect a board of directors should not be carefully guarded and protected, the statute giving the debtor a right to be heard or to propose a plan of reorganization could not truly be exercised, for the board of directors is the representative of the stockholders." Id. at 65 (quoting, Bush Terminal, 78 F.2d at 665).

27. Owens Corning has refused to fulfill its obligation under the Delaware General Corporation Law and its bylaws to convene an annual shareholders' meeting. It has failed to conduct such a meeting for more than five years, thereby necessitating immediate action in the Delaware Chancery Court to rectify the situation. Accordingly, the relief requested herein should be granted.

**B. The Scope Of The Automatic Stay Does Not Bar The Prosecution Of A Section 211(c) Action In Delaware Chancery Court.**

28. The United States District Court for the District of Delaware has ruled that the automatic stay does not prohibit shareholders from asserting their state law rights to effectuate a management change, including a voting of shares to oust a debtor's board of directors. See In re Marvel Entertainment Group, 209 B.R. 832 (D. Del. 1997).

29. In Marvel, three holding companies issued bonds prior to their Chapter 11 filings, which indebtedness was secured by pledges of the stock of their primary subsidiary. See Marvel,

---

[3] Indeed, a Delaware corporation must hold the required annual shareholder meeting even if the corporation cannot literally comply with federal law proxy rules, in light of, among other things, the implicit guarantee of the Fourteenth Amendment of the United States Constitution of "the stockholders' right to 'know to what standards of accountability they may hold those managing the corporation's business and affairs.'" Newcastle Partners, L.P. v. Vesta Insurance Group, Inc., 2005 Del. Ch. LEXIS 174, *14-18 (Del Ch. November 15, 2005) (Exhibit F) (quoting, Vantagepoint Venture Partners 1996 v. Examen, Inc., 871 A.2d 1108, 1113 (2005)).

209 B.R. at 834. After the Chapter 11 filing, the bond indenture trustee and an official bondholders' committee moved the Delaware Bankruptcy Court for an order lifting the automatic stay so that the indenture trustee could foreclose on the subsidiary's stock, and the bondholders could thereafter vote the shares to replace the debtor's existing board of directors. See id. The Delaware Bankruptcy Court lifted the automatic stay so that the bondholders could foreclose on the subsidiary's shares, but thereafter ruled that Bankruptcy Code Section 362(a)(3) prevented the bondholders from voting the subsidiary's shares to replace the board absent further relief from the automatic stay. See id. at 834-35.

30.    On appeal, the Delaware District Court vacated the Bankruptcy Court injunction. Guided by the above-cited principles regarding the continuation of shareholder rights during Chapter 11, the District Court held that "the automatic stay provisions of the Bankruptcy Code are not implicated by the exercise of shareholders' corporate governance rights." See id. at 838. The District Court specifically rejected the argument that the extension of the automatic stay under Section 362(a)(3) to acts "to exercise control over property of the estate" prohibits efforts by shareholders to elect a new board of directors. See id. The District Court reasoned that, if Congress intended Section 362(a)(3) to override the well-established case law permitting shareholders to compel a shareholders' meeting during a Chapter 11 case (through, among other things, filing a state court action), the Bankruptcy Code's legislative history would contain some indication of that intention, which it does not. See id. at 838.

31.    Based upon Marvel, which the Ad Hoc Committee asserts is binding on this Court (and in any event is premised on sound reasoning that this Court should follow), the Ad Hoc Committee is well within its rights to file a Section 211(c) action in Delaware Chancery Court without first having to file this Motion with this Court. Nevertheless, in due deference to this

Court, the *Ad Hoc* Committee first requests entry of an order confirming such rights which should be summarily entered.

### C.    Enforcement Of Shareholder Section 211(c) Rights Is Not A Matter For This Court To Decide.

#### 1.    The Delaware Chancery Court Has Expertise In Delaware Corporation Law That This Court Does Not Have.

32.    The Delaware Chancery Court is a specialized court, serving to primarily adjudicate matters of Delaware corporation law. See Marcel Kahan et al., The Myth of State Competition in Corporate Law, 55 Stan. L. Rev. 579, 708 (2002) (noting that the Delaware Chancery Court has limited jurisdiction and its docket consists mainly of corporate cases, resulting in "corporate disputes being decided by judges who have developed expertise in corporate law"). Its expertise in that area cannot be matched by any other court and, accordingly, its opinions are cited authoritatively throughout the country on corporate law matters. See, e.g., Teamsters Local Nos. 175 & 505 Pension Trust Fund v. IBP, Inc., 123 F. Supp. 2d 514, 519 (D.S.D. 2000) ("Not only does Delaware law apply to this case, but the Delaware chancery court, through its daily interpretation of that law, has earned a reputation for its expertise concerning corporate governance."). As the late Chief Justice of the United States William H. Rehnquist remarked, "[T]he Delaware state court system has established its national preeminence in the field of corporation law due in large measure to its Court of Chancery. Because the Court of Chancery, by design, has no jurisdiction over criminal and tort cases -- matters which create huge backlogs in other judicial systems -- corporate litigation can proceed quickly and effectively." William H. Rehnquist, The Prominence of the Delaware Court of Chancery in the State-Federal Joint Venture of Providing Justice, Speech at the Bicentennial of the Delaware Court of Chancery, 48 Bus. Law. 351, 354-55 (1992). The Delaware Chancery Court is, therefore, the

proper venue to adjudicate a Section 211(c) action by shareholders. Indeed, Section 211(c) specifically states that such actions should be brought in the Delaware Chancery Court.

33.     In Saxon Indus., Inc. v. NKFW Partners, 488 A.2d 1298 (Del. 1985), the Delaware Supreme Court expressly rejected the argument that the Delaware Chancery Court was an inappropriate forum to seek to compel a shareholders' meeting during a concurrent bankruptcy case. In Saxon, the debtor argued that the bankruptcy court would be more a suitable forum because the bankruptcy court would, so posited the debtor, consider and weigh the competing demands and relative equities of all the interested parties. Id. at 1300. The Delaware Supreme Court rejected that argument, stating that "[the debtor's] preference for the bankruptcy court ignores the fact that a proceeding there does not address the same issues of corporate governance as does an action under Section 211 of Delaware's General Corporation Law." Id.

### 2. Enforcement Of Shareholder Section 211(c) Rights Is Not A Matter Falling Within This Court's Core Jurisdiction.

34.     This Court's jurisdiction is of a very limited nature. See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982). This Court may only decide and enter final orders and judgments in proceedings that are "core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1).[4]

---

[4]     Pursuant to 28 U.S.C. § 157(c)(2), parties may consent to the Court's adjudication of non-core matters. Nevertheless, and as stated above, the Ad Hoc Committee does not consent to this Court adjudicating any matter (including its members' Section 211(c) rights under the Delaware General Corporation Law), aside from the narrow request made in this Motion.

35.    Section 157(b) does not precisely define "core proceeding," but rather provides an illustrative list that may be considered "core."    The Third Circuit has adopted a test for determining whether a proceeding is "core."    Under that test, "a proceeding is core if it invokes a substantive right provided by title 11 or if it a proceeding, that by its nature, could arise only in the context of a bankruptcy case."    In re Marcus Hook, 943 F.2d 261, 267 (3d Cir. 1991). Conversely, "[a]ctions which do not depend on the bankruptcy laws for their existence and which could proceed in another court are not core proceedings." Halper v. Halper, 164 F.3d 830, 836 n.7 (3d Cir. 1999) (quoting In re Gardner, 913 F.2d 1515, 1518 (10th Cir. 1990)).

36.    Here, it is beyond cavil that Section 211(c) shareholder rights against Owens-Corning are derived entirely from applicable state law.    The Bankruptcy Code does not create such rights, and, certainly, actions to compel a shareholders' meeting pursuant to Section 211(c) do not arise solely within the context of bankruptcy cases.    Accordingly, the Ad Hoc Committee's intended action to compel Owens Corning to comply with its obligations under the Delaware General Corporation Law is a non-core proceeding with respect to which this Court may not enter final findings of fact and conclusions of law.    Therefore, entry of the requested order confirming shareholder rights to commence such action before the Delaware Chancery Court is warranted and appropriate.

### 3.    Judicial Economy Would Undoubtedly Be Served By Having The Delaware Chancery Court, Rather Than This Court, Address An Action For Enforcement Of Shareholder Section 211(c) Rights.

37.    As the intended action to enforce Section 211(c) shareholder rights constitutes at best a non-core matter, and absent consent of the parties, this Court may not enter final findings of fact and conclusions of law if such an action were filed in this Court.    See 28 U.S.C. § 157(c).

Rather, this Court would be relegated to issuing proposed findings of fact and conclusions of law that would have to be heard anew by the District Court. See 28 U.S.C. § 157(c)(1).

38.    By contrast, the Delaware Chancery Court has the express authority under Section 211(c) to adjudicate all actions brought thereunder. Given the multiple layers of judicial review that would be required if the Section 211(c) action were instead brought in this Court, judicial economy is undoubtedly served by allowing the prosecution of the Section 211(c) action directly in the Delaware Chancery Court.[5]

## II.    The Relief Requested Should be Granted Because The Purported Directors' Authority To Direct Or To Bind Owens Corning Is Suspect.

### A.    By This Challenge To Their Authority, The Purported Directors Can Not Bind Shareholders and Other Parties.

39.    As noted above, a Delaware corporation's board of directors derives its power to act from its shareholders. As no purported member of the Owens Corning board has stood for election in five years, their authority to act on behalf of Owens Corning is suspect. See MM Cos., Inc. v. Liquid Audio, Inc., 813 A.2d 1118, 1126 (Del. 2003) ("[T]he stockholder franchise has been characterized as the 'ideological underpinning' upon which the legitimacy of the directors managerial power rests.").

---

[5] Indeed, this Court's abstention from hearing a Section 211(c) action may be warranted given the availability of a proper forum for the efficient adjudication of the action (the Delaware Chancery Court) and the predominance of state law issues in connection with such action. See 28 U.S.C. § 1334(c)(1) ("[n]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to cases under title 11.")

40.    The *Ad Hoc* Committee raises a direct challenge to the right of the purported members of the Owens Corning board to occupy their positions. See Young v. Janas, 103 A.2d 999, 302 (Del. Ch. 1916) (preclusion of direct challenge to directors' status "would seriously impair the vitality of charter and bylaw provisions as well as the theory of corporate democracy"). In light of the *Ad Hoc* Committee's public challenge of the Board's authority and legitimacy, any further action taken by the purported Owens Corning Board, including with respect to a plan of reorganization that purports to wipe out equity, would be ripe for challenge on the ground that any such actions were made *ultra vires*. See Dillon v. Scotten, Dillon Company, 335 F. Supp. 566, 569-70 (D. Del. 1971) (holding that "the *de facto* directors' doctrine [which provides that the actions of directors whose elections are challenged may generally be valid and binding as to third parties] does not apply when there is a direct challenge to a disputed office. That doctrine may not be used to perpetuate illegal control.") (bracketed text supplied). See also Bentas v. Haseotes, 769 A.2d 70, 76 (Del. Ch. 2000) ("Holdover directors [i.e., directors who remain in office because, among other things, shareholder elections have not properly been convened] are a 'default' result, but under our statutory scheme of governance, that default arrangement cannot be a long term substitute for an effective annual election.") (bracketed text supplied). Cf. Anderson v. Int'l Union, 370 F.3d 542, 551 (6th Cir. 2004) ("A third party may not, however, reasonably rely upon an agent's ostensible authority if the third party knows that the agent is not authorized to act in a particular manner.").

41.    As a matter of law, the only way to lift the cloud over Owens Corning is to immediately conduct a shareholders' meeting. Accordingly, the relief requested in the Motion should be granted.

**B.     A Consensual Resolution Of The
         Cases May Be Achieved With A New Board.**

42.     The unfortunate result of Owens Corning's obstinate refusal to negotiate and
otherwise deal in good faith with its shareholders is the lost opportunity to resolve these Chapter
11 cases on fully consensual basis.  Indeed, the *Ad Hoc* Committee does not believe that its
interests are so fundamentally at odds with all others in the cases that a fully consensual plan
could not be arrived at.  Moreover, the *Ad Hoc* Committee does not believe that designing a
consensual plan requires a divine spark of inhuman creativity.

43.     The *Ad Hoc* Committee notes that, in another large asbestos-related Chapter 11
case, a plan structure has been proposed that will enable the debtor to exit bankruptcy promptly
while, at the same time, preserving equity value should the FAIR Act become law in a reasonable
period of time.  Specifically, in In re The Babcock & Wilcox Co., et al., No. 00-10992 (Bankr.
E.D. La.), the debtors have filed a plan of reorganization contemplating the issuance of a $250
million promissory note and a $355 million contingent payment right to a trust established for the
benefit of asbestos claimants.  See Summary Disclosure Statement filed in the Babcock & Wilcox
case, true and correct copies of the relevant pages of which are attached hereto as Exhibit G, at
12-14.  In a nutshell, payment on the note and the contingent payment right may be made if the
FAIR Act has not been made law on or before November 30, 2006.  See id.

44.     As Owens Corning is not presently disposed to negotiate with its shareholders, the
*Ad Hoc* Committee does not understand why such a plan structure (or alternative structures that
the *Ad Hoc* Committee is readily prepared to propose to other parties-in-interest and to
memorialize, including through its own plan) could not work in these cases.  The purported
directors seem unwilling to pursue or incapable of pursuing a fully consensual approach, which is
likely to result in a protracted and expensive confirmation battle.  See, e.g., 11 U.S.C.

- 18 -

§ 1129(a)(1) (to be confirmed, plan must comply with applicable provisions of the Bankruptcy Code); 11 U.S.C. § 1129(a)(2) (proponent of plan must comply with applicable provisions of the Bankruptcy Code to have such plan confirmed); 11 U.S.C. § 1129(a)(3) (to be confirmed, plan must be "proposed in good faith and not by any means forbidden by law"); Consolidated Rock Products v. DuBois, 312 U.S. 510, 526 (1941) (holding that earning capacity is the essential criterion to ensure fair and equitable distributions among the claimants); Matter of Penn Central Transportation, 596 F.2d 1102, 1115-15 (3d Cir. 1979) ("[T]he market value of the security [in a reorganized debtor] will depend on the investing public's perception of the future prospects of the enterprise.    That perception may well be unduly distorted by the recently concluded reorganization and the prospect of lean years for the enterprise in the immediate future.") (bracketed text supplied); In re Exide Tech., 303 B.R. 48, 65-66 (Bankr. D. Del. 2003) (forward-looking valuation of a reorganized debtor appropriate to avoid the "taint" of bankruptcy). See also Spitzer v. Stichman (In the Matter of Hudson & Manhattan Railroad Company), 278 F.2d 402, 405-10 (2d Cir. 1960) (court considered potential future events, such as a possible sale to and possible condemnation by public agencies, in valuing the reorganizing debtor).

45.    Accordingly, it is in the best interests of the estates that the members of the *Ad Hoc* Committee proceed with all deliberate speed to obtain an order of the Delaware Chancery Court compelling Owens Corning to immediately conduct a shareholders' meeting.

### III.    Alternatively, Ample Cause Warrants The Granting Of Stay Relief So That The *Ad Hoc* Committee May Prosecute A Section 211(c) Action In The Delaware Chancery Court.

46.    Even assuming arguendo that the scope of the automatic stay extends to Section 211(c) actions, for the reasons set forth above, ample cause clearly exists for granting the *Ad Hoc* Committee relief from the automatic stay to prosecute a Section 211(c) action to enforce

shareholder rights in the Delaware Chancery Court. See 11 U.S.C. § 362(d)(I) ("[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay... for cause").

47.    Any party opposing the stay relief request on the basis of cause bears the burden of proof on the issue. See 11 U.S.C. § 362(g). Given the reasons set forth above, no opposing party will be able to meet its burden of proof that cause does not exist for the granting of stay relief as requested in this Motion.

48.    Further, for the reasons set forth herein, and in particular in light of the Owens Corning Board's refusal for five years to hold a shareholders' meeting in spite of the clear requirements of Delaware law and Owens Corning's own bylaws and the Debtors' efforts to hastily emerge from Chapter 11, this Court should rule that its stay relief order take effect immediately. See Fed. R. Bankr. P. 4001(a)(3) (ten-day stay period for an order granting stay relief applies "unless the court orders otherwise").

[Remainder of Page Intentionally Left Blank]

## CONCLUSION

**WHEREFORE,** the *Ad Hoc* Committee respectfully requests that this Court enter an order in the form submitted herewith: (1) granting this Motion, (2) (a) confirming that Owens Corning shareholders are entitled to prosecute an action in Delaware Chancery Court to compel Owens Corning to immediately honor its obligation to convene an annual shareholders' meeting, or (b) in the alternative, granting the *Ad Hoc* Committee relief from the automatic stay to prosecute such an action in the Delaware Chancery Court, and (3) granting to the *Ad Hoc* Committee such other and further relief as is just and proper.

Dated: December 20, 2005

CONNOLLY BOVE LODGE & HUTZ LLP

Jeffrey C. Wisler, Esq. (#2795)
Christina M. Thompson (#3976)
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
(302) 888-6258

- and -

BROWN RUDNICK BERLACK ISRAELS LLP
Edward S. Weisfelner, Esq.
Robert J. Stark, Esq.
Seven Times Square
New York, New York 10036
(212) 209-4800

-and-

Anthony L. Gray, Esq.
John C. Elstad, Esq.
One Financial Center
Boston, Massachusetts 02111
(617) 856-8200

#435270

*CO-COUNSEL TO THE AD HOC COMMITTEE*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------x
                                    :
In re:                              :      Chapter 11
                                    :
OWENS CORNING, et al.,              :      Case Nos. 00-3837 (JKF)
                                    :
            Debtors.                :      (Jointly Administered)
                                    :      Related to Docket No. _____
----------------------------------------------------x
```

## ORDER ALLOWING MOTION OF THE *AD HOC* COMMITTEE OF PREFERRED AND EQUITY SECURITY HOLDERS FOR ENTRY OF AN ORDER (I) CONFIRMING THAT OWENS CORNING SHAREHOLDERS ARE ENTITLED TO PROSECUTE AN ACTION IN DELAWARE CHANCERY COURT TO COMPEL A SHAREHOLDERS' MEETING, OR (II) IN THE ALTERNATIVE, GRANTING STAY RELIEF TO PROSECUTE SUCH AN ACTION

Upon consideration of the motion (the "Motion")[1] of the *Ad Hoc* Committee for entry of an order confirming that Owens Corning shareholders are entitled to prosecute an action in the Delaware Chancery Court to compel Owens Corning to immediately honor its obligation to convene an annual shareholders' meeting or, in the alternative, to grant relief from the automatic stay to prosecute such an action in the Delaware Chancery Court; and the Court having jurisdiction over the request made in the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and due and adequate notice of the Motion having been given under the circumstances; and after due deliberation and hearing thereon, and sufficient cause appearing therefor; it is hereby ORDERED, ADJUDGED, FOUND and DECREED that:

1.    The Motion is hereby GRANTED.

2.    The *Ad Hoc* Committee is permitted to prosecute an action before the Delaware Chancery Court (including, without limitation, any appeals relating thereto before appellate

---

[1] Terms not otherwise defined herein shall have the meanings ascribed to them, if any, in the Motion.

courts of competent jurisdiction) seeking to compel Owens Corning to convene immediately its annual shareholders' meeting.

3.    The *Ad Hoc* Committee is hereby granted relief from the automatic stay to prosecute an action before the Delaware Chancery Court (including, without limitation, any appeals relating thereto before appellate courts of competent jurisdiction) seeking to compel Owens Corning to convene immediately its annual shareholders' meeting, as cause exists for such relief in accordance with 11 U.S.C. § 362(d)(1). This order shall not be subject to the 10-day stay period provided under Fed. R. Bankr. P. 4001(a)(3).]

4.    The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

Dated: _____


_____
The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

# EXHIBIT A



# OWENS CORNING

## BY-LAWS

**As Amended February 3, 2000**

1

# BY-LAWS

## of

## OWENS CORNING

## ARTICLE I
## STOCKHOLDERS

**Section 1.    Annual Meeting.**

An annual meeting of the stockholders, for the election of directors to succeed those whose terms expire and for the transaction of such other business as may properly come before the meeting, shall be held at such place, either within or without the State of Delaware, on such date, and at such time as the Board of Directors shall each year fix, which date shall be within thirteen months subsequent to the last annual meeting of stockholders.

**Section 2.    Special Meetings.**

Except as otherwise required by law or by the Certificate of Incorporation and subject to the rights of the holders of any class or series of stock having a preference over the common stock of the Corporation as to dividends or upon liquidation, dissolution or winding up, special meetings of stockholders may be called only by the Board of Directors pursuant to a resolution approved by a majority of the whole Board of Directors. Special meetings of stockholders shall be held at such place, within or without the State of Delaware, date and time as the Board of Directors shall fix.

**Section 3.    Organization and Conduct of Business.**

Such person as the Board of Directors may have designated or, in the absence of such a person, the Chief Executive Officer of the Corporation or, in his absence, such person as may be chosen by the holders of a majority of the shares entitled to vote who are present, in person or by proxy, shall call to order any meeting of the stockholders and act as chairman of the meeting. In the absence of the Secretary of the Corporation, the secretary of the meeting shall be such person as the chairman appoints. The chairman of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as he determines to be in order.

At a meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before a meeting, business must be (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors, (b) otherwise properly brought

# EXHIBIT B

# CERTIFICATE OF INCORPORATION

## OF

## OWENS-CORNING FIBERGLAS CORPORATION

We, the undersigned, in order to form a corporation for the purposes hereinafter stated, under and pursuant to the provisions of the General Corporation Law of the State of Delaware, do hereby certify as follows:

**First.** The name of this corporation is OWENS-CORNING FIBERGLAS CORPORATION.

**Second.** Its principal office in the State of Delaware is located at 100 West Tenth Street, City of Wilmington, County of New Castle, State of Delaware. The name and address of its resident agent is The Corporation Trust Company, 100 West Tenth Street, Wilmington, Delaware.

**Third.** The nature of the business and the objects and purposes to be transacted, promoted and carried on by the corporation are as follows:

A. To manufacture, fabricate, buy, sell and deal in all kinds, forms and combinations of fibres composed of glass, minerals or any other substance and in the products thereof or in which such fibres form a part; and machinery, tools, implements, materials and supplies for the manufacture thereof; and to acquire, construct, equip, operate, maintain and dispose of factories, laboratories and all other things necessary or convenient for manufacturing and dealing in such fibres and substances and products thereof, and such machinery, tools, implements, materials, and supplies;

B. To manufacture, purchase or otherwise acquire, own, mortgage, pledge, sell, assign and transfer, or otherwise dispose of, and to invest, trade, deal in and deal with goods, wares and merchandise, and real and personal property of every class and description;

C. To apply for, purchase or otherwise acquire patents, licenses, inventions, improvements, processes, copyrights, trade systems, trade-marks and trade names and any secret or other information and any right, option, or contract in relation thereto, and to fulfill the terms and conditions thereof, and to maintain, lease, license, sell, transfer or otherwise dispose of and turn to account and deal in the same;

D. To enter into any agreement for the sharing of profits, union of interests, cooperation or joint adventure, or otherwise, with any person, partnership, trustee, joint stock association or corporation or any business or transaction capable of being conducted so as, directly or indirectly to benefit this corporation;

00082

8401180230

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

* * * * *

**FILED**

APR 27 1984    10AM

*Michael C. Koston*

SECRETARY OF STATE

OWENS-CORNING FIBERGLAS CORPORATION, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

FIRST: That at a meeting of the Board of Directors of OWENS-CORNING FIBERGLAS CORPORATION on February 8, 1984, resolutions were duly adopted setting forth proposed amendments to the Certificate of Incorporation of said corporation, declaring said amendments to be advisable, and calling the annual meeting of the stockholders of said corporation for consideration thereof. The proposed amendments set forth by said resolutions are as follows:

That the Certificate of Incorporation of this Corporation, as amended, be further amended so that Article Fourth thereof shall read as follows:

"FOURTH. The total number of shares of stock which the Corporation is authorized to issue is 108,000,000 shares of which:

(a) 8,000,000 shares shall be Preferred Stock, issuable in series, of no par value per share, and

(b) 100,000,000 shares shall be Common Stock of par value of $1.00 per share.

The designations, powers, preferences and rights, and the qualifications, limitations or restrictions of the Preferred Stock and the Common Stock are as follows:

A. PREFERRED STOCK

The Preferred Stock may be issued from time to time in one or more series and with such designation for each such series as shall be stated and expressed in the resolution or resolutions providing for the issue of each such series adopted by the Board of Directors. The Board of Directors in any such resolution or resolutions is expressly authorized to state and express for each such series:

(i) Voting rights, if any, including, without limitation, the authority to confer multiple votes per share, voting rights as to specified matters or issues or, subject to the provisions of this Certificate of Incorporation, as amended, voting rights to

-1-

involuntary, the assets and funds of the Corporation remaining
after the payment to the holders of the Preferred Stock at the
time outstanding of the full amounts to which they shall be
entitled shall be distributed among the holders of the Common
Stock according to their respective shares.

(iii) The shares of Common Stock shall entitle the holders of
record thereof to one vote for each share upon all matters upon
which stockholders have the right to vote, subject only to any
exclusive voting rights which may vest in holders of the
Preferred Stock under the provisions of any series of the
Preferred Stock established by the Board of Directors pursuant
to the authority provided in this Article Fourth."

That the Certificate of Incorporation of this Corporation, as amended, be
further amended so that Article Eleventh thereof shall read as follows:

"ELEVENTH.  (a) Elections for directors shall not be by ballot
unless demand is made for election by ballot by a stockholder
entitled to vote for the election of directors.

(b)  The business and affairs of the Corporation shall be managed by
a Board of Directors consisting of not less than nine nor more than
twelve persons.  The exact number of directors within the minimum
and maximum limitations specified in the preceding sentence shall be
fixed from time to time by the Board of Directors pursuant to a
resolution adopted by the affirmative vote of a majority of the
entire Board of Directors; and such exact number shall be eleven
unless otherwise determined by resolution so adopted by a majority
of the entire Board of Directors.  As used in this Certificate of
Incorporation, the term "entire Board of Directors" means the total
authorized number of directors which the Corporation would have if
there were no vacancies.

At the 1984 Annual Meeting of Stockholders, the directors shall be
divided into three classes, as nearly equal in number as possible,
with the term of office of the first class to expire at the 1985
Annual Meeting of Stockholders, the term of office of the second
class to expire at the 1986 Annual Meeting of Stockholders and the
term of office of the third class to expire at the 1987 Annual
Meeting of Stockholders.  Commencing with the 1985 Annual Meeting of
Stockholders, directors elected to succeed those directors whose
terms have thereupon expired shall be elected for a term of office
to expire at the third succeeding Annual Meeting of Stockholders
after their election.  If the number of directors is changed, any
increase or decrease shall be apportioned among the classes so as to
maintain, if possible, the equality of the number of directors in
each class, but in no case will a decrease in the number of
directors shorten the term of any incumbent director.  If such

-3-

equality is not possible, the increase or decrease shall be apportioned among the classes in such a way that the difference in the number of directors in any two classes shall not exceed one.

(c) Subject to the rights of the holders of any series of Preferred Stock or any other class of capital stock of the Corporation (other than the Common Stock) then outstanding, newly-created directorships resulting from an increase in the authorized number of directors in any class of directors or vacancies in any such class resulting from death, resignation, retirement, disqualification, removal from office or other cause shall, if occurring prior to the expiration of the term of office of such class, be filled only by the affirmative vote of a majority of the remaining directors of the entire Board of Directors then in office, although less than a quorum, or by the sole remaining director. Any director of any class so elected shall hold office for a term that shall coincide with the remaining term of that class. His successor shall be elected by the stockholders at the same time and for the same term as the other directors of that class.

(d) Whenever the holders of any one or more series of Preferred Stock issued by the Corporation shall have the right, voting separately by series, to elect directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by this Article Eleventh unless expressly otherwise provided by the resolution or resolutions providing for the creation of such series.

(e) Notwithstanding any other provision of this Certificate of Incorporation and subject to the other provisions of this Article Eleventh, the Board of Directors shall determine the rights, powers, duties, rules and procedures that shall affect the directors' power to manage and direct the business and affairs of the Corporation. Without limiting the foregoing, the Board of Directors shall designate and empower committees of the Board of Directors, shall elect and empower the officers of the Corporation, may appoint and empower other officers and agents of the Corporation, and shall determine the time and place of, and the notice requirements for, Board meetings, as well as quorum and voting requirements for, and the manner of taking, Board action."

SECOND: That thereafter, pursuant to resolution of its Board of Directors, an annual meeting of the stockholders of said corporation was duly called and held, upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware, at which meeting the necessary number of shares as required by statute were voted in favor of the amendments.

THIRD: That said amendments were duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

-4-

IN WITNESS WHEREOF, said OWENS-CORNING FIBERGLAS CORPORATION
has caused this certificate to be signed by Richard A. Tudkin, its Senior
Vice-President, and attested by Dennis L. Jarvala, Assistant Secretary,
this 19th day of April, 1984.

OWENS-CORNING FIBERGLAS CORPORATION

By _____
        Senior Vice-President

_____
Assistant Secretary

rcs 02-R24

-5-

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 04:05 PM 01/02/1996
960001434 - 367411

CERTIFICATE OF OWNERSHIP AND MERGER

MERGING

OC MERGER CORP.

INTO

OWENS-CORNING FIBERGLAS CORPORATION

(Pursuant to Section 253 of the

General Corporation Law of Delaware)

Owens-Corning Fiberglas Corporation, a corporation organized and existing under the laws of Delaware (the "Corporation"), does hereby certify:

FIRST:   That the Corporation owns all of the outstanding shares of each class of stock of OC Merger Corp., a Delaware corporation incorporated on the 7th day of December, 1995, pursuant to the Delaware General Corporation Law.

SECOND:   That the Corporation, by the following resolutions of its Board of Directors, duly adopted at a meeting held on December  14 , 1995, determined to and did merge into itself said OC Merger Corp., by the adoption thereof:

RESOLVED, that the Corporation merge, and it hereby does merge, into itself OC Merger Corp. and assumes all of its obligations.

RESOLVED, that said merger shall become effective upon the filing of a Certificate of Ownership and Merger with the Secretary of State of the State of Delaware.

RESOLVED, that upon effectiveness of said merger, the name of the Corporation shall be changed to Owens Corning and Article First of the Certificate of Incorporation of the Corporation, as heretofore amended, shall be amended to read as follows:

"First.   The name of this corporation is Owens Corning."

RESOLVED, that except for the foregoing amendment to Article First, the Certificate of Incorporation, as previously amended, shall remain unchanged by the merger and in full

force and effect until further amended in accordance with the Delaware General Corporation Law.

RESOLVED, that the proper officers of the Corporation be, and they hereby are, directed to make and execute a Certificate of Ownership and Merger setting forth a copy of the resolutions to so merge OC Merger Corp. and to assume its obligations, and to so change the name of the Corporation, and the date of adoption thereof, and to cause the same to be filed with the Secretary of State of the State of Delaware and to do all acts and things whatsoever, whether within or without the State of Delaware, which may be necessary or proper to effect said merger and change of name.

In witness whereof, the Corporation has caused this certificate to be signed by its duly authorized office, this 29th day of December 1995.

OWENS-CORNING FIBERGLAS CORPORATION

By:

Name: Dennis L. Jarvela
Title: Vice President - Corporate Law
and Assistant Secretary

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 02:35 PM 04/17/1997
971125296 - 0367411

# CERTIFICATE OF AMENDMENT

## OF

## CERTIFICATE OF INCORPORATION

\* \* \* \* \*

OWENS CORNING, a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

FIRST: That at a meeting of the Board of Directors of OWENS CORNING (the "Company") on February 6, 1997, resolutions were duly adopted setting forth a proposed amendment to the Certificate of Incorporation of the Company, declaring said amendment to be advisable, and directing that said amendment be considered at the annual meeting of the stockholders of the Company. The proposed amendment set forth by said resolutions is as follows:

The first paragraph of Section (b) of Article ELEVENTH of the Company's Certificate of Incorporation is amended to read as follows:

(b) The business and affairs of the Corporation shall be managed by a Board of Directors consisting of not less than nine nor more than fourteen persons. The exact number of directors within the minimum and maximum limitations specified in the preceding sentence shall be fixed from time to time by the Board of Directors pursuant to a resolution adopted by the affirmative vote of a majority of the entire Board of Directors; and such exact number shall be eleven unless otherwise determined by resolution so adopted by a majority of the entire Board of Directors. As used in this Certificate of Incorporation, the term "entire Board of Directors" means the total authorized number of directors which the Corporation would have if there were no vacancies.

SECOND: That thereafter, pursuant to resolution of its Board of Directors, an annual meeting of the stockholders of the Company was duly called and held on April 17, 1997, upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware, at which meeting the necessary number of shares as required by statute and the Certificate of Incorporation of the Company were voted in favor of the amendment.

THIRD: That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, said Owens Corning has caused this certificate to be signed by its duly authorized officer this 17th day of April, 1997.

OWENS CORNING

By _____
Rodney A. Nowland
Assistant Secretary

# EXHIBIT C

Table of Contents

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D. C. 20549

---

## FORM 10-K

---

**Annual Report Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934**

**For the Fiscal Year Ended December 31, 2004**

**Commission File No. 1-3660**

# Owens Corning

---

**One Owens Corning Parkway**

**Toledo, Ohio 43659**

**Area Code (419) 248-8000**

**A Delaware Corporation**

**I.R.S. Employer Identification No. 34-4323452**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| None | |

**Securities registered pursuant to Section 12(g) of the Act:**

**Common Stock - $.10 Par Value**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

On June 30, 2004, the last business day of Registrant's most recently completed second fiscal quarter, the aggregate market value of Registrant's $.10 par value common stock (Registrant's voting stock) held by non-affiliates was $32,652,428 (assuming for purposes of this computation only that the Registrant had no affiliates).

- 49 -

## ITEM 9B. OTHER INFORMATION

Owens Corning has nothing to report under this Item.

## PART III

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF OWENS CORNING

### INFORMATION CONCERNING DIRECTORS

At January 31, 2005, Owens Corning's Board of Directors was composed of ten directors, divided into three classes. Each class of directors serves for a term expiring at the third succeeding annual meeting of stockholders after the year of election of such class, and until their successors are elected and qualified. As of January 31, 2005, Owens Corning has not scheduled an annual meeting of stockholders for 2005 or any subsequent period.

Information concerning each director of Owens Corning as of January 31, 2005, is set forth below.

### Class Expiring At First Succeeding Annual Meeting Of Stockholders

**Gaston Caperton,** 64. President and Chief Executive Officer of The College Board, not-for-profit educational association, New York, NY and Chairman of The Caperton Group, a business investment and development company, Shepherdstown, WV; former Governor of the State of West Virginia. Director since 1997.

A graduate of the University of North Carolina, Mr. Caperton began his career in a small insurance agency, became its principal owner and chief operating officer, and led the firm to become the tenth largest privately-owned insurance brokerage firm in the U.S. He also has owned a bank and mortgage banking company. Mr. Caperton was elected Governor of West Virginia in 1988 and 1992. In 1997, Mr. Caperton taught at Harvard University as a fellow at the John F. Kennedy Institute of Politics. Prior to beginning his current position in mid-1999, Mr. Caperton also taught at Columbia University, where he served as Director of the Institute on Education and Government at Teachers College.

Mr. Caperton is a director of United Bankshares, Inc., Energy Corporation of America, West Virginia Media Holdings, and Prudential Financial. He was the 1996 Chair of the Democratic Governors' Association, served on the National Governors' Association executive committee and as a member of the Intergovernmental Policy Advisory Committee on U.S. Trade, and was Chairman of the Appalachian Regional Commission, Southern Regional Education Board, and Southern Growth Policy Board.

**William W. Colville,** 70. Retired; former Senior Vice President, General Counsel and Secretary of Owens Corning. Director since 1995.

A graduate of Yale University and the Columbia University Law School, Mr. Colville began his career at Owens Corning in 1984 as Senior Vice President and General Counsel. Prior to joining Owens Corning, he was President of the Sohio Processed Minerals Group from 1982 to 1984, and General Counsel of Kennecott Corporation from 1980 to 1982.

Mr. Colville is a director of Nordson Corporation.

10K Wizard - SEC filings.                                                    Page 54 of 183

Case 1:06-cv-00136-JPF     Document 1-3     Filed 02/28/2006     Page 16 of 43

Table of Contents

- 50 -

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF OWENS CORNING (continued)

**Landon Hilliard,** 65. Partner, Brown Brothers Harriman & Co., private bankers, New York, NY. Director since 1989.

A graduate of the University of Virginia, Mr. Hilliard began his career at Morgan Guaranty Trust Company of New York. He joined Brown Brothers Harriman in 1974 and became a partner in 1979.

Mr. Hilliard is a director of Norfolk Southern Corporation, Western World Insurance Company, and Russell Reynolds Associates, Inc. He is also Chairman of the Board of Trustees of the Provident Loan Society of New York and Secretary of The Economic Club of New York.

**Robert B. Smith, Jr.,** 67. Director, Virginia Environmental Endowment, a nonprofit, funded, grant making corporation dedicated to improving the environment. Director since 2004.

A graduate of the University of North Carolina and the University of North Carolina Law School, Mr. Smith's previous experience included serving as Trustee of the Dalkon Shield Claimants Trust, a public interest trust created by the Federal Bankruptcy Court to compensate those damaged by the Dalkon Shield, and as Vice President for Government Relations of the Pharmaceutical Manufacturers Association. His prior experience also included various positions related to the U.S. Senate, including: Chief Counsel and Staff Director, U.S. Senate Government Operations Committee; Chief Counsel, U.S. Senate Subcommittee on Revision and Codification of the Laws; Chief Legislative Assistant, Senator Sam J. Ervin, Jr.; Special Counsel, U.S. Senate Antitrust and Monopoly Subcommittee; and Counsel, U.S. Senate Subcommittee on Constitutional Rights.

### Class Expiring At Second Succeeding Annual Meeting Of Stockholders

**Ann Iverson,** 60. President and Chief Executive Officer of International Link, an international consulting firm, Scottsdale, AZ. Director since 1996.

Ms. Iverson began her career in retailing and held various buying and executive positions at retail stores in the U.S. through 1989, including Bloomingdales, Dayton Hudson, and US Shoe. She then joined British Home Stores as Director of Merchandising and Operations in 1990; Mothercare as Chief Executive Officer in 1992; Kay-Bee Toy Stores as President and Chief Executive Officer in 1994; and Laura Ashley Holdings plc. as Group Chief Executive in 1995. In 1998, she founded and became President and Chief Executive Officer of International Link.

Ms. Iverson is a director of several privately-held companies. She is also a member of the Board of Trustees of the Thunderbird School of International Management, and a member of Financo Global Consulting.

**W. Walker Lewis,** 60. Chairman, Devon Value Advisers, financial consulting and investment banking firm, Greenwich, CT and New York, NY. Director since 1993.

Previously, Mr. Lewis served as Senior Advisor to SBC Warburg Dillon Read; Senior Advisor to Marakon Associates; and Managing Director, Kidder, Peabody & Co., Inc. Prior to April 1994, he was President, Avon U.S. and Executive Vice President, Avon Products, Inc. Prior to March 1992, Mr. Lewis was Chairman of Mercer Management Consulting, Inc., a wholly-owned subsidiary of Marsh & McLennan, which is the successor to Strategic Planning Associates, a management consulting firm he founded in 1972. He is a graduate of Harvard College, where he was President and Publisher of the Harvard Lampoon.

Mr. Lewis is Chairman of London Fog Industries, Inc. and a director of Mrs. Fields' Original Cookies, Inc. He is also a member of the Council on Foreign Relations and the Washington Institute of Foreign Affairs.

Table of Contents

- 51 -

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF OWENS CORNING (continued)

**Michael H. Thaman,** 40. Chairman of the Board and Chief Financial Officer, Owens Corning. Director since 2002.

A graduate of Princeton University, Mr. Thaman joined Owens Corning in 1992. He was elected Chairman of the Board of Owens Corning in April 2002, and became Chief Financial Officer in 2000. Before assuming his current positions, Mr. Thaman held a variety of leadership positions at Owens Corning, including serving as President of the Exterior Systems Business beginning in 1999 and President of the Engineered Pipe Systems Business beginning in 1997.

Prior to joining Owens Corning, Mr. Thaman was a Vice President in the New York office of Mercer Management Consulting, a strategy consulting firm.

Mr. Thaman is a director of Florida Power & Light Group, Inc.

### Class Expiring At Third Succeeding Annual Meeting Of Stockholders

**Norman P. Blake, Jr.,** 63. Former Chairman, President and Chief Executive Officer of Comdisco, Inc., global technology services, Rosemont, IL. Director since 1992.

A graduate of Purdue University, Mr. Blake also previously has served as Chief Executive Officer of the United States Olympic Committee; Chairman, President and Chief Executive Officer of Promus Hotel Corporation; Chairman, President and Chief Executive Officer of USF&G Corporation; and Chairman and Chief Executive Officer of Heller International Corporation of Chicago.

Mr. Blake is a member of the Purdue Research Foundation, Purdue University's President's Council and Dean's Advisory Council, Krannert Graduate School of Management. He is the recipient of the degree of Doctor of Economics honoris causa from Purdue University, granted jointly by the Krannert Graduate School of Management and School of Liberal Arts. He has also been awarded The Ellis Island Medal of Honor.

**David T. Brown,** 56. President and Chief Executive Officer, Owens Corning. Director since January 2002.

A graduate of Purdue University, Mr. Brown assumed his current position in April 2002. Before that, he served as Executive Vice President and Chief Operating Officer of Owens Corning since January 2001. Previously, he held numerous leadership positions in sales and marketing at Owens Corning, including serving as President of the Insulating Systems Business beginning in 1997, President of Building Materials Sales and Distribution beginning in 1996, and President of the Roofing and Asphalt Business beginning in 1994. Mr. Brown joined Owens Corning in 1978 after working for Procter & Gamble, Shearson Hammill and Eli Lilly.

Mr. Brown is a director of BorgWarner Inc. He also is on the Board of Directors of the Toledo Museum of Art and the Dean's Advisory Council for Purdue's Krannert Graduate School of Management. He is a past board member of the Asphalt Roofing Manufacturers Association Executive Committee, National Roofing Contractors Association Advisory Board, Thermal Insulation Manufacturers Association, and Executive Committee of the North American Insulation Manufacturers Association.

Table of Contents

- 52 -

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF OWENS CORNING (continued)

**W. Ann Reynolds,** 67. Former President and Professor of Biology of The University of Alabama at Birmingham, Birmingham, AL, 1997-2003. Director since 1993.

A graduate of Kansas State Teachers College and the University of Iowa, Dr. Reynolds previously served as Chancellor of City University of New York for seven years and served eight years as Chancellor of the California State University System.

Dr. Reynolds is a director of Humana, Inc., Abbott Laboratories, Maytag Corporation, and the Post-Gazette, Champaign-Urbana, IL. She is also a member of the Society for Gynecological Investigation and the Perinatal Research Society.

## INFORMATION CONCERNING EXECUTIVE OFFICERS

Certain information concerning Owens Corning's executive officers is included on page 15 hereof.

## INVOLVEMENT IN CERTAIN LEGAL PROCEEDINGS

As indicated in Item 1 above, Owens Corning and 17 of its domestic subsidiaries filed for protection under Chapter 11 of the United States Bankruptcy Code on October 5, 2000. Of the executive officers listed on page 15 hereof, Messrs. Brown, Johns and Thaman served as executive officers of Owens Corning at or within two years before the time of such filing. In addition, Messrs. Brown, Dean, Dietzel, Krull and Thaman also served as executive officers of one or more of such domestic subsidiaries at or within two years before the time of such filing. Director Norman P. Blake, Jr., served as an executive officer of Comdisco, Inc. in July 2001, when such firm filed for protection under Chapter 11 of the United States Bankruptcy Code.

## IDENTIFICATION OF AUDIT COMMITTEE

Owens Corning has a separately-designated standing Audit Committee presently consisting of Norman P. Blake, Jr. (Chairman), Ann Iverson, W. Walker Lewis and W. Ann Reynolds. No other persons served on the Audit Committee during 2004.

## AUDIT COMMITTEE FINANCIAL EXPERT

Owens Corning's Board of Directors has determined that Norman P. Blake, Jr., Chairman of the Audit Committee, is an audit committee financial expert and that he is independent as that term is used in Item 7(d)(3)(iv) of Schedule 14A under the Exchange Act.

# EXHIBIT D



EDWARD S. WEISFELNER
direct dial: 212-209-4800
eweisfelner@brownrudnick.com

Seven
Times
Square
New York
New York
10036
tel 212.209.4800
fax 212.209.4801

December 15, 2005

**BY FACSIMILE**

Owens Corning World Headquarters
One Owens Corning Parkway
Toledo, OH 43659
Attention: Board of Directors:
           Mr. Norman P. Blake, Jr.
           Mr. David T. Brown
           Mr. Gaston Caperton
           Mr. William W. Colville
           Mr. Landon Hilliard
           Ms. Ann Iverson
           Mr. W. Walker Lewis
           Ms. W. Ann Reynolds
           Mr. Robert B. Smith, Jr.
           Mr. Michael H. Thaman

Re:   **Chapter 11 cases of Owens Corning and its debtor affiliates (collectively, the "Debtors")**

Dear Ladies and Gentlemen:

This firm is counsel to the *Ad Hoc* Committee of Preferred and Equity Security Holders (the "*Ad Hoc* Committee"). The members of the *Ad Hoc* Committee include the following institutions: (a) Catalyst Investment Management Co., LLC; (b) Clinton Group, Inc.; (c) Deutsche Bank Securities Inc.; (d) GSO Capital Partners LP; (e) Hain Capital Group, LLC; (f) Harbert Distressed Investment Master Fund, Ltd.; (g) Harvest Management, LLC; (h) JPMorgan; (i) Lehman Brothers; (j) Plainfield Asset Management LLC; (k) Taconic Capital Advisors LLC; (l) Tudor Investment Corporation; and (m) Venor Capital Management LP. These institutions hold (among other things), individually and/or through their funds and/or managed accounts, approximately 10.8 million shares in the aggregate of Owens Corning common stock (or approximately 19.6% of all outstanding shares of the common stock) and approximately 2.5 million shares in the aggregate of certain 6 ½ % convertible monthly income preferred securities issued by a non-Debtor affiliate of Owens Corning (or approximately 62.5% of all outstanding shares of such preferred securities).

As you know, Owens Corning has failed to convene a meeting of shareholders in more than five years and the terms of each purported Owens Corning director expired years ago. Three of you were appointed by other purported directors, never once standing shareholder vote, and, regardless,



December 15, 2005
Page 2

continue to occupy board seats notwithstanding term expiration. In sum, none of you are occupying board seats in accordance with Delaware law or Owens Corning's own bylaws.

Since the very beginning of Owens Corning's chapter 11 cases, Owens Corning's management has addressed the chapter 11 process with an inappropriately skewed view in favor of asbestos-related plaintiffs. This is clearly evidenced by pending motions for the appointment of a trustee and also an examiner brought by commercial creditors in the bankruptcy cases. This inappropriate bias is also evidenced by management's rush to exit chapter 11 despite impending federal legislation (the "Fairness in Asbestos Injury Resolution Act of 2005" or the "FAIR Act") that will create a national trust to satisfy fully asbestos-related claims and, at the same time, greatly reduce Owens Corning's financial obligation to satisfy such claims. To Owens Corning, it should make no difference if estate value is largely allocated to asbestos-claimants pursuant to Section 524(g) of the Bankruptcy Code or to other rightful parties-in-interest under the regime to be enacted soon by Congress. Yet, Owens Corning's management appears to be pressing a plan on parties-in-interest so that it can be confirmed and consummated in advance of the FAIR Act's passage and, as a result, allocate a windfall to the asbestos plaintiffs. This, we think, speaks volumes about the purported directors' artificially skewed view in favor of the asbestos plaintiffs.

Accordingly, the *Ad Hoc* Committee hereby demands that the Owens Corning Board convene a shareholders' meeting immediately. Please let us have your answer to this demand by noon (Eastern Time) on Monday, December 19, 2005. In the event you refuse this demand or fail to answer by such deadline, please be advised that the *Ad Hoc* Committee will file a motion with the Bankruptcy Court seeking confirmation that it may prosecute an action in state court to compel Owens Corning to convene immediately a shareholder meeting for the election of directors or, in the alternative, for relief from the automatic stay to prosecute such an action. In addition, the *Ad Hoc* Committee presently intends to file a motion with the Bankruptcy Court seeking the appointment of an official preferred and equity security holders committee. We expect your and your professionals' support for the relief to be requested in these motions.

In the meantime, the *Ad Hoc* Committee also advises you that it stands ready to work with you and your professionals to formulate a plan of reorganization that preserves estate value for all of your constituents, including your shareholders, particularly by accounting for the likely enactment of the FAIR Act. Such a plan is achievable in these cases. As an example, the debtors in another large asbestos-related Chapter 11 case (In re The Babcock & Wilcox Co., et al., No. 00-10992 (Bankr. E.D. La.)) have presented a plan that will enable them to exit bankruptcy promptly while, at the same time, preserving equity value should the FAIR Act become law in a reasonable period of time. Specifically, the Babcock & Wilcox plan contemplates the issuance of a $250 million promissory note and a $355 million contingent payment right to a trust established for the benefit of asbestos claimants, which note and contingent payment right are conditioned on (among other things) the passage of the FAIR Act by November 30, 2006.

The members of the *Ad Hoc* Committee reserve all rights and remedies, including, without limitation, the right to hold each of you personally accountable for any action as a director taken in advance of a shareholders' meeting duly conducted in accordance with Delaware law. We also note

 December 15, 2005
Page 3

that pursuant to established legal authority, a reorganization plan may not shield you from such liability.

Please have your professionals contact the undersigned if you wish to discuss any of the foregoing matters.

Very truly yours,

Edward S. Weisfelner

Edward S. Weisfelner

Copies: Members of the *Ad Hoc* Committee
Norman Pernick, Esq.
Larry J. Nyhan, Esq.

# EXHIBIT E

# SIDLEY AUSTIN BROWN & WOOD LLP

BEIJING

BRUSSELS

CHICAGO

DALLAS

GENEVA

HONG KONG

LONDON

ONE SOUTH DEARBORN STREET
CHICAGO, ILLINOIS 60603
TELEPHONE 312 853 7000
FACSIMILE 312 853 7036
www.sidley.com

FOUNDED 1866

LOS ANGELES

NEW YORK

SAN FRANCISCO

SHANGHAI

SINGAPORE

TOKYO

WASHINGTON, D.C.

WRITER'S DIRECT NUMBER
(312) 853-7710

WRITER'S E-MAIL ADDRESS
lnyhan@sidley.com

December 19, 2005

**VIA E-MAIL**

Edward S. Weisfelner, Esq.
Brown Rudnick
Seven Times Square
New York, NY 10036

Re:     Demands of the *Ad Hoc* Committee of Preferred and
        Equity Security Holders (the "*Ad Hoc* Committee")

Dear Mr. Weisfelner:

This letter responds to your letter of December 15, 2005 directed to the board of directors (the "Board") of our client, Owens Corning (the "Company"). Your allegations concerning the legal status of the Board and an alleged bias of management and the Board are both baseless and wrong. Each director has been duly elected and qualified, and is serving in accordance with Delaware law. Moreover, the Company's management and the Board have at all times acted in a manner that is entirely consistent with their obligations to the community of interests impacted by the Company's Chapter 11 cases.

Consistent with Judge Fitzgerald's direction, the Company intends to file a plan of reorganization before the end of 2005, and the Company intends diligently to prosecute confirmation of that plan. The *Ad Hoc* Committee is, of course, free to express its views to Judge Fitzgerald in context of the plan confirmation process. The Company does not believe that it is a prudent use of estate resources to convene a shareholders' meeting at this time and, accordingly, refuses the *Ad Hoc* Committee's demand for such a meeting. Moreover, for the reasons set forth in the Norman Pernick's November 23, 2005 letter to David Klauder of the Office of the United States Trustee opposing the appointment of an equity committee, a copy of which was distributed to you, the Company will not support a motion for the appointment of one or more equity committees.

As you know, Judge Fitzgerald has repeatedly ruled that the proposed Fairness in Asbestos Injury Resolution Act of 2005, Bill S. 852 or similar legislation should have no impact on the Company's Chapter 11 cases unless and until such legislation is actually enacted. Against

SIDLEY AUSTIN BROWN & WOOD LLP IS A LIMITED LIABILITY PARTNERSHIP
PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

SIDLEY AUSTIN BROWN & WOOD LLP                    CHICAGO

Edward S. Weisfelner, Esq.
December 19, 2005
Page 2


this backdrop, please be advised the Company will consider any effort by the *Ad Hoc* Committee
to compel a shareholder meeting as an attempt directly to interfere with Company's efforts gain
confirmation of a plan of reorganization that fairly allocates value in a manner that is consistent
with the Bankruptcy Code. Accordingly, the Company will treat any such activity as a violation
of the automatic stay unless it is preceded by an order from Judge Fitzgerald granting relief from
the automatic stay.

        I trust that this is responsive to your letter. We are, of course, available to answer
any questions you may have concerning the foregoing.

                                  Sincerely,

                                  Larry J. Nyhan

/ls

cc:    Stephen K. Krull, Esq.
       Norman L. Pernick, Esq.
       James F. Conlan, Esq.

# EXHIBIT F

LEXSEE 2005 DEL CH LEXIS 174

NEWCASTLE PARTNERS, L.P., Plaintiff, v. VESTA INSURANCE GROUP, INC.,
a Delaware corporation, Defendant.

C.A. No. 1485-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2005 Del. Ch. LEXIS 174*

November 14, 2005, Submitted
November 15, 2005, Decided

**SUBSEQUENT HISTORY:** [*1] Revised November 16, 2005. Affirmed by *Vesta Ins. Group, Inc. v. Newcastle Ptnrs., L.P., 2005 Del. LEXIS 463 (Del., Nov. 16, 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporation filed a motion for relief from an order and judgment, pursuant to Del. Ch. Ct. R. 60(b), which directed the corporation to hold its annual meeting within a set time. The corporation also sought an interim stay under Del. Ch. Ct. R. 62(b). The matter arose upon the filing of an action by plaintiff stockholder, seeking an order compelling the corporation to hold the meeting pursuant to *Del. Code Ann. tit. 8, § 211(c)*.

**OVERVIEW:** The corporation had not published its annual report or certified financial statements in a timely manner, and it had failed to hold its annual meeting for electing directors. The large stockholder brought suit, which resulted in the trial court's order directing the corporation to hold the meeting. An exceptionally long period of 90 days was permitted in order to allow completion by the corporation of financial reports so the necessary SEC filings and solicitation of proxies could be had. The trial court had based this decision on confident predictions by corporate witnesses of the ability to complete the documents. However, the documents had not yet been completed when the corporation filed its motions, claiming that the trial court's order conflicted with the mandate of Del. Gen. Corp. Law § 211(c) and SEC proxy rules. The court found that there was no basis for relief under Del. Ch. Ct. R. 60(b), as the shareholders had a right to convene the annual meeting. There was no conflict between the trial court's order and SEC rules and statutes, and further, the court concluded that the matter

was within the internal affairs doctrine and thereby controlled by Delaware law.

**OUTCOME:** The court denied the corporation's motions.

**LexisNexis(R) Headnotes**

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN1] The clear mandate of § 211(c) of the Delaware General Corporation Law, at *Del. Code Ann. tit. 8, § 211(c)*, and Security and Exchange Commission proxy rules, in normal circumstances, prohibits registered companies from convening annual meetings for the purpose of electing directors without first disseminating an annual report and either a proxy statement or an information statement.

*Civil Procedure > Relief From Judgment > Relief Generally*
[HN2] Del. Ch. Ct. R. 60(b) permits a party to seek relief from a final judgment or order, based on six enumerated grounds.

*Civil Procedure > Entry of Judgments > Stay of Proceedings & Supersedeas*
*Civil Procedure > Relief From Judgment > Relief Generally*
[HN3] Under Del. Ch. Ct. R. 62(b), a court may in its discretion stay the execution of any order pending the disposition of a motion for relief from a judgment pursuant to Del. Ch. Ct. R. 60.

*Civil Procedure > Relief From Judgment > Relief Generally*
[HN4] See Del. Ch. Ct. R. 60.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN5] The shareholder meeting to elect directors is a cornerstone of Delaware corporate law. Therefore, the Delaware courts have repeatedly recognized that the policy justifications behind *Del. Code Ann. tit. 8, § 211* are so strong that if the statutory elements required to compel a shareholder's meeting are shown, the right to relief is "virtually absolute."

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN6] Pursuant to SEC proxy regulations, the prior dissemination of an annual report is required to solicit proxies under *17 C.F.R. § 240.14a-3*; moreover, both an annual report and an information statement are required to be furnished to stockholders pursuant to 17 C.F.R. § § 14c-2 and 14c-3, where the registrant plans to hold an annual meeting to elect directors but does not intend to solicit proxies.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN7] The policy of a strong stockholder franchise underlies the Security and Exchange Commission's rules on the distribution of proxy and information statements.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN8] In 1964, Congress responded to the Security and Exchange Commission's (SEC) lack of authority by enacting 17 C.F.R. § 14(c), requiring substantially the same filings for meetings at which no proxies are be solicited as the SEC then required for solicitations.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
[HN9] The history of corporate filing requirements for meetings suggests that the purpose of 17 C.F.R. § 14(c) and the rules promulgated thereunder is to prevent regis-

trants from avoiding their disclosure obligations by the simple expedient of declining to solicit proxies in connection with any meeting of stockholders. This is consistent with Congress's original purpose in including proxy regulation in the 1934 Act that management of properties owned by the investing public should not be permitted to perpetuate themselves by the misuse of corporate proxies. Nothing in either that statute or regulation suggests any purpose to interfere with the power of state courts to require that stockholder meetings be held in accordance with the requirements of state corporation law in situations where the registrant corporation is delinquent in its Security and Exchange Commission (SEC) filing obligations and, thus, is unable to comply with the literal terms of the SEC proxy rules. 17 C.F.R. § 14(c) and *Del. Code Ann. tit. 8, § 211* do not actually conflict. Rather, they both serve the same purpose of helping to safeguard the shareholders' foundational voting rights.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Meetings & Voting*
*Constitutional Law > Procedural Due Process > Scope of Protection*
[HN10] The important policies underlying the internal affairs doctrine include that the power of the state of incorporation to mandate stockholder meetings in appropriate circumstances not be lightly overturned. As the Delaware Supreme Court has recently explained, the internal affairs doctrine is the basic understanding that only the law of the state of incorporation governs and determines issues relating to a corporation's internal affairs. The doctrine is rooted not only in the decisions of the United States Supreme Court, but also in the Fourteenth Amendment's implicit guarantee of the stockholders' right to know to what standards of accountability they may hold those managing the corporation's business and affairs. There are, of course, some circumstances in which a state's governance of internal corporate affairs is preempted by federal law, but those instances are rare, and occur only when the law of the state of incorporation is "inconsistent with a national policy on foreign or interstate commerce."

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*

[HN11] The internal affairs doctrine governs the choice of law determinations involving matters peculiar to corporations, that is, those activities concerning the relationships inter se of the corporation, its directors, officers, and shareholders.

COUNSEL: Bruce L. Silverstein, Esquire, Melanie K. Sharp, Esquire, Martin S. Lessner, Esquire, Christian Douglas Wright, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Steven Wolosky, Esquire, OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP, New York, New York; Attorneys for the Plaintiff.

J. Travis Laster, Esquire, ABRAMS & LASTER LLP, Wilmington, Delaware; James F. Hughey, Jr., Esquire, BALCH & BINGHAM LLP, Birmingham, Alabama; Attorneys for the Defendant.

JUDGES: LAMB, Vice Chancellor.

OPINIONBY: LAMB

OPINION:

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

Vesta Insurance Group, Inc. has not held a meeting for the purpose of electing directors since June 2004. It has also not published its annual report or certified financial statements for the year ended December 31, 2004. On July 7, 2005, Newcastle Partners, L.P., a large stockholder of Vesta, brought suit under *8 Del. C. § 211* seeking an order compelling Vesta to hold an annual meeting for the election of directors. At the conclusion of trial on August 19, 2005, the court rendered its oral decision, directing that Vesta hold its annual meeting [*2] within 90 days, or no later than November 17, 2005. The court allowed such an exceptionally long period of delay only because Vesta's trial evidence strongly suggested that it would be able to complete its 2004 financial reports by September 30 and, thus, would be able to make the necessary SEC filings to permit management to solicit proxies at the mandated meeting.

Although it is now six weeks after the date Vesta's trial witnesses confidently predicted for completion of the 2004 financial statements, that task remains incomplete. Seeking to further delay its 2005 annual meeting, Vesta now moves for relief from this court's Order, under Court of Chancery Rule 60(b), and for an interim stay of that judgment pursuant to Court of Chancery Rule 62(b). Fundamentally, Vesta's claim for relief rests on a supposed conflict between this court's Order issued pursuant to [HN1] the clear mandate of *Section 211(c) of the Delaware General Corporation Law* and SEC proxy rules that, in normal circumstances, prohibit registered companies from convening annual meetings for the purpose of electing directors without first disseminating an annual report and either a proxy statement or an information statement. [*3] Because Vesta has not and cannot show a basis for relief from this court's judgment, its motion is denied.

I.

By Order and Final Judgment entered on September 1, 2005, the court directed Vesta, a Delaware corporation, to hold its 2005 annual meeting of stockholders no later than November 17, 2005. The court's Order further provided, as contemplated by *Section 211(c)*, that the shares of Vesta stock represented at the annual meeting, either in person or by proxy, and entitled to vote thereat would constitute a quorum for the purpose of that meeting, notwithstanding any contrary provision found in Vesta's certificate of incorporation or bylaws.

The decision to allow Vesta 90 days to hold its meeting, rather than the usual period of 30 to 45 days, reached what the court regarded as the outer bounds of its discretion. The court agreed to such an extended delay only because Vesta's trial witnesses confidently predicted, with what appeared to be a reasonable basis in fact, that the process of finalizing Vesta's 2004 financial statements (and restating earlier ones) would be complete by September 30, 2005. If the task could be accomplished by that date, the court reasoned, Vesta [*4] would be able to disseminate its 2004 annual report and year-end financial statements in advance of the mandated meeting date. Recognizing that, if it could be done within an acceptable time frame, it was desirable that stockholders have that information in hand in advance of the meeting, the court set the meeting date at the outer limit of the possible dates.

Vesta's confident predictions of a September 30 completion have proven to be wrong. In fact, the company's auditors, PriceWaterhouseCoopers LLC ("PWC"), still have not finished their review of Vesta's 2004 financial statements. And, although Vesta's President and CEO now *hopes* that PWC can finish its work by December 31, 2005, he is unable to offer any assurances to that effect, stating that Vesta "cannot predict when [the 2004 financial statements] will be complete." n1 In its motion, Vesta argues that it should be relieved of its obligation to hold its 2004 annual meeting ordered by this court until those financial statements are ready because, it claims, it will otherwise be placed in jeopardy of violating the federal securities laws. Its principal argument in support of this position is that members of the staff of [*5] the United States Securities and Exchange Commission have suggested to Vesta's lawyers, on at least

2005 Del. Ch. LEXIS 174, *

two occasions, that it cannot hold the meeting in compliance with this court's Order without violating the SEC's proxy rules.

> n1 Def.'s Mot. For Relief from J., Gayle Aff., P 4.

The first such communication came in a letter received on November 9, 2005, in which an examiner in the SEC Division of Corporate Finance requested clarification of Vesta's plans in light of SEC rules on proxy solicitations and information statements. Thereafter, in a telephone conversation another Corporation Finance staff member, presumably senior to the examiner, recommended that Vesta "not proceed with the meeting without compliance with the proxy rules." n2 According to the affidavit of its counsel submitted by Vesta, this advice was preceded by the following statement:

> He stated that the staff had seen similar situations in the past, but that the staff had never dealt with a situation where ultimately a company [*6] required by court order to hold a meeting was not also able to distribute a proxy statement in compliance with the proxy rules. He stated that the staff did not want to be in a position to decide what position it would have to take if, in fact, Vesta held its meeting without compliance with the proxy rules.

> n2 Def.'s Mot for Relief from J., Waters Aff., 7.

Vesta argues that these ambiguous communications from members of the SEC staff leave Vesta in the uncomfortable position of having to disobey either this court or the SEC. Vesta therefore requests relief from the court's prior judgment, seeking to have the deadline before which it must hold its annual meeting delayed indefinitely.

The plaintiff, Newcastle Partners, L.P., opposes Vesta's attempt to delay the annual meeting, arguing that none of the facts presented by the defendant would prevent the planned annual meeting from going forward as required on November 17, 2005. Rather, the plaintiff argues, the defendant's motion is an attempt to circumvent [*7] the court's September 1, 2005 Order, leaving shareholders with no definite date for Vesta's already overdue annual meeting.

Vesta seeks reconsideration on the basis of Court of Chancery Rules 60(b) and 62(b). [HN2] Rule 60(b) permits a party to seek relief from a final judgment or order, based on six enumerated grounds. n3 The two on which the defendant relies in this case are those that allow relief for "newly discovered evidence," and for "any other reason justifying relief from the operation of the judgment." [HN3] Under Court of Chancery Rule 62(b), the court may in its discretion stay the execution of any order pending the disposition of a motion for relief from a judgment pursuant to Rule 60.

> n3 Rule 60(b) contemplates relief in the following circumstances: [HN4] "On motion and upon such terms as are just, the Court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: (1) Mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment."

[*8]

## II.

[HN5] The shareholder meeting to elect directors is a cornerstone of Delaware corporate law. Therefore, the Delaware courts have repeatedly recognized that the policy justifications behind *8 Del. C. § 211* are so strong that if the statutory elements required to compel a shareholder's meeting are shown, the right to relief is "virtually absolute." n4 In this case, the defendants conceded that no annual meeting had been held since June 1, 2004, exceeding the maximum 13-month period between meetings allowed by statute. Vesta having failed to prove any possible ground for denying the relief sought by Newcastle Partners, the court summarily ordered Vesta to hold its 2005 annual meeting. In requiring that the meeting be held no later than November 17, 2005, the court exercised the full measure of its discretion to grant the company additional time to complete preparations for that meeting. As already discussed, the court relied on the testimony of Vesta's witnesses suggesting that it would be ready to distribute updated financial information to its stockholders in time for a November 17 meeting. n5

2005 Del. Ch. LEXIS 174, *

n4 *Speiser v. Baker, 525 A.2d 1001 (Del. Ch. 1987).*

[*9]

n5 The court noted in its previous oral decision that it was "not aware of any authority in this Court that has allowed or ordered setting of a meeting more than 90 days post [judgment]." *See Walsh v. Search Exploration Inc., 1990 Del. Ch. LEXIS 132* (setting a period of 90 days after judgment); *Hecco Ventures v. Texas American Energy Corp., 1986 Del. Ch. LEXIS 435* (approximately two months); *Shay v. Morlan Int'l, Inc., 1983 Del. Ch. LEXIS 405* (70 days).

As the court recognized at the time of trial, Vesta could not, of its own volition, convene a meeting at this time in conformity with SEC proxy regulations. This is because [HN6] the prior dissemination of an annual report is required to solicit proxies under Rule 14a-3; n6 moreover, both an annual report and an information statement are required to be furnished to stockholders pursuant to Rules 14c-2 and 14c-3, n7 where the registrant plans to hold an annual meeting to elect directors but does not intend to solicit proxies.

n6 *17 C.F.R. § 240.14a-3.*

[*10]

n7 *17 C.F.R. § § 240.14c-2 and 14c-3.*

Vesta's reading of its communications with the SEC, however, is entirely too strong. The cited letter does not order Vesta to stop the annual meeting, or to take any other action inconsistent with this court's Order. n8 Rather, it merely asks for further explanation of how precisely Vesta's proposed action fits into the structure of the SEC regulations. Apparently, that request was not answered in writing. Similarly, the telephonic communication discussed above neither threatened enforcement action against Vesta nor even suggested that the responsible SEC staff have formulated a view that compliance with this court's Order could violate any SEC rules. Obviously, this communication falls far short of a definitive interpretation of the SEC rules.

n8 Def.'s Mot. For Relief from J., Ex. C.

It is also unlikely that the SEC would ever undertake to stop an annual meeting of stockholders ordered [*11] by this court, because to do so would cut directly against [HN7] the policy of a strong stockholder franchise that underlies the SEC's rules on the distribution of proxy and information statements. A brief history of the proxy rules illustrates the point. For the first forty years after the enactment of the Securities Exchange Act of 1934, the contemporary equivalent of *Rule 14a-3* was the only provision that required companies to provide information to stockholders in connection with shareholder meetings. But just as today, *Rule 14a-3* only required the company to provide information when it was actively soliciting proxies. When a company did not solicit proxies in connection with a shareholder meeting, the company had no duty at all under federal law to send notice of the meeting to shareholders. This dichotomy between the company's duties when it chose to solicit proxies and when it did not inevitably gave companies keen to save themselves the expense or potentially embarrassing disclosures of a proxy statement a strong incentive to proceed without soliciting proxies. As early as 1939, in fact, observers began to notice the results of the perverse incentives created by the existence of [*12] what is now *Rule 14a-3.* As one academic commentator noted:

It is understood that from October 1, 1938 to April 1, 1939, approximately 70 corporations whose securities are listed on the New York Stock Exchange out of approximately 775 such corporations adopted the policy of not soliciting proxies from their stockholders in connection with annual meetings. Under the former proxy rules of the Commission it is understood that only 12 out of approximately 775 such corporations did not solicit proxies. n9

The effects that the circumvention of the proxy regulations had on shareholders and on corporate governance were significant. Presented with the possibility of governing the corporation without soliciting proxies, directors saw a method to govern without accountability. A study of the Glidden corporation in 1950 demonstrates the danger: by simply refusing to solicit proxies, the Glidden directors made sure that no quorum was present at their annual meeting. Unable to elect new directors, then, the company determined that "the directors and officers must hold over until their successors are elected and qualified," leaving the shareholders with almost no way to exercise their [*13] franchise. n10 As evident as the problem was to observers, however, the academic consensus in 1950 was that the Commission lacked the power to solve the problem with the tools at hand. n11

2005 Del. Ch. LEXIS 174, *

[HN8] In 1964, Congress responded to the SEC's lack of authority by enacting *Section 14(c)*, requiring substantially the same filings for meetings at which no proxies are be solicited as the SEC then required for solicitations. n12

n9 Arthur H. Dean, *Non-Compliance with Proxy Regulations*, 24 CORNELL L. Q. 483, 487 n.8 (1939).

n10 David C. Bayne, *Around and Beyond the SEC*, 26 IND. L.J. 207, 212 (1950).

n11 *Id.* at 211, *citing* Friedman, *SEC Regulation of Corporate Proxies*, 63 HARV. L. REV. 796, 819 (1950).

n12 Louis Loss & Joel Seligman, SECURITIES REGULATIONS, § 6-C-7 (1989).

[HN9] This history suggests that the purpose of *Section 14(c)* and the rules promulgated thereunder is to prevent registrants from avoiding their disclosure obligations by the [*14] simple expedient of declining to solicit proxies in connection with any meeting of stockholders. This is consistent with Congress's original purpose in including proxy regulation in the 1934 Act that "management of properties owned by the investing public should not be permitted to perpetuate themselves by the misuse of corporate proxies." n13 Nothing in either that statute or regulation suggests any purpose to interfere with the power of state courts to require that stockholder meetings be held in accordance with the requirements of state corporation law in situations where the registrant corporation is delinquent in its SEC filing obligations and, thus, is unable to comply with the literal terms of the SEC proxy rules. n14 Indeed, the fact that neither party in this case can point the court to authority that has raised the potential conflict between *Section 211* or similar provisions under other state corporation statutes and *Section 14(c)*, or the rules thereunder, in some 40 years of coexistence is strong evidence that the two provisions do not actually conflict. Rather, they both serve the same purpose of helping to safeguard the shareholders' foundational voting rights.

n13 Dean, *supra* note 6, at 485, *citing* H.R. REP. No. 1383 (1934).

[*15]

n14 Indeed, the SEC sometimes uses its discretion to issue orders exempting companies from the requirements of that section when the protec-

tion of public shareholders is not as keenly at stake as in cases of potential entrenchment. Loss & Seligman, *supra* note 9.

The basic compatibility between the state and federal laws is especially evident in this case. None of Vesta's shareholders have had the opportunity to vote their shares in 18 months, and Vesta cannot provide reliable guidance on when the audited financial statements required to prepare an annual report may become available. Few circumstances could be more consistent with the federal law's purpose of protecting the shareholders' franchise than this court's Order directing that Vesta's shareholders be allowed to vote and, if they choose, to replace one or more of the directors standing for reelection.

The court also notes that its Order is consistent with [HN10] the important policies underlying the internal affairs doctrine that the power of the state of incorporation to mandate stockholder meetings in appropriate circumstances not be [*16] lightly overturned. As the Delaware Supreme Court has recently explained, the internal affairs doctrine is the basic understanding that "only the law of the state of incorporation governs and determines issues relating to a corporation's internal affairs." n15 The doctrine is rooted not only in the decisions of the United States Supreme Court, n16 but also in the *Fourteenth Amendment's* implicit guarantee of the stockholders' right to "know to what standards of accountability they may hold those managing the corporation's business and affairs." n17 There are, of course, some circumstances in which a state's governance of internal corporate affairs is preempted by federal law, but those instances are rare, and occur only when the law of the state of incorporation is "inconsistent with a national policy on foreign or interstate commerce." n18

n15 *Vantagepoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005).

n16 *Examen, Inc. v. Vantagepoint Venture Partners 1996*, 873 A.2d 318 (Del. Ch., 2005), *citing CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89, 107 S. Ct. 1637, 95 L. Ed. 2d 67 (1987); *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S. Ct. 2629, 73 L. Ed. 2d 269 (1982).

[*17]

n17 *Vantagepoint*, 871 A.2d at 1113, *citing McDermott, Inc. v. Lewis*, 531 A.2d 206, 214 (Del. 1987).

n18 *Vantagepoint*, 871 A.2d at 1113.

The issue presented in this case, in its most simple form, is whether a shareholder meeting will happen on November 17, 2005, or will be indefinitely delayed. This determination is paradigmatically within the internal affairs doctrine as explained by the courts of this state and of the United States. n19 Any suggestion that there is an irreconcilable conflict between the mandate of this court's Order and Final Judgment and SEC statutes and regulations would both misconstrue the scheme of federal proxy regulation and weaken a basic premise of American corporate law that is a defining characteristic of our federal system. n20

n19 *McDermott*, 531 A.2d at 215 [HN11] ("The [internal affairs] doctrine governs the choice of law determinations involving matters *peculiar* to corporations, that is, those activities concerning the relationships *inter se* of the corporation, its directors, officers, and shareholders.").

[*18]

n20 Frederick Tung, *Origins of the Internal Affairs Doctrine* (2005) http://papers.ssrn.com/sol3/papers.cfm?abstract_id=686592 (tracing the history of the internal affairs doctrine, and attempting to explain why states uniformly maintained the doctrine even though it is facially a limitation on their own power over corporations doing business within their borders but which are domiciled elsewhere.).

For all the foregoing reasons, the court concludes that Vesta has shown no basis for relief under Court of Chancery Rule 60(b). The plaintiff has a clear right under Delaware law to convene an annual meeting. The fact that the reason Vesta delayed in calling its 2005 meeting was its inability to complete its 2004 financial statements does not diminish the right of Vesta stockholders to meet for the purpose of choosing directors.

### III.

For the foregoing reasons, the defendant's motion for relief under Court of Chancery Rules 60(b) and 62(b) is DENIED. IT IS SO ORDERED.

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE
THE BABCOCK & WILCOX COMPANY

DEBTOR(S)

NUMBER
00-10992
SECTION "B"

CHAPTER 11
REORGANIZATION

Jointly Administered with

DIAMOND POWER INTERNATIONAL, INC.
BABCOCK & WILCOX CONSTRUCTION CO., INC.
AMERICON, INC.

00-10993
00-10994
00-10995

SUMMARY DISCLOSURE STATEMENT AS OF NOVEMBER 10, 2005
UNDER SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO
THE JOINT PLAN OF REORGANIZATION AS OF SEPTEMBER 28, 2005,
AS AMENDED THROUGH NOVEMBER 10, 2005, PROPOSED BY THE DEBTORS,
THE ASBESTOS CLAIMANTS' COMMITTEE, THE FUTURE ASBESTOS-RELATED
CLAIMANTS' REPRESENTATIVE, AND MCDERMOTT INCORPORATED

DATED:         November 10, 2005
               New Orleans, Louisiana

KIRKLAND & ELLIS LLP
John Donley
Theodore L. Freedman
Deanna D. Boll
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

National Counsel for the Debtors
and Debtors in Possession

CAPLIN & DRYSDALE, CHTD.
Elihu Inselbuch
Peter Van N. Lockwood
Julie W. Davis
Nathan D. Finch
375 Park Avenue, 35th Floor
New York, NY 10022
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

National Counsel for the
Asbestos Claimants' Committee

HELLER, DRAPER, HAYDEN,
   PATRICK & HORN, L.L.C.
Jan M. Hayden
William H. Patrick, III
Warren Horn
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 568-1888
Facsimile: (504) 522-0949

Louisiana Counsel for the Debtors
and Debtors in Possession

YOUNG CONAWAY STARGATT
   & TAYLOR, LLP
James L. Patton, Jr.
Richard H. Morse
Edwin J. Harron
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel to the Legal Representative for
Future Asbestos-Related Claimants

BALDWIN & HASPEL, LLC
James P. Magee (#01203)
Dennis M. Laborde (#17979)
2200 Energy Center
1100 Poydras Street
New Orleans, LA 70163-2200
Telephone: (504) 585-7711
Facsimile: (504) 585-7751


Louisiana Counsel for the Asbestos
Claimants Committee

JENNER & BLOCK LLP
Daniel R. Murray
One IBM Plaza
Chicago, IL 60611-7603
Telephone: (312) 222-9350
Facsimile: (312) 527-0484


Counsel for McDermott Incorporated

SESSIONS, FISHMAN & NATHAN, LLP
J. David Forsyth (Bar No. 5719)
201 St. Charles Avenue
Suite 3500
New Orleans, LA 70170
Telephone: (504) 582-1521
Facsimile: (504) 582-1564


Counsel to the Legal Representative for
Future Asbestos-Related Claimants

ADAMS & REESE LLP
John M. Duck
4500 One Shell Square
New Orleans, LA 70139
Telephone: (504) 585-0226
Facsimile: (504) 566-0210


Louisiana Counsel for McDermott Incorporated

## TABLE OF CONTENTS

I. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS................................................1
    A.    Reliance on Information in the Disclosure Statement................................2
    B.    Voting Rules and Procedure..........................................................4
    C.    Confirmation Hearing. ...............................................................4

II. BRIEF HISTORY OF THE CHAPTER 11 CASES AND THE THIRD AMENDED PLAN ................6
    A.    Procedural History. .................................................................6
    B.    Third Amended Plan of Reorganization (Key Provisions). ............................7
    C.    B&W Financial Condition Since Filing the Third Amended Plan......................11

III. JOINT PLAN OF REORGANIZATION AS OF SEPTEMBER 28, 2005 (amended as of
NOVEMBER 10, 2005) ...................................................................11
    A.    Recent Settlement Negotiations – Impact of "Fair Act". ...........................11
    B.    Key Provisions of the Plan.........................................................12

        i.    *Changes Under the Plan Relating to Consideration
            Transferred to the Asbestos PI Trust*....................................13

        ii.    *Treatment of Claims Other Than Asbestos Personal Injury
            Claims*...................................................................14

        iii.    *Certain Conditions of the Plan*.........................................15

        iv.    *Apollo/Parks Township Claims.*.........................................16

        v.    *Pension Plans*...........................................................17

        vi.    *Rights of Action*.......................................................17

IV. SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMANTS................................18

V. VOTING PROCEDURES AND REQUIREMENTS ....................................................21

VI. CONFIRMATION OF THE PLAN..............................................................22
    A.    Confirmation Hearing ...............................................................22
    B.    Requirements for Confirmation of a Plan...........................................24
    C.    Cramdown...........................................................................29

VII. OCCURRENCE OF PLAN EFFECTIVE DATE....................................................29

VIII. CONCLUSION AND RECOMMENDATION.......................................................29

SUMMARY DISCLOSURE STATEMENT AS OF NOVEMBER 10, 2005

SUBMITTED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE

WITH RESPECT TO THE JOINT PLAN OF REORGANIZATION

AS OF SEPTEMBER 28, 2005 (AS AMENDED THROUGH NOVEMBER 10, 2005)
PROPOSED BY THE PLAN PROPONENTS

I.

NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

We – the Debtors, the Asbestos Claimants' Committee (the "ACC"), Eric Green in his capacity as the Future Asbestos-Related Claimants' Representative (the "FCR"), and McDermott Incorporated ("MI," and collectively with the Debtors, the ACC, and the FCR, the "Plan Proponents") – have filed the Joint Plan of Reorganization as of September 28, 2005 (as amended through November 10, 2005) (the "Plan," a copy of which is attached hereto as Exhibit "A") with the United States Bankruptcy Court for the Eastern District of Louisiana (the "Bankruptcy Court").[1]

In accordance with Section 1125 of the Bankruptcy Code, we submit this Summary Disclosure Statement (this "Disclosure Statement"), which contains a summary of the Plan, to creditors of the Debtors in connection with the solicitation of acceptances of the Plan. Section 1125(b) of the Bankruptcy Code prohibits solicitation of an acceptance or rejection of a plan of reorganization unless a copy of such plan of reorganization or a summary thereof is accompanied or preceded by a copy of a disclosure statement approved by the applicable Bankruptcy Court.

On November 10, 2005, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable hypothetical, reasonable investors typical of the creditors, whose votes are being solicited, to make an informed judgment as to whether to accept or reject the Plan. HOWEVER, APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE (1) A DETERMINATION OF THE COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN, (2) AN ENDORSEMENT BY THE COURT OF THE PLAN, OR (3) A GUARANTEE OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

---

[1] Unless otherwise defined herein or otherwise indicated, all capitalized terms contained in this Disclosure Statement will have the meanings assigned to such terms in the Plan.

The Fairness in Asbestos Injury Resolution Act of 2005 (the "FAIR Act") was introduced in the U.S. Senate on April 19, 2005 as Senate Bill S. 852. It was reported favorably out of the Senate Judiciary Committee on June 16, 2005 and awaits consideration by the Senate. In addition, a similar bill was introduced as a bill in March 2005 in the U.S. House of Representatives as H.R. 1360.

In its current form, the FAIR Act would create a privately funded, federally administered trust fund to resolve pending and future asbestos-related personal injury claims. Under the terms of the FAIR Act, companies – such as B&W – that have made expenditures in connection with asbestos personal injury claims, as well as insurance companies, would contribute amounts to a national trust on a periodic basis to fund payment of claims filed by asbestos personal injury claimants who qualify for payment based on a specified allocation methodology. The draft legislation also contemplates, among other things, that the national fund would terminate if, after the administrator of the fund begins to process claims, the administrator determines that, if any additional claims are resolved, the fund would not have sufficient resources when needed to pay 100% of all resolved claims, the fund's debt repayment and other obligations. In that event, the fund would pay all then resolved claims in full, and the legislation would generally become inapplicable to all unresolved claims and all future claims. As a result, absent further federal legislation, with regard to the unresolved claims and future claims, the claimants and defendants would return to the tort system. There are many other provisions in the FAIR Act that would impact B&W and the other Debtors, the Chapter 11 proceedings and the Debtors' parent companies.

It is not possible to determine whether the FAIR Act will be presented for a vote or adopted by the full Senate or the House of Representatives, or signed into law. Nor is it possible at this time to predict the final terms of any bill that might become law or its impact on B&W, the other Debtors, the Chapter 11 proceedings, or the Debtors' parent companies. This uncertainty regarding the FAIR Act or federal legislation similar to the FAIR Act for the resolution of asbestos personal injury claims brought us back to the negotiation table to seek an alternative way to resolve the Chapter 11 proceedings in a manner that achieves a more certain resolution than the settlement under the Third Amended Plan which is currently the subject of appeals.

**B.     Key Provisions of the Plan.**

Our Plan seeks to provide for payment of the claims held by the Debtors' creditors. We believe that the impaired creditors under the Plan receive either similar or better treatment under the Plan than under the Third Amended Plan. Most features of the Plan work precisely the same way as under the Third Amended Plan,

12

except to the extent described below and in the Plan and Plan Documents (which may be viewed at www.babcock.com/pgg/pr/reorganization.html.

   *i.*     *Changes Under the Plan Relating to Consideration Transferred to the Asbestos PI Trust.*

The Plan and Plan Documents include the following key provisions relating to the consideration being transferred to the Asbestos PI Trust if the Effective Date timely occurs:

- MII, through BWICO, will retain full ownership of B&W and its subsidiaries following the Effective Date of the Plan, instead of transferring B&W and its subsidiaries to the Asbestos PI Trust.

- On the Effective Date, MII and its affiliates will pay or cause B&W to pay the Asbestos PI Trust $350 million cash.

- On the Effective Date, MII and its affiliates will assign to the Asbestos PI Trust all insurance rights that were to be assigned to the Asbestos PI Trust under the Third Amended Plan. The Plan Proponents have already liquidated certain of the insurance rights valued at approximately $890 million subject to the satisfaction of certain conditions. We continue to pursue negotiations to liquidate the remaining insurance rights. There can be no assurance of the success of those negotiations.

- On the Effective Date, B&W will issue a promissory note in the principal amount of $250 million to the Asbestos PI Trust, and MII will provide a contingent payment right in the amount of $355 million to the Asbestos PI Trust, both of which will be subject to the condition precedent that the FAIR Act has not been enacted and made law on or before November 30, 2006 (the "Trigger Date").

     If the FAIR Act is not made law on or before the Trigger Date, MII will be required to satisfy the contingent payment right and the promissory note will be payable in full.

     If the FAIR Act has been enacted and made law on or prior to the Trigger Date, and is not subject to a constitutional challenge to its validity by January 31, 2007, the contingent payment right will not vest and will be fully canceled, and the amount payable pursuant to the $250 million note will be limited to $25 million due to the condition precedent not having been satisfied.

     If, as of the Trigger Date, the FAIR Act has been enacted and made law but is subject to a constitutional challenge, payments under the promissory note (except for the $25 million payment due on December 1, 2007) and the contingent payment right will be suspended until the constitutional challenge to the legislation is resolved by a final, non-appealable judgment.

     If the FAIR Act is found to be constitutional, then the contingent payment right will not vest and will be fully canceled, and the amount payable pursuant to the $250 million note will be limited to the $25 million payment due on December 1, 2007.

     If the FAIR Act is found to be unconstitutional, then MII will be required to satisfy the contingent payment right and the promissory note will be payable in full.

- The $250 million promissory note will be guaranteed by MII and BWICO, and these guarantee obligations will be secured by 100% of B&W's outstanding Capital Stock. If the condition

13

precedent is met, the promissory note will bear annual interest at the rate of 7% from the Trigger Date, with a five-year term and level annual principal payments commencing December 1, 2007.

- The $355 million contingent payment right, subject to the condition precedent, will be payable within 180 days after the Trigger Date, with accrued interest at 7% per annum from the Trigger Date until the payment is funded.

In exchange for the payments and assignments described above, the Plan contemplates that B&W will be indemnified by the Asbestos PI Trust from any and all Asbestos PI Trust Claims, with such claims being channeled to the Asbestos PI Trust as under the Third Amended Plan. The protections afforded to Non-Debtor Affiliates and the other Asbestos Protected Parties under the Third Amended Plan remain substantially the same under the Plan. In essence, the renegotiation of the consideration being provided to the Asbestos PI Trust was designed to bring about resolution of the Chapter 11 proceeding more quickly and with more certainty than the Third Amended Plan, which is now the subject of a number of appeals and 9033 Objections.

ii.    Treatment of Claims Other Than Asbestos Personal Injury Claims.

The Plan proposes to pay Allowed (1) Administrative Expense Claims, (2) Tax Claims, (3) Priority Claims, (4) Unsecured Trade Claims, (5) Non-Priority Secured Claims, and (6) Workers' Compensation Claims in full as was contemplated under the Third Amended Plan. Accordingly, pursuant to the Voting Procedures Order we will not solicit the votes of holders of such claims.

In addition, the Plan proposes to pay Allowed General Unsecured Claims (Class 5 Claims) (which we believe accepted the Third Amended Plan in view of the changed votes in that class) in the same manner as was contemplated under the Third Amended Plan. Accordingly, if Class 5 votes to accept the Plan, each holder of an Allowed Claim in Class 5 will be paid a Pro Rata Share of the General Unsecured Share Payment, a Pro Rata Share of additional cash in the amount of $250,000, and applicable liability insurance for such claims. In the event Class 5 does not vote to accept the Plan, each holder of an Allowed Class 5 Claim will be paid a Pro Rata Share of the General Unsecured Share Payment and any applicable liability insurance for such claims. The Bankruptcy Court has made a finding in connection with the Third Amended Plan estimating the General Unsecured Claims at no more than $1 million.[15]

The Plan proposes to pay Allowed Asbestos PD Claims (Class 7 Claims) in the same manner as was contemplated under the Third Amended Plan, which was dependent upon whether Class 7 voted to accept the

---

[15]    Amended Findings and Conclusions at page 19.

14

## CERTIFICATE OF SERVICE

I, Christina M. Thompson, hereby certify that on this 20th day of December, 2005, I caused a true and correct copy of the **Motion of** *Ad Hoc* **Committee of Preferred and Equity Security Holders for Entry of an Order (I) Confirming that Owens Corning Shareholders are Entitled to Prosecute an Action in Delaware Chancery Court to Compel a Shareholders' Meeting, or (II) in the Alternative, Granting Stay Relief to Prosecute Such an Action** to be served upon the parties identified on the attached service list by first class mail, postage pre-paid.


Christina M. Thompson (No. 3976)

#435346-1

## File a Motion:
## 00-03837-JKF OWENS CORNING, A DELAWARE CORPORATION

**U.S. Bankruptcy Court**

**District of Delaware**

Notice of Electronic Filing

The following transaction was received from Thompson, Christina Maycen entered on 12/20/2005 at 3:06 PM EST and filed on 12/20/2005

**Case Name:**       OWENS CORNING, A DELAWARE CORPORATION
**Case Number:**    00-03837-JKF
**Document Number:** 16496

**Docket Text:**
Motion to Approve *Motion of the Ad Hoc Committee of Preferred and Equity Security Holders for an Entry of an Order (I) Confirming that Owens Corning Shareholders are Entitled to Prosecute an Action in Delaware Chancery Court to Compel a Shareholders' Meeting, or (II) in the Alternative, Granting Stay Relief to Prosecute Such an Action* Filed by Ad Hoc Committee of Equity Security Holders Hearing scheduled for 1/30/2006 at 10:00 AM at US Bankruptcy Court, 824 Market St., Wilmington, DE. Objections due by 1/13/2006.. (Attachments: # (1) Notice # (2) Proposed Form of Order # (3) Exhibit A-E# (4) Exhibit F-G# (5) Certificate of Service # (6) Service List) (Thompson, Christina)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**K:\Bankruptcy\CTHOMPSON\1388801 Final Shareholders Motion.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=12/20/2005] [FileNumber=4469431-0
] [31ec1f3bcaf3a4ba43208c9b094e544595c179953bde67b98770e02428e4c5bccb6
9648f4ba30497aca1198bb68391edb9f02b42291fac1880372305b2d27077]]
**Document description:**Notice
**Original filename:**K:\Bankruptcy\CTHOMPSON\1388801 Notice of Motion for Final Shareholders Motion.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=12/20/2005] [FileNumber=4469431-1
] [3eba422afe54331693c1b8e9add03d69c77871319564fc6fb705b2f05d1baa43c31
4ff826f99e957fc209e822a572d235ca4c15d00183b80b8e6a91016d5374b]]
**Document description:**Proposed Form of Order
**Original filename:**K:\Bankruptcy\CTHOMPSON\1388801 Order for Final Shareholders Motion.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=12/20/2005] [FileNumber=4469431-2
] [7f0e37d133e399d9667e36b6e5bdb24ac274a5f4aac8d0f95db8a1e9ca0dafcd2c6
a24cfe94ed1d523bf1a1ed4093675da439914dbb529d3e4b7989ba9adb7ef]]
**Document description:**Exhibit A-E
**Original filename:**K:\Bankruptcy\CTHOMPSON\1388801 Exhibits A-E to Final Shareholders Motion.pdf
**Electronic document Stamp:**

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                .    Chapter 11
                                      .
OWENS CORNING, *et al.*,                   .    Case Nos.00-
03837(JKF)
                                      .    Jointly Administered
          Debtors.                    .
                                      .    Jan. 30, 2006 (10:43 a.m.)
                                      .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

work to try to get involved in the process.  We sent correspondence to the debtors' management and board, and they shut the door on us.  We've been trying to work to be involved in a collaborative process to get to a consensual plan, and we've just not been included in the process.  And, our motivation is not, Your Honor, to take away the debtors' exclusivity rights or to otherwise highjack the plan of reorganization.

        THE COURT: Okay.

        MR. LOCKWOOD: Thank you, Your Honor.

        THE COURT: It seems to me that what I should do with this motion is simply hold it until such time as we know whether the FAIR Act does or doesn't pass because it seems to me that if in fact the FAIR Act passes then at that point in time the debtor's probably going to have to go back to the drawing boards and do something anyway, and to the extent that the FAIR Act doesn't pass, whether equity wants to import a new board, wants the debtor to include FAIR Act provisions in its plan, and so forth is totally irrelevant. The debtor doesn't have to do it, and there is no legislation out there that's going to give these equity constituents any funds.  So, Mr. Pernick, I want this continued from month to month until I know what's going to happen with respect to the FAIR Act.  With respect to whether the automatic stay

applies, I believe it does apply, but because I'm going to continue this motion until I find out what the resolution with respect to the FAIR Act is, I don't think I need to address it at this point in time, but it seems to me that the automatic stay clearly prohibits entities from attempting to take control of the debtor or the debtor's property. That seems to be exactly what putting in a new board of directors would do. I do think this is within the core jurisdiction of the Court to determine especially with respect to the issue of whether the stay applies or doesn't apply. And I should point out that in a case several years ago, but the circumstances were much different, where an involuntary action was commenced against the debtor and the board essentially refused to meet. I ordered the trustee in that case to get a board together because the trustee had no entity that it was attempting to do with, and there were entities who were willing to sit on the board in the case, and I did that not based on state law but based on the fact that under 157 I do have core jurisdiction to control the administration of the estate, and in my view, it was necessary to do it. In my view here, right now, it's exactly the opposite. I see no basis for this now, but I'm not convinced that there won't be a basis if the FAIR Act passes.

So, Mr. Pernick, continue it from month to month until we

see what the outcome with respect to the FAIR Act is.

MR. RAHL: Your Honor, on a point of - I think a
very important point that Mr. Graulich made in the context of
the motion for an equity committee, I did not want to
interrupt that process, but I must respond. Mr. Graulich
made reference to the fact that apparently Credit Suisse is
in some way circulating a consent among members of the Bank
Group to, I gather, withdraw and dismiss prior to
confirmation their appeal of the asbestos estimation. Your
Honor, if you may recall the history of how Credit Suisse got
itself in that situation was that they were taking over, in
effect, the appeal by the Official Creditors Committee on
behalf of all the financial - the entire financial creditor
constituency, and you made it very clear at the time that
only - there could only be one counsel prosecuting that. It
had been our understanding, both from the filing that was
made and separate private communication we had with counsel
for Credit Suisse, that they would continue to pursue that
appeal unless and until there was a confirmation. And
obviously, if there's a confirmation, we have a very
different situation at hand. If the Bank Group is going to
seek to withdraw their appeal before this plan is confirmed,
Your Honor, I think that - and we'll have to work out in

motion to substitute counsel.  The Circuit's going to decide whether you can withdraw an appeal, not me.  Take it there. I have enough problems to deal with.

MR. GRAULICH: Okay.  Again, if there's any suggestion, I apologize.  It would be withdrawn as of the effective date.

THE COURT: All right.

MR. GRAULICH: So I think that takes care of Mr. Rahl's concerns.

THE COURT: Okay.

MR. PERNICK: Your Honor, the next item on the agenda is -

THE COURT: Mr. Pernick -

MR. PERNICK: I'm sorry.

THE COURT: - I want to add one comment, please, with respect to § 362.  The property of the debtor and how the debtor distributes property is a property right of the estate.  The debtor's fiduciary obligations with respect to its creditors and how it is going to treat those creditors is something that the automatic stay is intended to enhance and to protect.  Therefore, an effort to attempt to take control of a board so that the board's going to require the debtor to do something other than what the estate as an estate as opposed to its shareholder constituency feels is proper, is

an act to control the property of the estate and the debtor itself, and it is definitely covered by 362 in that sense. So, in any event, it doesn't change my order to continue it, but that's my view. Yes, what's next?

MR. PERNICK: Thank you, Your Honor. The next item is item number 24 which is the status conference that the Court required regarding the Official Committee of Unsecured Creditors' professionals. I'm not sure who's going to speak to that, but I just thought I'd introduce it.

MR. GRAULICH: Your Honor, as reflected in the agenda, the creditor constituencies have filed a report and three supplements. I'm prepared to give an oral update for the benefit of Your Honor as to what at least from the agent's prospective professionals have been doing since the last written update.

THE COURT: Well, yes, because it seems that there is, once again, and at loggerheads, and I'm really confused. I seem to have Credit Suisse off on one tangent and the rest of the Committee on another, and I am really not at all clear as to why I am paying two or three sets of counsel to try to get your act together and get on board doing the same thing, and it's not happening. I really - I'm not getting it.

MR. GRAULICH: Well, the Court and the estate is not paying multiple bank counsel.

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    .     Chapter 11
                                          .
OWENS CORNING *et al.*,                   .     Case No. 00-03837(JKF)
                                          .     Jointly Administered
                                          .
        Debtors.                          .     February 21, 2006
                                          .     10:00 a.m.
                                          .     (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

1          MR. ELSTAD: Your Honor may I - -

2          THE COURT: Yes, sir.

3          MR. ELSTAD: - - speak on this point?

4          THE COURT: On the issue of item 9?

5          MR. ELSTAD: Yes.

6          THE COURT: Yes.

7          MR. PERNICK: That's fine.

8          THE COURT: Please.

9          MR. ELSTAD: Good morning, Your Honor.  John Elstad

10   from Brown Rudnick on behalf of the Ad Hoc Committee of

11   Preferred and Equity Security Holders.  Just very briefly,

12   Your Honor, we don't believe that the FAIR Act is dead.

13   Certainly what happened in the senate last week was a set

14   back.  But we understand that if Senator Inouye of Hawaii had

15   been there, it would have passed.  He was away because his

16   wife was ill.  Senator Frist reversed his vote to preserve

17   his right to bring the act back to the floor.  We believe it

18   will return to the floor with the necessary votes in March.

19   But there is another point I, if I may, I'd like to raise.

20   As Mr. Pernick mentioned, you ordered - - you directed the

21   Debtors to continue our motion from hearing to hearing until

22   the prospects for the FAIR Act are more clear.  Your Honor,

23   we respectfully request that you do decide our motion.  Our

24   motion was a motion for relief from stay.  It involved the

25   scope of the automatic stay.  We sought confirmation that the

1    stay didn't apply to shareholder efforts to compel a

2    shareholder meeting, or alternatively relief to proceed.  And

3    as argued at the January 30th hearing, and in our motion, we

4    believe that there's important precedents in other circuit

5    courts of appeal.

6          THE COURT: But it's irrelevant under these

7    circumstances if the FAIR Act doesn't apply.  Because

8    essentially, I will be giving an advisory opinion because

9    there is no money for equity in this case unless the FAIR Act

10   applies.  And the arguments at the hearing in January, I

11   think, at least from the Debtors' point of view, make that

12   clear.  So there's no point.  I would be doing nothing other

13   than giving an advisory opinion under the facts of these

14   cases, because at the moment, it doesn't appear that the

15   Debtor is going to be able to propose a plan that will

16   provide for a distribution to equity.  So what's the point?

17         MR. ELSTAD: Well, Your Honor, one thing that the

18   shareholders seek is a contingency on behalf of the - - on

19   account of the FAIR Act.

20         THE COURT: But you don't have a right to that.  I

21   mean you have the right to negotiate for that, but you don't

22   have a right to demand it.

23         MR. ELSTAD: Your Honor, shareholders exercising

24   their governance rights could seek exactly that through

25   replacing the board.  It's a realistic - -

As Mr. Pernick mentioned, you ordered - - you directed the
Debtors to continue our motion from hearing to hearing until
the prospects for the FAIR Act are more clear.  Your Honor,
we respectfully request that you do decide our motion.  Our
motion was a motion for relief from stay.  It involved the
scope of the automatic stay.  We sought confirmation that the
stay didn't apply to shareholder efforts to compel a
shareholder meeting, or alternatively relief to proceed.  And
as argued at the January 30th hearing, and in our motion, we
believe that there's important precedents in other circuit
courts of appeal.

THE COURT: But it's irrelevant under these
circumstances if the FAIR Act doesn't apply.  Because
essentially, I will be giving an advisory opinion because
there is no money for equity in this case unless the FAIR Act
applies.  And the arguments at the hearing in January, I
think, at least from the Debtors' point of view, make that
clear.  So there's no point.  I would be doing nothing other
than giving an advisory opinion under the facts of these
cases, because at the moment, it doesn't appear that the
Debtor is going to be able to propose a plan that will
provide for a distribution to equity.  So what's the point?

MR. ELSTAD: Well, Your Honor, one thing that the
shareholders seek is a contingency on behalf of the - - on

account of the FAIR Act.

THE COURT: But you don't have a right to that.  I
mean you have the right to negotiate for that, but you don't
have a right to demand it.

MR. ELSTAD: Your Honor, shareholders exercising
their governance rights could seek exactly that through
replacing the board.  It's a realistic - -

THE COURT: There is no way that at this point in
time, in this case, that this Court is going to not, not go
along with the Chancery Courts in the State of Delaware, and
indicate that this is not the right time to take a look at
replacing the board because of this.  If the board were
replaced, and did try to force a plan that provided a
distribution to equity when there is no money for equity,
that plan would be unconfirmable.  And I would immediately be
in the position of putting a trustee in place, because that
plan and the governance, the people who would be governing
would not be honoring their fiduciary duties to the rest of
the estate.  I would be doing nothing more than giving an
advisory opinion.  I am going to continue this matter until
the March hearing, which is March 27th.  If the FAIR Act does
get back to the floor, hopefully you'll know it by that date.
If not, I'll continue it again to April, because maybe since
they're saying in March, and there are 4 days left in March,

maybe it won't happen until the 31st. So I'm going to

continue this until March 27th, and possibly again until

April. And if, in fact, at that point in time, it doesn't

look like the FAIR Act is going anywhere, at that point I'll

probably decide this issue. But I don't see a basis for it

now. It would be advisory. So I'll continue it for that

cause, for those reasons, until those dates.

MR. ELSTAD: Thank you, Your Honor.

MR. PERNICK: And Your Honor just for the record, in

case I misspoke, I wasn't saying from the Debtors' standpoint

it's dead. I just was reporting on the prospects and where

it stood. I think we all agree that nobody in Washington is

saying it is absolutely dead and it's never going to come

back up. And I think the Court's correct to wait and see

what happens for the next month and see what people do down

there. The one thing I've learned, with all due respect to

everybody here including the Court, nobody's real good at

predicting what's going to happen down there, and I think we

just need to wait and see.

THE COURT: All right. It's continued until March.


MR. PERNICK: That leaves us with 2 other items,

just -- and then there's one more that's not going forward,

just so we have the record straight. And then we'll circle

# UNREPORTED OPINIONS

Not Reported in F.Supp.                                                            Page 1
Not Reported in F.Supp., 1997 WL 700511 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

# H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Albert T. ALADJEM, Jr., Petitioner
v.
Andrew CUOMO, Secretary, U.S. Department of
Housing and Urban Development [FN1]

> FN1. Pursuant to Federal Rule of Civil
> Procedure 25(d)(1), Andrew Cuomo is
> substituted for his predecessor, Henry
> Cisneros.

andKaren A. MILLER, Secretary's Representative,
Respondents.
**No. CIV. A. 96-6576.**

Oct. 30, 1997.

David G. Concannon, Kohn, Swift & Graf, P.C.,
Phila, PA, for Albert T. Aladjem, Jr., Petitioner.
Lois W. Davis, Nancy Griffin, Assistant U.S.
Attorney, Phila, PA, Nancy Griffin, for Henry G.
Cisneros, Secretary of the United States Department
of Housing and Urban Development, Karen A.
Miller, Secretary's Representative and Senior Equal
Employment        Opportunity        Representative,
Philadelphia Regional Office, the United States
Department of Housing and Urban Development,
Respondent.

### MEMORANDUM

POLLAK, J.
\*1 Petitioner Aladjem charges his employer, the
Department of Housing and Urban Development,
with failing to perform its legally mandated duties to
investigate fully his discrimination claims and to
grant him hearings on these claims. Aladjem's
underlying grievances are that HUD practiced
national origin, sex, and age discrimination against
him in violation of Title VII and the ADEA. He
alleges that despite five years of requests for
investigation and hearings with the appropriate Equal
Employment Opportunity officials, neither adequate
investigation nor the appointment of an
administrative law judge, as required by law, has
occurred. Aladjem has invoked the extraordinary
remedy of mandamus as well as the Administrative

Procedure Act, 5 U.S.C. § 702.

Currently before the court is HUD's motion to
dismiss for want of subject matter jurisdiction. HUD
argues that Aladjem has failed to meet the
prerequisites for mandamus relief, and that the court
is therefore without power to entertain Aladjem's suit.
Specifically, HUD maintains that the actions Aladjem
seeks to compel are discretionary rather than
ministerial and that the petitioner has an adequate
alternative remedy. HUD also argues that Aladjem
is not entitled to relief under the APA because the
inaction of which Aladjem complains is not final
action subject to judicial review according to 5
U.S.C. § 706(1), and that no relief is available under
the APA because an adequate alternative remedy is
available.

### I. Mandamus Relief (or Relief in the Nature of Mandamus):

As a preliminary matter, it must be noted that Rule
81(b) of the Federal Rules of Civil Procedure
abolished the writ of mandamus in the district courts,
but provided that the "relief heretofore available" by
means of the writ can still be obtained by motion or
complaint provided that the court otherwise has
jurisdiction in the matter. 28 U.S.C. § 1361;
Sanchez-Espinoza v. Reagan, 770 F.2d 202, 207 n. 7
(D.C.Cir.1985); 12 Charles A. Wright et al., Federal
Practice and Procedure § 3134 (1997). Despite the
writ's abolition, however, it is of little moment that
Aladjem has styled his pleading as a petition for writ
of mandamus rather than a complaint requesting
mandamus-style relief, as the court is free to interpret
this petition as a complaint requesting a mandatory
injunction. See Stehny v. Perry, 907 F.Supp. 806
(D.N.J.1995).

Requests for relief in the nature of mandamus are
governed by the same principles that formerly
governed mandamus petitions: (1) the duty to be
compelled must be ministerial and not discretionary,
(2) the plaintiff must have a clear right to the
performance of the duty, and (3) the plaintiff must
have no adequate alternative remedy. Holmes v.
United States Bd. of Parole, 541 F.2d 1243 (7th
Cir.1976). In this case, it is not necessary to address
the first and second requirements, as an examination
of Aladjem's pleadings, taking all factual recitals as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 2
Not Reported in F.Supp., 1997 WL 700511 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

true, reveals that Aladjem has an alternative remedy, namely, suit in the district court.

*2 Both Title VII, which governs Aladjem's sex and national-origin discrimination claims, and the ADEA, which governs his age discrimination claims, allow an aggrieved federal employee to sue directly in federal court after 180 days have elapsed without a final decision. *See* 42 U.S.C. § 2000e-16(c); 29 U.S.C. § 633a(c); 29 C.F.R. § 1614.408. Therefore, his entitlement to press his claims in federal court constitutes an adequate alternative remedy to a remedy in the nature of mandamus. *See Adams v. EEOC,* 932 F.Supp. 660 (E.D.Pa.1996)(Plaintiff not entitled to § 1361 relief compelling agency to remand Title VII claims to EEOC because private action available.); *Feldstein v. EEOC,* 547 F.Supp. 97, 100 (D.Mass.1982)(Mandamus relief will not issue to compel EEOC to investigate Title VII claims because employee can vindicate rights directly in court.).

Aladjem, however, urges that this logic places him in a "Catch-22" position, to wit: In the present action, the agency argues that Aladjem can sue on the merits rather than compel agency action, but if he sues directly, the agency will claim that he has failed to exhaust his remedies. If this notional agency claim were enough to foreclose suit, this argument might impugn the adequacy of the alternative remedy. When carefully examined, however, it is apparent that Aladjem's situation is not the kind of insuperable double bind that Joseph Heller had in mind.

It is true that, as a general matter, administrative remedies must be exhausted before filing suit. *See, e.g.,* *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); *Glisson v. United States Forest Service,* 55 F.3d 1325, 1326 (7th Cir.1995). Additionally, it has been held that, unlike Title VII, the ADEA did not allow a complainant who had invoked the administrative process to sue without exhausting the administrative process that he initiated, despite the lapse of 180 days after the filing of a complaint. *Purtill v. Harris,* 658 F.2d 134 (3d Cir.1981). If this issue arises, however, neither the exhaustion requirement nor the *Purtill* decision, however, dooms petitioner's access to court to such an extent that this alternative remedy must be deemed inadequate. This is so for two reasons.

First, the *Purtill* decision came before the 1992 revision of the statute's implementing regulations, which currently treat ADEA claims the same as Title VII claims with regard to the alternative of opting out

of the administrative process after 180 days. *See* 57 Fed.Reg. 12634 (April 10, 1992). The regulation now reads in relevant part:
A complainant who has filed an initial complaint ... is authorized under Title VII, the ADEA, and the Rehabilitation Act to file a civil action in an appropriate United States District Court:
...
(b) After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and a final decision has not been issued ....

29 C.F.R. § 1614.408. In holding that exhaustion was required under the regime prevailing prior to this 1992 revision, the *Purtill* court had reasoned that there was nothing in the relevant section of the ADEA that was comparable to the Title VII provision allowing suit after 180 days, and that nothing in the legislative history explained the difference. 658 F.2d at 138. Given the administrative clarification of the statute, the exhaustion requirement would presumably no longer apply to Aladjem and therefore not vitiate his alternative remedy.

*3 Second, even if an exhaustion doctrine were to apply, it would hardly bar an adequate remedy, especially given the facts Aladjem has alleged. Aladjem's petition, the factual allegations of which are accepted as true for the purposes of this motion, states that, for what is now more than five years, he has been unable to secure a hearing for his claims. On the one hand, exhaustion may not be required since the facts recited in the petition tend to support any of the grounds for excusing exhaustion, including either (1) good-faith effort to exhaust coupled with unreasonable delay on the part of the agency (*see, e.g.,* *McCarthy v. Madigan,* 503 U.S. 140, 147, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); *Gibson v. Berryhill,* 411 U.S. 564, 575 n. 14, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Allen v. Butz,* 390 F.Supp. 836 (E.D.Pa.1975)), or (2) the futility of exhausting remedies (*see, e.g.,*; *Bowen v. City of New York,* 476 U.S. 467, 485, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1968)). On the other hand, if exhaustion is not excused, it is *ipso facto* a requirement that Aladjem pursue a non-futile avenue of recourse, and thus the administrative process (followed, if necessary, by suit in federal court) provides an adequate alternative remedy.

In sum, the fact that HUD may proffer an exhaustion defense in no way renders Aladjem's option of suit in district court an inadequate alternative. Consequently, HUD's motion to dismiss the claim for mandamus relief will be granted without prejudice.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1997 WL 700511 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

II. Review Under the Administrative Procedure Act

As noted above, Aladjem's petition also invokes judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq. Although the petition conflates mandamus relief and judicial review under the APA, the court will, to give petitioner the benefit of a liberal construction of his pleading, analyze the two issues separately as distinct claims for relief. See Davis Assocs., Inc. v. Secretary, Dept. of Housing and Urban Development, 498 F.2d 385 (1st Cir.1974)(doing same).

HUD argues that the petition should be dismissed because there is no final action to review and because Aladjem has an alternative remedy. Aladjem counters that the protracted delay allegedly perpetrated by HUD constitutes final action subject to judicial review. Although it is true that an agency's prolonged delay can sometimes amount to reviewable final action (see, e.g., General Motors Corp. v. NTSB, 898 F.2d 165 (D.C.Cir.1990); Thompson v. United States Dep't of Labor, 813 F.2d 48 (3d Cir.1987)), finality is not the only jurisdictional prerequisite for review. APA § 704 also requires that there be "no other adequate remedy in a court." as well. FN2 As the discussion in Part I above above has shown, Aladjem has an adequate remedy-a trial de novo in federal court-and accordingly cannot invoke judicial review. See Ward v. EEOC, 719 F.2d 311, 313 (9th Cir.1983)(APA does not authorize suit against EEOC for negligence in processing claims, as alternative remedy available); Feldstein v. EEOC, 547 F.Supp. 97, 99-100 (D.Mass.1982)(APA does not authorize action against the EEOC to compel investigation of discrimination claims).

> FN2. Aladjem also points to APA § 706, which states that a reviewing court is empowered to "compel agency action unlawfully withheld or unreasonably delayed," as a grant of power to the court to enjoin the agency. This section, however, is not a self-executing grant of jurisdiction. Rather, it is a statement of the scope of review, and thus presupposes that judicial review is available. So it is only in § 704-entitled "Actions reviewable"-that we must look to see if the court may review the agency's action.

*4 Thompson v. United States Dep't of Labor, 813

F.2d 48 (3d Cir.1987), upon which petitioner places much weight, is not to the contrary. Thompson was a Rehabilitation Act case in which the Third Circuit reversed a trial court's determination that the APA gave it no authority to compel agency action that had been delayed. Id. at 52. Significantly, the statute under which the complainant in Thompson sought review was § 503 of the Rehabilitation Act, which section, in contrast to Title VII, the ADEA and other sections of the Rehabilitation Act, does not provide a private right of action. See Beam v. Sun Shipping and Dry Dock, 679 F.2d 1077 (3d Cir.1982). Therefore, unlike the instant case, the court was not confronted with a situation in which the complainant had an alternative remedy in court.

Furthermore, the Thompson court held that the APA authorizes suit to compel agency action unlawfully withheld or unreasonably delayed "at least where judicial review of an agency's final action would be in the district court in the first instance." 813 F.2d at 52. Aladjem reasons that because the district courts can entertain Title VII and ADEA claims, the instant case is one in which judicial review would be in the district courts. This analysis confuses judicial review with the private right of action granted by Title VII and the ADEA. Neither Title VII nor the ADEA permits judicial review of agency actions on discrimination complaints; the statutes do, however, entitle the aggrieved party to try his or her claims de novo, an altogether different undertaking. See 42 U.S.C.2000e-5(f); Stewart v. EEOC, 611 F.2d 679, 682 (7th Cir.1979).

Consequently, the APA does not afford petitioner review of the agency's action, and HUD's motion to dismiss Aladjem's claim under the APA, as well as his petition for mandamus relief, will be granted without prejudice. The court will grant Aladjem leave to amend his initial pleading to state a complaint on the merits of his discrimination claims.

An appropriate order follows.

### ORDER

Upon consideration of respondent Cuomo's motion to dismiss for lack of subject-matter jurisdiction, and petitioner's response thereto, it is hereby ORDERED that respondent's motion to dismiss is GRANTED without prejudice. It is further ORDERED that petitioner has leave to file an amended complaint with the court within 30 days of the entry of this order.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 700511 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

E.D.Pa.,1997.
Aladjem v. Cuomo
Not Reported in F.Supp., 1997 WL 700511 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:96cv06576 (Docket) (Sep. 27, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in B.R.                                                    Page 1
Not Reported in B.R., 1999 WL 409389 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

▷

Only the Westlaw citation is currently available.
United States Bankruptcy Court, E.D. Pennsylvania.
In re Joseph A. LASHINGER, Jr., Debtor.
**No. 97-15113DWS.**

June 15, 1999.

Douglas J. Smillie, Fitzpatrick Lentz & Bubba, P.C.,
Center Valley, PA, for Debtor.
James J. Oliver, Murphy, Oliver, Caiola & Gowen,
Norristown, PA, for Maria Lashinger.
Andrew Schwartz, Philadelphia, PA, for Chapter 7
Trustee.
Dave P. Adams, Office of the U.S. Trustee,
Philadelphia, PA, for United States Trustee.

*MEMORANDUM OPINION*

SIGMUND, Bankruptcy J.
**\*1** Before the Court is Maria D. Lashinger's
("Movant") Motion for an Extension of Time for
Taking Appeal (the "Motion") of this Court's Order
dated May 6, 1999 [FN1] and entered on the Court's
docket on May 10, 1999 (the "Order"). [FN2] No
hearing having been requested [FN3] and finding none
to be necessary, I will decide the Motion on the
papers presented and applicable law.

> FN1. The Order discharged the obligation of
> Joseph Lashinger to hold Maria Lashinger
> harmless in connection with a judgment in
> favor of Frank Serafini.

> FN2. I take judicial notice of the docket
> entries in this case. Fed.R.Evid. 201,
> incorporated in these proceedings by
> Fed.R.Bankr.P. 9017. *See Maritime Elec.
> Co., Inc. v. United Jersey Bank,* 959 F.2d
> 1194, 1200 n.3 (3d Cir.1991); *Levine v.
> Egidi,* 1993 WL 69146, at \*2 (N.D.Ill.1993);
> *In re Paolino,* 1991 WL 284107, at \*12 n. 19
> (Bankr.E.D.Pa.1991); *see generally In re
> Indian Palms Associates, Ltd.,* 61 F.3d 197
> (3d Cir.1995).

> FN3. The Motion was not accompanied by a
> notice of hearing as required by Local
> Bankruptcy Rule 9014-3, perhaps (I

thought) based on the erroneous belief that
Rule 9014-2 applied (motions determined
without hearing) or perhaps because the
Local Rules were not consulted. During the
preparation of this Opinion, Debtor's
counsel filed an answer, noting that the
Local Rules for filing a motion were ignored
and stating his assumption that no hearing
was scheduled but wishing to put on the
record his objection to the Motion. In
response, Movant's counsel quickly
forwarded to the Court a form "Order
Requiring Hearing" again reciting
"unfamiliarity with bankruptcy rules of
procedure" as cause of any inconvenience to
the court or opposing counsel. Had counsel
consulted the Local Rules either before
filing the Motion or after they were quoted
by Debtor's counsel, she would have learned
that she was still not abiding by them and
that the procedure she employed had been
superceded by the enactment of the amended
Local Rules on February 1, 1999.

BACKGROUND

The relevant facts are as follows. [FN4] The Order
having been entered on May 10, a notice of appeal
from the Order was due no later than May 20, 1999.
[FN5] The task of preparing the notice of appeal was
delegated to an associate unfamiliar with bankruptcy.
The lead attorney who appeared for Movant was out
of town during the week in connection with another
case, [FN6] and the only other associate had recently left
the firm. The associate reviewed the Federal Rules of
Appellate Procedure and mistakenly determined that
there was a thirty day period to file a notice of
appeal. On Friday, May 21, 1999, when she was
preparing the notice of appeal for filing with the
district court, the associate became aware [FN7] that
there were separate rules for bankruptcy appeal. The
associate immediately prepared and filed the Motion
attaching (but not separately filing) a notice of
appeal. The actual Notice of Appeal was filed on
May 27, 1999, seventeen days after the Order was
entered but within the extension period of Rule
8002(c). [FN8]

> FN4. While I make no factual findings, I
> will accept the averments of the Motion as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

facts for the purpose of deciding this Motion since even if proven, they are insufficient to support the relief sought.

FN5. Contrary to the assumption made in the Motion, the time for taking an appeal runs from the "entry" of the Order, *i.e.,* when it is noted on the official public record, the docket. *Danzig v. Danzig (In re Danzig),* 1999 WL 246472 (8th Cir.B.A.P.1999). As stated by the court in *In re Bunt,* 165 B.R. 894, 895 n.3. (Bankr.E.D.Ark.1994), " '[e]ntry' of a document is distinct from "dated" or "filed." The term "dated" refers to the date the judge signs the order. A document is "filed" on the date the clerk file-stamps it. A document is "entered" when it is actually recorded on the docket sheet or book by the clerk." *See* Fed.R. Bankr.P. 5003.

FN6. The Motion does not state whether the lead attorney was familiar with the bankruptcy appellate rules, and if so, why he didn't alert his inexperienced associate that there were only ten days to file the appeal. Rather the neglect is attributed to the associate who apparently finally got educated by the court.

FN7. The Motion is silent as to how the belated discovery was made.

FN8. I do not therefore have to reach the question of whether a notice of appeal attached to a motion for an extension of time to appeal but not separately filed is sufficient to give the court jurisdiction to decide the question of whether there has been excusable neglect. *Shareholders v. Sound Radio, Inc.,* 109 F.3d 873, 879 (3d Cir.1997)(Rule 8002 does not allow a party to claim excusable neglect after the thirty days have expired as the court has no jurisdiction to consider the untimely appeal at that point.).

## DISCUSSION

The Motion is governed by Federal Rule of Bankruptcy Procedure 8002 which provides in pertinent part:
(c) EXTENSION OF TIME FOR APPEAL. The bankruptcy judge may extend the time for filing the notice of appeal by any party for a period not to

exceed 20 days from the expiration of the time otherwise prescribed by this rule. A request to extend the time for filing a notice of appeal must be made before the time for filing a notice of appeal has expired, *except that a request made no more than 20 days after the expiration of the time for filing a notice of appeal may be granted upon a showing of excusable neglect* if the judgment or order appealed from does not authorize the sale of any property or the obtaining of credit or the incurring of debt under § 364 of the Code, or is not a judgment or order approving a disclosure statement, confirming a plan, dismissing a case, or converting the case to a case under another chapter of the Code. (Emphasis added.)

Here the notice of appeal was filed after the ten day appeal period expired, but no more than 20 days after the expiration of the appeal period. Thus, the Motion may be granted upon a showing of excusable neglect. Movant's sole reason offered for the untimeliness was that inexperienced counsel was "justifiably" relying on the incorrect procedural rule as to the amount of time allowed to file the notice of appeal. Motion ¶ 5.

The interpretation of "excusable neglect" has become more liberal since the seminal decision of the United States Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership,* 507 U.S. 380, 113 S.Ct. 1489 (1993). In that case, the definition was expanded beyond the traditional grounds of "circumstances beyond a party's control" to include "inadvertence, mistake or carelessness." *Id.* at 1489, 113 S.Ct. at 1495. In *Pioneer,* the Court found that an attorney's failure to timely file a proof of claim was excusable neglect under Rule 9006 where the notice of the bar date provided by the clerk's office was provided in an ambiguous and out of the ordinary manner. Notably, the Court gave little weight to the fact that the attorney was experiencing upheaval in his law practice at the time of the bar date. *Id.* at 396, 113 S.Ct. at 1499.

*2 Significantly, *Pioneer* involved excusable neglect under Rule 9006 and since its issuance, courts have been considering whether its less stringent standard should be applied in the context of a late filed bankruptcy appeal pursuant to Rule 8002. While there does not appear to be a case of the Third Circuit so holding, dicta in that Court's decision in *Sound Radio,* 109 F.3d at 879, leads me to conclude that it, like the overwhelming majority of other courts, would look to that test in determining a request for an extension of time to file a notice of appeal. FN9 *E.g., Christopher v. Diamond Benefits Life Insurance Co. (In re Christopher),* 35 F.3d 232, 235 (5th Cir.1994)

Not Reported in B.R.
Not Reported in B.R., 1999 WL 409389 (Bkrtcy.E.D.Pa.)
(Cite as: Not Reported in B.R.)

(as Supreme Court used standards from different places in Federal Rules of Civil Procedure, *Pioneer* standard applies to appeals from bankruptcy court); *Berger v. Buck (In re Buck),* 220 B.R. 999, 1002 (10th Cir.B.A.P.1998) (applies *Pioneer* standard); *Key Bar Investments, Inc. v. Cahn (In re Cahn),* 188 B.R. 621, 631 (9th Cir.B.A.P.1995) (observing that 9th Circuit recently applied *Pioneer* holding to extension of time to file notice of appeal under Rule 4(a)(5) of Federal Rules of Appellate Procedure).

> FN9. Although recognizing the applicability of *Pioneer* to a Rule 8002(c) late filing, my colleague Judge Scholl held that "strictness in the standard of interpretation of 'excusable neglect' is considerably heightened in the context of Rule 8002(c) because the extension of an appeal period involves jurisdictional issues and affects the successful party's and the public's interest in seeing an end come to litigation ...'." *In re Taylor,* 217 B.R. 465, 466-67 (Bankr.E.D.Pa.1998); *see also In re Mowers,* 160 B.R. 720, 724 (Bankr.N.D.N.Y.1993) ("Case law from the Second Circuit reveals that the 'excusable neglect' standard under 8002(c) is strict and must be narrowly applied.") (*Citing* cases).

There is no question but that counsel's failure to make a timely filing constitutes neglect. *Pioneer,* 507 U.S. at 388, 113 S.Ct. at 1494-95. Whether the neglect is excusable requires me to turn to the test articulated by the Supreme Court as follows:

Because Congress has provided no other guideposts for determining what sorts of neglect will be considered "excusable," we conclude that the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include, as the Court of Appeals found, the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

507 U.S. at 394-95, 113 S.Ct. at 1498. *See also Chemetron Corp. v. Jones,* 72 F.3d 341, 348 (3d Cir.1995).

Applying that test here, it is apparent that the first three factors weigh in favor of granting the Motion. There is no prejudice to the Debtor other than the burden of being subjected to the appeal, a burden he would be free of only for the fortuity for him of the late filing. The delay was insignificant and has no bearing on the Chapter 7 bankruptcy case which is fully administered. The Debtor enjoys his bankruptcy discharge which is unaffected by a pending appeal. Thus, the Motion turns on the last factor: the reason for the delay, including whether it was within the control of the movant and whether movant acted in good faith.

Numerous courts have applied the more relaxed *Pioneer* test in the context presented here, an untimely filing of notice of appeal caused by an error committed by counsel. In so doing, they have focused on the following language in the opinion to conclude that attorney misreading of the rules or misunderstanding of the law is not a basis to find excusable neglect:

**3** Our view that the phrase "excusable neglect" found in Bankruptcy Rule 9006(b)(1) is not limited as petitioner would have it is also strongly supported by the Federal Rules of Civil Procedure, which use that phrase in several places. Indeed, Rule 9006(b)(1) was patterned after Rule 6(b) of those Rules. Under Rule 6(b), where the specified period for the performance of an act has elapsed, a district court may enlarge the period and permit the tardy act where the omission is the "result of excusable neglect." As with Rule 9006(b)(1), there is no indication that anything other than the commonly accepted meaning of the phrase was intended by its drafters. It is not surprising, then, that in applying Rule 6(b), the Courts of Appeals have generally recognized that "excusable neglect" may extend to inadvertent delays. *Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute "excusable" neglect,* it is clear that "excusable neglect" under Rule 6(b) is a somewhat "elastic concept" and is not limited strictly to omissions caused by circumstances beyond the control of the movant.

*Id.* at 390, 113 S.Ct. at 1498 (footnotes omitted and emphasis added). For example, in *Pyramid Energy, Ltd. v. Duquoin National Bank (In re Pyramid Energy, Ltd.),* 165 B.R. 249 (Bankr.S.D.Ill.1994), the court refused to find excusable neglect where counsel filed the notice of appeal one-day late on the grounds that two weekends and the Christmas holidays impacted the ability of the office to complete the task. The court noted that counsel had ample opportunity to file a timely notice and that the delay was well within counsel's control, focusing on the fact that the court has issued an oral ruling over a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

month before the written order was entered. [FN10] It stated:

> FN10. Somewhat similarly here, Movant was on notice at the conclusion of the hearing, almost one month before the Order was entered, that she was not likely to get the outcome she sought in that contested matter. While I took the matter under advisement to prepare my findings of fact and conclusions of law in a written opinion, I made some partial rulings on legal issues from the bench and stated my adverse factual findings on other of the issues. Presumably in response, Movant authorized the filing of two motions while I had the matter under advisement-one seeking to reopen the record; the other to remand the dischargeability issue to state court. Doc. No. 74 and 76. It is fair to conclude therefrom that Movant was considering her options in connection with an adverse judgment long before the Order was entered.

To the extent that counsel's failure to file the notice of appeal was due to his misreading of the rules or to problems with the tickler system in his office, Pioneer provides no respite. The Pioneer court, in assessing the culpability of counsel's actions, gave "little weight" to the fact that counsel was experiencing upheaval in his law practice at the time of the bar date. Pioneer, 507 U.S. at ___, 113 S.Ct. at 1499. Further, the court indicated that ignorance of the rules or a mistake in construing the rules does not constitute "excusable neglect" even under the liberal standard there espoused. See id., 113 S.Ct. at 1496. Id. at 251. In HML II, Inc. v. Ginley (In re HML II, Inc.), 1999 WL333232 (6th Cir. BAP1999), a debtor sought to justify an untimely filing by its attorneys' unfamiliarity with bankruptcy procedure, specifically the proper calculation of time. Like here, the attorney relied on the wrong rules of procedure, thus miscalculating the due date. Citing to its own Circuit's interpretation of Pioneer to refuse excusal of an attorney's misreading of Rule 8002, Duncan v. Washington, 1994 WL 232397 at *3 (6th Cir.1997) and Deym v. Von Gragstein, 127 F.3d 1102, 1997 WL 650933, at *2 (6th Cir.1997) (Table, Text in Westlaw), the court affirmed the bankruptcy court's order denying a motion to extend the time to file. In Turner v. Ruta, 173 B.R. 165 (D.C.D.Ill.1994), the district court agreed there was no excusable neglect when the debtor failed to file a timely appeal based on the advice of an associate of his out of town

attorney that he had more than ten days to file the notice of appeal. The appeal was not filed until two days after the attorney returned and six days after the initial ten-day period.

**\*4** Even in situations where a party is unaware of the entry of an order, courts have refused to find neglect excusable. In Official Committee of Creditors v. Field (In re Investors & Lenders, Ltd.), 169 B.R. 546 (Bankr.D.N.J.1994), the court found no excusable neglect where the failure to file the appeal was attributed to the lack of receipt of the order before the appeal period ran. In that case also the parties were aware that an adverse ruling was forthcoming and the court noted that they could have checked the docket to ascertain the date of its entry. In Cahn, supra excusable neglect was not found when counsel's tardiness was attributable to its lack of receipt of notice of entry of the order and the opponent's failure to lodge a separate judgment. The latter was not required and the former was not an excuse.

These cases give effect to the Supreme Court's pronouncement that "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute "excusable" neglect." However, in using the phrase "do not usually constitute", the Court leaves the door open for a finding that inadvertence, ignorance of the rules or mistakes construing rules may be excusable neglect. A few examples have been located. Buck, supra is the easy case. The client was out of town and the lawyer could not reach him prior to the expiration of the appeal period. In W-V Enterprises, Inc. v.. Croft (In re Croft), 174 B.R. 524 (Bankr.E.D.Mo.1994), the debtor's failure to provide his attorney with his change of address until one day after the appeal period had expired causing a three day late filing was excusable. These cases have elements of situations almost beyond the ability of counsel to control. The court in Southern Commerce Bank v. Katzman (In re Katzman), 207 B.R. 295 (Bankr.M.D.Fla.1997), found that ignorance and misunderstanding of the time requirements by debtor, a pro se litigant, and erroneous advice by two attorneys who did not represent him, was excusable. The debtor's pro se status seemed to influence the court.

With this survey of the post-Pioneer cases as a backdrop, I must examine the totality of the circumstances here to determine whether they warrant the elasticity contemplated by Pioneer. I find that they do not. Movant's counsel's conduct goes beyond mere confusion or misunderstanding of the rules. In this sense I disagree with the Motion which

Not Reported in B.R.                                                                     Page 5
Not Reported in B.R., 1999 WL 409389 (Bkrtcy.E.D.Pa.)
**(Cite as: Not Reported in B.R.)**

characterizes reliance on the wrong rule as "justifiable." It is not justifiable to practice in a court and not realize that such court has its own rules of procedure-both national and local. [FN11] Unfamiliarity with bankruptcy law or the bankruptcy rules is from time to time cited to this Court by state court attorneys as an explanation for their inadequate performance in bankruptcy cases. I have always found that acknowledgment made without apology to be a strange one. If one is engaged to represent a client in a matter, one is charged with knowledge of the substantive and procedural law necessary to fulfill that representation. Rules of Professional Conduct 1.1. To excuse performance because of unfamiliarity with the existence of rules of procedure when those rules are clearly set out in a book that should be on the desk of any attorney doing bankruptcy work dilutes the standards for practice in this court.

> FN11. Movant's error has been compounded twice in the filing of this Motion where the Local Rules were also not consulted. *See* note 3 *supra.*

**\*5** My focus to this point has been on the conduct of Movant's attorney, the Motion being silent as to the client's involvement in the authorization and implementation of the appeal. In certain contexts, courts are reluctant to visit the sins of counsel on the clients. In determining a motion for dismissal or default judgment for failure to comply with pretrial or discovery orders, the Third Circuit Court of Appeals has held that a party's lack of responsibility for its counsel's dilatory conduct, while not dispositive, is one factor to consider. *Poulis v. State Farm Fire and Casualty Co.,* 747 F.2d 863, 867 (3d Cir.1984). [FN12] However, in the context of a late filing of a proof of claim, the Supreme Court in *Pioneer* stated that the circuit court erred in deeming it inappropriate to penalize parties for the omissions of their attorney. Referring to its prior decisions that found "no merit to the contention that dismissal of a petitioner's claim because his counsel's unexcused conduct imposes an unjust penalty on the client," the *Pioneer* Court reiterated that "parties are held accountable for the acts and omissions of their counsel." 507 U.S. at 396, 113 S.Ct. at 1499. In applying *Pioneer* as the guiding authority for resolving the Motion, I am guided by the Supreme Court's express rejection of the circuit court's view to the contrary and find it inappropriate to relax the standard based on the absence of any evidence of the client's culpability. If anything, the standard for the late filing of a notice of appeal would appear to be more rigorous than the standard for a late filed claim as the party has at least had her day in court. *See* note 9 *supra.*

> FN12. In so reasoning, the Court also recognized that a client cannot always avoid the consequences of the acts or omissions of its counsel. *Id.* at 863.

An Order consistent with this Memorandum Opinion shall be entered.

*ORDER*

AND NOW, this 15th day of June 1999, upon consideration of Maria D. Lashinger's Motion for an Extension of Time for Taking Appeal (the "Motion") of this Court's Order dated May 6, 1999 and entered on the Court's docket on May 10, 1999, and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby ORDERED that the Motion is DENIED.

Bkrtcy.E.D.Pa.,1999.
In re Lashinger
Not Reported in B.R., 1999 WL 409389 (Bkrtcy.E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 1048898 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

**C**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.
Angela TESE-MILNER, Plaintiff,
v.
United States Bankruptcy Judge Marvin A.
HOLLAND, Defendant.
**No. 97-CV-4904 (JG).**

Nov. 26, 1997.

Douglas J. Kramer, Baden Kramer Huffman & Brodsky, New York, for Petitioner.

MEMORANDUM AND ORDER

GLEESON, District J.

**\*1** On July 10, 1997, petitioner Angela Tese-Milner filed a motion in which she asked respondent, the Honorable Marvin A. Holland, a bankruptcy judge in this district, to recuse himself in *In re Baldwin Home Product Corp. d/b/a Dave's Lumber,* No. 191-17206-352 ("*Baldwin* "). Judge Holland denied the motion on August 8, 1997. On September 7, 1997, the petitioner filed the instant amended petition for a writ of mandamus directing Judge Holland to disqualify himself from *Baldwin*. For the reasons set forth below, the petition is denied.

FACTS

The petitioner in this case is the Chapter 7 trustee in *Baldwin* and in *In re E.J. Robins, Inc.,* Case No. 190-10453-352 ("*Robins* "), two Chapter 7 proceedings assigned to Judge Holland. [FN1] At an appearance in *Robins* on February 20, 1997, Judge Holland, acting *sua sponte,* scheduled a hearing to decide whether he should subject the petitioner to Rule 11 sanctions in connection with her law firm's fee application in that case. At that time, Judge Holland also stated that, given that he was considering imposing Rule 11 sanctions on the petitioner in *Robins,* she might want to consider requesting him to recuse himself in the pending *Baldwin* proceeding.

FN1. At oral argument, the petitioner's attorney stated that the petitioner is the party

in interest in *Baldwin*. Consequently, this petition does not implicate the case law applicable where a judge's behavior evidences bias not towards a particular party, but rather towards that party's attorney. *See, e.g., United States v. Ahmed,* 788 F.Supp. 196, 202 (S.D.N.Y.) ("Except in rare circumstances, the appearance of bias against an attorney is insufficient to justify recusal."), *aff'd,* 980 F.2d 161 (2d. Cir.1992); *United States v. Helmsley,* 760 F.Supp. 338, 341 (S.D.N.Y.1991) ("It is one of the earliest and most fundamental lessons of judging that a judge must rule on the merits without regard to the personality of the attorney or any unpleasant experiences the judge may have had with the attorney in the past."), *aff'd,* 963 F.2d 1522 (2d Cir.1992).

Thereafter, the petitioner brought a motion before Judge Holland seeking to recuse him in the *Robins* matter. At a hearing on March 12, 1997, Judge Holland informed the petitioner that, at the February 20 hearing, he had suggested that the petitioner consider asking him to recuse himself from any further proceedings in *Baldwin,* not in *Robins.* [FN2] As a result, the petitioner withdrew her recusal motion with respect to *Robins.*

FN2. Judge Holland stated that he thought the petitioner should seek his recusal in *Baldwin* rather than *Robins* because the petitioner had a greater financial exposure in *Baldwin.*

On March 20, 1997, at a hearing on the *Baldwin* matter, Judge Holland reiterated his suggestion that the petitioner consider seeking his disqualification. Judge Holland stated that the information he had learned about petitioner in *Robins* "may have created a subjective and even an unconscious prejudice towards her" in *Baldwin.* [FN3] He further stated that he was "very troubled by this ethical responsibility" and that he knew that "at minimum [he had] to give [the parties] the opportunity to have [their] input ."

FN3. Judge Holland also stated that, if *Baldwin* had been a jury trial and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 2
Not Reported in F.Supp., 1997 WL 1048898 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

allegations he asserted in *Robins* had been brought to the attention of the jury, "it would certainly be grounds for mistrial." Judge Holland also noted, however, that he was "not sure" he was subject to "the same prejudices that a jury would be."

Approximately four months later, on July 10, 1997, the petitioner filed a motion, pursuant to 28 U.S.C. § § 455(a) and (b)(1), asking Judge Holland to recuse himself from further proceedings in *Baldwin*. At a hearing held on July 17, 1997, Judge Holland expressed his suspicion that "the delay in making the motion for recusal was occasioned by some tactical move." Rather than deciding the motion, however, he adjourned oral argument until July 24, 1997.

Judge Holland began the hearing on July 24 by stating that the affidavit the petitioner's attorney had submitted in support of the petitioner's recusal motion had left out "a lot of law," including "[l]aw that says that anything that [he] learn[ed] as a result of a judicial proceeding is not grounds for recusal." The petitioner's attorney responded by informing Judge Holland that the basis for the petitioner's motion was Judge Holland's previous statements that he was "predisposed" against the petitioner "in an improper way." The petitioner's attorney then attempted to show Judge Holland a copy of the transcripts of the prior hearings at which those statements were made. Upon learning that the transcripts were not included in the petitioner's moving papers, however, Judge Holland refused to consider them. When the petitioner's attorney asked for an adjournment so that Judge Holland could consider the statements, Judge Holland stated that he would grant such a request only if the petitioner was "willing to pay opposing counsel's expenses in coming" to court to argue the motion. The petitioner's attorney declined to do so, and Judge Holland thereafter informed the parties that the recusal motion was denied. Judge Holland signed the settlement order denying the motion on August 8, 1997.

**\*2** On September 4, 1997, the petitioner filed the instant amended petition for a writ of mandamus. The petitioner also served Judge Holland with a summons directing him to "file with the Clerk of this Court and serve upon petitioner's attorney ... an answer to the amended petition." Rather than filing an answer, Judge Holland instead submitted what he has termed a "reaction" to the amended petition. Judge Holland explained his failure to file an answer by observing that, pursuant to Federal Rule of Appellate Procedure 21(b)(4), "[t]he trial court judge may request

permission to respond but may not respond [to a writ of mandamus] unless invited or ordered to do so by the court of appeals." Judge Holland assumes that, although this Court is not an appellate one, Rule 21(b)(4) nevertheless applies to this action and that, as such, he may not file an answer until I "invite" or "order" him to do so. As such, Judge Holland filed the "reaction" in order to "affirm [his] willingness to promptly file and serve [his] answer" upon the direction of this Court.

### DISCUSSION

#### A. *The Procedural Posture*

Before reaching the merits of the petitioner's position, I must first address the procedural posture of this petition.

Judge Holland's "reaction" correctly points out that Federal Rule of Civil Procedure 81(b) abolished the writ of mandamus in the district court. In *In re Theodore Olson, et al.,* 20 B.R. 206, 209 (D.Neb.1982), the debtors in a Chapter 11 proceeding filed an "amended emergency motion on appeal" with the district court, seeking an order disqualifying the bankruptcy judge from any further proceedings. After noting that "a lower court judge's determination not to disqualify himself is reviewable by way of a petition for a writ of mandamus," the district court decided to treat the debtors' emergency appeal as a petition for a writ of mandamus. *Id.* In so doing, the court recognized that, pursuant to Rule 81(b), "the writ of mandamus has been abolished in the federal district courts." *Id.* at 209 n. 5. The court held, however, that, "due to the fact that [it was] convened in an appellate posture," mandamus was nevertheless an appropriate remedy. *Id.; see also In re Drexel Burnham Lambert Inc.,* 861 F.2d 1307 (2d Cir.1988) (reviewing, via writ of mandamus, district court's refusal to recuse pursuant to 28 U.S.C. § § 455(a) and (b)), *cert. denied,* 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989). I therefore find that, despite Federal Rule of Civil Procedure 81(b), the petitioner correctly used a writ of mandamus as the vehicle to present the instant motion.

Judge Holland relied on Federal Rule of Appellate Procedure 21(b)(4) in not filing an answer to the petition. As another district court in this circuit has noted, "[i]n bankruptcy matters, this Court is governed by the same considerations of appellate jurisdiction as apply to the Circuit Court's review of

Not Reported in F.Supp.                                                                                          Page 3
Not Reported in F.Supp., 1997 WL 1048898 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

this Court's decisions." *In re St. Johnsbury Trucking Co., Inc.,* 176 B.R. 122, 124 (S.D.N.Y.1994). As such, I find that Judge Holland reliance upon Federal Rule of Appellate Procedure 21(b)(4) was not misplaced and, therefore, that he correctly refrained from filing an answer to the amended petition.

### B. *The Merits of Petitioner's Position*

**\*3** Sections 455(a) and (b) of Title 28 of the United States Code provide that any judge of the United States "shall" disqualify himself from any proceeding "in which his impartiality might reasonably be questioned" or "[w]here he has a personal bias or prejudice concerning a party." "[R]ecusal motions are committed to the sound discretion of the district court." *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992). As such, the issue on appeal is only whether Judge Holland abused his discretion in refusing to recuse himself. *See United States v. Conte,* 99 F.3d 60, 65 (2d Cir.1996).

The petitioner offers two arguments in support of her request for mandamus relief. First, she contends that Judge Holland's repeated suggestions that she seek to have him disqualified evidenced that he was not capable of ruling with impartiality in the *Baldwin* proceeding. Second, the petitioner argues that the fact that Judge Holland denied the petitioner's recusal motion without giving any reason for so doing constituted "further evidence of his lack of impartiality."

As the Supreme Court has recognized, subsections (a) and (b) of § 455 differ in two respects. First, whereas "subsection (a) deals [only] with the objective appearance of partiality," subsection (b) contains a "subjective-knowledge requirement." *Liteky v. United States,* 510 U.S. 540, 553 n. 2, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1993). Second, "subsection (a) covers all aspects of partiality and not merely those specifically addressed in subsection (b)." *Id.* As in *Liteky,* however, "[w]hat is at issue in the present case is an aspect of 'partiality' already addressed in (b), personal bias or prejudice." *Id.* Consequently, "[t]he 'objective appearance' principle of subsection (a) makes irrelevant the subjective limitation of (b)(1): [Judge Holland] d[id] not have to be subjectively biased or prejudiced, so long as he appear[ed] to be so." *Id.*

In deciding the "sensitive question" of whether, pursuant to § 455(a), a judge must be recused, "the test of impartiality is what a reasonable person,

knowing and understanding all the facts and circumstances, would believe." *Drexel Burnham Lambert,* 861 F.2d at 1309. In seeking to recuse a judge pursuant to § 455(a), a party must demonstrate that the circumstances surrounding a judge's ruling "create an objectively reasonable basis for questioning [that] judge's impartiality, by showing 'a deep-seated favoritism or antagonism that would make fair judgment impossible.' ' *International Business Machines Corp.,* 45 F.3d at 644 (citing *Liteky,* 510 U.S. at 555). Usually, but not always, a party seeking recusal will succeed under either § § 455(a) or (b) only if she is able to show that the alleged bias and prejudice stem from an extrajudicial source. *See Liteky,* 510 U.S. at 554-55 (acknowledging existence of a "significant (and often determinative) 'extrajudicial source' factor ... in recusal jurisprudence"). It is only "in the rarest circumstances" that "judicial rulings alone can warrant recusal." *International Business Machines Corp.,* 45 F.3d at 644 (citing *Liteky,* 510 U.S. at 555).

**\*4** At oral argument, the petitioner's attorney conceded that the petitioner is not contending that Judge Holland's alleged bias stemmed from an extrajudicial source. Instead, the petitioner contends that Judge Holland's repeated suggestions that she seek to have him disqualified are evidence of his impartiality.

It is true that " 'there may be instances in which a judge's behavior during prior judicial proceedings can demonstrate sufficient friction between the judge and the complaining party to support a finding of bias." ' *Lewis v. Tuscan Dairy Farms,* 25 F.3d 1138, 1141 (2d Cir.1994) (citation omitted) (discussing requirements of § 455(b)(1)). I find, however, that this is not one of those instances. In the March 20 hearing, Judge Holland stated that, in light of the allegations he made against the petitioner in the *Robins* matter, he was "troubled" by his ethical responsibilities in continuing to preside over *Baldwin.* Given his uncertainty over his obligations, his decision to invite briefing on the issue was an entirely understandable one. Indeed, because § 455(a) is self-enforcing, *see, e.g., United States v. El-Gabrowny,* 844 F.Supp. 955, 961 (S.D.N.Y.1994), Judge Holland could simply have chosen to disqualify himself. That he instead invited the parties to brief the issue is evidence not of his bias, but rather of the seriousness with which he took the ethical obligations imposed upon him by § 455. [FN4]

FN4. In fact, Judge Holland specifically

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 4
Not Reported in F.Supp., 1997 WL 1048898 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

stated on March 20 that he was "not sure what [he] would do if [the petitioner] were to make the motion."

The petitioner also argues that Judge Holland demonstrated his bias when he failed to give any reasons for denying the recusal motion. As even the petitioner's attorney acknowledged at oral argument, however, Judge Holland was under no obligation to issue an opinion. The fact that he did not do so therefore in no way suggests that he was biased against the petitioner.   <sup>FN5</sup>   In addition, Judge Holland's July 17 statements regarding the petitioner's four-month delay in filing the recusal motion and his July 24 statements regarding the extrajudicial source doctrine suggest that, in considering the merits of the petitioner's motion, he properly took into account both the fact that petitioner had delayed and the fact that his alleged bias did not stem from a extrajudicial source. *See United States v. Brinkworth,* 68 F.3d 633, 639 (2d Cir.1995) (holding that motion for recusal must be made in timely manner); *Liteky,* 510 U.S. at 554-55 (noting "significant (and often determinative) 'extrajudicial source' factor ... in recusal jurisprudence").

FN5. The petitioner argues that Judge Holland should have issued an opinion in support of denial of the recusal motion because, according to the petitioner, in the March 20 hearing Judge Holland "stated that he wanted to make a decision in which his reasons would be 'clearly articulated and preserved for appellate review." ' In so contending, the petitioner misconstrues Judge Holland's March 20 statements, which were as follows:
... I feel strongly that whatever rights [the petitioner] has should be preserved, should be placed on the record, such that whatever decision I make is clearly articulated and preserved for an [a]ppellate review, and so that it's done by counsel who's not personally involved in the matter.
These remarks suggest that Judge Holland was less concerned with preserving his own views than with ensuring that the petitioner's views be preserved for appellate review.

CONCLUSION

I cannot find that Judge Holland abused his discretion in refusing to recuse himself. The petition for a writ

of mandamus is therefore denied.

So Ordered.

E.D.N.Y.,1997.
Tese-Milner v. Holland
Not Reported in F.Supp., 1997 WL 1048898 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:97cv04904 (Docket) (Aug. 21, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Civil Action No. _____ |
|  | ) |  |
| THE MEMBERS OF THE | ) |  |
| *AD HOC* COMMITTEE OF | ) |  |
| PREFERRED AND EQUITY | ) |  |
| SECURITY HOLDERS, | ) |  |
|  | ) |  |
| Petitioners. | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) | Bankruptcy Case No. 00-3837 (JKF) |
|  | ) | (Jointly Administered) |
| OWENS CORNING, *et al.*, | ) |  |
|  | ) |  |
| Debtors. | ) | United States Bankruptcy Court for the |
|  | ) | District of Delaware (Fitzgerald, J., sitting |
|  | ) | by designation) |
|  | ) |  |

**ORDER GRANTING PETITION OF THE MEMBERS OF THE *AD HOC* COMMITTEE
OF PREFERRED AND EQUITY SECURITY HOLDERS FOR ENTRY OF
AN ORDER PROVIDING FOR RELIEF IN THE NATURE OF MANDAMUS**

Upon consideration of the *Petition of the Members of the Ad Hoc Committee of Preferred*

*and Equity Security Holders for Entry of an Order Providing for Relief in the Nature of*

*Mandamus* ("Petition"); and upon consideration of any and all objections and/or responses that

were filed in opposition to the Petition; and it appearing that due and proper notice of the Petition

has been given to all interested parties in this case; and after due deliberation and sufficient cause

appearing therefor;

IT IS ORDERED THAT:

1.      The Petition is granted.

2.     The Bankruptcy Court is hereby directed to enter an order or a judgment adjudicating the Motion (as defined in the Petition) within fifteen (15) days from the date of this Order.

Dated:_____          _____
                                United States District Judge

#449648

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 28th day of February, 2006, I caused a copy of the **Petition of The Members of the Ad Hoc Committee of Preferred and Equity Security Holders for Entry of an Order Providing for Relief in the Nature of Mandamus** to be served as indicated upon the following parties.

### BY HAND DELIVERY

Norman L. Pernick, Esq.
J. Kate Stickles, Esq.
Saul Ewing LLP
222 Delaware Avenue
Wilmington, DE 19801

Francis A. Monaco, Jr., Esq.
Monzack & Monaco, P.A.
1201 Orange Street, Suite 400
Wilmington, DE 19801

Marla R. Eskin, Esq.
Mark T. Hurford, Esq.
Campbell & Levine, LLC
800 North King Street, Suite 300
Wilmington, DE 19801

William H. Sudell, Jr., Esq.
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19801

Mr. David D. Bird
Clerk of Court
United States Bankruptcy Court
824 Market Street, 3rd Floor
Wilmington, DE 19801

Edwin Harron, Esq.
Sean T. Greecher, Esq.
Young Conaway Stargatt & Taylor, LLP
1000 West Street, 17th Floor
Wilmington, DE 19801

Richard W. Riley, Esq.
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801

David M. Klauder, Esq.
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801

The Honorable Judith K. Fitzgerald
United States Bankruptcy Court
824 Market Street, 5th Floor
Wilmington, DE 19801

**BY TELEFAX AND FIRST CLASS U.S. MAIL**

Larry Nyhan, Esq.
James F. Conlan, Esq.
Jeffrey C. Steen, Esq.
Sidley Austin LLP
1 South Dearborn Street
Chicago, IL 60603

Charles O. Monk, II, Esq.
Jay A. Shulman, Esq.
Saul Ewing LLP
Lockwood Place, 500 East Pratt Street
Baltimore, MD 21202

J. Andrew Rahl, Jr., Esq.
John B. Berringer, Esq.
Howard D. Ressler, Esq.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

William S. Katchen, Esq.
Duane Morris LLP
744 Broad Street, Suite 1200
Newark, NJ 07102

James I. McClammy, Esq.
Davis Polk & Wardell
450 Lexington Avenue
New York, NY 10017

Jane W. Parver, Esq.
Andrew A. Kress, Esq.
Edmund M. Emrich, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Peter Van N. Lockwood, Esq.
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, D.C.  20005

Lewis Kruger, Esq.
Kenneth Pasquale, Esq.
Denise K. Wildes, Esq.
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

Elihu Inselbuch, Esq.
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152

Marc J. Phillips (No. 4445)

#449535

2

JS 44 (Rev. 12/96)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS - (PETITIONERS)**
THE MEMBERS OF THE *AD HOC* COMMITTEE OF PREFERRED AND EQUITY SECURITY HOLDERS

**DEFENDANTS**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)

**(SEE ATTACHED)**

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/CC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 720 Labor Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 740 Labor Railway Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☒ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 535 Death Penalty | | | |
| ☐ 290 All Other Real Property | | ☐ 540 Mandamus & Other | | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

REQUEST FOR AN ORDER DIRECTING THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, THE HONORABLE JUDITH K. FITZGERALD, TO ADJUDICATE THE *AD HOC* COMMITTEE'S MOTION FOR CONFIRMATION THAT THE AUTOMATIC STAY OF SECTION 362 OF THE BANKRUPTCY CODE DOES NOT BAR SHAREHOLDERS FROM SEEKING TO COMPEL THE DEBTORS TO HOLD ITS ANNUAL SHAREHOLDERS MEETING, OR IN THE ALTERNATIVE RELIEF FROM THE AUTOMATIC STAY.

**VII. REQUESTED IN** CHECK IF THIS IS A **CLASS ACTION** DEMAND:   CHECK YES only if demanded in complaint:
**COMPLAINT:** ☐ UNDER F.R.C.P. 23        JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S)** (See instructions):
**IF ANY**    JUDGE JKF    DOCKET NUMBER 00-3837 UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

DATE
2/28/06

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

Attachment to Civil Cover Sheet

Attorneys for Petitioners
The Members of the Ad Hoc Committee of Preferred and Equity Security Holders


CONNOLLY BOVE LODGE & HUTZ LLP
Jeffrey C. Wisler (No. 2795)
Christina M. Thompson (No. 3976)
Marc J. Phillips (No. 4445)
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
(302) 658-9141
jwisler@cblh.com
cthompson@cblh.com
mphillips@cblh.com


    - and -

BROWN RUDNICK BERLACK ISRAELS LLP
Edward S. Weisfelner, Esq.
Robert J. Stark, Esq.
Seven Times Square
New York, New York 10036
(212) 209-4800


    - and -

Anthony L. Gray, Esq.
John C. Elstad, Esq.
One Financial Center
Boston, Massachusetts 02111
(617) 856-8200

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS–44

### Authority For Civil Cover Sheet

The JS–44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    **(a) Plaintiffs – Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.    **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1)  Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant.  (2)  When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3)  This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4)  This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below: federal question actions take precedence over diversity cases.)

III.    **Residence (citizenship) of Principal Parties.**  This section of the JS–44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    **Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1)  Cases which originate in the United States district courts.

Removed from State Court.  (2)  Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3)  Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened.  (4)  Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District.  (5)  For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6)  Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7)  Check this box for an appeal from a magistrate judge's decision.

V.    **Nature of Suit.**  Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.    **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.    **Requested in Complaint.**  Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases.**  This section of the JS–44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

## United States District Court for the District of Delaware

Civil Action No. _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

_____FEB 2 8 2006_____
(Date forms issued)

_____
(Signature of Party or their Representative)

_____*Marc J. Phillips*_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action