## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Civil Action No. 06-136 (JPF) |
| | : | |
| THE MEMBERS OF THE | : | Chapter 11 |
| *AD HOC* COMMITTEE OF | : | |
| PREFERRED AND EQUITY | : | Bankruptcy Case No. 00-3837 (JKF) |
| SECURITY HOLDERS, | : | |
| | : | (Jointly Administered) |
| Petitioners. | : | |
| | : | United States Bankruptcy Court for the |
| IN RE: | : | District of Delaware (Fitzgerald, J., sitting |
| | : | by designation) |
| OWENS CORNING, *et al.*, | : | |
| | : | |
| Debtors. | : | |

### OBJECTION OF DEBTORS TO MOTION OF *AD HOC* COMMITTEE
### OF PREFERRED AND EQUITY SECURITY HOLDERS FOR ENTRY OF
### AN ORDER PROVIDING FOR RELIEF IN THE NATURE OF MANDAMUS

Owens Corning and seventeen of its affiliates and subsidiaries, debtors and debtors-in-possession in the above-referenced bankruptcy cases (collectively, the "Debtors")[1], hereby object to the Petition of the Members of the *Ad Hoc* Committee of Preferred and Equity Security Holders (the "*Ad Hoc* Committee") for Entry of an Order Providing For Relief in the Nature of Mandamus (the "Mandamus Petition"), for the reasons set forth below.

---

[1]    The Debtors are: Owens Corning, CDC Corporation, Engineered Yarns America, Inc., Falcon Foam Corporation, Integrex, Fibreboard Corporation, Exterior Systems, Inc., Integrex Ventures LLC, Integrex Professional Services LLC, Integrex Supply Claim Solutions LLC, Integrex Testing Systems LLC, Homexperts LLC, Jefferson Holdings, Inc., Owens-Corning Fiberglas Technology Inc., Owens Corning HT, Inc., Owens-Corning Overseas Holdings, Inc., Owens Corning Remodeling Systems, LLC and Soltech, Inc.

## PRELIMINARY STATEMENT

1.      The Mandamus Petition is yet another baseless attempt by the *Ad Hoc* Committee[2] to continue to hinder and delay the Debtors' plan confirmation process and the successful completion of their chapter 11 cases.  The *Ad Hoc* Committee has now clogged the docket of this Court with three successive challenges to sensible determinations made by the Bankruptcy Court, each within the sound discretion and core bankruptcy jurisdiction of that tribunal.  The challenge at bar represents a fundamental misuse of the extraordinary remedy of mandamus-type relief, which, as this Court is well aware, has been reserved in the history of federal jurisprudence only for those rare circumstances in which a gross and irremediable miscarriage of justice has transpired.  As set forth in this objection, the *Ad Hoc* Committee has not – and cannot – come anywhere close to meeting that exceedingly high burden under any of the facts, the law or the equities of this case.

2.      On December 20, 2005, the *Ad Hoc* Committee filed companion motions seeking the appointment of an official equity holders' committee (the "Equity Committee Motion") and authority to file an action in the Chancery Court of the State of Delaware (the "Delaware Chancery Court") to compel a shareholders' meeting (the "Shareholder Motion"). Predicated upon nothing more than pure speculation that (1) the Fairness in Asbestos Injury Resolution Act of 2005, Bill S. 852, (the "FAIR Act") *may* become law at some indeterminate

---

2        According to the Motion, the members of the *Ad Hoc* Committee currently are: Catalyst Investment Management Co., LLC; Deutsche Bank Securities Inc.; Hain Capital Group, LLC; Harbinger Capital Partners Master Fund I. Ltd. f/k/a Harbert Distressed Investment Master Fund, Ltd.; Plainfield Asset Management LLC; and Tudor Investment Corporation.  As has been made clear to the Bankruptcy Court, several of these sophisticated financial institutions (or their affiliates) also hold significant debt positions across the Debtors' capital structure.  See Debtors' Objection to Motion for Appointment of an Official Committee, at 8-9.

-2-

time in the future and (2) the Third Circuit *may* reverse this Court's $7 billion estimation of Owens Corning's asbestos-related liabilities (the "Estimation Decision")[3], the primary and admitted purpose of the two motions was to force a distribution to out-of-the-money equity holders from the Debtors' insolvent estates, regardless of the risk to the Debtors' real parties in interest -- the Debtors' asbestos and commercial creditors -- posed by further delaying or blocking confirmation of the Fifth Amended Plan (defined below).

      3.     The Mandamus Petition is a seriously flawed vessel full of material omissions and misstatements, chief among them the *Ad Hoc* Committee's demonstrably false contention that it has "a substantial economic interest in the Debtors' chapter 11 cases and its reorganization" (Mandamus Petition at 3). At no time did the *Ad Hoc* Committee introduce any evidence below of Owens Corning's solvency, and the Bankruptcy Court found that "[t]here is no evidence before me that the debtor is solvent at this point in time in any way" and "I don't see how at this point equity is entitled to a distribution or will get a distribution under any scenario." Transcript of the January 30, 2006 Hearing (the "Jan. 30 Transcript"), at 73 (copy attached as Exhibit 1). Based on these findings of fact, the Bankruptcy Court (1) entered an order denying the Equity Committee Motion, *without prejudice*, to which the *Ad Hoc* Committee has sought leave to take an immediate interlocutory appeal,[4] and (2) instructed Debtors' counsel to continue

---

[3]    As discussed more fully herein, the *Ad Hoc* Committee ignores that even if either or both of these events were to come to pass, it is far from clear that the equity holders would be entitled to any recovery.

[4]    See Motion of the *Ad Hoc* Committee of Preferred and Equity Security Holders for Leave to Appeal Bankruptcy Court Order Denying Motion for the Appointment of an Official Preferred and Equity Security Holders Committee (the "Motion for Leave") (Bankr. D.I. No. 17038) and Debtors' Opposition and Answer to Motion of the *Ad Hoc* Committee of Preferred and Equity Security Holders for Leave to Appeal Bankruptcy Court Order Denying Motion for the Appointment of an Official Preferred and Equity Security Holders Committee (Bankr. D.I. No. 17106).

the Shareholder Motion from month to month until the prospects of the FAIR Act – *the very predicate of the Shareholder Motion* - became evident.[5]  The *Ad Hoc* Committee's petition is – at best – premature.  Such a brief extension of court consideration on the merits cannot, without more, justify the extraordinary remedy of mandamus-type relief.

4.    The Mandamus Petition is entirely without merit, invoked solely to delay the underlying chapter 11 proceedings in an obvious attempt to use that leverage as a negotiating tool on behalf of the *Ad Hoc* Committee's constituency.  The Committee's position is designed to force the Bankruptcy Court to rule – now – on the Committee's underlying motion to lift the section 362(a) bankruptcy stay with the hope of compelling Owens Corning to hold a shareholders' meeting.  Mandamus Petition at 1.  The sole purpose of such a meeting is to elect a board of directors who will attempt to devise a new plan of reorganization giving value to the Committee's equity constituents at the expense of the Debtors' commercial creditors and asbestos injury claimants.  Yet, as recognized by Judge Fitzgerald, absent passage of the FAIR Act, the securities holders have *no* economic interest at stake.

5.    That the *Ad Hoc* Committee would file a petition for mandamus-type relief for the ultimate purpose of forcing illegitimate distributions to out-of-the-money equity holders is a flagrant misuse of that extraordinary remedy.  Mandamus is a notoriously drastic

---

[5]    See, e.g., Transcript of the February 21, 2006 Hearing (the "Feb. 21 Transcript") (copy attached as Exhibit 2): "I am going to continue this matter until the March hearing, which is March 27th. If the FAIR Act does get back to the floor, hopefully you'll know it by that date. If not, I'll continue it again to April, because maybe since they're saying in March, and there are 4 days left in March, maybe it won't happen until the 31st. So I'm going to continue this until March 27th, and possibly again until April. And if, in fact, at that point in time, it doesn't look like the FAIR Act is going anywhere, at that point I'll probably decide this issue. But I don't see a basis for it now. It would be advisory. So I'll continue it for that cause, for those reasons, until those dates."

remedy, granted only in extraordinary circumstances, and cannot be properly granted here. The *Ad Hoc* Committee cannot show that it has a *clear and indisputable* right to the requested relief *and* that there is no other adequate means of relief. Nor can the *Ad Hoc* Committee demonstrate any cognizable harm to Owens Corning shareholders under the circumstances of these five-year-old chapter 11 cases during which, time and again, the Bankruptcy Court has painstakingly found that equity is out of the money, and therefore has no legitimate economic interest in the Debtors' enterprise which is now well along the way toward a hard-earned reorganization.

6.      If anything, Judge Fitzgerald's conscientious and deliberate ruling on the Shareholder Motion more than afforded the *Ad Hoc* Committee all of the process that it is fairly due, and offered the petitioner a customized remedy based on the very argument that it has now pressed upon the Bankruptcy Court three separate times – that the potential passage of the FAIR Act at some future point in time might possibly impact the unfortunate but overwhelming economic reality of these cases that, under the law, the billions of dollars of liabilities that the Debtors owe to their thousands of tort, commercial and other creditors must be paid in full in cash before equity can receive anything. Because the Debtors lack sufficient assets to satisfy creditors' claims in full, equity will receive nothing in these cases.

7.      Finally, even if the *Ad Hoc* Committee could meet such a stringent standard (which the Debtors firmly deny), a grant of mandamus-type relief is purely discretionary and the balance of the equities tilts heavily against the *Ad Hoc* Committee. Put simply, this Court should summarily deny the *Ad Hoc* Committee's effort to hijack these chapter 11 cases and force out the Debtors' current Board of Directors in order to manufacture distributions to equity out of these hopelessly insolvent estates.

## BACKGROUND FACTS

**A.      The Fifth Amended Plan and Disclosure Statement**

8.      On December 31, 2005, as promised, the Debtors filed their Fifth Amended Joint Plan of Reorganization for Owens Corning and Its Affiliated Debtors and Debtors-In-Possession (the "Fifth Amended Plan") and the related Disclosure Statement (the "Disclosure Statement"). Following extensive negotiation, the Official Committee of Asbestos Claimants (the "ACC") and the Legal Representative for Futures Claimants (the "FCR") joined as co-proponents of the Fifth Amended Plan. The Fifth Amended Plan is also supported by the steering committee (the "Bank Steering Committee") of the holders (the "Bank Holders") of obligations under Owens Corning's primary pre-petition bank credit facility (the "Pre-Petition Credit Facility"). The Debtors are advised that the Bank Agent and the Majority Lenders (*i.e.*, those holding more than 50.1% of the outstanding obligations under the Pre-Petition Credit Facility) now support the Fifth Amended Plan as well. Accordingly, as of today, representatives of holders of approximately 85% of the more than $10 billion of pre-petition unsecured claims against Owens Corning support the Fifth Amended Plan, and are invested in a fair and orderly plan confirmation process. Following the District Court's estimation of contingent asbestos liabilities and the Third Circuit's definitive ruling on substantive consolidation last year, the filing by the Debtors -- with the consent of key creditor constituencies -- of a confirmable plan marks real and substantial progress toward an orderly emergence from chapter 11. The Bankruptcy Court has scheduled a hearing on April 5, 2006, to determine the adequacy of the proposed Disclosure Statement for the Fifth Amended Plan and has scheduled hearings on the confirmation of the Fifth Amended Plan itself to begin July 10, 2006.

-6-

9.     As a product of substantial negotiation following the Third Circuit's substantive consolidation ruling, the Fifth Amended Plan reflects the economic reality of these cases that there is currently no reasonable prospect for any recovery by Owens Corning's equity holders, an undisputed fact which the Bankruptcy Court has frequently recognized but which the *Ad Hoc* Committee stubbornly and self-servingly refuses to acknowledge.  In fact, under the Fifth Amended Plan, asbestos claimants (whose representatives are plan co-proponents) with claims estimated by this Court after a full trial and opportunity to be heard by all parties in interest against Owens Corning alone at $7.0 billion, bondholders with claims of approximately $1.4 billion, and general unsecured creditors (including subordinated creditors), with claims of more than $550 million  are not entitled to full payment.  In addition, the Debtors estimate that there are administrative and priority creditors of approximately $135 million.  Therefore, it is fundamentally misleading of the *Ad Hoc* Committee and its counsel to contend that the *Ad Hoc* Committee has "a substantial economic interest in the Debtors' Chapter 11 cases and its reorganization" (Mandamus Petition at 3) when it is beyond legitimate dispute that equity has no economic interest under any plausible scenario under the facts and state of the law that currently exist.

10.     In light of these economic realities and the progress toward emergence marked by the Debtors' recent filing of the Fifth Amended Plan, the Mandamus Petition is nothing more than a continued attempt by the *Ad Hoc* Committee to hinder and delay the Debtors' plan confirmation process and the successful completion of these cases.  The *Ad Hoc* Committee admits that the Mandamus Petition, and the underlying relief sought in the Shareholder Motion, are premised entirely on the assumption that the FAIR Act (described very optimistically and incorrectly by the *Ad Hoc* Committee as "impending legislation,"

-7-

(Shareholder Motion at 8)[6] will pass.  The *Ad Hoc* Committee apparently believes that the passage of the FAIR Act will provide cover for its demand for an improper proxy fight over five years into these cases so that a newly appointed Board of Directors can abandon the broad consensus of the Fifth Amended Plan (and, as the Bankruptcy Court has repeatedly noted, ignore its fiduciary duties to the real parties in interest – the creditor body) and instead attempt to force a payout to the equity holders for counsel to recoup its fees from the estate.

### B.     The *Ad Hoc* Committee's Shareholder Motion

11.     On December 22, 2005, the *Ad Hoc* Committee filed its Shareholder Motion seeking to "confirm" the purported right of the shareholders to bring an action in the Delaware Chancery Court compelling Owens Corning to hold an annual shareholders' meeting or, in the alternative, for relief from the automatic stay to enable the Committee to prosecute such an action.  The *Ad Hoc* Committee relied heavily upon passage of the FAIR Act, ascribing prospects for the Debtors' solvency, and hence the need for a shareholders' meeting, on passage of the FAIR Act.  Shareholder Motion at 8-9.  In fact, without a change in the law – or an unlikely reversal of the Estimation Decision – recovery for the equity holders is simply beyond the realm of possibility.

12.     Beneath its disingenuous emphasis on shareholder democracy, the primary motive underlying the *Ad Hoc* Committee's Mandamus Petition is, without question, to take control of these chapter 11 cases during the Debtors' statutorily-granted exclusive period to file

---

[6]     At the January 30 hearing, counsel for the *Ad Hoc* Committee advised the Bankruptcy Court that "I think that the passage of the FAIR Act is highly likely, Your Honor." Jan. 30 Transcript at 59. Far from this rosy prediction, however, and as discussed herein, on February 14, 2006, the FAIR Act failed to obtain enough votes to overcome a procedural challenge to its funding feasibility. Consequently, the FAIR Act has been removed from the Senate floor pending further developments.

and seek confirmation of a plan of reorganization. By pursuing a hostile takeover of the Board and, thereby, the control and direction of these cases, the *Ad Hoc* Committee ultimately seeks to force a distribution to out-of-the-money equity holders from the Debtors' insolvent estates, regardless of the risk to the Debtors' real parties in interest -- the Debtors' asbestos and commercial creditors -- posed by further delaying or blocking confirmation of the Fifth Amended Plan.

        13.     Rather than face up to the underlying economics of these cases, the *Ad Hoc* Committee treats the passage of the FAIR Act or reversal of the Estimation Decision, as well as their impact on the recovery of equity holders, as a near certainty. To further promote these dubious arguments, the *Ad Hoc* Committee attempts to frame the Debtors' reorganization process as a "mad rush to exit Chapter 11" to avoid this purported impact:

> in the face of impending federal legislation . . . that will create a national trust to satisfy fully asbestos-related claims and, at the same time, greatly reduce Owens Corning's financial obligation to satisfy such claims. The FAIR Act has already passed the Senate Judiciary Committee and is scheduled to hit the Senate floor as early as January 2006... The *Ad Hoc* Committee understands that Owens Corning is aggressively pushing this plan on parties-in-interest so that it can be confirmed and consummated in advance of the FAIR Act's passage and, as a result, ensure that asbestos-related claimants keep the windfall.

Shareholder Motion at ¶ 20. By predicating its requested relief on passage of the FAIR Act becoming law or the Estimation Decision being reversed, the *Ad Hoc* Committee only emphasizes that the outcome sought is wholly contingent on a purely speculative future occurrence, one not properly within the purview of the Bankruptcy Court or this Court.

        14.     The Debtors filed an objection to the Shareholder Motion (the "Debtors' Objection"), contending that the real motive of the *Ad Hoc* Committee was to interfere with the Debtors' exclusive right to propound and solicit votes upon a plan of reorganization and thereby to cause further delay to the Debtors' reorganization process by continuing to insist upon the

prospect of a recovery for equity holders, a remote possibility even accepting as true the *Ad Hoc* Committee's highly questionable assumptions about passage of the FAIR Act or reversal of the Estimation Decision. See Debtors' Objection (Bankr. D.I. No. 16701). In addition to concerns raised by the inherently speculative nature and suspicious timing of the Shareholder Motion, the Debtors pointed out the clear authority against requiring a meeting of shareholders where the shareholder demand would jeopardize the reorganization or where the debtor corporation is insolvent. Debtors' Objection at 8-12.

15. The Debtors also objected to the *Ad Hoc* Committee's brazen assumption that the relief sought in its motion is not subject to the automatic stay under Bankruptcy Code section 362(a)(3) or, in the alternative, that the Committee is entitled to relief from the stay to pursue its claims. Debtors' Objection at 12-14. Contrary to the position taken by the *Ad Hoc* Committee, the protection of the automatic stay extends to all property of and actions against property of the Debtors' estates.[7] This broad net clearly encompasses actions by shareholders attempting to exercise dominion or control over a debtor by compelling shareholder meetings, changing the composition of the board of directors, or voting proxies. More specifically, the automatic stay's protection covers the Debtors' established and exclusive property right in controlling the reorganization of their estate without interference, such as that from the Shareholder Motion. See Bank of America v. 203 N. LaSalle Street Partnership, 526 U.S. 434, 455 (1999) (recognizing the significance and value of the exclusive right of the debtor to file a plan). See also Jan. 30 Transcript at 84.

---

[7]    Property of the estate, for example, includes information and documents possessed by a corporate debtor, as well as "intangible rights related to corporate information and documents." In re Commercial Financial Services. Inc., 247 B.R. 828, 843 (Bankr. N.D. Okla. 2000).

C.    **The January 30 Hearing**

16.    The *Ad Hoc* Committee argued strenuously at the January 30, 2006 hearing that the potential impact of the FAIR Act should be considered in evaluating the motions before the court. Jan. 30 Transcript at 37-42. Judge Fitzgerald, however, appropriately closed the door on this possibility, noting that the passage of the FAIR Act is purely hypothetical:

> the FAIR Act has not passed, and so, frankly, it is not something that I can consider in valuing the debtor right now. The Court has to look at what the value of the debtor may be based on pending legislation that may or may not pass, and it if does, may or may not pass in the near term, and if it does, may or may not look anything like what it looks like now. That's all hypothetical.

Jan. 30 Transcript at 38.

17.    Nonetheless, the *Ad Hoc* Committee continued to attempt to make the FAIR Act a prominent part of the discussion. During oral argument, Judge Fitzgerald made it very clear that without passage of the FAIR Act, the *Ad Hoc* Committee's arguments were without foundation:

> I'm not going to see how it makes sense and unless and until somebody can convince me that there is going to be a return to those entities . . . which is dependent on the fact that the FAIR Act may pass, which is nothing but a wish and a prayer.

Jan. 30 Transcript at 36.

18.    After hearing extensive argument on the Shareholder Motion, Judge Fitzgerald was unconvinced a decision could be rendered without certainty about the FAIR Act's future, and instructed Debtors' counsel to continue the Shareholder Motion from month to month until such time as the ultimate outcome of the FAIR Act legislation is more clear. "I want this continued from month to month until I know what's going to happen with respect to the FAIR

-11-

Act . . . I'm going to continue this motion until I find out what the resolution with respect to the FAIR Act is." Jan. 30 Transcript at 93-94.

### D.    The Latest Obstacles to Passage of the FAIR Act

19.    The fairness and wisdom of the Bankruptcy Court's ruling at the January 30 hearing has been borne out by widely-reported subsequent developments regarding the FAIR Act that have clouded the prospects of it becoming law in its current incarnation during this legislative session. This Court can take judicial notice of the fact that on February 14, 2006, the Senate engaged in a vote on a procedural objection to the FAIR Act and failed to obtain the 60 votes necessary to keep debate on the FAIR Act alive. See Bloomberg, "Asbestos Fund Leaders Seek Votes to Save Legislation," James Rowley, Feb. 14, 2006 (copy attached as Exhibit 3); Wall Street Journal, "Asbestos Trust Fund Bill is Defeated," Brody Mullins, p. A10, Feb. 15, 2006 (copy attached as Exhibit 4). As a result of this vote, the legislation has been withdrawn from the Senate floor. See Bloomberg, "W.R. Grace, Owens Corning Fall After Asbestos Legislation Fails," James Gunsalus, Feb. 15, 2006 (copy attached as Exhibit 5). Senate Majority Leader Frist has subsequently said that he only plans to bring the bill up again if he is assured of winning the 60 votes necessary to keep debate alive. See Bloomberg, "Asbestos Trust Fund Alternative May Get Debate, Senator Says," James Rowley and Michael McKee, Feb. 16, 2006 (copy attached as Exhibit 6). Although the *Ad Hoc* Committee will undoubtedly continue to trumpet the prospects of legislation that has now languished in the Congress for over three years, it is fair to conclude that, as of the date of this objection, the likelihood of passage of the FAIR Act has certainly not increased since the January 30 hearing. Thus, the *Ad Hoc* Committee's assurance to the Bankruptcy Court that the FAIR Act would pass at the January 30 hearing looks

-12-

less than prescient, and its inclusion of the FAIR Act language in the current Mandamus Petition is misleading.

### E.    February 21 Hearing

20.    At the February 21, 2006 hearing, the *Ad Hoc* Committee essentially sought a verbal rehearing of its Shareholder Motion in spite of the lack of positive developments in the FAIR Act legislation.  Judge Fitzgerald again declined to rule on the Shareholders' Motion, stating:

> . . . essentially, I will be giving an advisory opinion because there is no money for equity in this case unless the FAIR Act applies. And the arguments at the hearing in January, I think, at least from the Debtors' point of view, make that clear.  So there's the point.  I would be doing nothing other than giving an advisory opinion under the facts of these cases, because at the moment, it doesn't appear that the Debtor is going to be able to propose a plan that will provide for a distribution to equity.  So what's the point?

Feb. 21 Transcript at 8.

21.    Judge Fitzgerald appropriately stressed that the ultimate result the *Ad Hoc* Committee seeks (i.e. a new Board of Directors that would force a payout to out-of-the-money equity holders) would be inconsistent with the Debtors' fiduciary duties:

> There is no way that at this point in time, in this case, that this Court is going to not, not go along with the Chancery Courts in the State of Delaware, and indicate that this is not the right time to take a look at replacing the board because of this. If the board were replaced, and did try to force a plan that provided a distribution to equity when there is no money for equity, that plan would be unconfirmable. And I would immediately be in the position of putting a trustee in place, because that plan and the governance, the people who would be governing would not be honoring their fiduciary duties to the rest of the estate. I would be doing nothing more than giving an advisory opinion.

Id. at 9.

22.    Accordingly, Judge Fitzgerald continued the Shareholder Motion to the March 27, 2006 hearing on Owens Corning matters:

> I am going to continue this matter until the March hearing, which is March 27[th]. If the FAIR Act does get back to the floor, hopefully you'll know it by that date. If not, I'll continue it again to April, because maybe since they're saying in March, and there are 4 days left in March, maybe it won't happen until the 31st. So I'm going to continue this until March 27th, and possibly again until April. And if, in fact, at that point in time, it doesn't look like the FAIR Act is going anywhere, at that point I'll probably decide this issue. But I don't see a basis for it now. It would be advisory. So I'll continue it for that cause, for those reasons, until those dates.

Id.

23.    The *Ad Hoc* Committee now claims that this continuance is tantamount to a "refusal" by the Bankruptcy Court to exercise jurisdiction, and brings this petition for mandamus relief to compel the Bankruptcy Court to enter judgment on the Shareholder Motion, notwithstanding the fact that (1) the Shareholder Motion will be before the Court again at the next omnibus hearing for Owens Corning matters, scheduled for March 27, 2006, and (2) Judge Fitzgerald indicated that she would rule on the Shareholder Motion no later than the April 17, 2006 omnibus hearing date.

## ARGUMENT

**A.    Mandamus is an Extraordinary Remedy and is Wholly Inappropriate Here**

24.    According to the All Writs Act, the Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions.  See 28 U.S.C. § 1651(A).  In particular, "mandamus may be available if an order is not appealable because it is not final and does not fall within an exception to the finality doctrine." Commc'n Workers of Am. v. Am. Tel. and Tel. Co., 932 F.2d 199, 208 (3d.

-14-

Cir. 1991). Mandamus relief allows an appellate court to confine an inferior court to the lawful exercise of jurisdiction or compel the lower court to exercise jurisdiction when it is obligated to do so. In re Patenaude, 210 F.3d 135, 140 (3d Cir. 2000).[8] Traditionally, mandamus has been reserved for situations where a court's failure to consider the petitioner's claims would result in a fundamental miscarriage of justice. Hamm v. Saffle, 300 F.3d 1213, 1216 (10th Cir. 2002); Murphy v. Penn. Board of Probation and Parole, 2004 WL 2040502, *2 (E.D. Pa. Sept. 13, 2004) (copy attached as Exhibit 8). As a practical matter, "'it is widely accepted that mandamus is extraordinary relief that is rarely invoked.'" In re Federal-Mogul Global, Inc., 300 F.3d 368, 378 (3d Cir. 2002) (quoting In re United States, 273 F.3d 380, 385 (3d Cir. 2001). "Because the remedy is so drastic, the Supreme Court has instructed federal appellate courts to use the power grudgingly and only in extraordinary circumstances." DeMasi v. Weiss, 669 F.2d 114, 117 (3d Cir. 1982). Thus, relief in the nature of mandamus is available only in exceptional cases where traditional bases of jurisdiction do not apply, and the use of mandamus relief must be carefully circumscribed. In re Pasquariello, 16 F.3d 525, 528 (3d Cir. 1994). Resort to this infrequent remedy is even narrower in the bankruptcy context.[9] "The broad scope of interlocutory appeal

---

[8]    By operation of Rule 81(b) of the Federal Rules of Civil Procedure, the writ of mandamus has been abolished at the district court level. However, Rule 81(b) provides that the same type of relief can still be obtained through a motion requesting mandamus-type relief. See Fed. R. Civ. P. 81(b). The examples of mandamus-type relief at the district court level are few and far between, though "requests for relief in the nature of mandamus are governed by the same principles that formerly governed mandamus petitions," and the applicable legal standard is the same as for traditional mandamus relief. Aladjem v. Cuomo, 1997 WL 700511, *1 (E.D. Pa. Oct. 30, 1997) (copy attached as Exhibit 7).

[9]    In examining the few bankruptcy cases where mandamus was actually granted, it is clear that the relief requested here cannot pass muster. See, e.g., In re Sharon Steel Corp., 918 F.2d 434, 436 (3d Cir. 1990) (granting mandamus where lower court judge inexplicably refused to rule on motion for consideration); Haines v. Liggett Group, Inc., 975 F.2d 81, 88 (3d Cir. 1992) (granting writ to prevent disclosure of privileged documents, noting

-15-

authorized by section 158(a) necessarily decreases availability of this extraordinary writ. Consequently, mandamus is completely unavailable in most bankruptcy situations." In re Kaiser Steel Corp., 911 F.2d 380, 386 (10th Cir. 1990).

25.     To obtain mandamus relief, the *Ad Hoc* Committee must show that there are no other adequate means to obtain the desired relief *and* that there is a *clear and indisputable* right to the relief sought. See DeMasi, 669 F.2d at 117; Patenaude, 210 F.3d at 140. Even when the preconditions are established, however, the decision of whether to grant relief in the nature of mandamus wholly within the discretion of the appellate court. See Patenaude, 210 F.3d at 141 ("'It is within a court's discretion to refrain from issuing the writ even when the requirements for mandamus are technically satisfied. The availability of the writ does not compel its exercise.'") (quoting In re Chambers Dev. Co., 148 F.3d 214, 223 (3d Cir. 1998)); U.S. v. Ferri, 686 F.2d 147, 152 (3d Cir. 1982) ("Even if a petitioner is able to meet these heavy burdens, the issuance of the writ is still nonetheless 'in large part a matter of discretion with the court to which the petition is addressed'") (quoting Citibank, N.A. v. Fullam, 580 F.2d 82, 90 (3d Cir. 1978)).

**B.      The *Ad Hoc* Committee Does Not Have a Clear and Indisputable Right to Relief**

26.     The *Ad Hoc* Committee cannot meet its heavy burden of establishing that it has a clear and indisputable right to relief from the automatic stay to commence an action in the Delaware Chancery Court, or even if the stay is lifted, that the *Ad Hoc* Committee members in fact have the right to compel an insolvent debtor to conduct a shareholders' meeting for their illegitimate purposes.

---

"the Court admonishes federal appellate courts to exercise their writ power with caution"); In re Sch. Asbestos Litig., 977 F.2d at 772 (judge arbitrarily dismissed a motion as untimely despite not having set a deadline).

27.    As an initial matter, there can be no serious dispute over the scope of the
Bankruptcy Court's continuing jurisdiction to stay "any act [of the *Ad Hoc* Committee or its
members] to obtain possession of property of the estate or of property from the estate or to
exercise control over property of the estate." See 11 U.S.C. § 362(a)(3). Indeed, it is clear from
the *Ad Hoc* Committee's own authorities that this Court has jurisdiction to prevent the
shareholders from voting to replace the Board of Directors—the ultimate goal of the requested
shareholders' meeting. In re Johns-Manville Corp., 801 F.2d 60, 63-64 (2d Cir. 1986) (Manville
III) (holding that the bankruptcy court had jurisdiction under 11 U.S.C. § 105(a) and 28 U.S.C. §
157(b)(2)(A) to prohibit the equity committee from pursuing an action in Delaware state court to
compel the debtor to hold a shareholders' meeting); In re Marvel Entm't Group, Inc., 209 B.R.
832, 838 (D. Del. 1997) (finding that a bankruptcy court may bar shareholders from voting
shares to replace the debtor's board of directors where such action constitutes clear abuse); see
also In re Bicoastal Corp., 1989 Bankr. LEXIS 2046 (Bankr. M.D. Fla. Nov. 21, 1989) (copy
attached as Exhibit 9) (holding that section 362(a)(3) prevents a shareholder from exercising its
right to elect a majority of the debtor's board of directors). Read together with section 1121 of
the Bankruptcy Code, section 362(a) is meant not only to give the debtor a "breathing spell"
from its creditors in order to control its reorganization, but also is meant to preserve the property
of the estate for all creditors' benefit and to allow a debtor to put forth a confirmable plan of
reorganization. Bicoastal, No. 89-8198, 1989 Bankr. LEXIS 2046, at *17.

28.    Thus, even if relief from the stay were granted, it is far from clear and
indisputable that the *Ad Hoc* Committee members could successfully compel a shareholders'
meeting given the current circumstances. As a general matter, the state-law right of shareholders
to convene an annual meeting is conditional, and must often yield to the federal rights and

-17-

interests of all stakeholders in a collective chapter 11 proceeding. This is particularly applicable

when, as here, there is no reasonable possibility that the shareholders can recover any value in

the reorganization, thereby undermining any potential legitimate reason for convening a

shareholders' meeting. This fact alone is enough to stay an attempt to compel a shareholders'

meeting. See Manville III, 801 F.2d 60, 64. In Manville III, the Second Circuit Court of

Appeals recognized that the insolvency of a debtor can be, in and of itself, a sufficient reason to

deny the right to compel a shareholders' meeting:

> We note that if Manville were determined to be insolvent, so that
> the shareholders lacked equity in the corporation, denial of the
> right to call a meeting would likely be proper, because the
> shareholders would no longer be real parties in interest.

Manville III, 801 F.2d at 65, n. 6.

29.    Shareholder demands for special meetings may also be prevented where

they constitute "clear abuse" and "bad faith" by creating a real jeopardy to reorganization

prospects, such as by upsetting the fragile consensus supporting a plan. See Manville III, 801

F.2d 60 at 64; Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.), 66

B.R. 517, 518 (Bankr. S.D.N.Y. 1986) ("Manville IV");[10] see also Marvel Entm't, 209 B.R. at

---

[10]    In Manville IV, the Bankruptcy Court for the Southern District of New York, on remand
from the Second Circuit, specifically found that the shareholders' demand for an annual
meeting constituted "clear abuse" under the Second Circuit's test. Manville IV, 66 B.R.
at 520. After sifting through four years of contentious negotiations and proceedings
related to the massive and complicated asbestos bankruptcy, the court enumerated five
reasons why the shareholders should not be permitted to force a shareholders' meeting:
(1) damage to the consensus in support of the plan; (2) termination of plan exclusivity;
(3) likelihood of causing liquidation; (4) potential for appointment of a trustee; and (5)
impossibility of new management success. Id. at 536-540. The court also noted the lack
of mitigating factors, and held that the five potential stumbling blocks, in the context of
the length, size, and bitterness of the reorganization, constituted clear abuse and would
irreparably harm the debtor's estate. Id. at 541. All of these factors weigh heavily in
favor of denying the right to compel a shareholder meeting here.

-18-

838 (finding that a bankruptcy court may prohibit shareholders from voting shares to replace the debtor's board of directors where such action constitutes clear abuse and bad faith). The Mandamus Petition demonstrates that the *Ad Hoc* Committee and its members are willing to risk the entire plan confirmation process to gain leverage they do not have under the laws that exist today. Under both federal bankruptcy and state corporate law, there is no legitimate purpose to be served by permitting out-of-the-money shareholders to conduct a proxy contest and oust the Board during the middle of the Debtors' plan confirmation process against the will of the Debtors' creditors – who are the real stakeholders here. Any such result would turn on its head the absolute priority rule in bankruptcy (which is a codification of the well-established rules of distribution out of bankruptcy) that creditors must be paid in full before equity takes anything. See 11 U.S.C. § 1129(b).

30.    The *Ad Hoc* Committee's lack of legitimacy is further revealed by the fact that the relief, if granted, would be of no real consequence to current equity holders. The Bankruptcy Court found, based on the uncontroverted evidence in the record, that current equity is out of the money, and that, by virtue of the absolute priority rule, current equity holders cannot receive any recovery through the ultimate relief they seek to obtain. Simply stated, permitting an unnecessary, distracting and costly proxy fight cannot alter the underlying reorganization value available for distribution to creditors in these cases, or the multiple billions of dollars of claims asserted against the Debtors that must under the law be paid in full before equity is entitled to any recovery. This Court should not countenance the *Ad Hoc* Committee's attempt to accomplish, by mandamus, such a useless act. Cf. Republic Indus., Inc. v. Central Pennsylvania Teamsters Pension Fund, 693 F.2d 290, 296 (3d Cir. 1982) (stating that the law should never command a litigant to perform a useless action). As Judge Fitzgerald stressed at the February 21

-19-

hearing: "If the board were replaced, and did try to force a plan that provided a distribution to equity when there is no money for equity, that plan would be unconfirmable. And I would immediately be in the position of putting a trustee in place, because that plan and the governance, the people who would be governing would not be honoring their fiduciary duties to the rest of the estate." Feb. 21 Transcript at 9.

31.    This Court should also flatly reject the *Ad Hoc* Committee's contention that it has a right to have its Shareholder Motion adjudicated immediately.  Undue delay can be a potential ground for the issuance of writ of mandamus, but only when the delay is so extreme as to constitute a failure to exercise jurisdiction.  Compelling adjudication inherently interferes with the lower court's discretion in the exercise of its jurisdiction, and thus appellate courts have been very reluctant to base a grant of mandamus on this rationale.  In fact, nearly all the cases cited by the *Ad Hoc* Committee to inform the mandamus relief standard support this very principle.  See, e.g., Madden v. Myers, 102 F.3d 74, 79 (3d Cir. 1996) (denying petitioner's claim for writ of mandamus where federal habeas petition had not been ruled on for three months); McDonnell Douglas Corp. v. Conductron Corp., 429 F.2d 30, 31 (3d Cir. 1970) (declining to issue a formal writ of mandamus ordering judge to rule on motion to transfer); Coleman by Lee v. Stanziani, 735 F.2d 118, 120 (3d Cir. 1984) (denying mandamus to compel judge to grant motion, noting that "mandamus to control the exercise of discretion is wholly inappropriate"); Satter v. KDT Indus., Inc., 28 B.R. 374, 375 (S.D.N.Y. 1982) (court refused to grant writ of mandamus compelling bankruptcy court judge to end stay of proceedings); Wagner v. U. S. Bankruptcy Court, 92 B.R. 614, 616 (E.D. Pa. 1988) (denying petition for writ of mandamus seeking to compel bankruptcy court to adjudicate Chapter 13 petition).

-20-

32.    The transcripts of the Bankruptcy Court's January 30, 2006 and February 21, 2006 hearings make clear that, contrary to the *Ad Hoc* Committee's continual protestations, the Court *did* exercise its jurisdiction over the Shareholder Motion, and did enter a ruling that was both thoughtful and reasonable, and preserved the rights and potential interests of all concerned parties, while permitting the Debtors' reorganization efforts to proceed without further delay.  Indeed, by permitting the *Ad Hoc* Committee to have another opportunity to return to Court and reassert its arguments if, as it vociferously predicted, the FAIR Act were soon enacted into law, the Bankruptcy Court customized its ruling in a manner that gave recognition to the very FAIR Act argument urged by the Committee.  In doing so, the Bankruptcy Court corrected the *Ad Hoc* Committee's misconception of the scope of the automatic stay to protect the Debtors' exclusive right to pursue the Fifth Amended Plan.

33.    In the extremely rare case where a mandamus petition was granted, mandamus was only available because a lower court *clearly and indisputably* departed from generally accepted practice in a way that was arbitrary, unjustified, or unexplained.  See In re Sch. Asbestos Litigation, 977 F.2d 764, 772 (3d Cir. 1992) (granting the petitioner's writ of mandamus petition as to the disqualification of the district court judge); In re Sharon Steel Corp., 918 F.2d at 436 (granting mandamus relief because of the lower court judge's "unexplained abdication of judicial power").  Here, Judge Fitzgerald has clearly articulated her position on the record by explaining that even if the relief were granted at this time and the Board were replaced, she would be unable to allow the new board to force a plan providing for distribution to equity because doing so would be a violation of the Board's fiduciary duties.  Feb. 21 Transcript at 9. Judge Fitzgerald's decision to reserve ruling on the motion pending future FAIR Act

-21-

developments cannot be said to be "arbitrary" or "inexplicable," particularly where she has expressed her intent to fully resolve the Shareholder Motion as early as April 17, 2006.

### C.    The *Ad Hoc* Committee Has Other Avenues For Relief

34.    The *Ad Hoc* Committee cannot show that no other adequate means exist to obtain the requested relief.  Where an appeal may still be available, mandamus-type relief is not a proper remedy.  In re Kensington Int'l. Ltd., 353 F.3d 211, 219 (3d Cir. 2003) ("'Mandamus must not be used as a mere substitute for appeal.'  If, in effect, an appeal will lie, mandamus will not.") (quoting In re Sch. Asbestos Litig., 977 F.2d at 772).  The Shareholder Motion was considered at both the January 30, 2006 and February 21, 2006 hearings, but Judge Fitzgerald decided to hold over the Shareholder Motion for another hearing because a critical component of the *Ad Hoc* Committee's underlying argument – *i.e.*, the FAIR Act – remains purely speculative. Although an order adjudicating the Shareholder Motion has not yet been entered, the motion thus far has only been continued twice and the next omnibus hearing is only weeks away.  With only 42 days having passed since the Bankruptcy Court first considered the Shareholder Motion, this is hardly an outright refusal to adjudicate the order.

35.    The *Ad Hoc* Committee complains that it cannot appeal the Shareholder Motion in its current posture, but without passage of the FAIR Act and/or reversal of the Estimation Decision, there is no basis for appeal whatsoever under the applicable law and facts. The *Ad Hoc* Committee has no basis to claim that the Bankruptcy Court is required to enter immediate judgment on the Shareholder Motion.  A bankruptcy court has inherent power to manage the cases before it, which includes exercising the discretion to grant, deny, stay, or condition motions before it.  Relief in the nature of mandamus is particularly inappropriate where, as here, the action the petitioner seeks to compel is within this type of discretionary

-22-

power of the court. See Aladjem, 1997 WL 700511 at *4 (writ of mandamus petition dismissed where relief sought was discretionary in nature and where alternative remedies to mandamus existed).

36.     The *Ad Hoc* Committee's argument that section 362(e) of the Bankruptcy Code compels the Bankruptcy Court to adjudicate the motion within 30 days (Mandamus Petition at 11) also has no merit. The legislative history is quite clear that section 362(e) "provides a protection for *secured* creditors that is not available under present law." In re Brusich & St. Pedro Jewelers, Inc, 28 B.R. 545, 549 (Bank. E.D. Pa. 1983) (emphasis in original) (citing H.R. 8200, 95th Cong., 1st Sess. (1977) pp. 340-344). Section 362(e) is designed "to prevent unnecessary delays and adverse effects on the bankrupt estate's assets and the rights of *secured creditors* which have historically been occasioned by the inaction of the bankruptcy courts . . . ." In re Wedgewood Realty Group, Ltd., 878 F.2d 693, 696 (3d Cir. 1989) (emphasis added). The *Ad Hoc* Committee members are preferred and equity shareholders of Owens Corning -- not secured creditors. See, e.g., Case v. Los Angeles Lumber Prod. Co., 308 U.S. 106, 116 (1939) (stockholder's interest is subordinate to the rights of both secured and unsecured creditors). Therefore, the *Ad Hoc* Committee has no entitlement to the benefits of section 362(e) of the Bankruptcy Code.[11] Furthermore, even if section 362(e) were applicable, there has been

---

[11]     Assuming, *arguendo*, that section 362(e) applies to the members of the *Ad Hoc* Committee as equity holders as opposed to secured creditors, in accordance with the provisions of section 362(e) the "[f]ailure either (1) to hold a hearing within thirty days of the filing of the request for relief, or (2) to issue an order continuing the stay and to schedule a final hearing within thirty days of the preliminary hearing, results in automatic termination of the stay." Wedgewood, 878 F.2d at 697. Pursuant to section 362(e), however, the court may "order such stay continued in effect pending the conclusion of the final hearing . . . ." 11 U.S.C. § 362(e). As the *Ad Hoc* Committee has acknowledged, the thirty-day period can be extended "for a specific time which the court finds is required by compelling circumstances." Mandamus Petition at 11. According to the legislative history, "the occurrence of an event beyond the parties' control" provides

-23-

no violation of section 362(e) here. Section 362(e) by its terms allows a court to extend the time for adjudication of a relief from stay motion by ordering the stay continued pending a final determination of whether relief from the stay is indeed warranted. See 11 U.S.C. § 362(e). The stay motion was timely heard by the Bankruptcy Court at the January 30, 2006 hearing, and was continued pending final adjudication in accordance with the requirements of section 362(e). Jan. 30 Transcript at 93-94.

37.     Finally, it is noteworthy that while the *Ad Hoc* Committee asserts that it is unable to appeal the Shareholder Motion at this moment, there is a possibility that the *Ad Hoc* Committee may seek an interlocutory appeal of the Shareholder Motion in the near future. The next omnibus hearing in the Bankruptcy Court for Owens Corning is scheduled for March 27, 2006, at which time the *Ad Hoc* Committee will presumably again raise this matter, and at which time Judge Fitzgerald may well rule on the Shareholder Motion. If Judge Fitzgerald denies the Shareholder Motion, the *Ad Hoc* Committee may then seek leave to appeal. Whether or not the appeal is successful, this alternative avenue to the requested relief cannot be dismissed. The fact that pursuing this avenue may cause some delay to the *Ad Hoc* Committee is not a ground to ignore this alternative as a possible means of relief. See, e.g., In re Nwanze, 242 F.3d 521 (3d Cir. 2001) (denying writ petition despite the delay in relief denial would cause to petitioner by forcing him to pursue alternative remedy).

---

the Bankruptcy Court with compelling circumstances to extend the thirty-day period. 140 Cong. Rec. H 10764 (Oct. 4, 1994). Here, the compelling circumstances that remain outside of the *Ad Hoc* Committee's and the Debtors' control include, among other things, the status of the FAIR Act before Congress.

**D.     The *Ad Hoc* Committee is Not Entitled to Discretionary Relief**

38.     Even if the *Ad Hoc* Committee could somehow comply with the strict requirements for mandamus relief, this Court should not choose to utilize its discretion to issue such relief. Each of the members of the *Ad Hoc* Committee, on information and belief, acquired its stock holdings during the pendency of these chapter 11 cases with its eyes wide open, well aware of the financial condition of the Debtors and the other material developments throughout these cases that are a matter of public record. As a matter of law, there can be no irreparable harm to the Debtors' sophisticated financial institutional shareholders by expecting them to stand in line behind the real parties in interest in these cases, the asbestos and commercial creditors. As discussed, this purported outcry over corporate governance rights is in reality only a thinly veiled attempt to hijack these cases to somehow wring out a recovery from the Debtors' insolvent estates. There is simply not enough money to go around, and the equity holders are plainly barred from recovering from the estate until all other creditors have been fully paid.

## CONCLUSION

39.     The *Ad Hoc* Committee is not remotely entitled to the relief sought here. The Debtors have repeatedly pointed out that the *Ad Hoc* Committee's efforts are disingenuous and geared only toward causing further delay to the Debtors' reorganization. See Jan. 30 Transcript at 85; see also Debtors' Objection at 14. Over the past 65 months the Debtors' shareholders have been actively involved in the Debtors' reorganization process, and have (together with the *Ad Hoc* Committee) had a full opportunity to participate as parties in interest under section 1109 of the Bankruptcy Code. Only now, when it has become apparent that the Debtors have reached the broad consensus necessary to move forward with a plan -- one that necessarily does not provide payment to equity holders -- has the *Ad Hoc* Committee decided to

seek an alleged entitlement to a shareholders' meeting. The *Ad Hoc* Committee's transparent and self-serving attempt to force recovery where there is none to be had is not only futile, but detrimental to the Debtors' other creditors, as well as the Debtors' pending reorganization process on the whole. The Mandamus Petition is an improper effort by parties lacking any substantial economic interest to manipulate the reorganization process for their own illegitimate purposes, and should not be granted.

[SIGNATURES ON NEXT PAGE]

-26-

Dated:  March 14, 2006

SIDLEY AUSTIN LLP


James F. Conlan
Larry J. Nyhan
Jeffrey C. Steen
1 South Dearborn Street
Chicago, IL  60603
(312) 853-7000

-and-

Guy S. Neal
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000

Co-Counsel for Owens Corning, *et al.*
Debtors and Debtors-in-Possession

-and-

SAUL EWING LLP


By:    /s/ Norman L. Pernick
       Norman L. Pernick (No. 2290)
       J. Kate Stickles (No. 2917)
       Domenic E. Pacitti (No. 3989)
       222 Delaware Avenue
       P.O. Box 1266
       Wilmington, DE  19899-1266
       (302) 421-6800

       Counsel for Owens Corning, *et al.*
       Debtors and Debtors-in-Possession

533932

DC1 832204v.1

# EXHIBITS TO

## OBJECTION OF DEBTORS TO MOTION OF *AD HOC* COMMITTEE
## OF PREFERRED AND EQUITY SECURITY HOLDERS FOR ENTRY OF
## AN ORDER PROVIDING FOR RELIEF IN THE NATURE OF MANDAMUS

| | |
|---|---|
| Exhibit 1 | Transcript of January 30, 2006 Hearing |
| Exhibit 2 | Transcript of the February 21, 2006 Hearing |
| Exhibit 3 | Bloomberg, "Asbestos Fund Leaders Seek Votes to Save Legislation," James Rowley, Feb. 14, 2006 |
| Exhibit 4 | Wall Street Journal, "Asbestos Trust Fund Bill is Defeated," Brody Mullins, Feb. 15, 2006 |
| Exhibit 5 | Bloomberg, "W.R. Grace, Owens Corning Fall After Asbestos Legislation Fails," James Gunsalus, Feb. 15, 2006 |
| Exhibit 6 | Bloomberg, "Asbestos Trust Fund Alternative May Get Debate, Senator Says," James Rowley and Michael McKee, Feb. 16, 2006 |
| Exhibit 7 | Aladjem v. Cuomo, 1997 WL 700511 (E.D. Pa. Oct. 30, 1997) |
| Exhibit 8 | Murphy v. Penn. Board of Probation and Parole, 2004 WL 2040502 (E.D. Pa. Sept. 13, 2004) |
| Exhibit 9 | In re Bicoastal Corp., 1989 Bankr. LEXIS 2046 (Bankr. M.D. Fla. Nov. 21, 1989) |

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .      Chapter 11
                                .
OWENS CORNING, *et al.*,        .      Case Nos.00-03837(JKF)
                                .      Jointly Administered
        Debtors.               .
                                .      Jan. 30, 2006 (10:43 a.m.)
                                .      (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

16874

1    THE COURT: This is the matter of Owens Corning, 00-

2    3837.  The participants I have by phone are Gordon Harris,

3    James McClammy, Isaac Pachulski, John Shaffer, Joseph

4    Gibbons, Michael Davis, Michael Insalaco, Sandy Esserman,

5    David Parsons, Monte Travis, Bruce White, Christine Jadge,

6    Robert Millner, Rory Dunne, Ira Levee, Stephen Blauner,

7    Howard Steel, Stephen Vogel, Marti Murray, David Witkins,

8    Rebecca Pacholder, Stuart Kovensky, Sara Gooch, Oliver Butt,

9    and Rob Lennon.  I'll take entries in court, please.

10    MR. PERNICK: Good morning, Your Honor, Norman

11    Pernick on behalf of the debtors.

12    THE COURT: Anyone else want to enter an appearance?

13    Good morning.

14    MR. GRAY: Your Honor, good morning.  Anthony Gray,

15    Brown, Rudnick, Berlack, Israel for the Ad Hoc Committee of

16    Preferred and Equity Security Holders.

17    MR. KRESS: Andrew Kress from Kaye Scholer on behalf

18    of Mr. McMonagle as the Future's Representative.

19    MR. RAHL: Andrew Rahl from Anderson Kill on behalf

20    of the Bonds and Trade.

21    MR. STEEN: Jeffrey Steen, Sidley Austin also on

22    behalf of the debtors.

23    MR. SUDELL: William Sudell of Morris, Nichols on

24    behalf of the Creditors Committee.

25    MR. GRAULICH: Good morning, Your Honor.  Timothy

1  Graulich of Weil Gotshal & Manges on behalf of Credit Suisse

2  as agent.

3      MR. LOCKWOOD: Good morning, Your Honor.  Peter

4  Lockwood, Caplin & Drysdale for the Asbestos Claimants

5  Committee.

6      MR. KRUGER: Lewis Kruger, Your Honor, with my

7  partner Ken Pasquale, Stroock, Stroock & Levine counsel for

8  certain bondholders.

9      MS. ZIEG: Good morning, Your Honor, Sharon Zieg of

10 Young Conaway Stargatt & Taylor on behalf of the Asbestos

11 Futures Representative.

12     MR. KLAUDER: Good morning, Your Honor.  David

13 Klauder for the United States Trustee.

14     MR. HURFORD: Good morning, Your Honor.  Mark

15 Hurford of Campbell & Levine on behalf of the ACC.

16     THE COURT: Mr. Pernick?

17     MR. PERNICK: Your Honor, just on the phone list, we

18 had a couple of additional add-ons because unfortunately we

19 had people coming in from Toledo, particular Mr. Kroll, Mr.

20 Christie and Mr. Gibb, and I think they're on the phone.

21 Just because of the fog they couldn't get in.  So, I

22 apologize that that was a last minute.  I think we let

23 chambers know that we made that adjustment.

24     THE COURT: All right, thank you.

25     MR. PERNICK: Your Honor, if you'd like I'll go

1   through the agenda and just to make sure that our records

2   match with each other about what's going forward and what's

3   resolved and continued.  I have as continued to the February

4   21 hearing -

5           THE COURT: Mr. Pernick, I'm sorry -

6           MR. PERNICK: Uh-huh.

7           THE COURT:  - wait just a second.  Okay, thank you.

8           MR. PERNICK: No problem.  Item number 1 and number

9   2, that's the - Number 1 is the Committee's Trustee motion

10  and number 2 is the protective order related to the Trustee

11  motion.  And as the Court saw, I think in the agenda but also

12  in the exhibit that was attached to the disclosure statement,

13  the Bank Steering Committee is seeking authority to dismiss

14  those as well as some other actions in light of the agreement

15  that was reached.  Continued to March 27th is item number 14,

16  which is the R/S motion to extend time to file a late proof

17  of claim.  We have filed CNOs or COCs on items number 3, 4,

18  5, 6, and 10, those are all omnibus objections to claims, as

19  well as item numbers 15 and 16, which relate to the Allianz,

20  that's A-l-l-I-a-n-z, settlement, that's an insurance

21  settlement, and number 18, which is the Asahi share purchase

22  agreement.  We have resolved and we will be submitting a

23  motion and/or an order to the Court, number 9, which is the

24  objection to the Mayer proof of claim.  I actually think that

25  one - I'll check my notes, is a scheduling order that we're

1  going to submit. Yeah, we're going to try to submit a

2  consensual scheduling order on item number 9. And item

3  number 13, there's a settlement motion on for February 23rd

4  before Your Honor. That was a pretrial conference for today,

5  obviously we're requesting that that be continued so that the

6  Court can hear the settlement motion. You entered orders on

7  numbers 8, 13, 17, and 19.

8         THE COURT: I'm sorry, what were those again?

9         MR. PERNICK: Eight, which is the objection to the

10  Red Roof Inns' claim; 13, the WilTel settlement; 17, the

11  Newark/Ohio property sale; and 19, which is the seal motion

12  related to the Asahi sale purchase agreement motion. Numbers

13  21 and 22 were two pre-trials for today. They are two

14  adversary actions against asbestos law firms. Unfortunately,

15  these two law firms were in the New Orleans area, and we

16  could not get tolling agreements with them because of the

17  events down there. So, we actually filed the litigation and

18  then we moved to stay it just to preserve the claims. And

19  that - And item number 7 is withdrawn. That's the debtor's

20  motion to strike with respect to InaCom, and that would leave

21  us with the following as far as my records are concerned.

22         THE COURT: Has that been done on the docket?

23         MR. PERNICK: Excuse me?

24         THE COURT: Has it been withdrawn on the docket,

25  item 7?

1    MR. PERNICK: I believe we did. Let me just check.

2  Yes, that was withdrawn, notice to withdraw filed on January

3  20th.  It's docket number 16746.

4    THE COURT: Okay, thank you.

5    MR. PERNICK: So that leaves us with matters going

6  forward: item number 11, which is the motion for appointment

7  of an Equity Committee; item number 12, which is the motion

8  to compel a shareholders meeting; item number 20, which is

9  the debtor's motion to extend exclusivity; item number 24,

10  which is the status conference regarding the Committee's

11  professionals, and then I have one housekeeping item at the

12  end of the hearing today.

13    THE COURT: All right.

14    MR. PERNICK: Unless the Court would prefer

15  otherwise, my suggestion is I'd like to move to number 20 and

16  do that first and then take on items number 11 and 12.

17    THE COURT: That's fine.

18    MR. PERNICK: Your Honor, we listened with interest

19  to the USG hearing and it seems like today is a day for good

20  news at least in a second hearing which is ours.  As the

21  Court, I think, is aware, we did what the Court ordered.  We

22  filed a confirmable plan and disclosure statement and a

23  complete set of documents not a placeholder set, which I

24  think some of our partitas (phonetical) were concerned with.

25  But we actually filed, a full set of documents, and we just

1   supplemented the last two pieces of financial information

2   which were the projections and another thing.  We did that, I

3   think, last week.  We filed all of their documents except

4   those two by December 31 as the Court ordered.  I'd like to

5   just, if I can, refresh the Court and counsel with what the

6   Court said on November 14th because that's the issue that's

7   really been joined for today by the objectors in responding

8   to our motion, and I'm on page 44 of the November 14th

9   transcript.  "The Court: Well, maybe it's not such a bad idea

10  to have the debtor actually do a draft of what it thinks the

11  term sheet ought to look like and let people take potshots at

12  it, and if, in fact, you can't get a consensus, you can't.

13  If that's still what the debtor thinks is in the best

14  interest of the estate, you file the plan but that way what I

15  won't hear when we get to the disclosure statement hearing

16  the next time is that there has been a group left out in the

17  cold because they would have had an equal opportunity, and if

18  they can't agree, then more's the pity.  They can't agree."

19  I said, "Your Honor, I thought I was clear but I apologize if

20  I wasn't.  We are not going to file a plan without talking to

21  each group and giving them the benefit of our ideas about

22  what that plan should be."  And then continuing on page 46 of

23  the transcript, the Court said to me: "Okay, make sure this

24  is my order, that the debtor circulates a term sheet to all

25  constituent groups before it files its plan in sufficient

time for the constituent groups to react to that term sheet
so that in the event that there is a spark of hope that there
can be a consensus that the debtors can then go back to those
groups and attempt to, you know, tweak to the extent that is
necessary for the term sheet. If that effort fails, then it
will not be for the debtor's lack of effort. That's what I
want to see, the debtor's effort. I'm not purporting to
suggest to the debtor when and how to go about doing it
except to set the time line. I want it done in enough time
that the groups can react and that the debtor has some
opportunity to renegotiate with other groups based on the
comments that it obtained." And, Your Honor, that's exactly
what we did, and if the Court will recall where we were at
that point in time was, we did not have an agreement really
with anybody on what the fifth amended plan would say. We
didn't have an agreement with the ACC, the Futures Rep., the
banks or the bondholder groups. What we filed not only has
the ACC and Futures Rep. as co-proponents to the plan, but is
also supported by the Bank Steering Committee which, as of
the latest information, holds approximately 46 percent of the
bank debt. That plan takes into account the substantive
consolidation and estimation rulings. It treats similarly
situated creditors alike, and the Court has set now, which we
noticed on Friday, a disclosure statement for that plan for
April 5th. We would have preferred to reach a fully

consensual deal by December 31, but we didn't quite get
there.  We will continue to attempt to do so.  The plan that
we filed, however, can be crammed down on those who seek
delay.  We prefer not to do it that way, but we will do it if
we have to.  We submit that the debtor's exclusivity has
helped keep the focus and drive the process and the results
to date.  Basically, we've done everything that we've said
we'd do.  We actually believe that we did a little bit more
than that.  We've much progress, and we're not done yet.  We
should be permitted to continue.  With respect to evidence
for today, and I'm at a little bit of a disadvantage for two
reasons: One, Mr. Krohl I was going to proffer, and he's not
here, but he is on the phone, and I think what I'd like to do
is - there's really only a couple of points of contention, I
think, on the facts.  I think I just - I was involved in when
the term sheets went, what discussions happened.  I think I'd
make representations on the record, if counsel for the
objectors would like to actually have the evidence heard,
then we can maybe make arrangements with the Court's schedule
for Mr. Krohl to fly in later today and do that.  We can do
it on the phone.  It's really at the Court's pleasure.  I'm
hoping it's not necessary, but I wanted to at least, for the
record, let the Court and the parties know that we are
prepared to make that evidentiary record to the extent it's
necessary.  And that evidentiary record, let me ask two

1  things: One, I'd ask the Court to incorporate by reference

2  the proffer that I made for Mr. Krohl back at the November

3  14th hearing.  I don't think there's any reason to go back

4  and restate that proffer.  I really want to focus on the

5  events since the November 14th hearing, which I think serve as

6  more than a basis for the extension that we request today.

7          THE COURT: All right, I can incorporate those by

8  reference.

9          MR. PERNICK: Your Honor, the main objector group is

10 a crossover group of bondholders and bank holders.  There is

11 - We still do have Mr. Rahl's group, which as I understand it

12 is two bondholders, and I believe that they are both still

13 represented by him and still in their positions.  The

14 crossover group alleges a blocking position in each of the

15 bank and the bond debt.  They do not allege that they have a

16 control position or an ability to deliver or vote for a plan.

17 They only allege that they have the position to block any

18 attempts to get a class vote, and in our view, they're

19 attempting to leverage the bank vote to improve the bond side

20 of their recovery, which is perfectly acceptable from their

21 point of view, but from the debtor and the Court's point of

22 view, we believe that that's a relevant fact because it

23 affects whether or not at this point in time the Steering

24 Committee is going to get the authority to actually do a lot

25 of things down the line that they need to do.  Right now

FORM FED-25    PENGAD · 1-800-631-6989

1  they're at 46 percent.  I think it's our belief that they

2  will be well above 51 percent if you had fewer bank holders

3  and fewer bondholders.  If you look at the objection that was

4  filed by Mr. Kruger and the crossovers, they really allege

5  that we didn't talk in earnest with them, and they haven't in

6  our view updated their objection and argument to reflect

7  events since the January 13th objection that they filed even

8  though they filed a corrected objection on the 27th, and they

9  leave some key facts out, in our point of view.  First of

10  all, they neglect to tell the Court that only two members of

11  their group ever agreed to be restricted and sign

12  confidentiality agreements.  We don't necessarily have a

13  problem with that, but it makes it difficult to negotiate

14  when you don't have the full compliment who are inside the

15  loop and understand what the deal is and have the ability to

16  sign off.  Now, I know what the responses are to that.  That

17  if there's a deal that's good enough, it's put on the table,

18  they'll bring them in, but the Court should understand that

19  they're trying to play both sides of the fence.  They want to

20  trade, but they also want to have part of their group

21  negotiate, and I only make it for the point not for the truth

22  of the matter, but I really make it for the point that it

23  just made the negotiations difficult.  Second, they say they

24  want to make a deal, but as I mentioned before they refused

25  to restrict their trading to do so, and that again is also

making it difficult.  They've never alleged that they have

the ability to deliver two-thirds an amount in a vote of the

class, only that they have a blocking position.  Now, even

with all of that, we did talk to them.  We gave them - I

can't remember whether it was a 5-page single spaced term

sheet or a 7-page but a pretty detailed term sheet in the

beginning of December.  We actually received from them a term

sheet on December 7th, which was relatively detailed,

detailing a totally different structure, and we evaluated

that, and we talked to them, but the Court needs to

understand that we had a strategy of what we felt like we

needed to talk to the ACC and the Futures Rep. first and find

out almost as a mediator what would be acceptable to them,

what was the range of possibilities, what did we think would

be things that they may or may not accept.  We then went to

the banks, because we thought that we could actually close

with them faster than we could close with the bondholders.

We, unfortunately, were set, you know, were given a set of

circumstances where substantive consolidation and estimation

were decided.  Sub-Con wasn't necessarily decided the way

that we argued it, but we had that decision, and so it just

made, in our view, and I think this is the debtor's

discretion and business judgment, a better strategy to go

talk to the banks and the ACC and the Futures Rep. first, all

along trying to decide what might be acceptable to the

1  bondholders and then go to the bondholders second.  So when

2  the bondholders complained that we didn't get to them soon

3  enough or we didn't negotiate with them fair enough, I think

4  it's a question of timing, but I think they will have

5  difficulty standing up before you now and telling you, as we

6  sit here on January 30th, that we have not had substantive

7  discussions with them about the terms of the consensual plan.

8        MR. KRUGER: There will be no problem with our

9  saying that, Your Honor.

10        MR. PERNICK:  Okay.

11        MR. KRUGER:  We have not.

12        MR. PERNICK: The discussions that happened from the

13  debtor's point of view happened at both the lawyer and the

14  principal level.  They happened in December.  They happened

15  in January.  We hope they will still continue to happen, and

16  we believe that they are and they will.  The problem is that

17  they're interested in a very different structure with a lot

18  more debt than we are in the plan, and I believe a lot more

19  debt than asbestos is interested in, but they're here to

20  speak for themselves.  What's really going on here, Your

21  Honor, is that the bondholders believe that the enterprise

22  value is greater, significantly greater than we have in the

23  plan of reorganization, and they would like to capture that

24  by having all the equity, and they believe that asbestos

25  should take cash instead of the equity without much of that

upside, and that's the discussion that has been taking place
and will take place.  We just have a disagreement about that,
but it doesn't mean that we won't reach a resolution, but
there are two different structures right now that are on the
table.  So what it comes down to is they really just don't
like our strategy.  We worked hard to make a deal with the
ACC and the Futures Rep. and then the banks.  We then turned
to the bonds.  We believe we made extraordinary progress
particularly since the November 14th hearing.  We have
exclusivity.  In our view it's been working.  The bonds
desire to control that process for their own benefit, and we
don't believe that's a valid basis for an objection.
Amazingly, the crossovers alleged in their objection that,
quote, "In light of the debtor's core five-year track record
of failing to resolve these cases, the time has come to
permit another constituency to move these cases to
conclusion."  That's on page 4 of their objection.  I just
don't know if they've been in the same case that we've all
been in for these five years.  I don't know how they could
conclude that.  There is no evidence in their objection or
presented today that is a basis for that statement.  There
are no facts alleged or substantiated in our view that the
debtors have done anything other than act as a fiduciary for
the entire estate and in its best interest.  In sum, we did
talk.  We have been talking, and we'll continue to talk if

1    there's any interest and a reason to do so.  So their

2    strategy, in our view, is clear.  We believe that they would

3    like to create their own adoption, and that by delaying, they

4    will be able to do that, and what they've done the Court may

5    or may not have seen some of these, but just so that it's on

6    the record and I bring the Court up to speed, you might

7    recall that we had a fraudulent conveyance action that was a

8    backup to the substantive consolidation trial that Judge

9    Wolin put on a second track.  They moved to intervene in that

10   action and amend that fraudulent conveyance action versus the

11   banks in the District Court, and they seek to pursue

12   derivative claims.  They also sued the banks in Your Honor's

13   court for equitable subordination piercing the corporate veil

14   in the Bankruptcy Court.  These lawsuits, in our view, are

15   really confirmation objections and a collateral attack on the

16   plan that we filed.  The interesting thing, and I think the

17   amazing thing to at least everybody on our side of the table

18   is that they essentially –

19            THE COURT: Mr. Pernick, I'm sorry –

20            MR. PERNICK: That's fine, Your Honor.

21            THE COURT: Mr. Pernick, I'm sorry –

22            MR. PERNICK: No problem, Your Honor.

23            THE COURT: I lost you with the bonds who sued the

24   banks in the Bankruptcy Court on equitable subordination and

25   subrogation grounds?

1          MR. PERNICK: Yes.  And I actually was moving onto

2     the next point which is that we were all on our side of the

3     table pretty much flabbergasted at what the bondholders filed

4     in their objection particularly the crossover group.

5     Basically, in our view, they put an alternative plan out

6     there in considerable detail.  I'm not sure if you look at it

7     anybody could really tell me what was left out of that

8     between that and the actual plan except the filling out of

9     the words to describe the same thing.  I mean it really was

10    extraordinary.  I think if the Court looks at the entire

11    objection, but particularly pages 3 and 8, if it's not over

12    the line, Your Honor, it's dangerously close to the line of

13    an improper solicitation, and you have to ask yourself a

14    little bit why this happened and, of course, we can only give

15    you our view of what the possibilities are, and we think

16    there's one or two.  One, remember what I mentioned in the

17    beginning.  They only have two of their holders who have

18    signed confidentialities. So, there's a lawyer's and those

19    two holders who were having discussions, and then there's a

20    whole group out there that's trading that presumably is not

21    privy to those discussions.  This is an interesting way to

22    let them know what's going on and what at least from the

23    crossover perspective, from the negotiator's perspective,

24    what they've been talking to the debtors about.  I'm not sure

25    that that was appropriate, Your Honor.

1    THE COURT: I'm not sure it is either, and I think

2  we're going to deal with that in another proceeding.

3    MR. PERNICK: And, Your Honor, we believe that

4  there's plenty of reason to approve our request, but on that

5  basis alone, we believe that their objections should be

6  overruled.  However, now that it's out there, I think it's

7  more than appropriate to make a couple of observations

8  because their arguments are inconsistent.  I think it's easy

9  for the Court to see that we have a confirmable plan that's

10  on the table.  We treat similarly situated creditors alike.

11  They get a strict recovery.  Asbestos and the bondholders get

12  a strict of cash and stock, that there's no difference in the

13  form of recovery between them.  The crossovers intimate that

14  our plan's not confirmable, but clearly it is on that basis,

15  and I'm sure they'll articulate other reasons that it's not,

16  but that's really not a discussion at length for today.

17  That's a confirmation objection that they're free to raise if

18  the Court is willing to proceed towards a disclosure

19  statement and towards a confirmation hearing.  They also

20  allege on page 4 that their plan will have the support of the

21  bank and bondholders, but again, remember what I mentioned in

22  the beginning.  All they have is a blocking position.

23  They're not going to tell Your Honor and they haven't told

24  Your Honor that they have two-thirds an amount and 51 percent

25  in number.

THE COURT: What difference does it make anyway? This is an issue for exclusivity. It's not a confirmation hearing about a plan the terms of which should not have been put on a public record under these circumstances and apparently were and will be addressed by this Court in a sanctions hearing.

MR. PERNICK: I agree with that, Your Honor. I guess the only point of it that I was trying to make is that they have told Your Honor that they have a confirmable plan, but in our view they don't. It's not even close if you look at the terms of it. They're asking asbestos to accept a recovery that asbestos, I think, is going to tell you they're not interested in doing, and the only reason I mention that in the context of exclusivity is, if you're trying to decide whether to extend exclusivity for the debtor, I think the prospects of a successful resolution are key to that decision, and they haven't put anything out there. I think they made a mistake in telling you as much as they did, because I think it's clear that they don't have an alternative that could even be confirmable if Your Honor was willing to terminate exclusivity. The Ad Hoc Committee of Equity Holders also filed an objection, and I'll just make a couple of quick points about that and deal with their objection in more detail after they speak, but I will note that five of the twelve members, as we mentioned in our

1   objection to their motion that they filed to form an Equity

2   Committee also hold bank or bond debt.  So they're not really

3   a totally separate group.  They really object that there's no

4   FAIR Act provision but the problem with that is that's really

5   asbestos's to give or I guess the Court could order it,

6   although I'm not sure that even that's appropriate.  It's

7   really a negotiation, and if asbestos doesn't want to give

8   that right now, I don't think we can make them do that, and I

9   don't think it's a fair objection to say that that's a basis

10   for not extending exclusivity.  Obviously they haven't heard

11   the Court's many admonitions that we take the facts in this

12   case as they are and that there's no speculation.  We've

13   already had that discussion about the FAIR Act, and again, if

14   the FAIR Act is passed, we'll all deal with that, but we're

15   not dealing with those facts today.  The rest of their

16   objections dealing with not maximizing value are really

17   confirmation objections and not for today.  The official

18   bondholders representatives also filed an objection.

19   Remember it's only Wilmington Trust Company and Hancock - and

20   interestingly they propose a different plan, although I don't

21   know that they went into the kind of detail that the

22   crossovers did, but they don't even agree on the bondholder's

23   side of the table what the alternative plan would be if Your

24   Honor terminated exclusivity.  Really, in summary, after five

25   years, after rulings on substantive consolidation and

1  estimation, after the filing of a plan and disclosure

2  statement that has everybody's support but the bondholders,

3  we believe that all roads lead to the confirmation process

4  and should lead to there.  We believe that the case should

5  move promptly through that process, we hope with the

6  bondholders' consent after further negotiation, but if not,

7  we believe that it will still move forward, and we also would

8  suggest to the Court that driving to confirmation a

9  confirmable plan with the debtor's continued exclusivity may

10  well lead to an exit.  It will put the right pressure on the

11  parties.  Hopefully that turns into a consensual plan, but if

12  it doesn't then everybody has sort of made their bets, and we

13  go to confirmation and see if we can get our plan confirmed.

14  Terminating exclusivity will not facilitate moving this case

15  forward.  It's going to lead at least to two alternative

16  plans that you've heard about, neither one of which we think

17  make a lot of sense.  The Bondholder Committee plan basically

18  is, let's litigate for another two or three years and then

19  once that litigation's resolved, and assuming that nobody

20  else can be creative and think of more litigation, maybe

21  we'll move forward then.  I don't think the debtor's really

22  up for that alternative.  We've done enough litigation.  We

23  may have some litigation in the context of confirmation where

24  frankly all of these objections really can and should be

25  litigated in the context of confirmation.  The only other

1  point that I'll raise, Your Honor, is we asked for the relief

2  in our motion for July 31, but it really depends a little bit

3  when the Court anticipates holding a confirmation hearing, so

4  we're more than happy if the Court's willing to grant the

5  July 31, but if the Court were to think about today what

6  confirmation hearing date you had in mind, just for

7  practicality purposes, you may want to set a different

8  exclusivity deadline that tracks that date but that's really,

9  I think, for a little bit later discussion if the Court's

10  inclined to grant the motion.

11          THE COURT: Okay.  Mr. Lockwood?

12          MR. LOCKWOOD: Just a few points, Your Honor.

13  First, I really hope that we don't have to spend a good chunk

14  of this morning listening to a he-said/she-said kind of

15  debate about - with evidence and cross-examination about

16  whether the debtor and the bondholders did or didn't

17  communicate in each other minds adequately in the last month

18  about the plan.  The fact of the matter is that there's a

19  plan on file.  So we're talking about extension of the

20  exclusivity to solicit the votes for that plan.  The plan is

21  supported by the Asbestos Claimants Committee and the Futures

22  Representative and the banks.  There's certainly ample time

23  between now and the time the plan goes out for a vote or

24  comes to a confirmation hearing for discussions between the

25  banks and the bonds and the equity and the asbestos claimants

1    to take place, and as Mr. Kruger knows, my door's open and

2    his door's open, and we've had some preliminary discussions,

3    and I'm sure we'll continue to have discussions on these

4    topics.  The real issue here is, does it make any sense to

5    have competing plans filed in this case, potentially a

6    multiplicity, I guess, of competing plans which could be the

7    effect of what would happen if the Court lifted exclusivity.

8    In the context in which it is to the negotiating advantage of

9    one side, namely the people who are moving to terminate

10   exclusivity, not really to have a near-term resolution of

11   these matters.  Unfortunately in part for us and

12   unfortunately double time for the bondholders, there have

13   been decisions that were made in this case by superior courts

14   as a result of this Court's decision to go along with, in

15   effect, having certain confirmation issues litigated prior to

16   the time we had a confirmation hearing.  As Mr. Pernick

17   pointed out, the Third Circuit has decided the substantive

18   consolidation issue.  Now, it's true that the bondholders may

19   file a cert petition, and indeed the Futures Representative

20   has filed a cert petition, and it's possible that the Supreme

21   Court might agree to hear that.  There's also been an

22   estimation decision by the District Court, which is likewise

23   on appeal before the Third Circuit, and depending on whoever

24   wins or loses that, we might have a cert petition on that as

25   well.  And then we've got a variety of avoidance-type

actions, veil piercing – There's an opportunity here which the Asbestos Claimants Committee and the Futures Rep. had as well as the bondholders to keep this case in litigation for many years litigating both with the banks and with each other, et cetera. And, then we have the FAIR Act, which Your Honor heard some discussion of earlier today and has heard discussion of probably at practically every omnibus hearing in every asbestos case that got anywhere near a disclosure statement over the last two and a half years since the FAIR Act first came on the scene in the middle of 2003. The fact of the matter is, for example, with respect to the proposed Equity Committee proposal here and their objection, if the FAIR Act were passed this month, which Senator Frist has said, Going to bring it on in February. I guess we're not in February yet, next month, and it was signed into law then the bonds and the equity would get everything that they could agree upon dividing up among themselves and assuming the Act was held constitutional, the asbestos side of this would be out of the game. But, (a) it hasn't happened; (b) we don't know whether it's going to happen; and (c) if it doesn't happen, it might be up, as Mr. Isenberg said in the USG hearing, There might be a new Congress. I mean, you don't drive a stake, like a vampire, through the heart of proposed legislation. It could go on forever. And any constituency that would benefit from its enactment is thereby created with

1  an incentive to try and drag things out through litigating as

2  many issues as they can.  Now, this plan that we're a co-

3  proponent of, has taken the table as it's set.  It

4  incorporates the Third Circuit's decision as it exists.  It

5  incorporates the District Court's decision as it exists, and

6  it incorporates the state of the law as it exists, and we

7  can, therefore, we believe, move toward a confirmation of

8  that plan and a cram-down if that's necessary and if we can't

9  negotiate something that's satisfactory to the bondholders in

10  the interim.  What on earth would we achieve by lifting

11  exclusivity and winding up with competing plans where

12  different groups have already signed on to different plans

13  and, therefore, by a catharsis they're going to vote for

14  their plan and not for somebody else's plan and then have

15  some kind of litigation ensue about the accuracy of the

16  disclosure statements and the confirm-ability of plans.  I

17  mean, it just really doesn't make any sense here, and so, we

18  would urge Your Honor to grant the exclusivity extension for

19  solicitation.  Let's move forward with this plan.  If they

20  can defeat it and we can't negotiate with something, sobeit,

21  but at least we're looking at something that has a near-term

22  conclusion to it as opposed to this possibility of endless

23  litigation.  Thank you, Your Honor.

24        THE COURT: Mr. Graulich.

25        MR. GRAULICH: Good morning, Your Honor.  Timothy

Graulich, again, on behalf of Credit Suisse as agent. I

would just like to make two brief observations in support of

the debtor's motion this morning, and it feels like a lot

longer ago, but I guess it was only about two months ago

where I was standing at this very podium arguing in support

of the termination of the debtor's exclusivity on behalf of

the banks. Based upon the bank's concern at that point that

without the benefit of having seen the debtor's plan, at that

point there was not a plan prepared, that the plan may in

fact be so problematic that it would be unlikely to gain

support and would potentially not be confirmable. I'm happy

to report that after over the last two months there's been

quite bit of activity in this case. So much activity in fact

that the Steering Committee and the agent now wholeheartedly

support the continuation of exclusivity in this case. First,

the debtors effectively dealt with our principal concern,

which is the fact that we were going to be stymied with a

plan that had no hope of being confirmed. While this plan

certainly doesn't have the unanimous support of every

conceivable constituency in the case, I don't believe that's

the standard for determining whether or not to extend

exclusivity. The standard ought to be whether or not the

debtors are moving in good faith to a confirmable plan and to

a confirmation hearing. The debtors met with the agent and

its representatives including each member of the Steering

1    Committee by telephone, in person, and in fact the non-cram-

2    down treatment of the bank claim under the plan is a product

3    of those negotiations.  So, vis-a-vis, the agent, the debtor

4    certainly has more than lived up to its obligation and its

5    promise to deal effectively with our constituency.  And

6    secondly, I'd like to - the second item that has occurred

7    over the last, say, six weeks that would also, I think,

8    strongly argue in favor of continuing exclusivity is that

9    we've been given a bit of a window of what this case would

10   look like should exclusivity be terminated.  As Mr. Pernick

11   has referenced, there is a pending action now before Your

12   Honor against the banks where the plaintiff is the official

13   representative that - not to get into the merits of it, but

14   it certainly seems very similar on a number of points to what

15   has already been litigated before the Third Circuit.  There's

16   now also a motion pending in the District Court to bring

17   other - to resurrect the existing fraudulent conveyance

18   action that the debtors in their business judgment are

19   prepared to terminate, essentially, at this point and to add

20   a whole host of other causes of action to that, many of which

21   seem to be duplicative of the causes of action before Your

22   Honor.  So, in short, terminating exclusivity in this case is

23   basically another recipe for three or four more years of

24   litigation and maybe that's the intention.  Certainly the

25   Bank Group has not benefitted by continued endless litigation

1    in this case.  Our recovery in this case is not dependent

2    upon the FAIR Act.  We have no need to want to see this case

3    dragged out any longer than it should be, and, you know, just

4    looking at the calendar, it seems that the Sub-Con issue took

5    about three years to work its way through the courts.  This

6    case, you know, we would defer to the judgment of the debtors

7    on this and concur that this case - the best interest of this

8    case is not served by another three-year detour through

9    litigation.  So, in sum, the Steering Committee and the agent

10   supports the debtors' request for a continuation of

11   exclusivity.

12            THE COURT: All right.

13            MR. KRESS: Your Honor, on behalf of the Futures

14   Representative, we strongly support the debtors' motion to

15   continue exclusivity.  We firmly believe, Your Honor, that

16   the only way this case will result in a consensual plan is to

17   start the train moving down the path to its confirmation.

18   Until that starts, people - we do not believe that people

19   will be ready to sit down and negotiate.  There's no reason

20   for them to.  Delay works to their benefit, and therefore,

21   Your Honor, we think, let's start this process.  Let's go and

22   start the path and put the pressure on the parties to either

23   come to grips and come to a consensual conclusion, or if

24   necessary, litigate it, but one way or the other, it has to

25   move, Your Honor, and not be stymied.

1          THE COURT: Mr. Rahl?

2          MR. RAHL: Good morning, Your Honor.  I think after

3     five years in this case I finally know where I stand.  It's

4     been a long time.  The reason for saying that, frankly, is

5     that for the last five years we have been working very

6     closely with the debtor, and we have certainly had no

7     complaints about the process over the last couple of months

8     in terms of discussions, disclosure, et cetera, between the

9     constituencies, and we have had, obviously extensive

10    conversations with Mr. Kruger's group, the Ad Hoc Committee

11    in that it is our understanding now that that Committee

12    represents virtually half of the bondholder constituency, 47

13    percent give or take, something like that.  We are the same

14    people who made a deal with the debtor two years ago, and we

15    really haven't changed, and I do want to address, I think,

16    two fundamental mis-characterizations of where we're coming

17    from at this point.  First and foremost, the litigation, so

18    to speak, that was filed in this Court and in the District

19    Court was commenced back in 2002 in the context of the flap

20    we had in <u>Cybergenics</u> where the Third Circuit ruled one way

21    and then reversed itself *en banc* a few months later.  These

22    actions were filed in the interim.  The Third Circuit again,

23    in it's <u>Sub-Con</u> opinion made express reference to the

24    fraudulent conveyance claims and other objections to the

25    bank's claims, and it became apparent to us at the end of

December when it's clear that there was not going to be any
consensual resolution with the bondholder constituency, that
we had to revive these claims. The idea that we revived
these objections, many of which were brought by the debtor
itself initially, objections to the bank's claims and other
related issues, in no way reflects an intention to impose
another three years of litigation on this case. I don't even
fundamentally disagree with the debtor's characterization of
at least some of these points as confirmation issues.
Indeed, one of the fundamental claims, if you will, in the
District Court litigation is in fact an objection styled as
an objection to the bank's claims. It was so characterized
that way by the debtor, and we have retained that
characterization. Our principal objective here is inasmuch
as a great deal of the discovery, by no means all that would
be necessary but a great deal of it has already been
completed in the context of the Sub-Con litigation. Our
principal point here is to simply get the rest of this
discovery going out of the way before a confirmation hearing
is scheduled. In the anticipation, I certainly know the
debtor is hopeful of getting something scheduled either late
summer, early fall in the anticipation that we will then be
in a position at a confirmation hearing to get rulings on all
of these issues in an appropriate and well-considered way.
So that's one point. No objective whatsoever here to have

1    years and years of additional litigation.  We've already had

2    plenty of time to work out the issues and, as I said, I'd

3    say, I guess, I'd venture 85 percent of the discovery was

4    completed long ago and is still sitting in the data room.

5    Second point I would make is that the concept certainly as we

6    see it of terminating exclusivity, again, is not to delay

7    things.  Let's get two plans out the door, one that the

8    bondholders can agree on; one that the – the debtor's plan,

9    obviously, and simply have them voted on at the same time.

10   We'll use the same disclosure statement, slightly modified.

11   We've got plenty of time to get all that done in time for a

12   disclosure hearing, which, as I understand it, has been

13   scheduled for – Is it April 3rd in this case?  – April 5th in

14   this case.  I thought it was interesting that the settlement

15   terms in USG that were announced this morning, very similar,

16   actually, to what Mr. Kruger's group is proposing in terms of

17   plan structure, and, this way, no one in the case will run

18   the risk that we'll be stuck at the end of the day, that is

19   sometime this fall, with a plan that can't be confirmed

20   because one way or the other, certainly the plan that we have

21   in mind would treat asbestos the same way they're being

22   treated in the debtor's plan, one way or the other, we will

23   have one plan that can be confirmed.  And I certainly also

24   agree that until we get closer to that day, that the kind of

25   pressure that is being discussed in terms of timing and

1  leading into the kind of situation where a consensual

2  settlement can be reached, again, that is a dynamic that we

3  understand and support.  It has been.  It was the dynamic, I

4  think, that was in part behind the whole prior attempt to

5  confirm a consolidated plan.  I guess the final point I would

6  make is that, just to clarify, the nature of our group, if

7  you will, is, we represent in addition to the trade

8  creditors, I might add, also the sort of pure bondholder

9  constituency here, we pay a lot of attention to what Mr.

10  Kruger's group has to say.  That said, everyone knows they

11  have a lot of bank debt.  They even have some equity unless

12  I'm mistaken.  There are two bondholders left on the Official

13  Creditors Committee.  Five and a half years ago, the

14  Committee started with nine members.  Five of them have

15  resigned.  There are only two bank debt holders on that

16  Committee as well.  One of the bondholders is the indentured

17  trustee and Wilmington Trust, and they happen coincidentally

18  to be the indentured trustee for all of the debtor's $1.3

19  billion of senior bond debt.  So, they do speak for and have

20  a fiduciary duty to the entire constituency, just for the

21  record on that, Your Honor.  But in any event, the objective

22  here is to get two plans, presumably perhaps three, but I

23  suspect that one way or another, we could get it down - get

24  the number down to two, get them out the door at the same

25  time, tee them up at the same time on the same schedule, and

PENGAD • 1-800-631-6989

FORM FED-25

1    one way or another, Your Honor, get this case confirmed by

2    the end of the year.  Thank you.

3         THE COURT: Mr. Kruger?

4         MR. KRUGER: Your Honor, I think our papers maybe

5    say it all, but just for the record, I remember sitting here

6    and hearing Mr. Pernick telling the Court that the debtor

7    would continue to make whatever efforts are necessary to gain

8    the support of the banks, bonds, the ACC, and the Futures

9    Rep., and that they fully intend to continue to engage the

10   banks, the bondholders, the ACC, and the Futures Rep. in

11   substantive plan discussions prior to filing their amended

12   plan.   There have indeed been a couple of meetings, but

13   there have been no negotiations unless you take saying "no"

14   as negotiations.  There's been no negotiations, and that

15   really lead us to believe that we needed to object to

16   exclusivity in order to be able to propose a reorganization

17   plan that we believe would be confirmable and that would meet

18   the consent of all of the various constituencies.  The idea,

19   really, that there should only be one plan because it is

20   convenient to the parties and that that plan should result in

21   a prospective cram-down hearing since it's clearly

22   objectionable to the clients that we represent.

23         TELEPHONE OPERATOR: Please hold while your pass

24   code is being verified.  Four, 8, 9, 7, 9, 7 is not a pass

25   code that is valid at this time.  If you need further

1    assistance, please call your moderator or -

2        MR. KRUGER: Can't compete with that.

3        THE COURT: No.

4        MR. KRUGER: In any event, as I was saying, Your

5    Honor, maybe it's just a sense of frustration but a belief

6    that if we did indeed have the termination of exclusivity and

7    the ability to file a plan, we believe that we could file a

8    plan that would indeed be both confirmable and acceptable to

9    both the bank parties and -

10        TELEPHONE OPERATOR: Welcome to Ready Conference.

11    Please enter your pass code followed by the pound sign.

12    Thank you, your pass code has been accepted.  Please wait for

13    the tone and then say your name and press the sound sign.

14        MR. KRUGER: It's better negotiations than we had

15    before.

16        TELEPHONE OPERATOR: At the tone, you will be the

17    24th caller in the conference.  Joining conference.

18        MR. KRUGER: All right.

19        THE COURT: This is Judge Fitzgerald.  I hope we're

20    back on the record on Owens Corning.

21        MR. KRUGER: All right.  Your Honor, as I said, it

22    was not our intention to delay the process but rather to make

23    the process one that would be more amenable to a consensual

24    plan.  We believe that we could indeed file one if the Court

25    terminated exclusivity.  We believe we could file a plan very

1   promptly that would be acceptable to both the banks and to

2   the asbestos claimants and the Futures Representative as

3   well, and that we could do it on the same time table that now

4   exists with the April 5th hearing on the disclosure document

5   and the prospect of a summertime confirmation of a plan.

6   It's unfortunately our belief that the debtor has made little

7   or no efforts to derive a consensual plan vis-a-vis the

8   bondholders. That's just an unfortunate fact.  Whether there

9   will be negotiations in the future that are more successful,

10   I have no indication of that from the debtors themselves.  We

11   had asked them at various times through this process to

12   convene a meeting of all the parties that we might indeed

13   have substantive negotiations.  The debtor declined to do so.

14   The result of it is, of course, the papers that you see in

15   front of you today.  So we would ask the Court to terminate

16   exclusivity so that we might proceed to file a reorganization

17   plan.

18               THE COURT: Okay.  Mr. Pernick?

19               MR. GRAY: Your Honor, I would like to be heard.

20               MR. PERNICK: Oh, sorry.

21               MR. GRAY: Your Honor, good morning again.  Anthony

22   Gray of Brown Rudnick Berlack Israel for the Ad Hoc Committee

23   of preferred and equity security holders.  Your Honor, our

24   Committee consists of eleven institutions, and those

25   institutions or funds or accounts that they manage hold

1  approximately in the aggregate 19.5 percent of the Owens

2  Corning common stock and approximately 54.2 percent of the

3  shares of the outstanding preferred securities.  Your Honor,

4  I'll be very brief in terms of our objection to the

5  exclusivity extension motion.  Your Honor, we do not believe

6  that the debtors have met their burden under § 1121 of the

7  Bankruptcy Code to show cause that granting an extension for

8  the exclusivity period for six months is warranted.  Your

9  Honor, the Credit Suisse's counsel in his remarks indicated

10  that the standard here with respect to granting or denying an

11  exclusivity extension motion has as an important

12  consideration whether the debtor's moving in good faith

13  toward a - in connection with its plan negotiations.  Your

14  Honor, there could be absolutely no dispute, I think, that

15  the debtors are not including the equity and preferred

16  security holders at all in the process.  We certainly did not

17  receive a term sheet nor were we invited to participate in

18  the process.  The reality is, is that the debtors have

19  slammed the doors on us and have not included us at all in

20  the process.  The debtors have indicated -

21          THE COURT: This is an unofficial committee.  It's

22  not an official committee.  The debtor can't go out to every

23  constituent in the case and invite them to participate in a

24  case.  That's not what the Code's all about.  The debtor is

25  required to negotiate in this instance with the Future Claim

1  Rep. and the Committees to try to get together a plan that's

2  consensual not with every creditor.  That would be impossible

3  in a case like this.

4          MR. GRAY: Your Honor, that's a very important point

5  with respect to our motion for the appointment of an Official

6  Equity Committee in these cases because we also agree with

7  you that having the official committee appointed in these

8  cases representing the interests of all equity and preferred

9  securities holders makes sense, but the bottom line is -

10         THE COURT: I didn't say that.  I don't think it

11 makes sense.  I said it didn't make sense the last time this

12 issue came up.  I still don't see how it makes sense, and I'm

13 not going to see how it makes sense and unless and until

14 somebody can convince me that there is going to be a return

15 to those entities.  Looking at this plan, even looking at the

16 plan that Mr. Kruger's Committee would intend to file which

17 is dependent on the fact that the FAIR Act may pass, which is

18 nothing but a wish and a prayer, and if it does pass may

19 require modifications for every company depending on the

20 circumstances in which they sit, but looking at that issue in

21 this case is not a reason to think that equity's in the

22 money.  I have no evidence in this case that there is going

23 to be a return unless some secured creditor somewhere decides

24 that it wants to give some of its money to equity that

25 equity's going to get any funds.

1    MR. GRAY: Your Honor, I understand the Court's

2    concern, but I would say that the passage of the FAIR Act is

3    an important factor with respect to the valuation of these

4    debtors and whether equity is in the money and I would also

5    say -

6    THE COURT: Passage of the FAIR Act, if it happens,

7    nobody knows what it's going to be like.  Look at the

8    Bankruptcy Code we got.  I mean just this one small example.

9    MR. GRAY: But, Your Honor, other debtors and the

10   asbestos claimants in other cases have acknowledged that the

11   passage of the FAIR Act is an important issue and it included

12   a Babcock & Wilcox and does it this morning, USG, have

13   included components, mechanisms -

14   THE COURT: Yes.

15   MR. GRAY:  - that accommodate those -

16   THE COURT: Yes, USG is going to do a totally cash

17   plan, and its cash in the amount that it's committed depends

18   on whether or not the FAIR Act passes by the end of this

19   Congress, that's true.  That doesn't mean that a debtor that

20   doesn't have a totally cash investment that it can make into

21   a plan has the same ability to do what USG has decided that

22   it's going to attempt to do, number one, and number two,

23   there's no reason why a debtor has to say that pending

24   legislation that may or may not pass and if it does may not

25   look anything like what it looks like right now in any event

1    is the basis to fund the plan.

2        MR. GRAY: Well, Your Honor, I would submit to Your

3    Honor that if the FAIR Act is passed there is substantial

4    value for equity, and I can go through the numbers now if

5    you'd like or it can wait for my presentation on the -

6        THE COURT: It's irrelevant.  It's irrelevant, but

7    the FAIR Act has not passed, and so, frankly, it is not

8    something that I can consider in valuing the debtor right

9    now.  The Court has to look at what the value of the debtor

10   is now not what a hypothetical value of the debtor may be

11   based on pending legislation that may or may not pass, and if

12   it does, may or may not pass in the near term, and if it

13   does, may or may not look anything like what it looks like

14   now.  That's all hypothetical.  This Court, you know, I

15   understand the need for making estimations, but that's going

16   too far.

17       MR. GRAY: Well, I believe, Your Honor, that the

18   FAIR Act should be included in the calculus.  I believe, as

19   well, that the good faith requirement of 1129(a)(3) requires

20   that a plan be proposed in good faith.  There are models out

21   there, Your Honor, the Babcock & Wilcox case and now USG -

22       THE COURT: It doesn't matter.

23       MR. GRAY:  - that include that component -

24       THE COURT: It doesn't matter.  Every case is

25   adjudged on its own facts.  I see nothing in this case that

1  indicates that this debtor is acting in bad faith.  The

2  debtor has waited for the Third Circuit to come down with the

3  substantive consolidation trial.  The Third Circuit has made

4  a ruling.  The debtor has incorporated the provisions into

5  its plan, which is a very different kind of plan than it was

6  beforehand before that ruling came down when the debtor was

7  attempting to convince the Circuit of something that the

8  debtor lost on.  So, how can you say that the debtor, which

9  is now taking cognizance of the law in a fashion that the

10  debtor didn't want to advocate, is in bad faith?

11        MR. GRAY: Well, that's the substantive

12  consolidation issue, Your Honor.  I'm focused on the FAIR Act

13  issue, and I believe that the FAIR Act issue -

14        THE COURT: You can stop that argument.  The FAIR

15  Act is not law.  That would be - my telling the debtor to

16  take cognizance of the FAIR Act would be the same thing as my

17  telling the debtor to take cognizance of a pension change or

18  a tax code change that might happen or might not happen 25

19  years in the future or maybe tomorrow.  Who knows?  You know,

20  you wouldn't be here arguing that because there is pending

21  legislation that says that the debtor may be subject to a

22  significantly higher tax claim based on the passage of an

23  act, that the debtor should take advantage of that or should

24  take cognizance of that fact.  Why should the debtor take the

25  FAIR Act into consideration?

1        MR. GRAY: I think the FAIR Act - the debtor should

2    take the FAIR Act into consideration -

3        THE COURT: Well, I don't.

4        MR. GRAY: - because -

5        THE COURT: I don't think the debtor can take it

6    into consideration if the debtor chooses not to.  I think you

7    can build an alternative plan in some circumstances.  I don't

8    know how the debtor could do it in this case when it's not

9    going to be a cash-out plan.

10        MR. GRAY: I think it is possible to do it in this

11    case.  I think the bondholder groups outline - again, we were

12    not privy to the negotiations or lack, I guess, of

13    negotiations between the Ad Hoc Bondholder Group and the

14    debtors, but their plan term sheet does contemplate reducing

15    the asbestos liabilities of these debtors by incorporating

16    the FAIR Act component to $1 billion, and with that reduction

17    -

18        THE COURT: Yes, it has covered that plan, and for

19    that we are going to have a sanctions hearing because it's

20    improper.  It's a form of solicitation, and based on the fact

21    that your clients have bought into it, there's proof that

22    it's a form of solicitation.

23        MR. GRAY: Well, Your Honor, we certainly weren't

24    involved in any solicitation activities, but -

25        THE COURT: You read the plan.

1    MR. GRAY: Your Honor, it was on the record.

2    THE COURT: That's what I mean, and it shouldn't

3 have been.  Therefore, it wouldn't have been out there to

4 have read.

5    MR. GRAY: Well, Your Honor, I will sum up now.

6 It's clear that Your Honor and our group have disagreements

7 on this point, but my final point would be that we believe

8 that the debtor should proceed in good faith in terms of

9 trying to get to a consensual plan, and we think that

10 accommodating the FAIR Act is one of those components, it's

11 something that the debtor should not leave to the asbestos

12 claimants because that's simply a cop-out.  Management should

13 also be concerned about their fiduciary duties to their

14 equity holders and should consider seriously including us in

15 the process.  Thank you.

16    THE COURT: Well, what does the plan do that's on

17 the table with respect to the debtor to equity?

18    MR. GRAY: At the moment, Your Honor?

19    THE COURT: Yes.

20    MR. GRAY: The debtor's proposed to wipe out equity

21 completely.

22    THE COURT: Right.  So at this point in time the

23 debtor's valuation tends in its view to say that there is no

24 value for equity.  That is the extent of its fiduciary

25 obligation with respect to equity.  It can't do anything if

1  it can't return a return to equity.

2       MR. GRAY: Okay, but I disagree, Your Honor.  I

3  think they can taking into account the FAIR Act.  Thank you.

4       MR. PERNICK: Your Honor, I think we've already

5  adequately responded to all the points that were raised so we

6  have nothing further.

7       THE COURT: All right.  I see no basis on which to

8  terminate the debtor's exclusivity under these circumstances.

9  The debtor does have a plan on the table.  I don't know

10  whether it will be confirmed, but at least facially, it looks

11  as though it is confirmable.  I haven't heard objections and

12  so I'm not making rulings, but my statement to the debtor was

13  to put a plan of record that at least facially is

14  confirmable.  The debtor's done it.  Now, whether something

15  will come up that makes it un-confirmable, I don't know, but

16  at least from a first blush, first read, *prima facie* level it

17  looks as though this plan can be confirmed.  So, I think the

18  debtor has done what the Court has ordered and what its

19  fiduciary obligations are to all constituents.  I do want the

20  debtor to continue to negotiate with the bonds because I

21  think that's an important aspect of this case, and perhaps

22  there is still some adjustment that can be made that will get

23  the bonds onboard.  With respect to the equity, I haven't

24  heard anything in this case at this point that convinces me

25  that there is any value for equity in this case, and, you

1    know, that's a sad thing.  I'm not happy with that

2    resolution, nonetheless, it seems to me right now to be the

3    state of the facts.  To the extent that the debtor wants to

4    somehow or other tweak this to incorporate whatever the FAIR

5    Act is going to be if and when it's ever passed at some point

6    in the future, certainly I guess you can build plans on

7    hypotheticals if you choose to do it and the parties agree. I

8    think you've got a higher or not - I was going to say burden,

9    but I don't mean it in that sense.  I think you'll have a

10   more difficult task if it's not going to be a cash plan then

11   USG did in negotiating.  You know, if you want to take a stab

12   at it, I think that's the debtor's obligation, but I - in no

13   way do I see how the debtor ought to be compelled to take

14   advantage of an act that is not legislation, that's gone

15   through several modifications already and that may, if it

16   ever gets passed, come out of Congress as a much different

17   vehicle than it went in.  So, I don't know how you

18   accommodate that action without the consent of all the

19   constituents who would be governed by that, and that would,

20   in that instance, I think, include equity, but there is no

21   law at the moment that the debtor has to take cognizance of,

22   and I'm certainly not going to order the debtor to take

23   cognizance of a statute that doesn't exist.  So, I will -

24          MR. PERNICK: Thank you, Your Honor.

25          THE COURT:  - with respect to your dates, I'm

1  assuming that the issues for the disclosure statement will

2  really not be the major focus of this litigation since we

3  went through a disclosure statement hearing before that was -

4  and the disclosure statement was essentially approved but

5  subject to the outcome of the substantive consolidation

6  litigation, which, of course, means that that disclosure

7  statement's not valid now, but I think the substantive

8  information as updated should be sufficient. We went through

9  all of the objections. Is anybody anticipating that there

10 are going to be major objections to the disclosure statement

11 at this point?

12        MR. RAHL: I'll just note for the record, Your

13 Honor, I think there is one objection that is of some

14 substance. I'm not sure it rises to the level of major. In

15 the debtor's last plan and disclosure statement, there was a

16 different treatment for a $200 million issue known as the

17 NIPS -

18        THE COURT: Right.

19        MR. RAHL:  - and the debtor has completely reversed

20 its position on that treatment. It does have an impact on

21 the recoveries, and I think that is one issue that may come

22 up. It's the only substantive disclosure issue that I can

23 think of at this point other than the usual drafting exercise

24 that one always goes through for a major disclosure

25 statement.

1          THE COURT: All right.  Mr. Pernick, is there - can

2     you work to see if that for a disclosure statement issue, you

3     can get that objection resolved because if what it is, is to

4     explain what that is and how the debtor's going to use it, I

5     think for disclosure statement purposes, that's what you need

6     to do.

7          MR. PERNICK: Sure.  I think Mr. Rahl's comments

8     before are correct.  We have worked very well together for

9     the last five years and if he'll send me what language he'd

10    like, we'd be happy to sort of talk about it and see if we

11    can reach a resolution.  We resolved almost every disclosure

12    statement objection the last time.  We worked hard to do

13    that.  I think everybody worked hard with us to do that, and

14    with those same commitments, I'm hopeful that we'll be able

15    to resolve whatever comes up.  Whenever you have a document

16    this long, as the Court's well aware, I'm sure issues will

17    come up, but I can't imagine that we won't be able to resolve

18    them, and we'll work very hard to do so.

19         THE COURT: Okay.  What I was trying to get to by

20    this discussion is whether or not a disclosure statement's

21    going to be approved on April the 5th,  and I don't know at

22    this point, but if most of the objections are resolved and

23    you just have a little bit of word-smithing to do here and

24    there, then perhaps sometime in April the disclosure

25    statement will be approved, and I wanted to see whether or

1   not I should try to give you plan dates.  I think your idea

2   of keying the exclusivity extension to the end of that

3   solicitation period and the plan confirmation hearing makes

4   sense, which is why I was attempting to sort of backing that.

5          MR. PERNICK: Well, let me raise a couple of issues

6   with the Court that would affect the timing, but I do think

7   if the Court's willing to discuss dates for confirmation,

8   that will also help focus everybody on the process.  We have

9   to do some amended voting procedures.  They will be

10  substantially the same as the ones that the Court

11  conditionally approved the last time.  There are some changes

12  that we will black-line and send out to everybody.  What we

13  thought we would do is actually put those on either for the

14  March, I think, 27th omnibus hearing or the April 17th omnibus

15  hearing because right now for April 5th, I think we have the

16  entire day with the Court, and we wanted to give ourself the

17  best chance possible to finish the disclosure statement

18  hearing that day.  So, at the Court's pleasure, I'm happy to

19  put those voting procedures on for either of those omnibus

20  dates, and perhaps - I mean, we've looked at the calendar.

21  We don't see any other major items that have to be done on

22  either of those two dates, so, I think we have some

23  flexibility plus they're only three weeks apart, so that

24  helps too.

25          THE COURT: I don't really have a preference except

1    that if you get the voting procedures issues done then when

2    your disclosure statement's approved, you'll have forms that

3    are ready to go, so -

4              MR. PERNICK: Right.

5              THE COURT:  - you may want to put them on for March

6    27th in that sense.  But I -

7              MR. PERNICK: Well, we'll look at our calendars and

8    see.  The other problem is - well, the other issue, I

9    wouldn't call it a problem is, you may recall the last time

10   Judge Wolin had withdrawn the reference as to asbestos-

11   related items.  I don't remember the exact language, and I

12   think the Court can certainly interpret it that to mean that

13   you would conditionally approve the voting procedures, which

14   you did the last time, but that they had to go to the

15   District Court for final approval.  I'm not sure whether

16   that's still the case, but actually that's still the current

17   state of the law in this case, at least in our view, that it

18   has to go to the District Court if we could find a way to put

19   them back to the Bankruptcy Court which I think - We just

20   haven't made that application to Judge Fullam because we just

21   started considering it.

22             THE COURT: If in fact that's something that he has

23   to pass off on, I obviously can't give him orders.

24             MR. PERNICK: Right.

25             THE COURT: You know, so I think that would have to

1   go to him. I really don't recall why Judge Wolin would have

2   wanted to do the voting procedures motion itself. I

3   understood when he was looking at, possibly looking at

4   estimation issues that he was encompassing forms and that

5   sort of thing with respect to estimation, but I don't know

6   why –

7          MR. PERNICK: I think the reason was because at the

8   time the Official Committee had filed a motion to set an

9   asbestos bar date, and the parties interpreted that to also

10  include the voting procedures, which were related to that

11  issue. Now that we've had an estimation hearing, I think

12  that issue is not nearly as relevant as it may have been

13  before.

14         THE COURT: Yeah, I honestly don't recall any

15  discussion or specific order from him that said that that was

16  to be on his docket, but if it's out there, then I think you

17  need to address that with Judge Fullam.

18         MR. PERNICK: Okay, and that effects the timing, but

19  I think what we can do is maybe I'm just thinking out loud,

20  but maybe we'll put the voting procedures on for the 17th but

21  try to get to Judge Wolin and ask him to refer back down to

22  the extent they're still up there –

23         UNIDENTIFIED SPEAKER: Judge Fullam.

24         MR. PERNICK: I'm sorry, Judge Fullam, to the extent

25  they're still before him, any consideration of the voting

1    procedures.  I don't know what he'll do but I'm optimistic

2    that when we explain it to him he may just reconsolidate them

3    back in the Bankruptcy Court.

4        THE COURT: Okay.  That's fine.  I'm still trying to

5    work through the plan confirmation issues, which is where I'm

6    trying to go.

7        MR. PERNICK: right.

8        THE COURT: So, are you looking - Let's assume you

9    get an approved disclosure statement in April sometime.

10       MR. PERNICK: Uh-huh.

11       THE COURT: Are you looking for a hearing in July?

12   How much time do you want for solicitation and balloting?

13       MR. PERNICK: I think our worst case is 90 days, but

14   I heard the hearing before where the parties were discussing

15   60 days.  So, maybe Mr. Lockwood can help me out.

16       MR. LOCKWOOD: I'm sure we could do 60 or maybe 45.

17   We were trying to remember in USG and actually I think that

18   Kaiser was 45 days, Your Honor.

19       THE COURT: It was, but that was - that's really

20   pushing it.

21       MR. LOCKWOOD: Well, I mean, it would be in that

22   range, 45 to 60 days.  I don't  - certainly 90 to 120 is not

23   likely to be necessary.

24       THE COURT: Okay.  So, let's say 60 even if you do

25   60 days for solicitation that's probably the end of June, so,

1  you're looking at a confirmation hearing sometime early in

2  July?

3          MR. PERNICK: I think early to mid-July.

4          THE COURT: Okay, we'll see if we can get you some

5  dates while - Oh, did you already?  How many days?

6          MR. PERNICK: I mean, I heard Mr. Rahl's discussion

7  earlier, and I guess the real question is whether we're going

8  to litigate those issues as I heard him, I think, offer to

9  litigate those issues for the most part within confirmation.

10 I think the good news is that that will allow the schedule.

11 The bad news is we may need more days then what you would

12 normally need for a confirmation hearing.

13         THE COURT: Well, I have three days in July, that's

14 all.  I can reserve them all for you if you want.

15 Unfortunately, one of them is not with the other two.  One is

16 July 10th - Mona, are you sure I'm in town that day?  Okay.

17 July 10th, and the other two are the 17th and 18th of July, and

18 they would all be in Pittsburgh.

19         MR. PERNICK: Can I consult for one moment, Your

20 Honor?

21         THE COURT: Yes.

22         MR. PERNICK: Your Honor, I think those dates are

23 acceptable - They're not acceptable?

24         THE COURT: Well, yeah, they are. I'm just not

25 really sure about the 10th.  Something in the back of my mind

PENGAD · 1-800-631-6989

FORM FED-25

1  is telling me that I have a conflict that day, but it's not

2  on the calendar so I don't know if I'm mis-recollecting the

3  day or it just hasn't made the calendar yet.

4         MR. PERNICK: Okay.

5         THE COURT: So, I'll give them to you, the 10th, 17th

6  and 18th, but you may get an order from me if I find out that

7  in fact I have a conflict on the 10th that will make it just

8  the 17th and 18th.

9         MR. PERNICK: Okay, I think that's fine.

10        THE COURT: Okay, so we'll reserve those days

11  anyway.

12        MR. RAHL: Your Honor, just for the record on the

13  question of dates. We're happy to move ahead. We do

14  anticipate there are a few points of discovery that we need

15  to pursue between now and July, and while I understand that

16  Mr. Pernick isn't in a position - Mr. Pernick and Mr. Monk

17  aren't in a position to start making commitments on the fly

18  about that, I just want to note for the record that we do

19  expect some reasonable cooperation from them in that regard.

20        THE COURT: Okay, well, I think at the outset of the

21  case I tried to make it clear that if you need discovery to

22  get ready for plan confirmation you're to get it. So, to the

23  extent that you need it, I think it ought to start because I

24  really don't think the focus of the fight at this point is

25  going to be on the disclosure statement. So, I think we ought

PENGAD • 1-800-631-6989    FORM FED-25

1  to try to get through that and move to confirmation.

2         MR. RAHL: That's fine with us, Your Honor,

3  perfectly fine.

4         MR. PERNICK: Your Honor, I actually had a moment to

5  just confer with everybody.  I think if Mr. Rahl is agreeing

6  to litigate those issues all within confirmation, we will

7  agree that we will figure out cooperatively a discovery

8  schedule that accommodates the confirmation hearing dates

9  that Your Honor set.

10         THE COURT: Okay.

11         MR. RAHL: That's fine, Your Honor.

12         THE COURT: All right.

13         MR. GRAY: Your Honor, the Ad Hoc Committee -

14         THE COURT: You need to use the microphone, I'm

15  sorry.

16         MR. GRAY: I apologize, Your Honor.  The Ad Hoc

17  Committee reserves all rights with respect to objecting to

18  the disclosure statement.

19         THE COURT: Okay.

20         MR. GRAY: And also as to confirmation.

21         MR. PERNICK: Your Honor, so with those dates

22  actually the order that we presented and the request that we

23  made of July 31 may for today's purposes be acceptable.

24         THE COURT: Yeah, I think it probably is because

25  there may be some slippage in the dates in any event, so I

1  think July 31 is fine.

2          MR. PERNICK: Okay.

3          THE COURT: All right.  What agenda item is that,

4  20?  Is that what we're on?

5          MR. PERNICK: That was number 20.

6          THE COURT: All right, I'll have the order entered

7  as it was filed on the motion.

8          MR. PERNICK: Thank you, Your Honor, and that takes

9  us to item number 11, which is the motion for the appointment

10  of an Equity Committee, and I believe that's Mr. Gray's

11  motion.

12          MR. GRAY: Your Honor, the Ad Hoc Committee actually

13  has two motions before the Court.  The first is the -

14  requesting confirmation that it may proceed in the Delaware

15  Chancery Court to compel Owens Corning to convene a

16  shareholders meeting, and also, as was mentioned, we have a

17  motion requesting the appointment of an official Equity

18  Committee.  I'm happy to consider either motions in the order

19  that the Court wishes.

20          THE COURT: Well, you've already heard my concerns

21  about the appointment of an Equity Committee.  I need some

22  information somewhere that indicates to me that the equity

23  actually is in the money, and I just don't see it, and if the

24  answer is that it only is if I consider the FAIR Act, I'm not

25  considering the FAIR Act.  It's not a statute.  I can't

1    consider that act at this point.  So, maybe we should address

2    that because that's my concern.

3         MR. GRAY:  That's fine, Your Honor.  I'm happy to

4    start off with that motion and in fact that element.  As the

5    Court is well aware, 1102(a)(2) provides - of the Bankruptcy

6    Code provides the Court with the ability to appoint official

7    committees, if necessary, to assure adequate representation,

8    and the courts have looked at various factors.  One of the

9    factors is, as the Court mentioned, the prospect for recovery

10   for equity.  Your Honor, I will not go into the FAIR Act

11   issues again.  We do believe that the FAIR Act is an issue

12   that the Court should consider in the analysis, but the other

13   two points as well that are part of the analysis are that,

14   number one, the $7 billion asbestos estimation ruling is on

15   appeal to the Third Circuit.  Opening briefs have been filed

16   with the Third Circuit and responsive briefs are due next

17   month.  We think that the grounds for reversal of that

18   decision are meritorious, and we would also note that Credit

19   Suisse, which is the agent for the Bank Group and my

20   understanding part together with the Steering Committee

21   agreeing to the latest plan that the debtors have filed, is

22   also an appellant in that estimation appeal and has gone

23   ahead and continued to pursue its appeal of the estimation

24   ruling and has filed an extensive brief in connection with

25   that appeal.  So, we think that if that challenge is

1    successful with respect to the $7 billion estimation ruling

2    that there will be substantial value for equity as well.   And

3    then the other factor, Your Honor, with respect to the

4    solvency/reasonable possibility of overturn for equity is the

5    issue of the market capitalization.   Your Honor, based on the

6    price per share as of the close of business last Friday,

7    January 27th, with respect to the common stock, the common

8    stock was trading at $4.25 per share and approximately 21,as

9    of last week, approximately $21 per share for the preferred.

10   Given the outstanding amounts of shares of common stock and

11   preferred securities, 55.4 million approximately of the

12   common and 4 million approximately of the preferred

13   outstanding, there is a market capitalization of over $235

14   million for the common stock and $84 million for the

15   preferred securities.   We believe, Your Honor, that the Court

16   should take into account the market cap of the shares.   It's

17   not a speculative indicator of value.   There are numerous

18   holders in the market.   Even the debtors concede that there

19   are over at least 6,500 holders of the common stock alone out

20   in the marketplace.   Your Honor, I would also point out that

21   no less an authority than the United States Supreme Court has

22   determined that the market, particularly in the plan

23   confirmation context, that the market is the best indicator

24   of value, and that the Court made that determination in the

25   LaSalle decision.

1    THE COURT: And I don't disagree with that, but did

2    I get the numbers correct?  Two hundred thirty-five million

3    and 84 million respectively?

4    MR. GRAY: Correct.

5    THE COURT: Okay, then even just taking the asbestos

6    liability issue alone, just that, if the Circuit even reduces

7    the asbestos liability down to a billion dollars, equity's

8    not in the money.

9    MR. GRAY: Your Honor, the market capitalization, we

10    believe, takes into account the debt.  It represents the

11    residual value that's left over after accounting for both the

12    liabilities and the assets of the companies.  That residual

13    value we believe is reflected in the market capitalization.

14    We believe that the market has taken into account the

15    asbestos-related claims estimation amounts.

16    THE COURT: Well, maybe it has.  I don't have any

17    way of knowing whether it has or not, but since you're saying

18    that it's largely institutional investors who are buying at

19    least at the preferred level, I'll just assume for purposes

20    of this discussion that that's the case, that it has taken it

21    into account.  Nonetheless, the issue for equity to get some

22    funds is what the debtor's assets are worth.  So, the debtor

23    - and that's a liability, the 235 million is a liability from

24    the debtor's side because it has to pay the money back in the

25    event that the company does something that returns a

1    distribution to equity.  It's not a value additive for the

2    debtor.  So, the asset value for the debtor is what I really

3    need to look to, and I don't know what that is, but I don't

4    think the market capitalization is the way to get there.

5         MR. GRAY: Well, Your Honor, the total distributable

6    value that the debtors have indicated in their latest

7    disclosure statement indicates that they would have 5.9

8    billion to 6.7 billion of total distributable value.  Putting

9    aside for the moment the asbestos liabilities, the total

10   amount of debt, as best as we can tell from the disclosure

11   statement, including post-petition interest, potential post-

12   petition interest for other unsecured creditors, other than

13   the post-petition interest that would be paid to the banks

14   under the current plan is over $4 billion.  So, there is

15   substantial millions of dollars, almost $2 billion in fact,

16   of extra potential value that would find its way to equity.

17        THE COURT: If there were no asbestos liabilities.

18   Did I -

19        MR. GRAY: If you add in the asbestos liabilities at

20   say a billion dollars, which is - and I know Your Honor is

21   concerned about the FAIR Act, but if you took into account

22   the FAIR Act, the FAIR Act would reduce those liabilities to

23   approximately a billion as the bondholder group pointed out

24   in its papers down from $7 billion.  So even if you add in

25   the billion, you're still talking, based on the debtor's

1    numbers, and I'm not standing here today agreeing with what

2    the debtors are proposing in their plan, but even using the

3    debtor's numbers, you're still talking about residual value

4    of between a half a billion and $1.3 billion that would be

5    left over for equity.

6         THE COURT: Okay. If I took the FAIR Act into

7    consideration and thought that somehow or other it had some

8    meaning that I could attribute to it, which I don't see how

9    it does, but even if I did that, there is a court

10    determination that has said that the asbestos liabilities are

11    now $7 billion. That's subject to appeal. You've got one

12    heck of a burden, somebody does, to set aside 7 billion and

13    come down to no billion for current and future liabilities in

14    a company that was the market leader in the products that it

15    made and acknowledges that it has asbestos liabilities and

16    what its pre-petition settlements and litigations were with

17    the current claimants let alone the futures to take into

18    consideration. So, the likelihood that you're going to get

19    the 7 billion reduced to zero isn't very high, I think. Now,

20    it may go back for a new trial, but coming from 7 billion to

21    zero dollars is not likely.

22         MR. GRAY: I don't think it would have to go down to

23    zero dollars, Your Honor.

24         THE COURT: But it has to go down to less than 2.

25         MR. GRAY: It would have to go down possibly to less

1   than 2, and I understand Your Honor's point, but the bottom

2   line is, Your Honor, is that the concern for the preferred

3   and the equity security holders is that if the debtor's plan

4   proceeds without accounting for the possibility of lower

5   asbestos liabilities, another constituency will be getting a

6   windfall presumably that would be the asbestos claimants, but

7   another party out there will get a windfall purely because of

8   the chance that the plan would be confirmed before enactment

9   of the FAIR Act.  And -

10          THE COURT: Plans are confirmed before statutes are

11   amended all the time.  I mean this argument just doesn't hold

12   any water.  If we had to wait for Congress to pass different

13   statutes all the time, we'd never get plans confirmed.

14          MR. GRAY: Your Honor, there is precedent for

15   including forward -

16          THE COURT: It doesn't matter.  I understand there's

17   precedent.  There's lots more precedent for not including it.

18   So far there are only two cases that have, and I've had over

19   15 on my docket, none of which but those two have - one of

20   those on my docket has included it, so there's a lot more

21   precedent not to include it.  So where does that get us?

22          MR. GRAY: Well, I think that the passage of the

23   FAIR Act is highly likely, Your Honor.  As has been mentioned

24   in previous remarks to the Court this morning, it has already

25    merged from the Senate Judiciary Committee.  The majority

1  leader, Senator Frist, has indicated it's at the top of the

2  legislative agenda.  Moreover, my understanding is, is that

3  the Senate is expected to hear the asbestos bill as early as

4  next Monday on the Senate floor.

5       THE COURT: Well, if they pass something between now

6  and when this plan goes out, definitely at that point in

7  time, assuming that there's still a bankruptcy case or a

8  bankruptcy spin to this at all, then the documents will have

9  to be amended.  I have no qualm about saying that, but unless

10 and until they're passed, these documents do not need to be

11 amended.

12      MR. GRAY: Your Honor, I'd like to now turn and I'll

13 try to be very brief on the other factors that courts examine

14 in connection with equity committee motions.  I don't think

15 that there's any dispute that we meet the large and complex

16 case factor.  I don't think that there's any real dispute and

17 the debtors have certainly not raised one with regards to the

18 widely traded shares factor.  In fact, with respect to the

19 common stock, as when we filed our papers last December, over

20 the - I think it was the six to seven-week period prior to

21 our filing in December, the shares of the common stock were

22 trading at about 350 thousand per day on average.  As of last

23 week the average trading volume has increased to over 1.1

24 million shares per day.  That's, again, remembering that

25 we're talking about 55 million shares outstanding.  Your

1  Honor, we also think with respect to the time limits factor,

2  that our motion is timely.  We are at a critically important

3  phase in these cases.  The debtors are pursuing their plan,

4  not including the FAIR Act component that we discussed.  The

5  debtors are not close to a fully consensual plan.  It appears

6  that there are disagreements with major bondholders and with

7  the trade claimants regarding their treatment under the

8  debtor's plan and the plan structure.  In short, there's a

9  lot more time in negotiation that will have to be

10  accomplished within the next few weeks for the solicitation

11  and confirmation process to be completed and result in a

12  consensual plan if one is attainable.  The fact remains, Your

13  Honor, that we are at a critical juncture now.  This Ad Hoc

14  Committee and its members stand ready to work with the

15  constituents to try to resolve all issues and get to a

16  consensual plan, but the debtors have refused to deal with

17  us.  Finally, Your Honor, with respect to the need for an

18  official committee outweighing the potential cost for the

19  estate, it's clear, Your Honor, we think, that an official

20  committee isn't warranted to represent the interests of the

21  preferred securities and the equity holders.  The debtors

22  propose in their current non-consensual plan to wipe out

23  completely those interests, and there are other models out

24  there that would preserve value for those interests as we

25  previously discussed, Babcock & Wilcox and USG.  The debtors

1    tout their new plan, Your Honor, as their prime evidence that

2    they have met their fiduciary duties to all - to the entire

3    estate, including the preferred and equity security holders,

4    but clearly here, Your Honor, we, the equity secured and

5    preferred security holders have not been part of the process

6    and have been excluded by management.  In addition, Your

7    Honor, the debtors, notwithstanding the fact that they intend

8    to wipe out equity, are proposing in their new plan to pay

9    management at least $45 million in additional compensation on

10    the effective date while their equity and preferred

11    securities holders get nothing.  In conclusion, Your Honor -

12    Oh, with respect to the cost, I misspoke.  We believe, given

13    the need and the lack of adequate representation for all of

14    the equity security holders and the preferred security

15    holders that that need outweighs the cost for having an

16    official committee to represent all of those interests

17    supported in this case.  We note, Your Honor, that

18    substantial stakeholders in these cases have not objected to

19    this motion, namely the Ad Hoc Bondholder Group and other

20    bondholders and trade claimants and also the Official

21    Creditors Committee.  The debtors have pointed out that the

22    costs for this additional committee would be borne by the

23    creditors, if that's true, then the fact that those folks are

24    not objecting, I think, is very telling on this factor.

25          THE COURT: And how many of the members of your

1  official committee are members of the committees that aren't

2  objecting?

3         MR. GRAY: I honestly don't know, Your Honor, what

4  their debt holdings are.  The debtors reported that there is

5  some crossover.  We now have, as mentioned at the outset of

6  my presentation on the exclusivity motion, that we now have

7  eleven members.  A couple of our members have dropped off of

8  our Committee.  We will be amending our rule 2019 statement

9  to reflect that and those two members that have dropped off

10  are JP Morgan and Lehman.  So, there may be some crossover,

11  but I can't answer your question in terms of what the nature

12  of that crossover is.  Regardless, Your Honor, the fact that

13  there are institutions, significant institutions that are

14  involved in the case, I don't think weights against the

15  adequate representation point.  An official committee would

16  owe fiduciary obligations to all of the shareholders whether

17  they're institutional holders or individual holders.  And so,

18  we as an Ad Hoc Committee don't have that obligation.  An

19  official committee would have that obligation and would be

20  required to take all of the interests into account in

21  connection with addressing case issues.  In addition or in

22  conclusion, Your Honor, we think that the circumstances of

23  this case cry out for the immediate appointment of an

24  official committee to represent the interests of the

25  preferred and the equity security holders.  We think that we

1    meet all of the factors as described, and we also note as the

2    United States Trustee noted in its objection to our motion

3    that the legislative history of 1102 contemplates that the

4    official committees would be the primary negotiating bodies

5    for the formulation of the plan of reorganization, and that's

6    what we're proposing here.  Thank you, Your Honor.

7         THE COURT: Mr. Pernick.

8         MR. PERNICK: Your Honor, I think I can help a

9    little bit with the numbers, and Mr. Gray's not far off, but

10   these numbers are public.  They're on the record in the

11   disclosure statement, so, I think they're easy to talk about.

12   The first number that's not which is in the record in the

13   estimation hearing just to give the Court and the parties

14   some prospective, you may recall or you may know that we had

15   a number of experts who testified at that hearing.  The

16   bank's expert, Mr. Dunbar, had the lowest estimate of

17   anybody, and that was approximately $2 billion.  So even in

18   the estimation hearing and on the appeal I would presume -

19   While I guess there's a theoretical chance of the Court

20   reversing and a total victory for the appellants, the chances

21   of him getting a number lowest in what the lowest expert

22   testified to seems to me to be pretty unrealistic.

23        THE COURT: I agree with that, but -

24        MR. PERNICK: With respect to assets and

25   liabilities, let me talk first about liabilities -

1    THE COURT: Pardon me -

2    MR. PERNICK: sorry.

3    THE COURT:  - so with the 2 billion, assuming that
4    the lowest estimate is accepted at $2 billion, then is equity
5    in the money?

6    MR. PERNICK: Well, it's hard - I'm only hesitating
7    because I have to calculate five years worth of interest for
8    all of the bond debt and the unsecured creditors who would be
9    entitled to receive that before equity would receive
10    anything.  So, I can certainly do that calculation.  I can't
11    do it right now, but I can have Mr. Post (phonetical) do it
12    and get that to the Court.  It seems close.  My guess is that
13    equity won't be in the money, but until I do that
14    calculation, I don't know.  I mean, for example, the bank
15    debt, the pre-petition amount is 1.467 billion and their
16    number with interest and fees at the settled number, not the
17    full amount that they were claiming, is 2.2 billion just for
18    the bank debt.  So there was about $700 million of interest
19    and fees that they were entitled to that we agreed to and
20    that doesn't count probably about 300 million more that they
21    compromised from what they were originally claiming they were
22    owed.  Now, I know we could have a discussion about whether
23    they would have eventually gotten it or not, but we did - the
24    resolution that's in the plan contemplates that settlement
25    just to give you perspective.  So that's about 2.2 billion.

1   The bond debt, just to round up a little bit, is 1.4 billion

2   plus interest, and so the interest number may well be even

3   just for the bond debt another 5, 6, $700 million.  I don't

4   know exactly and I don't know if Mr. Rahl or Mr. Kruger

5   happen to have it, but we could calculate that.  You also

6   have about $275 million of trade and unsecured debt, and then

7   right now you have a $7 billion asbestos number.  Now this

8   is, by the way, all Owens Corning only because the equity

9   holders are not claiming that they have an equity interest in

10  the Fiberboard entities, so we pulled out when I talked to

11  you about distributable value, we pulled out the amount of

12  the Fiberboard trust which was about 1.4 billion.  We're just

13  looking at OC apart from Fiberboard.  On the asset side, what

14  you basically have in OC is about $1.1 billion in cash, about

15  a $5.2 billion total enterprise value, and about $200 million

16  of insurance recoveries and items like that.  So, it's

17  approximately $6.5 billion on the asset side.  His range of

18  5-9 to 6-7 was, I think, correct from the disclosure

19  statement.  On the two other small points just that Mr. Gray

20  raised that the Official Committee is necessary so that

21  shareholders can participate, I think Your Honor's been in

22  enough cases in Chapter 11s to know, this is really about who

23  is going to pay fees and whether or not they're going to get

24  official status which may help them a little bit in arguing

25  before the Court or other items, but it's really about who's

going to pay the fees.  These entities, and we disclosed only

what was public from pleadings that they filed, is that five

at that time of the thirteen members of their Committee were

bank holders and/or bondholders, and when you look at the

names of those entities, it's not just that there were five

or thirteen, it's who they are.  I mean, they're all more

than capable and have demonstrated themselves to be more than

capable of taking care of themselves let alone when they act

together.  It's Deutsche Banks' securities, Havre Distress

Investment Master Fund, JP Morgan, Lehman Bros. and Plain

Field Asset Management.  So, I don't think a serious argument

could be made that if you don't grant this motion, that

they're not going to be able to effectively participate, and

in fact, just as an example, Havre on its own is one of the

appellants in the estimation hearing and in the estimation

appeal.  Your Honor, I think those are the two main points:

the values and the ability to represent themselves.  So

unless the Court has any questions, I have nothing further in

response although I think some other parties do.

MR. LOCKWOOD: Just a few quick points, Your Honor.

With respect to the market price issue, there's been no

evidence that there's anything other than people buying what

amount to lottery tickets on the FAIR Act.  It may well be

that in an ordinary case where you haven't got a highly

publicized federal statute that would wipe out $7 billion of

1  liability that market - one might assume that the market

2  value representing an informed market was a consensus of the

3  investors as to what the, quote, "equity", close quote, was

4  of the company.  But here, it's quite clear that what you're

5  talking about, as Mr. Gray basically acknowledged, is a $6

6  billion reduction in what has been found to be and what this

7  Court must, I assume, until some higher court reverses it,

8  take to be a $7 billion liability here, and without regard to

9  whether Mr. Dunbar who Judge Fullam roundly rejected the

10  credibility and the methodology of, could come up with a

11  number that was $5 million lower, which if you scratched

12  around real hard, you might come up with a couple hundred

13  million dollars of equity to do that.  The Third Circuit

14  would not only have to reverse Judge Fullam, they'd have to

15  say, notwithstanding that he was at the trial and determined

16  the credibility of the witnesses, that he was not only wrong

17  in his result, but that he had to have accepted as a matter

18  of clear and convincing evidence that Fred Dunbar's testimony

19  was so overwhelmingly correct that the lower court should

20  have accepted it at face value.  That, I submit, is an

21  outcome that is just outside the realm of even remote

22  speculation.  So what you've got here is a combination of

23  folks out there in the market betting on the possibility of

24  future legislation, like they bet on sporting events.

25  There's all kinds of things that you can bet on and pay - I

1   mean, you're talking $3 a share was the number that was in

2   the Equity Committee's motion.  That's like buying a dollar

3   lottery ticket down at the gas station or something like

4   that.  That's not any evidence that there's residual equity

5   value here.  Mr. Gray also commented that there was no

6   objection for the bondholders to this Committee.  Not only

7   were the bondholders riddled with conflicts of interest on

8   that subject, but there were objections from the ACC and the

9   Futures Rep. who until somebody says differently have $7

10  billion worth of claims.  And so, I think it's a little bit

11  disingenuous to suggest that somehow or another the creditors

12  here all agree that it would be just terrific to have an

13  Equity Committee.  As Mr. Pernick pointed out, the bottom

14  line here is, is this Court on the basis of the sort of

15  flimsy showing that's been made here going to grant official

16  status to a group of people whose only incentive, only

17  incentive if so granted that status would be to find out ways

18  to try and hold up the confirmation of this case because the

19  FAIR Act, if it doesn't get enacted in February, which as

20  Your Honor pointed out, would moot all this discussion or in

21  March or in April or at anytime prior to the confirmation and

22  consummation of this plan, is always there potentially to get

23  re-introduced by some subsequent Congress at some subsequent

24  time, and the equity committees whose only hope of getting

25  value out of this case is the passage of that statute will

1    have total incentive at the expense of the debtor and all its

2    creditors to come in here and try and use its status and the

3    economic value that it's getting from the debtors to just

4    delay, delay, throw up as many roadblocks as it possibly can,

5    and I suggest to you, Your Honor, that that's hardly the kind

6    of conduct that your Court, Your Honor would want to

7    incentivize by creating an official committee under these

8    circumstances.  Thank you.

9        THE COURT: Anyone else?  Mr. Graulich?

10        MR. GRAULICH: Your Honor, I don't want to say

11    anything that would be in any way duplicative of the debtors

12    or the ACC on this, and in fact – on this issue, and in fact,

13    Your Honor, we filed an objection, and we're prepared to this

14    relief, and we're prepared to stand on that objection.  I

15    would just like to, just for a point of clarification make

16    clear the fact that Credit Suisse was the objecting party or

17    the main litigant in the estimation.  Based upon the timing

18    we've been given from the Third Circuit, we have filed a

19    notice of appeal, and, notwithstanding the plan, we have

20    filed a brief in support of the appeal, but if all the

21    parties would take a look at the letter that's attached as

22    the final exhibit to the plan, assuming the plan's confirmed,

23    the banks are prepared to withdraw this appeal and moreover,

24    we're in the process now of trying to solicit support from

25    the bank groups themselves to withdraw the appeal more

1  quickly.  So, to the extent that this action turns on the

2  likely results of the appeal, the appeal is something that

3  the banks, based upon their proposed treatment under the

4  plan, is prepared to waive, you know, assuming that we get

5  the treatment that's the non-cram-down treatment under the

6  plan.

7       MR. KLAUDER: Good afternoon, Your Honor.  David

8  Klauder for the United States Trustee's Office.  I just

9  wanted to note a few things.  A request was provided to our

10  office prior to this motion being brought.  This is actually

11  the third - or that was the third such request in this case.

12  I believe this is the first time the issue of an Equity

13  Committee has been formerly brought before you, but we've

14  gone through the process three times, gone out, gotten

15  solicitation, gone through the issues, and we've denied that

16  request all three times.  I wanted to make note of that.

17  Secondly, I agree wholeheartedly with what Mr. Pernick said,

18  that this isn't an issue of adequate representation.  It's an

19  issue of who pays.  The Equity Committee clearly wants the

20  estate to pay for their participation in these cases.  These

21  are sophisticated institutional investors.  They've come

22  together and certainly are going to be heard in this case.

23  They have the ability under 1109(b) to come together to be

24  heard as an Ad Hoc Committee, and they're doing such in this

25  case.  Why is it then that the estate has to pay, and we

don't believe that the facts before the case support official status. Lastly, isn't the issue of the possibility of an appeal the same speculation being as the FAIR Act? I mean, what we have, what is before us, the fact before us is a District Court opinion of $7 billion. To say it is appealed and it could be a billion it could be 2 billion, it's the same speculation. What we know is that it's $7 billion, and I think that is the point that should - that Your Honor should be considering the most.

THE COURT: Well, I think I have to consider the fact that it's $7 billion unless and until it's satisfied on appeal. It's a final judgment unless it's reversed. So, I have no discretion. As far as I'm concerned that's the number.

MR. KLAUDER: Your Honor, equity committees are not mandated by statute. It's a heavy burden to prove, and it hasn't been proven here so we would request that you deny the request for an equity committee. Thank you.

THE COURT: Anyone else? Mr. Gray, any final comments?

MR. GRAY: I do have just one comment, Your Honor, and that is that the Court should look at the issue of the potential return to equity as an issue of whether the debtors are hopelessly insolvent. I don't believe that the debtors are hopelessly insolvent. There are several possibilities

out there that would put equity in the money and under the

standard, Your Honor, we believe that we meet that element of

the test for approval of an official equity committee under

1102(a)(2).

THE COURT: Well, it seems to me that the test is

not met. There is no evidence before me that the debtor is

solvent at this point in time in any way. I have no

authority to assume that the liabilities are going to be

anything less than $7 billion because the District Court's

told me that's what they are, and I am not an appellate court

to set aside District Court determinations. So, as far as

I'm concerned, it's $7 billion. If I add up all the numbers

that have been put on the record with respect to the asset

value of the debtor, they don't total $7 billion, and that's

not the debtor's only claim. So, I don't see how at this

point equity is entitled to a distribution or will get a

distribution under any scenario, and at this point in time,

I, therefore, am denying this motion. If the FAIR Act passes

and this case is still pending, if the $7 billion number is

set aside and the number is low enough that in fact equity

stands a chance at recovering funds, at that point I will

certainly hear the Equity Committee's motion and probably

have a much different reaction to it than I have now. But as

of today, this motion is denied without prejudice. There is

no basis for me to find that equity will receive a return of

1   any type in this case based on the asset value of the debtor.

2   So, it's denied for that reason without prejudice.  Mr.

3   Pernick, if you will submit an order, run it by Mr. Gray

4   first, please.

5          MR. PERNICK: Thank you, Your Honor.

6          THE COURT: He has another motion, I think.

7          MR. PERNICK: That's right, I was just actually

8   going to -

9          THE COURT: Okay.

10         MR. GRAY: Thank you.  Thank you, Your Honor, for

11  hearing us on the shareholder meeting motion.  By this

12  motion, the Ad Hoc Committee seeks either confirmation of the

13  Court that it may proceed in the Delaware Chancery Court to

14  prosecute an action seeking to compel Owens Corning to

15  conduct its annual shareholder meeting - an annual

16  shareholder meeting or to stay relief or alternatively stay

17  relief to do so.  Your Honor, Owens Corning is a Delaware

18  corporation and in accordance with Delaware law and with its

19  own bylaws is required to hold annual shareholder meetings

20  for the purpose of, among other things, electing directors.

21  Owens Corning failed for years to conduct an annual

22  shareholder meeting, and indeed, the terms of all ten of its

23  purported directors has expired years ago by the terms of the

24  organizational documents of Owens Corning.  The members of

25  the Ad Hoc Committee, Your Honor, seek to exercise their

1    shareholder rights to pursue an action in the Delaware

2    Chancery Court in accordance with § 211©) of Title 8 of the

3    Delaware Code to compel Owens Corning to conduct its required

4    annual meeting.  Although the Ad Hoc Committee does not think

5    that it would violate the automatic stay by doing so, the Ad

6    Hoc Committee out of deference to this Court has nonetheless

7    brought this motion first to this Court with regards to the

8    scope - to consider the scope of the automatic stay.  Your

9    Honor, we believe that there's precedent that this Court

10   should follow directly from the District Court of Delaware,

11   the United States District Court of Delaware in the Marvel

12   Entertainment decision.  That decision, Your Honor - in that

13   decision the District Court reasoned under established

14   precedent going back decades that the corporate governance

15   rights of shareholders cannot be lightly tossed aside even

16   when a corporation is in bankruptcy.  The District Court in

17   Marvel further reasoned that nothing in the language of § 362

18   or its legislative history changed that established principle

19   of corporate democracy.  The District Court then ruled that

20   the voting of the stock in that case to replace the Board was

21   not a violation of the automatic stay.  We submit, Your

22   Honor, that Marvel is either binding on this Court or at

23   least very persuasive precedent that this Court should

24   follow.  Just like in Marvel the members of the Ad Hoc

25   Committee seek to exercise their corporate governance rights

1    to have a shareholder meeting and vote their shares.

2    Accordingly, Your Honor, we submit that the Court should

3    confirm the Ad Hoc Committee's proposed Delaware Chancery

4    Court action.  It does not violate the automatic stay.  What

5    I do want to make clear, Your Honor, is that we're not asking

6    the Court to consider the merits of the § 211©) action that

7    we're proposing to bring in the Delaware Chancery Court.  We

8    should not lose sight of that fact, and issues that you may

9    hear from the objecting parties regarding the purported

10    insolvency of the debtors or with regards to the motivation

11    behind bringing this particular motion or the action, is

12    irrelevant in this context.  The scope of the automatic stay

13    issue, Your Honor, which is the key issue that's presented by

14    our motion, is not dependent on the solvency or insolvency of

15    the debtor.  The automatic stay either applies or it does not

16    apply.  In accordance with the Saks and Industries case, Your

17    Honor, the Delaware Supreme Court expressly addressed the

18    issue of insolvency in this context and reasoned that

19    insolvency alone cannot deprive the stockholder of its rights

20    to a shareholder meeting.  There is no legal authority that

21    the opposing - that the debtors can point to that holds

22    otherwise.  There is dicta, Your Honor, in the Johns Manville

23    decision at footnote 6 in that decision which the Marvel

24    court noted is dicta.  And, moreover, the Marvel decision as

25    well did not address at all the solvency or insolvency

1    question when addressing the automatic stay issue in that

2    case.  In any event, Your Honor, it's certainly plausible as

3    the debtors have indicated at page 20 of their opposition,

4    that they may be able to raise affirmative defenses to the

5    § 211©) action, and we submit, even though we think those

6    defenses would be without merit that that sort of argument as

7    to the insolvency of the debtors, notwithstanding of course

8    the fact that the Delaware Supreme Court has ruled otherwise

9    could be addressed at that point.  Moreover, Your Honor, the

10   motivation behind why we're bringing this motion, we also

11   think is similarly irrelevant to your consideration of

12   whether the automatic stay applies or it does not.  The so-

13   called clear abuse cases that are - percolate throughout the

14   debtor's objection really address the situation of whether on

15   the merits that action should proceed and a debtor -

16   corporate debtor should proceed with convening a shareholder

17   meeting or not.  None of those cases address the question

18   before this Court regarding whether the automatic stay

19   applies or not.  Even if, Your Honor, the clear abuse of

20   cases were relevant to this consideration of the automatic

21   stay applying or not, we would submit, Your Honor, that the

22   standard under those cases, as <u>Johns Manville</u> correctly

23   pointed out is not that there's any delay that would be

24   occasioned by having the shareholder meeting, but only

25   whether the proposed shareholder meeting is intended to

FORM FED-25        PENGAD • 1-800-631-6989

1    torpedo the reorganization process.  That's clearly not the

2    case here, Your Honor, and first of all the debtors are not

3    on the eve of confirmation and secondly, they don't even have

4    consensus on their current plan.  They have no imminent

5    confirmation hearing.  You're planning to schedule that

6    months from now, and all that the Ad Hoc Committee is seeking

7    to do is to have a voice in the process and assure that their

8    interests are being considered and have a consensual plan.

9           THE COURT: But the issue still is the same.  The Ad

10   Hoc Committee or the equity has no right at this - I don't

11   want to say "right".  That's too strong a word.  Has no basis

12   at this point on which to assume that it can do anything to

13   compel itself a distribution through this plan, because there

14   is no evidence that the debtor is anything other than

15   insolvent at the moment.  And as a result, if the Equity

16   Committee sets aside the current board and puts a new board

17   in place that's going to vote to have a plan filed, that says

18   that it's going to get money, (a), it seems to me that that's

19   in violation of the automatic stay because it's clearly an

20   effort to control the debtor and the debtor's property, and

21   (b) an effort to collect a debt in the loose sense, to return

22   equity - money to equity, and ©) it's an effort, it seems to

23   me, to take control of a process that will result in an un-

24   confirmable plan to the detriment of every other constituency

25   in this case.  Now, I don't know how I can do anything other

1    than consider the motivations in deciding whether it's

2    appropriate to allow an Equity Committee that can't get a

3    distribution, that wants to at this point put in a board

4    that's going to try to compel a distribution, that would then

5    in turn file an un-confirmable plan to have a shareholder

6    meeting set forth.

7         MR. GRAY: Well, Your Honor, I respectfully

8    disagree.  I think that the scope of the automatic stay,

9    § 363(a)(3) talks about control over property of the debtor.

10   We are not proposing by this motion to have Your Honor

11   enforce § 211©) against the debtors here.  What we are

12   requesting is the right to exercise our corporate governance

13   rights to be able to elect a new - to be able to proceed in

14   Delaware Chancery Court to compel that election.  As the

15   _Marvel_ case determined, Your Honor, § 362 does not concern

16   itself with the issues of solvency or insolvency of the

17   debtor, and so -

18        THE COURT: I'm sorry, would you - I'm sorry, would

19   you say that again.

20        MR. GRAY: Absolutely, Your Honor, I apologize.  At

21   § 362, the scope of § 362 applies whether a debtor is

22   insolvent or solvent.  That's not the question.  The question

23   is whether we have valid corporate governance rights, and

24   that is the case, and the case law, the legal precedent echos

25   back decades regarding this issue of the exercise of

corporate governance rights with respect to bankrupt debtors,
indicates that we have this right notwithstanding the
automatic stay.  Your Honor, in addition, we would say that
if the Court were to determine that the automatic stay does
apply to prevent the Ad Hoc Committee from pursuing a
§ 211©) action in the Delaware Chancery Court, we believe
that there is cause for relief from stay, and I'll run
through those reasons very quickly, Your Honor.  Again, Owens
Corning has failed for years to conduct its annual
shareholder meeting and the terms of its directors have
expired.  Under established legal precedent, the
shareholders' rights continue even in bankruptcy.  The
Delaware Chancery Court, Your Honor, is well-qualified to
hear such an action and any defenses that the debtor may
raise in that action.  We also believe, Your Honor, that
judicial economy would be served by having the Delaware
Chancery Court reach its decision quickly on such an action
because otherwise a decision on that sort of action by this
Court would not be within this Court's core jurisdiction.  In
conclusion, Your Honor, pursuant to § 362 and established
precedent, we believe that this Court should confirm that the
Ad Hoc Committee will not violate the automatic stay by
pursuing a § 211©) action in the Delaware Chancery Court.
Alternatively, the Court should grant stay relief for the
Committee to do so.  Thank you, Your Honor.

1        MR. STEEN: Good afternoon, Your Honor.  Jeffrey

2  Steen, S-t-e-e-n, of Sidley Austin on behalf of the debtors.

3  Judge, I realize that I'm batting ninth here this afternoon,

4  and you have a very busy schedule, so I'll try to be brief.

5  But the same reasons that lead Your Honor to deny the Ad Hoc

6  Committee's motion to appoint an official committee and the

7  same reasons that lead Your Honor to extend the debtor's

8  exclusivity period through July 31st should defeat the attempt

9  of the Ad Hoc Committee to essentially hijack the debtor's

10  undergoing plan confirmation process under the guise of

11  convening a shareholders' meeting, now five years into the

12  case.  And listening carefully to Mr. Gray's presentation,

13  the debtors took pause and considered what is the real

14  objective here and why have they not raised any of these

15  allegations during the first 63 months of the case.  Now, one

16  does not have to read between the lines, Judge, to realize

17  that the agenda of the Ad Hoc Committee here is to take

18  control over these cases, to take control over the debtor's

19  exclusive right to propound and solicit acceptances of its

20  plan that we worked hard over the last couple of months to

21  gain the support of our co-proponents, the current asbestos

22  claimants, as well as the Futures Representative, and we also

23  have the support as we've said three or four times today of

24  the Bank Steering Committee.  Now 85 representatives of 85

25  percent of the claims of record against Owens Corning alone

are now invested in this plan confirmation process and we're moving ahead. Now, granting the Ad Hoc Committee's motion now is not in the best interest of the estate. It will only lead to further mischief, further delay, further costs, uncertainty, and financial burden that, guess what? will be borne by the debtor's creditors, particularly the asbestos creditors and the other commercial creditors and not the equity holders. Under these circumstances, the debtors believe there's no legitimate basis, there's no legitimate reason now that the plan process is firmly underway to impose that steep burden on the debtor's creditors. And I disagree, respectfully, with Mr. Gray's representation of the cases, everyone of the major federal cases and there are a handful of them. We cited some in our briefs, and they cited others in their brief. Everyone of the federal cases tries to apply what's been called the clear abuse standard to determine the legitimacy under facts and circumstances of a request by shareholders to conduct a shareholder meeting notwithstanding the pendency of a Chapter 11 case, and I submit to Your Honor, that in the real world, there's no way to address that standard other than looking at the true facts and circumstances including the insolvency of the debtor and the motivation behind the Ad Hoc Committee in its request. There are two compelling reasons that we've gone over in detail already in this hearing that should lead Your Honor to

summarily deny the Ad Hoc Committee's motion.  First,

unfortunately, equity is way out of the money under the facts

and circumstances and the current state of the law.  And

secondly, the relief requested by the Ad Hoc Committee would

directly interfere with, be a direct attack upon the debtor's

exclusive right to seek acceptances on its pending plan that

has the support of the asbestos creditors and the Bank

Steering Committee.  Now, Your Honor, I'm not going to repeat

what you said, but we agree completely that based upon the

financial valuation that the debtor's financial advisors have

done and we put in the disclosure statement, the ranges of

value were discussed earlier when the debtors are staring at

over $10 billion of liabilities at the parent company OCD

alone, in the face of a range of distributable value between

5.9 and 6.7 billion, the equity holders are currently out of

the money under the state of the law as it presently exists.

And secondly, Your Honor, now that we have an April 5th

disclosure statement hearing and plan confirmation scheduled

to tee off on July 10th, the debtors are going to move forward

with their co-proponents, with the Bank Steering Committee,

and hopefully with the other bond constituents in this case

to get that plan confirmed and to gear up for the disclosure

statement hearing and then go to solicitation.  What possible

benefit would there be in having a side show of a proxy fight

and a shareholder meeting for the avowed purpose of ousting

1   the current Board and coming up with another plan during the

2   debtors' own exclusivity period that is based upon the

3   speculation that the FAIR Act may at some point become the

4   law.  That makes no sense, and the risk of losing on that is

5   being imposed upon the debtors' creditors, who are the real

6   parties in interest in this case under present facts and

7   circumstances.  Contrary to the Ad Hoc Committee's arguments,

8   there's nothing more integral to the core jurisdiction of

9   this Court then the orderly administration of the debtors'

10   plan confirmation process.  This Court clearly has the power

11   and jurisdiction to protect the integrity of that plan

12   confirmation process currently underway.  The debtors'

13   exclusive right to solicit acceptances to their plan

14   constitutes property of the estate for purposes of § 541.  We

15   know that based upon one of the Supreme Court cases that

16   counsel cited, 203 North LaSalle.  That's an important

17   element and component of property of the estate, and it

18   demands and deserves protection under the automatic stay and

19   § 362(a)(3), and none of the cases, including Marvel and

20   Saxton cited by the Equity Committee are to the contrary.

21   Now, as we detailed in our court papers, Your Honor,

22   permitting the sideshow of a shareholder meeting just to oust

23   the Board and conduct a proxy fight during the pendency of

24   the plan confirmation process is going to directly jeopardize

25   the debtors' reorganization efforts to the detriment of the

1  creditor body, and we believe that that constitutes abuse

2  under the case law.  Under these circumstances, there's no

3  legitimate purpose to be served for a shareholder meeting at

4  this time, and in examining that question, it's worth

5  remembering again who the objectors are, what have they been

6  doing over the last 63 months, and what do they really hope

7  to accomplish here.

8          THE COURT: Well, tell me how the automatic stay

9  applies.

10         MR. STEEN: Under 362(a)(3), Your Honor, any effort

11  by any entity, either a creditor or an equity holder to take

12  control over property of the estate is protected under

13  362(a)(3), and we -

14         THE COURT: Your view is under North LaSalle that

15  the right to solicit the votes in the exclusive period is a

16  property interest of the debtor.

17         MR. STEEN: Yes, Judge, precisely.

18         THE COURT: Okay.  Anything else in that line?  Any

19  other way that -

20         MR. STEEN: I think there are other, Your Honor, I

21  think there are other cases, progeny of 203 North LaSalle,

22  lower court cases that subsequent to the writing of that

23  opinion find that the debtors' exclusivity period does

24  constitute property of the estate for purposes of 541, and it

25  is our argument that anything that constitutes property of

the estate under § 541 of the Code is deserving of protection

under the stay provisions in 362(a)(3).  Couple of other

comments, Your Honor: The Ad Hoc Committee again is comprised

of a number of sophisticated institutional investors who have

voluntarily acquired their securities during the pendency of

these cases with their eyes wide open.  Now, these investors

have every right to spend their money in the secondary

markets during the rough and tumble of these cases to

speculate on the possibility that at some point in the

future, the FAIR Act may become law.  But they don't have a

right to impose their investment decisions upon the will of

the creditor body that based on all representatives of the

creditor body here today are in favor of moving forward after

five long years and now that Sub-Con has been decided, and

Judge Fullam has decided estimation to get to a plan

confirmation hearing at the earliest possible time.  I think

that the Court should also factor into its decision making

that the equity holders have for their own tactical purposes

now waited over 63 months into this case to demand a

shareholder meeting.  Judge, the debtor takes very seriously

its corporate governance responsibilities.  The debtor has

taken extremely seriously every step of the way in this case

its fiduciary duties.  And we have been under Your Honor's

auspices for now over five years.  Everything that the debtor

has done, every major decision that the Board had taken has

1    seen the light of day under the microscope of the public

2    record in these proceedings.  And the Ad Hoc Committee and no

3    other equity holder to the best of our knowledge demanded any

4    kind of shareholder meeting until ten days after the US

5    Trustee's Office rejected the third consecutive demand by

6    equity holders to appoint an official committee on December

7    15th of 2005, just two weeks prior to our filing the plan of

8    reorganization and the disclosure statement.  And I think it

9    is worth noting that prior to the fifth amended plan, during

10    2003, the debtors filed five previous comprehensive plans of

11    reorganization with the support of other significant creditor

12    constituencies, and everyone of those plans wiped out equity,

13    and at no time did any shareholder in connection with any of

14    those five plans come before Your Honor or make a request

15    upon the company to conduct a shareholder meeting.  Nothing

16    has changed.  The only thing that has changed in terms of the

17    economics is that Judge Fullam as you correctly pointed out,

18    after a full trial, entered a ruling last year pegging

19    asbestos liability at 7 billion.  Judge, again, contrary to

20    counsel's argument, it is - The bottom line is that what the

21    Ad Hoc Committee is doing here is seeking to extract holdup

22    leverage now having failed to terminate the debtors'

23    exclusivity period, now having failed to appoint an official

24    equity committee at the expense of the estate.  What the Ad

25    Hoc Committee is really doing here, under the guise of a

1  shareholder demand, is to extract holdup leverage from
2  somebody.  Now, I don't know if it's the asbestos claimants.
3  I don't know if it's the banks.  I don't know if it's the
4  bonds, or maybe it's all three, that somebody is going to
5  leave money on the table notwithstanding the facts and
6  circumstances that in the absence of the passage of the FAIR
7  Act, equity is hopelessly out of the money in this case.
8  There's not going to be any meaningful harm, Judge, to
9  shareholders in this case by denying this motion.  As we have
10 made clear again today, if and when the FAIR Act is enacted
11 into law, before the debtors' plan is confirmed, then the
12 debtors and the other major parties will sit at a table and
13 have an opportunity to reevaluate the situation based on the
14 law and the facts and circumstances as actually exist at that
15 time.  And what the Ad Hoc Committee's motion really is, is a
16 collateral attack on the debtors' plan.  There will be time
17 enough to test the confirmation standards of the debtors'
18 plan against § 1129.  We don't need to do that today.  And
19 lastly, I'd like to inject a little bit of pragmatics into
20 this determination and even if the relief requested by the Ad
21 Hoc Committee were granted, it would not change the economic
22 reality of these cases.  The numbers just don't add up on the
23 current record for equity holders and that's unfortunate, but
24 that's reality, and waiving a wand and displacing the current
25 Board isn't going to change the numbers.  It will likely

1    delay the case and engender additional litigation and costs

2    and the risk of doing business in Chapter 11, but it's not

3    going to change that reality, and moreover, nor will

4    conducting a shareholder meeting today or tomorrow or next

5    month hasten by a single day the prospect of passage of the

6    FAIR Act. The two are completely unconnected. For these

7    reasons, Judge, the debtors respectfully request that the Ad

8    Hoc Committee motion be denied and that Your Honor find that

9    § 362(a)(3) of the Code, the automatic stay applies to any

10    effort by the Ad Hoc Committee to demand a shareholder

11    meeting in the Chancery Court. Unless Your Honor has any

12    further questions, that's all I have.

13        THE COURT: No. I don't.

14        MR. STEEN: Thank you.

15        MR. LOCKWOOD: Your Honor, although this isn't sort

16    of technically an answer to the question before your Court, I

17    think it's a point that might inform the Court in terms of

18    what we're looking at here. What the Equity Committee wants

19    to do here is to have a shareholders meeting. Why? Well,

20    it's obvious. They want to have a shareholders meeting so

21    that they could elect directors who would propose a new plan

22    or that would somehow or another give money to equity. Now,

23    under Delaware law, a board of directors is supposed to have

24    a fiduciary obligation to its shareholders and when it is

25    insolvent to its creditors. And what they're basically doing

1   here, is they want to go in and argue to the Delaware

2   Chancery Court that they should be able to have, solicit

3   through proxies a vote to put in a board of directors who

4   contrary to the fact that their duties would be to their

5   creditors because the company as has been discussed here ad

6   nauseam this morning is, at the moment, hopelessly insolvent,

7   would nevertheless put the equity interests ahead of the

8   creditors, notwithstanding that fact, and pull a plan.  Now,

9   what is this entity that they want to have do this?  It's a

10  debtor in possession.  Why are debtors in possession

11  permitted to run an estate under the Bankruptcy Code?  In the

12  old days, you had a trustee there, and you had trustees

13  because you want to make sure that people were neutral, and

14  when we amended the Code in '78, they put in this presumption

15  that you have the debtor in possession retain control of the

16  debtor's estate in the bankruptcy case, but the assumption

17  was, again, that the debtor in possession until proven to act

18  differently at which point you could make a motion for a

19  trustee, would impartially observe its fiduciary obligations

20  and in an appropriate case of insolvency recognize that those

21  fiduciary obligations ran to creditors not to equity.  And

22  yet, when you think about what's going on here, what the Ad

23  Hoc equity group is trying to do is turn that completely on

24  its head and have the Court accept under 362(a)(3) that they

25  could put in a group of directors chosen by them who would

1    take control of the estate's property in a context in which

2    they are taking advantage of the fact that you have a debtor

3    in possession here, which you might not have had, had the

4    debtor preferred its equity interests over its creditors,

5    notwithstanding its insolvency air now, and at the last

6    minute, right when we're about to go to a plan confirmation

7    hearing, throw a gigantic monkeywrench into the process, and

8    I suggest to Your Honor that that is certainly something –

9    and I'm sure Your Honor doesn't want to do, and the only real

10   question is are you compelled to do it, and I believe for the

11   reasons stated earlier by counsel for the debtor that you're

12   not so obligated.

13           THE COURT: Anyone else?  Mr. Gray?

14           MR. GRAY: Thank you, Your Honor.  I'd like to

15   provide a brief rebuttal.  Your Honor, I have several points

16   in my rebuttal.  First of all, with regards to the

17   applicability of LaSalle, I don't think LaSalle is applicable

18   here.  We're not intending by proceeding with our Delaware

19   Chancery Court action to take over or commandeer the plan

20   confirmation process or to take away or to seek to terminate

21   the exclusivity rights that the debtor has under the

22   Bankruptcy Code.  As the Court has acknowledged, the debtor

23   might but does not have to include a FAIR Act mechanism in

24   its plan.  We would seek a shareholder meeting, Your Honor,

25   so that the debtors' management would consider such a

1  provision and include such a provision.  It is not - It does

2  not mean in that context, Your Honor, that the new board for

3  Owens Corning would somehow usurp its duties, fiduciary

4  duties, to other constituents of the estate.  The motivation

5  here, Your Honor, of course, is that since equity doesn't

6  have a voice in these cases, the debtors have not included

7  equity holders in their plan negotiations and deliberations.

8  The motivation is leverage.  But <u>Johns Manville</u>, the <u>Johns</u>

9  <u>Manville</u> case, Second Circuit in <u>Johns Manville</u> expressly

10  ruled that just because equity holders want to gain leverage

11  in the process doesn't mean that there's some nefarious

12  purpose of trying to highjack the plan confirmation process.

13  That's not what we would like to do.  We just want to be

14  heard.  We want to have management consider our interests

15  too, and we are part of the estate, and yes, the FAIR Act is

16  not law yet, but it is acknowledged that it could become law

17  very soon, and that it could mean a substantial reduction in

18  the billions of dollars of these debtors' asbestos

19  liabilities, and that needs to be taken into account in the

20  plan confirmation process.  That would be the point here.

21  There's nothing nefarious about it, and finally, with respect

22  to the delay point, there's been no delay, Your Honor.  As

23  soon as this Ad Hoc Committee formed, we immediately set to

24  work to try to get involved in the process.  We sent

25  correspondence to the debtors' management and board, and they

1    shut the door on us.  We've been trying to work to be

2    involved in a collaborative process to get to a consensual

3    plan, and we've just not been included in the process.  And,

4    our motivation is not, Your Honor, to take away the debtors'

5    exclusivity rights or to otherwise highjack the plan of

6    reorganization.

7         THE COURT: Okay.

8         MR. LOCKWOOD: Thank you, Your Honor.

9         THE COURT: It seems to me that what I should do

10   with this motion is simply hold it until such time as we know

11   whether the FAIR Act does or doesn't pass because it seems to

12   me that if in fact the FAIR Act passes then at that point in

13   time the debtor's probably going to have to go back to the

14   drawing boards and do something anyway, and to the extent

15   that the FAIR Act doesn't pass, whether equity wants to

16   import a new board, wants the debtor to include FAIR Act

17   provisions in its plan, and so forth is totally irrelevant.

18   The debtor doesn't have to do it, and there is no legislation

19   out there that's going to give these equity constituents any

20   funds.  So, Mr. Pernick, I want this continued from month to

21   month until I know what's going to happen with respect to the

22   FAIR Act.  With respect to whether the automatic stay

23   applies, I believe it does apply, but because I'm going to

24   continue this motion until I find out what the resolution

25   with respect to the FAIR Act is, I don't think I need to

1    address it at this point in time, but it seems to me that the

2    automatic stay clearly prohibits entities from attempting to

3    take control of the debtor or the debtor's property.  That

4    seems to be exactly what putting in a new board of directors

5    would do.  I do think this is within the core jurisdiction of

6    the Court to determine especially with respect to the issue

7    of whether the stay applies or doesn't apply.  And I should

8    point out that in a case several years ago, but the

9    circumstances were much different, where an involuntary

10    action was commenced against the debtor and the board

11    essentially refused to meet.  I ordered the trustee in that

12    case to get a board together because the trustee had no

13    entity that it was attempting to do with, and there were

14    entities who were willing to sit on the board in the case,

15    and I did that not based on state law but based on the fact

16    that under 157 I do have core jurisdiction to control the

17    administration of the estate, and in my view, it was

18    necessary to do it.  In my view here, right now, it's exactly

19    the opposite.  I see no basis for this now, but I'm not

20    convinced that there won't be a basis if the FAIR Act passes.

21    So, Mr. Pernick, continue it from month to month until we see

22    what the outcome with respect to the FAIR Act is.

23       MR. RAHL: Your Honor, on a point of - I think a

24    very important point that Mr. Graulich made in the context of

25    the motion for an equity committee, I did not want to

FORM FED-25    PENGAD · 1-800-631-6989

interrupt that process, but I must respond. Mr. Graulich
made reference to the fact that apparently Credit Suisse is
in some way circulating a consent among members of the Bank
Group to, I gather, withdraw and dismiss prior to
confirmation their appeal of the asbestos estimation. Your
Honor, if you may recall the history of how Credit Suisse got
itself in that situation was that they were taking over, in
effect, the appeal by the Official Creditors Committee on
behalf of all the financial - the entire financial creditor
constituency, and you made it very clear at the time that
only - there could only be one counsel prosecuting that. It
had been our understanding, both from the filing that was
made and separate private communication we had with counsel
for Credit Suisse, that they would continue to pursue that
appeal unless and until there was a confirmation. And
obviously, if there's a confirmation, we have a very
different situation at hand. If the Bank Group is going to
seek to withdraw their appeal before this plan is confirmed,
Your Honor, I think that - and we'll have to work out in
which court this would unfold and whether it would be us or
the Official Creditors Committee itself, but one of us should
be - certainly we would move to have ourselves substituted in
place of - rather our client substituted and placed to
continue that appeal so that it's not abandoned prior to
confirmation. I just want to note that for the record, Your

1  Honor.  Obviously that's not before anyone today.  Thank you.

2           MR. GRAULICH: Your Honor, I think I could clear

3  this up if I created a misunderstanding, I apologize.  I was

4  referring to, and this is on file, there has not been a

5  change of plan by the Bank Group, the reference that I had

6  made with respect to doing that before confirmation was to

7  try and get the support of the Bank Group before confirmation

8  to withdraw the appeal as of the effective date.  For the

9  benefit if everybody in the Court and for Your Honor, what

10 the agent is committed to do is the agent has committed with

11 the support of the Steering Committee to seek authority and

12 specifically the authority is for authorization and

13 instruction from other bank debt holders to withdraw with

14 prejudice and without costs to any party on the effective

15 date of the plan resulting in a payment consistent with

16 paragraph (1) above, which is essentially a cash payment.

17          THE COURT: Look, I'm not going to be involved in

18 any way.  This is all an irrelevancy to me unless you file a

19 motion to substitute counsel.  The Circuit's going to decide

20 whether you can withdraw an appeal, not me.  Take it there.

21 I have enough problems to deal with.

22          MR. GRAULICH: Okay.  Again, if there's any

23 suggestion, I apologize.  It would be withdrawn as of the

24 effective date.

25          THE COURT: All right.

FORM FED-25     PENGAD • 1-800-631-6989

1    MR. GRAULICH: So I think that takes care of Mr.

2 Rahl's concerns.

3    THE COURT: Okay.

4    MR. PERNICK: Your Honor, the next item on the

5 agenda is —

6    THE COURT: Mr. Pernick —

7    MR. PERNICK: I'm sorry.

8    THE COURT:  — I want to add one comment, please,

9 with respect to § 362.  The property of the debtor and how

10 the debtor distributes property is a property right of the

11 estate.  The debtor's fiduciary obligations with respect to

12 its creditors and how it is going to treat those creditors is

13 something that the automatic stay is intended to enhance and

14 to protect.  Therefore, an effort to attempt to take control

15 of a board so that the board's going to require the debtor to

16 do something other than what the estate as an estate as

17 opposed to its shareholder constituency feels is proper, is

18 an act to control the property of the estate and the debtor

19 itself, and it is definitely covered by 362 in that sense.

20 So, in any event, it doesn't change my order to continue it,

21 but that's my view.  Yes, what's next?

22    MR. PERNICK: Thank you, Your Honor.  The next item

23 is item number 24 which is the status conference that the

24 Court required regarding the Official Committee of Unsecured

25 Creditors' professionals.  I'm not sure who's going to speak

1    to that, but I just thought I'd introduce it.

2         MR. GRAULICH: Your Honor, as reflected in the

3    agenda, the creditor constituencies have filed a report and

4    three supplements.  I'm prepared to give an oral update for

5    the benefit of Your Honor as to what at least from the

6    agent's prospective professionals have been doing since the

7    last written update.

8         THE COURT: Well, yes, because it seems that there

9    is, once again, and at loggerheads, and I'm really confused.

10   I seem to have Credit Suisse off on one tangent and the rest

11   of the Committee on another, and I am really not at all clear

12   as to why I am paying two or three sets of counsel to try to

13   get your act together and get on board doing the same thing,

14   and it's not happening.  I really - I'm not getting it.

15        MR. GRAULICH: Well, the Court and the estate is not

16   paying multiple bank counsel.

17        THE COURT: No, I meant Creditor Committee counsel

18   and bank counsel.

19        MR. GRAULICH: Okay.  Well, apropos of that, Your

20   Honor, in the last, you know, two months, it's obvious from

21   the presentations today as to what the banks and what Credit

22   Suisse and its professionals have been doing over the last

23   two months which is trying to negotiate a confirmable and

24   hopefully consensual plan of reorganization, and also now has

25   to deal with the fact that additional litigation has been

1    filed against the Bank Group both in the Bankruptcy Court and

2    in the District Court.

3          THE COURT: Yes, but I'm not sure why the estate

4    should be funding that.

5          MR. GRAULICH: Well, under the - there's a

6    standstill agreement between the debtors and the -

7          THE COURT: Mr. Graulich, pardon me.  It's somebody

8    on the phone.  Folks on the phone, can you please put your

9    mute buttons on.  Somebody's rustling papers near your

10   speaker phone, and it's very annoying.  Folks, please, put

11   your mute buttons on.  I haven't heard a click.  Does Court-

12   Call do it for us?  It's not Court-Call?  Folks, truly, I

13   really do not want to disconnect the phone because somebody

14   won't pay attention to an order but that's what I will do.

15   So, please, put your mute buttons on.  The next paper rustle

16   or half-conversation that I hear, I'm disconnecting.  Mr.

17   Graulich.  Thank you.

18         MR. GRAULICH: Your Honor, as the Court may recall,

19   there is a standstill agreement between Credit Suisse and the

20   Bank Group and the debtors with respect to the non-debtor

21   guarantors in this case.  Specifically, most importantly,

22   IPM, and so the terms of that standstill agreement would

23   clearly encompass the defense of these actions.  So it's not

24   that the banks are being paid because there's some official

25   entity under, you know, appointed by the Trustee.  We're

1    being paid based upon the standstill agreement that was

2    subsequently approved by the Court.

3         THE COURT: All right.

4         MR. GRAULICH: And so, from the debtors - but I

5    think Your Honor does raise a fair point which is whether the

6    prosecution of these actions falls within the authority of

7    the bondholders to bring actions that either on the one hand

8    the debtors have analyzed and elected not to bring, actions

9    that the debtor has commenced but is prepared to waive, or

10   other actions that are - while they certainly financially

11   impact upon the banks are really an attack on the debtors

12   themselves, for example, piercing the corporate veil.  So not

13   to raise, you know, obviously I'm noting it today, but the

14   debtors have - I'm sorry, the banks are preparing a motion to

15   dismiss the underlying litigation, and we are in fact now

16   analyzing that as one of the potential grounds for the

17   objection as to whether or not this is actually properly

18   within the scope, you know.  It's litigation the debtors are

19   not prepared to bring.  We're not convinced that the debtors

20   ought to be paying the bill for that, but that's not a matter

21   that we're prepared to really litigate today.  That maybe if

22   that's what the order says, then sobeit, but we're looking

23   into the issue as to whether or not that would be a proper

24   ground with respect to the motion to dismiss.

25         THE COURT: Why isn't the debtor doing that?  I mean

it would seem to me that if it's an effort to pierce the debtor's corporate veil, the debtor might have some interest in defending that litigation.

MR. PERNICK: Your Honor, Mr. Monk is actually handling that, but I can just tell the Court that just because the banks are taking action doesn't mean the debtor isn't also.

THE COURT: All right.

MR. PERNICK: The debtor's analyzing and deciding whether or not to – and we've already responded to a letter request to bring the derivative actions. We've given our view of the merits of those actions, and we are going to be filing and taking the lead and appropriate response to both of those sets of litigation.

THE COURT: All right. Okay. Give me a written status report for the next one, please. I'd like a written status report from both sides as to what's happening for the next one, please. Okay. You had a housekeeping matter, Mr. Pernick?

MR. PERNICK: Yes, and Mr. Isenberg is just going to handle it. It just deal with technicalities with respect to the disclosure statement notice. We just want to clarify it with the Court and everybody.

MR. ISENBERG: Good afternoon, Your Honor. Adam Isenberg, Saul Ewing on behalf of the debtors. Your Honor,

reference was made earlier today regarding the disclosure statement hearing, which will be April 5th in Pittsburgh. Your Honor, we went through this a couple of years ago when we had the last set of disclosure statement hearings, and you actually entered an order that clarified this. The terms of the order were such that we thought we should bring it to the attention of the Court again just to make sure we're not assuming something that's not correct. When we went through this in 2003, Your Honor, you authorized via written order, for the debtors to give notice of the disclosure statement hearing to asbestos PI claimants through their attorneys rather than directly. That is, you authorized the debtors to give notice of the disclosure statement hearing to the PI claimants through their lawyers, with certain exceptions, Judge: For those claimants who are pro se, for those claimants represented by lawyers with no address to the debtor's knowledge, and for those claimants who had filed proof of claims or who had otherwise appeared in the bankruptcy cases. And you had issued an order and I have it here. It was in April or May of 2003 that authorized that and the practical effect of that, Judge, is to save the expense and we fear confusion of mailing out what would be hundreds and thousands of notices of a disclosure statement hearing to folks who won't know what a disclosure statement hearing is. What we'd like to do, Judge, and again this is

1    just for clarification and in anticipation of the April 5th

2    hearing to make sure that in essence we can do that again,

3    and we need to know that because we have to get this notice

4    out.

5          THE COURT: Well, I think you did it by motion

6    before so that there was some agreement; wasn't there?  I

7    mean - How do I know what the asbestos plaintiffs' lawyers

8    how they want their clients served.  You need to tell me that

9    that's how they want them served.  I'm not going to tell you

10    that's how they want them served.

11          MR. LOCKWOOD: Your Honor, for the ACC, this was in

12    fact negotiated and agreed on in 2003, and there's absolutely

13    no reason why we should do it differently in 2006.

14          THE COURT: Well, I mean, I'm not sure I see a

15    reason to do it differently, but it's your disclosure

16    statement and your notice package that you have to live with

17    So, I think that's an issue between you and the constituents.

18          MR. ISENBERG: Well, Your Honor, all we're proposing

19    that we do is exactly what we did last time.  We're not

20    proposing any changes whatsoever with respect to how the

21    disclosure statement is noticed.

22          THE COURT: If those people are happy with that form

23    of notice, it's okay with me.  This is a different disclosure

24    statement, and it requires new notice, you know, but I'm not

25    going to order you to do it that way.  You've got to tell me

1  how you want it done.

2         MR. ISENBERG: Your Honor, in fact that's what we're

3  proposing.  I think the asbestos constituents are onboard.  I

4  think there is –

5         THE COURT: I don't know if they are or not.  If you

6  need a ruling from me, then file a motion.  If you don't need

7  a ruling from me, then do what you want and live with the

8  consequences.  I can't give you an advisory opinion about

9  that.

10        MR. ISENBERG: Your Honor, may I have a moment?

11  Your Honor, I think given the remarks of Mr. Lockwood, we'll

12  proceed as we did last time. We think that is what folks

13  want, and we think that is the approach that makes sense.

14        THE COURT: Okay.

15        MR. PERNICK: Your Honor, I think that's it from the

16  debtors' side.  The only thing is my sincerest apologies for

17  not have the foresight to wear a gold and black tie, and I

18  apologize for every lawyer in the courtroom for the same

19  thing.  I'm sure we're all in support of Pittsburgh.

20        THE COURT: Mr. Pernick, it's even worse.  You

21  didn't come in the door singing the Stealers song.

22        MR. PERNICK: I wish I could say I knew it, Your

23  Honor, but I can't.

24        THE COURT: I'll help you out.  It's Pittsburgh is

25  going to the Super Bowl.

1          MR. PERNICK: Thank you, Your Honor.

2          THE COURT: You're welcome.  All right, we're going

3   to take a five-minute recess and we'll reconvene.

4          (Whereupon at 1:20 p.m. the hearing in this matter

5   was concluded for this date.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19          I, Elaine M. Ryan, approved transcriber for the

20   United States Courts, certify that the foregoing is a correct

21   transcript from the electronic sound recording of the

22   proceedings in the above-entitled matter.

23

24   *Elaine M. Ryan*                      February 2, 2006
     Elaine M. Ryan
25   2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221

**EXHIBIT 2**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Chapter 11
                                    .
OWENS CORNING *et al.,*             .    Case No. 00-03837(JKF)
                                    .    Jointly Administered
                                    .
          Debtors.                  .    February 21, 2006
                                    .    10:00 a.m.
                                    .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

17034

2

1      THE COURT: This is the matter of Owens Corning, 00-

2   03837.  The participants I have listed by phone are Mary Beth

3   Hogan, Gordon Harriss, James McClammy, Isaac Pachulski, John

4   Shaffer, Joseph Gibbons, David Parsons, Monte Travis, Bruce

5   White, William Sussman, Dallas Albaugh, Andrew Chan,

6   Christine Jagde - -

7      COURT CALL OPERATOR: Joining conference.

8      THE COURT: Are you sure?

9      MR. PERNICK: No.

10      THE COURT: Stephen Vogel, Marti Murray, Rebecca

11   Pacholder, Tatiana Brikulskaya, Stuart Kovensky, Sara Gooch,

12   Oliver Butt, Gary Pakulsi, Rob Lennon, Andy Chang.  Folks,

13   please put your mute buttons on.  Okay.  Mr. Pernick.

14      MR. PERNICK: Good morning, Your Honor.  Norman

15   Pernick on behalf of the Debtors.  Your Honor, I think we

16   have a relatively short agenda today, but just to make sure

17   our records are straight, let me go through what I think is

18   continued, and orders entered, and then what's going forward.

19   I have in my records matters no. 1 and 2 continued to March

20   27th.  These are routine rollovers until the banks are in a

21   position to take action, which we note on the agenda.  No. 1

22   is the Committee's Trustee motion, and no. 2 is the motion

23   for protective order filed by Owens Corning related to that.

24      THE COURT: Are these matters still live?

25      MR. PERNICK: Under the letter agreement that was

FORM FED-25    PENGAD • 1-800-631-6989

3

1   filed as part of the disclosure statement, the banks have to

2   seek authority, actually the agent bank has to seek

3   authority, which is 51%, to dismiss those actions.  And I

4   understand that they're still undertaking that, and haven't

5   achieved it yet.  But they've committed to do that.

6          THE COURT: Because - -

7          MR. PERNICK: So they're technically still alive,

8   but.

9          THE COURT: Okay.  I think we need to get either

10  something - - one way or another we need to get these things

11  done.  At this point in time, so much time has gone by that

12  I'm not certain that the information in those motions would

13  have much meaning now.  I think they would have to be amended

14  in any circumstance to bring something up to date.  So I'm

15  really not sure why they're continued to be on the agenda.

16  If someone wants to pursue them, I think we should get them

17  started, and if they don't want to pursue them, then we ought

18  to get them off the docket.  So would you please work with

19  the bank so that next month we either set a scheduling order

20  and get the amendments in and get them done, or else we get

21  them off the docket, because this isn't making any sense.

22  They've been on for about 2 years now, and circumstances have

23  changed substantially since then, so.

24         MR. PERNICK: Okay.

25         THE COURT: Okay.

4

1      MR. PERNICK: Next, items no. 7, which is the Baron

2  & Budd motion for relief from stay, and no. 11, which is the

3  seal motion related to the Century motion for relief from

4  stay. We have filed CNO's or COC's on both of those. And if

5  - - I can give the Court the dates we filed those, but I

6  think they were filed last week. Let me just see.

7      THE COURT: Okay. I have not seen those yet.

8      MR. PERNICK: No. 7, which is the Baron & Budd, that

9  was filed on February 8th. It's Docket No. 16912. And no. 11

10 was filed on February 17th, on Friday. It's 16983. And both

11 of those are on the agenda letter, Your Honor. Just for your

12 records.

13     THE COURT: Okay. What is the resolution with

14 respect to 7? Because the agenda said a revised order was

15 going to be submitted, but I haven't seen it.

16     MR. PERNICK: I think the revised form of order was

17 attached to the CNO. And it's basically an order denying

18 that motion for relief. A consensual order. I probably have

19 an extra copy if you'd like to see it.

20     THE COURT: You have - - you have a copy - - if you

21 have the order, if that's what it does, and it's by consent,

22 I'll sign it.

23     MR. PERNICK: I actually do have an extra copy, Your

24 Honor.

25     THE COURT: Thank you.

5

1    MR. PERNICK: Your Honor entered orders on no. 3,

2    which is the motion to stay adversary actions, extension of

3    time to do that.  I believe that's through August 31st.  No.

4    4, which is the - -

5    THE COURT: Mr. Pernick, I'm sorry.

6    MR. PERNICK: Sorry.

7    THE COURT: I'm reading.  I wasn't paying attention.

8    Could you just wait a minute, please?

9    MR. PERNICK: Oh, sure.

10   THE COURT: Okay.  That took care of 7, what's 11

11   now?

12   MR. PERNICK: 11 was the Century - - the seal motion

13   related to the Century motion for relief.

14   THE COURT: Yes.

15   MR. PERNICK: And that was one that - - we did file

16   a certification on that also.  And that, that was just filed,

17   I believe, on Friday.

18   THE COURT: And what does it do?

19   MR. PERNICK: It's just - -

20   THE COURT: Permits the seal?

21   MR. PERNICK: Yeah.  Permits the seal.

22   THE COURT: All right.  I'll have that order

23   entered.

24   MR. PERNICK: And again, that's Docket No. 16983.

25   THE COURT: Okay.  Thank you.

1    MR. PERNICK: Item no. 3, the Court entered an

2  order.  That's on the extension of time and stay of the

3  adversary actions.

4    THE COURT: Yes.

5    MR. PERNICK: Item no. 4 is the NextiraOne

6  settlement.  You entered an order on that.  Item no. 5 is the

7  AT Plastics settlement.  You entered an order on that.  And

8  item no. 6 is the Harbert stipulation, and you entered an

9  order on that.  So that leaves item no. 8, which is the

10  Burchfield and Whitmire status conference.  Item no. 9, which

11  you required to be rolled over from hearing to hearing until

12  the FAIR Act is resolved, and that's the Ad Hoc Equity

13  Committee's motion to hold a shareholders meeting.  And I'll

14  probably handle that one very quick.  I think the Court, and

15  certainly parties in Court today are aware of what happened

16  with the FAIR Act last week.  There was a budget point of

17  order, which basically prohibited the FAIR Act from coming to

18  the floor of the senate.  I don't know whether anybody could

19  tell the Court that it's absolutely dead and not going to

20  happen yet, but it was a pretty serious blow to the prospects

21  of the FAIR Act this year.  I don't know whether the Court

22  wants to continue that, maybe, until next month, just to see

23  what happens.

24    THE COURT: Yeah.  I think we should.

25    MR. PERNICK: Okay.

7

1        MR. ELSTAD: Your Honor may I - -

2        THE COURT: Yes, sir.

3        MR. ELSTAD: - - speak on this point?

4        THE COURT: On the issue of item 9?

5        MR. ELSTAD: Yes.

6        THE COURT: Yes.

7        MR. PERNICK: That's fine.

8        THE COURT: Please.

9        MR. ELSTAD: Good morning, Your Honor.    John Elstad

10    from Brown Rudnick on behalf of the Ad Hoc Committee of

11    Preferred and Equity Security Holders.    Just very briefly,

12    Your Honor, we don't believe that the FAIR Act is dead.

13    Certainly what happened in the senate last week was a set

14    back.    But we understand that if Senator Inouye of Hawaii had

15    been there, it would have passed.    He was away because his

16    wife was ill.    Senator Frist reversed his vote to preserve

17    his right to bring the act back to the floor.    We believe it

18    will return to the floor with the necessary votes in March.

19    But there is another point I, if I may, I'd like to raise.

20    As Mr. Pernick mentioned, you ordered - - you directed the

21    Debtors to continue our motion from hearing to hearing until

22    the prospects for the FAIR Act are more clear.    Your Honor,

23    we respectfully request that you do decide our motion.    Our

24    motion was a motion for relief from stay.    It involved the

25    scope of the automatic stay.    We sought confirmation that the

8

1  stay didn't apply to shareholder efforts to compel a

2  shareholder meeting, or alternatively relief to proceed.  And

3  as argued at the January 30th hearing, and in our motion, we

4  believe that there's important precedents in other circuit

5  courts of appeal.

6          THE COURT: But it's irrelevant under these

7  circumstances if the FAIR Act doesn't apply.  Because

8  essentially, I will be giving an advisory opinion because

9  there is no money for equity in this case unless the FAIR Act

10  applies.  And the arguments at the hearing in January, I

11  think, at least from the Debtors' point of view, make that

12  clear.  So there's no point.  I would be doing nothing other

13  than giving an advisory opinion under the facts of these

14  cases, because at the moment, it doesn't appear that the

15  Debtor is going to be able to propose a plan that will

16  provide for a distribution to equity.  So what's the point?

17          MR. ELSTAD: Well, Your Honor, one thing that the

18  shareholders seek is a contingency on behalf of the - - on

19  account of the FAIR Act.

20          THE COURT: But you don't have a right to that.  I

21  mean you have the right to negotiate for that, but you don't

22  have a right to demand it.

23          MR. ELSTAD: Your Honor, shareholders exercising

24  their governance rights could seek exactly that through

25  replacing the board.  It's a realistic - -

1    THE COURT: There is no way that at this point in

2 time, in this case, that this Court is going to not, not go

3 along with the Chancery Courts in the State of Delaware, and

4 indicate that this is not the right time to take a look at

5 replacing the board because of this.  If the board were

6 replaced, and did try to force a plan that provided a

7 distribution to equity when there is no money for equity,

8 that plan would be unconfirmable.  And I would immediately be

9 in the position of putting a trustee in place, because that

10 plan and the governance, the people who would be governing

11 would not be honoring their fiduciary duties to the rest of

12 the estate.  I would be doing nothing more than giving an

13 advisory opinion.  I am going to continue this matter until

14 the March hearing, which is March 27th.  If the FAIR Act does

15 get back to the floor, hopefully you'll know it by that date.

16 If not, I'll continue it again to April, because maybe since

17 they're saying in March, and there are 4 days left in March,

18 maybe it won't happen until the 31st.  So I'm going to

19 continue this until March 27th, and possibly again until

20 April.  And if, in fact, at that point in time, it doesn't

21 look like the FAIR Act is going anywhere, at that point I'll

22 probably decide this issue.  But I don't see a basis for it

23 now.  It would be advisory.  So I'll continue it for that

24 cause, for those reasons, until those dates.

25    MR. ELSTAD: Thank you, Your Honor.

1    MR. PERNICK: And Your Honor just for the record, in

2  case I misspoke, I wasn't saying from the Debtors' standpoint

3  it's dead.  I just was reporting on the prospects and where

4  it stood.  I think we all agree that nobody in Washington is

5  saying it is absolutely dead and it's never going to come

6  back up.  And I think the Court's correct to wait and see

7  what happens for the next month and see what people do down

8  there.  The one thing I've learned, with all due respect to

9  everybody here including the Court, nobody's real good at

10  predicting what's going to happen down there, and I think we

11  just need to wait and see.

12    THE COURT: All right.  It's continued until March.

13    MR. PERNICK: That leaves us with 2 other items,

14  just - - and then there's one more that's not going forward,

15  just so we have the record straight.  And then we'll circle

16  back and deal with the ones that are left going forward.  The

17  Committee's professionals status conference, which is item

18  no. 10, is scheduled to go forward today.  And no. 13, which

19  is the emergency motion to adjourn the date for answering the

20  complaints in certain litigation brought by the bond holders

21  is also going forward.  That leaves item no. 12 as not going

22  forward, which is the Century motion for relief regarding the

23  Wellington litigation.  Anna Ang (phonetic) from Covington is

24  on the phone if the Court has any questions.  I believe that

25  we are discussing a resolution of that with Century, and

1   that's the reason that it's continued to next month.

2           THE COURT: All right.  Thank you.

3           MR. PERNICK: Your Honor, I think, unless the Court

4   wants to do it a different way, we'll start with no. 8, which

5   is the Burchfield and Whitmire status conference, and Mr.

6   Monk is going to handle that for my firm.

7           THE COURT: All right.

8           MR. MONK: Good morning, Your Honor.

9           THE COURT: Good morning.

10          MR. MONK: Charles Monk from Saul Ewing on behalf of

11  the Debtors.  Your Honor, this is a status conference on

12  essentially a claim objection litigation, and we have a

13  schedule to propose to the Court that we have agreed to.  The

14  - - and I'll just let you know what the schedule is, and see

15  if that's acceptable to the Court.  We would commence merit

16  discovery immediately, and complete all discovery by July 1st

17  of 2006.  Burchfield and Whitmire, who are the claimants in

18  this matter would serve a report of any expert witness they

19  intend to call at trial by May the 15th of 2006.  The Debtors'

20  response - - and Mr. Stein and Mr. Thaman are separately

21  represented, and I believe Mr. Sussman is on the line, he can

22  speak on their behalf, but I think he is in agreement with

23  this as well - - we'll serve a report, if any, of our expert

24  witness by June the 15th.  And then motions for summary

25  judgment or other dispositive motions will be filed by July

1    the 15th.

2              MR. SUSSMAN(Telephonic): No.  July 31, Your Honor.

3    Sorry about that Charles.

4              MR. MONK: Sorry.  My email was wrong.  July 31st.

5    Any oppositions would be filed 30 days thereafter, replies 15

6    days after that.  And then we would ask the Court to find a

7    date on your calendar probably, if there's an omnibus hearing

8    in September, the September omnibus hearing for a status

9    conference regarding setting a trial date if it's necessary

10   at that time.

11             THE COURT: Mr. Sussman?

12             MR. SUSSMAN(Telephonic): Yes, good morning, Your

13   Honor.  Yeah, I - - for Mr. Stein.  Mr. Thaman, well, he's

14   out of the case, so as far as my piece of the case is

15   concerned.  That is consistent generally with what I

16   discussed with counsel for Burchfield and Whitmire.  The only

17   thing that I think we discussed, and I don't know if it makes

18   more sense to the Court, to have the pre-trial held at the

19   omnibus in the month after Your Honor decides summary

20   judgment.  Assuming those motions are made, which I think

21   they will.

22             THE COURT: Am I going to - - I mean, at this point,

23   without knowing what those motions are going to be, am I

24   going to need an argument on the summary judgment issue

25   anyway?

1    MR. SUSSMAN(Telephonic): I would think that Your

2  Honor would want to hear argument on it.  It would, you know,

3  would be at the pleasure of the Court.  We just don't know

4  how things are going to play out, obviously, in discovery.

5  But I would think they would be - - based on the guidance

6  that Your Honor gave on the motion to dismiss - -

7    COURT CALL OPERATOR: Joining conference.

8    MR. SUSSMAN(Telephonic):  - - at least as far as

9  Stein is concerned, it might be pretty straightforward.  You

10  could probably do it on papers.  But obviously if the Court

11  wanted to hear argument, we're happy to do that.

12    THE COURT: Well, why don't we use this September

13  25th date just for a status conference to see, to set an

14  argument date, which I probably could do by phone in between

15  the September and October omnibus dates, I think.  And then

16  if, in fact, no motion for summary judgment is filed, we

17  could use that September date to do a schedule for pre-trials

18  and hopefully to set a trial date.  So why don't we just put

19  it on that September calendar for a status conference.  Not

20  to do the argument, but for further scheduling.

21    MR. MILLER: Your Honor, I'm Rick Miller.  I

22  represent Burchfield and Whitmire.  The - - I only had a

23  couple very brief comments.  First off, my co-counsel, Ms.

24  Morse (phonetic), who had been negotiating the pre-trial

25  order with Mr. Sussman sent me an email saying that the

14

1    responses to case dispositive motions would be - -

2              THE COURT: Oh, my.  Can you put - - can you turn

3    that down?

4              THE CLERK: (Microphone not recording.)

5              THE COURT:  I think it's the people who are talking

6    right now, Mona.  I'm sorry, Mr. Miller.  I apologize.

7              MR. MILLER: The email that I have from my co-

8    counsel, Ms. Morse, who was negotiating with Mr. Sussman the

9    dates that have been described to the Court this morning,

10   told me that the agreement was that responses to case

11   dispositive motions would be due 21 days after the motions

12   were filed, not 30.  I - - if 30 is the agreed date, I mean,

13   I don't think we have a problem with that, but - -

14             THE COURT: That's fine.

15             MR. MILLER: And the other thing is that I didn't

16   know whether the Court wanted us to do a written pre-trial

17   order with these dates, submitted under certification of

18   counsel.

19             THE COURT: I think that would probably be the best,

20   and - - but there - - that's fine.  That way you can put the

21   exact date in rather than just the number of days.  I take it

22   that it works out that the September 25th date will work with

23   these dates for this little status conference for further

24   scheduling.

25             MR. MILLER: I believe so, Your Honor.

1          MR. MONK: Yes Your Honor, it does.

2          THE COURT: All right.  Is that all right with you,

3    Mr. Miller?  If we just put this on for a quick status

4    conference that day?

5          MR. MILLER: No objection, Your Honor.

6          THE COURT: All right.  Thank you.  So with respect

7    to item 8 - -

8          MR. MONK: All right.  Your Honor, we'll draft the

9    order, circulate it, and submit it to the Court.

10          THE COURT: That's fine.  Thank you.  Okay.  Mr.

11    Pernick, thank you.

12          MR. PERNICK: You're welcome.  Your Honor, that

13    takes us to item no. 13.  I'm sorry.  To item no. 10.  Which

14    is the status conference on the Committee's professionals.

15          THE COURT: Yes.  I read the status reports.  I

16    don't have any questions, unless there's something additional

17    that someone wants to put of record.  Okay.  That's fine.

18    Thank you.

19          MR. PERNICK: And that takes us to item no. 13,

20    which is the emergency motion to adjourn the date for

21    answering the complaints.  And I think, at least from the

22    Debtors' standpoint, Mr. Monk's going to handle that.

23          THE COURT: Folks, could you please put your mute

24    buttons on now.  Mr. Monk?  I'm sorry, what is 13?

25          MR. MONK: This is the - - Your Honor, this is the

1    emergency motion filed jointly by the Debtors and the bond

2    holder and trade creditor interests, as well as the bank

3    agent, seeking to adjourn the due date - -

4              THE COURT: Oh, yes.

5              MR. MONK:   - - for the bank adversary to March the

6    21st.

7              THE COURT: Okay.

8              MR. MONK: And Your Honor, we, we sent this out as

9    - - sent it out as an emergency motion pursuant to the

10   Court's instructions, gave notice.  We've received no

11   objections.  So I believe that everybody's in agreement that

12   we can adjourn this due date.  I would just recount to you

13   where we stand in terms of these 2 adversary actions.  As the

14   Court is probably aware, the bond holders and trade creditor

15   interests filed, in this court, this bank adversary in

16   January, on January the 6th.  And at the - - on - - later in

17   January, they filed a motion in the District Court because

18   Judge Wollen(phonetic) had withdrawn the reference with

19   respect to the bank adversary that we filed back in 2002, to

20   intervene in that action and bring a number of claims.  Many

21   of which are similar.  They all involve the same set of

22   facts.  I don't think there's any dispute among the parties

23   with respect to that.  They informed us on February the 10th

24   that they intended to file a motion to withdraw the reference

25   with respect to the adversary action that they filed here on

1    January the 6th, and put both of those matters before Judge

2    Fullom(phonetic).  We had previously filed a motion to ask

3    Judge Fullom to refer the case that was before him back to

4    you so that it could all be decided here as part of the plan

5    proceedings.

6            THE COURT: Well Mr. Monk, with respect to this

7    issue, is this going to involve some substantive

8    consolidation issue?

9            MR. MONK: Your Honor, it - - it really is not,

10   because the 3rd Circuit has decided the substantive

11   consolidation matter and we are, although it's on a petition

12   for cert in the Supreme Court and the final briefs will be

13   filed in early March, and I assume we will have a decision by

14   the Supreme Court sometime this spring as to whether they're

15   going to consider the matter further.  This is really a

16   fraudulent conveyance action, it's an equitable subordination

17   claim, it is - - it's a variety of ways that the bond holders

18   and trade creditors think that they can achieve the same

19   objective that was sought by substantive consolidation from

20   their perspective in the case, there's no doubt about that

21   part.  But it really all amounts to an objection to how

22   they'll be treated under the proposed plan.  And we think

23   that the Court can make a determination on those issues as

24   part of plan confirmation.  We think that's what the

25   bankruptcy process and the bankruptcy statute is all about,

1  to bring everything here.  We think that there would be an

2  unnecessary dely and complication in the process to have a

3  separate piece of litigation going on in the District Court

4  at the same time we're trying to move forward with plan

5  confirmation here.

6          THE COURT: Okay.  It will not involve substantive

7  consolidation, however?  Or claims estimation?

8          MR. MONK: It will not involve substantive

9  consolidation.

10          THE COURT: Okay.

11          MR. MONK: That has been - - we've taken our shot at

12  that, Your Honor.  The 3rd Circuit has given us a final

13  decision.

14          THE COURT: All right.

15          MR. MONK: And obviously we're waiting on the

16  Supreme Court.  There is a factual record in this case,

17  there's no doubt about that.  Judge Wollen was the judge that

18  heard the evidence in that case.  Judge Fullom's knowledge of

19  that evidence is limited to reading the of Judge Wollen's

20  trial, because of the unique circumstances of the recusal

21  here.  I don't think that puts Judge Fullom in any better

22  position.  He's done that work, and obviously you haven't

23  yet.  And if - - and possibly some of that evidence may be

24  brought here, but we think we can streamline that process for

25  you, and make it - - bring the evidence that's absolutely

1   necessary for you to be aware of so that you can decide the

2   issues that will be necessary to be decided as part of

3   confirmation.

4           THE COURT: Okay. Well, with respect to the motion

5   to withdraw the reference, has there been that procedure used

6   here in Delaware that's required where there is a motion to

7   determine whether this is core or not before the District

8   Court will even rule on that motion?

9           MR. MONK: There has not been, to my knowledge.

10          THE COURT: Well, then I think whoever brought the

11  motion to withdraw the reference, if they really want it

12  considered, better get the pieces in order and file that

13  motion.

14          MR. MONK: That's - - would be addressed to my

15  colleague over here. On what we're before the Court, Your

16  Honor, we're simply looking for an adjournment so we have

17  time to let Judge Fullom resolve the question of whether

18  we're going to be before him or before Your Honor. When they

19  filed this adversary in early January, the bond holder and

20  trade creditor interests named essentially every bank who had

21  some contact with the bank credit facility. I'm generalizing

22  here, but lots and lots of banks. It's probably true that

23  many of those bank defendants have sold their interest in the

24  bank debt, and part of the reason that we're seeking the

25  adjournment now is just the sorting out process to figure out

20

who actually is in this case.  And also, obviously, all
parties agree that both - - that we should put these 2
matters together.  If in fact, there is a basis to go
forward.  And I think the Debtors have reason to believe that
the motion to intervene that was filed and the bank adversary
is not well placed, and we want to argue the merits of that.
But we need to figure out who is going to handle these cases.

       THE COURT: Okay.

       MR. MONK: So.

       THE COURT: That's fine.

       MR. MONK: That's our story.

       THE COURT: That makes sense to me that that's the
case.  My concern was that I wasn't sure if all of the banks
had been notified about the request for the continuance, and
I wanted to be sure that they were.

       MR. MONK: We have done everything we can.  And we
know that the - - we sent out emails.  The bank - - one of
our problems was that a lot of these banks were out of,
really out of the case.  At least thought they were out of
the case.  And so we, you know, we've done all the things
that we know how to do to try to get them notice of this.
Obviously it's just seeking an adjournment of when they have
to respond.

       THE COURT: Yes.

       MR. MONK: It's not the end of the world.

1           THE COURT: They should be happy as opposed to not

2  happy.

3           MR. MONK: They should be happy.  Exactly.  Thank

4  you, Your Honor.

5           THE COURT: Okay.  Do you have an order?

6           MR. MONK: Yes, Your Honor.

7           THE COURT: Thank you.  Okay.  That order is

8  entered.  Thank you.

9           MR. PERNICK: Your Honor, unless the Court has

10  anything further, I don't think from the Debtors' standpoint

11  we do.

12           THE COURT: Anybody else have any matters?  Okay.

13  We're adjourned.

14           MR. PERNICK: Thank you, Your Honor.

15           THE COURT: Thank you.

16           UNIDENTIFIED SPEAKER: Thank you, Your Honor.

17     (Whereupon at 10:35 a.m. the hearing in this matter was

18  concluded for this date.)

19

20

21

22

23

24

25

1    I, Jennifer Ryan Enslen, approved transcriber for

2 the United States Courts, certify that the foregoing is a

3 correct transcript from the electronic sound recording of the

4 proceedings in the above-entitled matter.

5

6 *Jennifer Ryan Enslen*     *2/27/06*

  Jennifer Ryan Enslen
7 18 Bar Drive
  Newark, DE 19702
8 (302) 836-1905

FORM FED-25  PENGAD • 1-800-631-6989

**EXHIBIT 3**

ATT4653978.txt
Asbestos Fund Leaders Seek Votes to Save Legislation (Update1)
2006-02-14 14:07 (New York)

(Adds Frist comment in fourth paragraph.)

By James Rowley
    Feb. 14 (Bloomberg) -- U.S. Senate supporters of a company-
financed $140 billion fund for asbestos exposure victims sought
to round up votes today to save the endangered proposal.
    Senator Arlen Specter, the legislation's chief sponsor, said
he doesn't know if he can gather the required 60 votes to
overcome an objection that the measure violates a congressional
rule limiting federal spending. Republicans control the Senate,
55-45, and the asbestos plan has some Democratic support.
    ``It's not easy to get 60 votes on a controversial bill like
this, but we are working on it,'' Specter, a Pennsylvania
Republican, told reporters. He said Senate leaders might postpone
the vote on the budget objection until supporters are more
confident they have the votes to defeat it.
    Senate Majority Leader Bill Frist, anticipating a close
vote, said he would shelve the legislation if it is blocked this
week. ``If we are unsuccessful this week in addressing asbestos,
that is it for this year,'' said Frist, a Tennessee Republican.
    The fund would end asbestos litigation that has forced
almost 80 companies into bankruptcy court, such as USG Corp., the
world's largest wallboard maker. Asbestos producers and
distributors and their insurers would finance the fund.

                    Business Is Divided

    The bill has divided business and organized labor. Large
companies such as General Electric Co. and Honeywell
International Inc. favor the plan because they would pay less
into the fund than to contest asbestos lawsuit claims. Smaller
companies, such as gas and oil engineering services provider
Foster Wheeler Ltd., say they would be forced to contribute too
much to the fund.
    Insurers such as Liberty Mutual Group Inc. and St. Paul
Travelers Cos. Inc. oppose the legislation because it doesn't
guarantee there would be no further asbestos litigation if the
fund were to fail.
    Frist moved last night to cut off debate on the measure and
on a substitute amendment Specter proposed when debate began last
week.
    Frist's move sets up two procedural hurdles as early as
tomorrow. It takes 60 votes to end debate on both the amendment
and the underlying legislation.
    ``The strategy is to move the bill along if we can,'' said
Specter, chairman of the Senate Judiciary Committee. He said he
has received ``a good response from a fair number of Democrats,
but the Democratic leadership is working it hard'' to defeat the
bill.
    Senate Democratic Leader Harry Reid, calling the measure one
of the worst pieces of legislation ever, has urged Democrats to
vote against waiving the budget rule, thus dooming the measure.

                    Vote Counting

    Vote counters say there are 10 to 15 Democrats who may
support waiving the budget rule. Nine Democrats, including four
sponsors of the asbestos bill, are considered solid votes to
overturn the budget objection and six others are possible
                    Page 1

ATT4653978.txt

supporters of the motion, according to Democrats and Republicans.
      The bill's opponents need 41 votes to kill the measure.
Nevada Republican John Ensign, who raised the budget objection,
said he believes he has the votes to block the fund.
      Texas Republican John Cornyn, who opposes the measure, says
the outcome is uncertain. He said he would vote to waive the
budget rule even though he wants ``a better bill.''
      Cornyn didn't hold out much hope the fund would be approved.
``I said at one point it's going to take a miracle for this bill
to become law,'' he said. ``While I believe in miracles, I am not
sure this one is going to come true.''
      Supporters took comfort in a new Congressional Budget Office
letter that the measure wouldn't increase the federal deficit
over the fund's 50-year life.

                        `Deficit Neutral'

      ``The bottom line from CBO is that this bill is `deficit
neutral.' There is no reason to sustain the budget'' objection,
Specter and Vermont Senator Patrick Leahy, the top Democratic
sponsor, said in a statement.
      Specter has argued any budget violations are mere
technicalities because the government-run trust would just
distribute money raised from companies.
      Still, the Congressional Budget Office said that revenues
would fall short by $7 billion in the first decade of the fund's
operation, forcing it to borrow. The office also said that
``substantial payments from the fund could continue well after
2015'' and result in more than $5 billion in federal spending in
at least one of the decades between 2016 and 2055.
      Cornyn said the budget office's letter doesn't resolve his
most serious worry, that borrowing to cover revenue shortfall
would lead to insolvency.
      ``If the fund is going to be so stressed'' as one
consultant's report concluded, ``then its going to be insolvent
in a matter of years,'' Cornyn said.

                         Federal Money

      Specter disagreed. ``I don't think you can read the CBO
report cutting any way but in favor of the bill,'' he said. ``The
CBO flatly says there is no federal money involved.''
      The budget office's latest report didn't address the
agency's earlier projection that claims against the fund could
range from $120 billion to $150 billion. In December, the agency
said there was a ``significant likelihood'' the fund wouldn't
collect enough money from companies to pay all claims.

--Editor: Rubin.

Story illustration: For government stories, see
{TOP GOV <GO>}. For stories about asbestos, see
{NI ASBESTOS <GO>}. For stories about asbestos-related suits see
{TNI ASBESTOS LAW <GO>}. For
the Asbestos Alliance's Web site see
http://www.asbestossolution.org.
To read the Congressional Budget Office's reports on
asbestos legislation see http://www.cbo.gov

To contact the reporter on this story:
James Rowley at 1-202-624-1913 or
jarowley@bloomberg.net

                              Page 2

ATT4653978.txt
To contact the editor responsible for this story:
Ken Fireman at (1) (202) 624-1978 or
kfireman1@bloomberg.net

[TAGINFO]

OWENQ US <Equity> CN
USG US <Equity> CN
OI US <Equity> CN
GRA US <Equity> CN
CB US <Equity> CN
DOW US <Equity> CN
FDMLQ US <Equity> CN
DD US <Equity> CN
HIG US <Equity> CN
S US <Equity> CN
GM US <Equity> CN
HON US <Equity> CN
HAL US <Equity> CN
AIG US <Equity> CN
CB US <Equity> CN
BRK/A US <Equity> CN
TAP/B US <Equity> CN
STA US <Equity> CN

NI NJ
NI FIN
NI CONS
NI AUT
NI EXE
NI MI
NI CNG
NI AUP
NI MD
NI DRG
NI CMD
NI ASBESTOS
NI TRN
NI LAW
NI DE
NI CHM
NI RET
NI INS
NI POL
NI IL
NI DC
NI PAC
NI HEA
NI CT
NI BMRFER
NI OH
NI GOV
NI CST
NI BLD
NI GEN
NI COS
NI BDA
NI CNG
NI SENATE

#<610849.263818.2005-11-10T14:40:00.25>#

Page 3

ATT4653978.txt
#<610849.263818.2005-11-10T14:40:00.25>#
-0- Feb/14/2006 19:07 GMT

**EXHIBIT 4**





FORMAT FOR
PRINTING
sponsored by

### February 15, 2006

# Asbestos Trust Fund Bill Is Defeated

**Effort to Overhaul System
Of Litigating Claims Fails;
Loss for Big Manufacturers**

By BRODY MULLINS
*February 15, 2006; Page A10*

**DOW JONES REPRINTS**

⟨ℝ⟩ This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

WASHINGTON -- A handful of Republicans joined most Democrats in dealing a deathblow last night to a $140 billion asbestos-litigation overhaul bill on Capitol Hill.

On a 58-41 vote, supporters of the asbestos bill failed to muster the 60 votes needed to clear a procedural hurdle raised by their opponents.

After the vote, Senate Majority Leader Bill Frist's office said that Republicans may bring the legislation back to the Senate floor later this year. Earlier in the day, Mr. Frist told reporters that this was the only week he would devote to the bill on the Senate floor.

However, proponents are unlikely to be successful this year. As it languished on Capitol Hill, a growing number of states, including Texas, have approved their own asbestos-overhaul laws that many U.S. corporations and insurance companies find favorable.

The bill under consideration in the Senate sought to revise the asbestos-litigation system by creating a $140 billion trust fund to pay health-care and other costs incurred by Americans injured by asbestos. The fund would be paid for primarily by companies with asbestos liabilities and their insurance companies.

Large U.S. manufacturers of asbestos and some insurance companies backed the bill because it would have reduced the amount of money they would have to pay in asbestos liabilities through the legal system.

But a growing number of smaller manufacturers and insurers opposed the legislation because it would increase the amount of money they would have to pay. Most trial lawyers also opposed the bill.

Since the early 1970s, industry has paid $70 billion to settle 730,000 asbestos claims, according to a recent Rand Corp. survey. At least 77 companies have filed for bankruptcy-court protection because of asbestos liability.

Sen. Arlen Specter of Pennsylvania crafted legislation that won the backing of a coalition of Republicans and Democrats. Mr. Specter argued that the bill would help asbestos victims receive

compensation for their illnesses and give companies certainty about how much they would owe.

But the bill was attacked by an odd coalition of conservative Republicans like Sen. Sam Brownback of Kansas, who believed the trust fund was too generous, and liberal Democrats like Sen. Edward Kennedy of Massachusetts, who said the bill was a giveaway to big business.

"It does not provide a reliable guarantee of just compensation to the enormous number of workers who are suffering from asbestos-induced disease," Mr. Kennedy said last week.

Opponents of the bill defeated it by raising a procedural motion that required Mr. Specter to find 60 senators to support the bill, rather than the usual 51 votes. Using a parliamentary tactic, opponents noted that the asbestos trust fund would need to borrow federal funds at the beginning to get off the ground, a violation of the chamber's budget rules.

Even if Mr. Specter had prevailed, he faced more challenges in the days ahead. Mr. Reid and Senate Democrats planned to launch a filibuster against the bill, forcing Mr. Specter to again find 60 votes to defeat his opponents.

Last night, Mr. Specter held out hope for the bill. He said Sen. Daniel Inouye of Hawaii was the one senator who didn't vote, and had planned to vote with Mr. Specter on the bill. According to Mr. Specter, Mr. Inouye left the Capitol because his wife was sick. With Mr. Inouye's and Mr. Frist's votes, the bill would have the requisite 60 votes. Mr. Frist had changed his vote to oppose the bill, so under Senate rules he would be able to bring the bill back to the Senate floor.

Among the Republicans who voted against Mr. Specter were Sens. Judd Gregg of New Hampshire, James Inhofe of Oklahoma and John McCain of Arizona. Democrats voting to defeat the bill were Mr. Reid and Sens. John Kerry of Massachusetts, Ben Nelson of Nebraska and Kent Conrad of North Dakota. The Democrats who supported Mr. Specter included Sen. Patrick Leahy of Vermont.

**Write to Brody Mullins at brody.mullins@wsj.com[1]**

**URL for this article:**
http://online.wsj.com/article/SB113997553681374401.html

**Hyperlinks in this Article:**
(1) mailto:brody.mullins@wsj.com

**Copyright 2006 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

# EXHIBIT 5

ATT5085616.txt
W.R. Grace, Owens Corning Fall After Asbestos Legislation Fails
2006-02-15 11:23 (New York)


By James Gunsalus
    Feb. 15 (Bloomberg) -- Shares of W.R. Grace & Co. and Owens
Corning, which are defending themselves against asbestos-related
lawsuits, fell after a proposed $140 billion fund for asbestos-
exposure victims was blocked in the U.S. Senate yesterday.
    W.R. Grace, a chemical and building materials maker whose
asbestos liabilities forced it into bankruptcy in 2001, dropped
as much as 13 percent. Owens Corning, also under Chapter 11
protection for the past five years, fell as much as 38 percent.
Owens Corning is the biggest U.S. maker of insulating material.
    The fund failed to overcome an objection that it would cost
taxpayers billions of dollars. Fund supporters fell one vote
short of the required 60 to waive a budget rule barring
legislation that increases government spending by $5 billion in
any of four decades after 2016.
    The companies are facing thousands of lawsuits from people
who were exposed to asbestos while on the job or from products
they bought. Exposure to asbestos, widely used in insulation,
fireproofing and other building material applications since the
early 1900s, can cause scarring of the lungs and cancer.
    W.R. Grace dropped 76 cents, or 7.7 percent, to $9.18 as of
11:19 a.m. in trading of 4.69 million shares, almost five times
the three-month average daily volume. Earlier they fell to $8.67
in New York Stock Exchange composite trading. Owens-Corning
dropped $1.31 to $2.65, a decline of 33 percent. Trading of 9.01
million shares was more than 10 times the average volume. The
stock earlier slid to $2.45.
    Opponents, citing a Congressional Budget Office study,
warned that the company-financed fund might not take in enough
revenue to cover all claims, forcing it to borrow money. The
chief sponsor of the bill, Republican Arlen Specter of
Pennsylvania, said the government would just be a conduit for
private financing, and the taxpayers wouldn't be at risk.
    The measure was intended to end asbestos lawsuits that have
forced into bankruptcy almost 80 companies. People with
respiratory disease or cancer would be paid from $25,000 to $1.1
million, depending on how sick they became from long-term
exposure to the fibrous mineral used to make brakes, roofing,
gaskets and other products.

--With reporting by James Rowley in Washington. Editor: Nol.

Story illustration: For government stories, see {TOP GOV <GO>}.
For stories about asbestos, see {NI ASBESTOS <GO>}. For stories
about asbestos-related suits see {TNI ASBESTOS LAW <GO>}. For
the Asbestos Alliance's Web site see
http://www.asbestossolution.org.

To contact the reporter on this story:
James Gunsalus in New York at (1) (212) 617-2358 or
jgunsalus@bloomberg.net.

To contact the editor responsible for this story:
Michael Nol at (1) (212) 617-2384 or
mnol@bloomberg.net.

[TAGINFO]
OWENQ US <Equity> CN
USG US <Equity> CN
                                            Page 1

**EXHIBIT 6**

ATTS180612.txt
Asbestos Trust Fund Alternative May Get Debate, Senator Says
2006-02-16 17:21 (New York)

By James Rowley and Michael McKee
     Feb. 16 (Bloomberg) -- The U.S. Senate, which blocked a
proposed company-financed fund for asbestos victims, may consider
an alternate approach to end the litigation crisis over the
cancer-causing material, said Senator John Ensign.
     Senate Republican Leader Bill Frist told lawmakers he may
permit debate on a new measure that would require plaintiffs to
show their illness was caused by asbestos exposure before they
could sue, Ensign said.
     ``If we have a large enough group of bipartisan senators,
then he could potentially schedule time on the floor for it,''
said Ensign, a Nevada Republican.
     A spokesman for Frist didn't immediately comment on Ensign's
remarks.
     The new approach was supported by 26 Republicans in a test
vote last week as the Senate debated the plan to end asbestos
lawsuits by creating a $140 billion trust fund financed by
companies. Asbestos litigation has forced almost 80 companies
into bankruptcy court.
     The trust fund approach was scuttled in a procedural vote by
the Senate this week. Nine Republicans joined Ensign in voting to
kill the fund.
     ``I don't think the current bill will come back to the
floor,'' Ensign said, referring to the fund proposal. The
alternative would be a measure imposing strict medical criteria
to weed out ``frivolous lawsuits,'' he said. ``If you eliminate
the people who are not sick, the potential liability goes down.''
     Democratic leader Harry Reid of Nevada has offered to work
with Republicans to craft such a measure. Ensign said a ``fairly
good-sized bipartisan group of senators is starting to work on
this legislation. I think we will be able to come up with
something that can be enacted this year.''

                    Specter's Position

     Trust-fund supporters, such as Pennsylvania Republican Arlen
Specter, say the medical criteria approach wouldn't help workers
who were employed by now bankrupt companies and wouldn't halt all
litigation.
     Under Senate procedures, supporters of the fund legislation
needed 60 votes to override Ensign's objection that blocked the
measure. Ensign objected that the trust would violate a
congressional limit placing a cap on spending.
     Fund supporters were one vote shy of 60, and Frist switched
his vote at the end to preserve his ability to seek another roll
call on the procedural obstacle.
     The trust legislation still ``has a heartbeat,'' said Frist,
a heart surgeon, after the Senate vote two days ago.

                    Seeking Assurances

     Republican Senate aides say Frist wouldn't seek to bring the
fund plan up again unless he is assured of winning 60 votes to
overcome Ensign's budget objection and other procedural hurdles.
     Specter held out hope yesterday that the fund idea isn't
dead. ``Senator Frist is trying to move back to a vote,'' he
said.
     Vermont Senator Patrick Leahy, the fund measure's chief
Democratic sponsor, declined yesterday to predict whether there
                              Page 1

ATT5180612.txt
would be another vote, saying that decision was up to Frist.
      Shares of insulation maker Owens Corning, which is in
bankruptcy reorganization, have dropped almost 50 percent in the
two days since the trust legislation was blocked. Owens Corning
shares fell 54 cents to $2.03 in over-the-counter trading today.

--Editor: Rubin.

Story illustration: For government stories, see
{TOP GOV <GO>}. For stories about asbestos, see {NI ASBESTOS
<GO>}. For stories about asbestos-related suits see
{TNI ASBESTOS LAW <GO>}. For the Asbestos Alliance's Web site see
http://www.asbestossolution.org.

To contact the reporter on this story:
James Rowley at 1-202-624-1913 or
jarowley@bloomberg.net

To contact the editor responsible for this story:
Ken Fireman at (1) (202) 624-1978 or
Kfireman1@bloomberg.net

[TAGINFO]
OWENQ US <Equity> CN
USG US <Equity> CN
OI US <Equity> CN
GRA US <Equity> CN
CB US <Equity> CN
DOW US <Equity> CN
FDMLQ US <Equity> CN
DD US <Equity> CN
HIG US <Equity> CN
S US <Equity> CN
GM US <Equity> CN
HON US <Equity> CN
HAL US <Equity> CN
AIG US <Equity> CN
CB US <Equity> CN
BRK/A US <Equity> CN
TAP/B US <Equity> CN
STA US <Equity> CN

NI NJ
NI FIN
NI CONS
NI AUT
NI EXE
NI MI
NI CNG
NI AUP
NI MD
NI DRG
NI CMD
NI ASBESTOS
NI TRN
NI LAW
NI DE
NI CHM
NI RET
NI INS
NI POL
NI IL
NI DC
                          Page 2

ATT5180612.txt

```
NI PAC
NI HEA
NI CT
NI BMRFER
NI OH
NI GOV
NI CST
NI BLD
NI GEN
NI COS
NI BDA
NI CNG
NI SENATE
```

```
#<610849.263818.2005-11-10T14:40:00.25>#
-0- Feb/16/2006 22:21 GMT
```

**EXHIBIT 7**



Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 700511 (E.D.Pa.)
**(Cite as: 1997 WL 700511 (E.D.Pa.))**

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Albert T. ALADJEM, Jr., Petitioner
v.
Andrew CUOMO, Secretary, U.S. Department of
Housing and Urban Development
[FN1]

> FN1. Pursuant to Federal Rule of Civil
> Procedure 25(d)(1), Andrew Cuomo is
> substituted for his predecessor, Henry
> Cisneros.

and
Karen A. MILLER, Secretary's Representative,
Respondents.
**No. CIV. A. 96-6576.**

Oct. 30, 1997.

David G. Concannon, Kohn, Swift & Graf, P.C.,
Phila, PA, for Albert T. Aladjem, Jr., Petitioner.

Lois W. Davis, Nancy Griffin, Assistant U.S.
Attorney, Phila, PA, Nancy Griffin, for Henry G.
Cisneros, Secretary of the United States Department
of Housing and Urban Development, Karen A.
Miller, Secretary's Representative and Senior Equal
Employment Opportunity Representative,
Philadelphia Regional Office, the United States
Department of Housing and Urban Development,
Respondent.

**MEMORANDUM**

POLLAK, J.

*1 Petitioner Aladjem charges his employer, the
Department of Housing and Urban Development,
with failing to perform its legally mandated duties to
investigate fully his discrimination claims and to
grant him hearings on these claims. Aladjem's
underlying grievances are that HUD practiced
national origin, sex, and age discrimination against
him in violation of Title VII and the ADEA. He
alleges that despite five years of requests for

investigation and hearings with the appropriate Equal
Employment Opportunity officials, neither adequate
investigation nor the appointment of an
administrative law judge, as required by law, has
occurred. Aladjem has invoked the extraordinary
remedy of mandamus as well as the Administrative
Procedure Act, 5 U.S.C. § 702.

Currently before the court is HUD's motion to
dismiss for want of subject matter jurisdiction. HUD
argues that Aladjem has failed to meet the
prerequisites for mandamus relief, and that the court
is therefore without power to entertain Aladjem's suit.
Specifically, HUD maintains that the actions Aladjem
seeks to compel are discretionary rather than
ministerial and that the petitioner has an adequate
alternative remedy. HUD also argues that Aladjem
is not entitled to relief under the APA because the
inaction of which Aladjem complains is not final
action subject to judicial review according to 5
U.S.C. § 706(1), and that no relief is available under
the APA because an adequate alternative remedy is
available.

I. Mandamus Relief (or Relief in the Nature of
Mandamus):

As a preliminary matter, it must be noted that Rule
81(b) of the Federal Rules of Civil Procedure
abolished the writ of mandamus in the district courts,
but provided that the "relief heretofore available" by
means of the writ can still be obtained by motion or
complaint provided that the court otherwise has
jurisdiction in the matter. 28 U.S.C. § 1361;
Sanchez-Espinoza v. Reagan, 770 F.2d 202, 207 n. 7
(D.C.Cir.1985), 12 Charles A. Wright et al., Federal
Practice and Procedure § 3134 (1997). Despite the
writ's abolition, however, it is of little moment that
Aladjem has styled his pleading as a petition for writ
of mandamus rather than a complaint requesting
mandamus-style relief, as the court is free to interpret
this petition as a complaint requesting a mandatory
injunction. See Stehny v. Perry, 907 F.Supp. 806
(D.N.J.1995).

Requests for relief in the nature of mandamus are
governed by the same principles that formerly
governed mandamus petitions: (1) the duty to be
compelled must be ministerial and not discretionary,
(2) the plaintiff must have a clear right to the
performance of the duty, and (3) the plaintiff must
have no adequate alternative remedy. Holmes v.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp. , 1997 WL 700511 (E.D.Pa.)
(Cite as: 1997 WL 700511 (E.D.Pa.))

_United States Bd. of Parole_, 541 F.2d 1243 (7th Cir.1976). In this case, it is not necessary to address the first and second requirements, as an examination of Aladjem's pleadings, taking all factual recitals as true, reveals that Aladjem has an alternative remedy, namely, suit in the district court.

**\*2** Both Title VII, which governs Aladjem's sex and national-origin discrimination claims, and the ADEA, which governs his age discrimination claims, allow an aggrieved federal employee to sue directly in federal court after 180 days have elapsed without a final decision. _See_ 42 U.S.C. § 2000e-16(c); 29 U.S.C. § 633a(c); 29 C.F.R. § 1614.408. Therefore, his entitlement to press his claims in federal court constitutes an adequate alternative remedy to a remedy in the nature of mandamus. _See_ _Adams v. EEOC_, 932 F.Supp. 660 (E.D.Pa.1996)(Plaintiff not entitled to § 1361 relief compelling agency to remand Title VII claims to EEOC because private action available.); _Feldstein v. EEOC_, 547 F.Supp. 97, 100 (D.Mass.1982)(Mandamus relief will not issue to compel EEOC to investigate Title VII claims because employee can vindicate rights directly in court.).

Aladjem, however, urges that this logic places him in a "Catch-22" position, to wit: In the present action, the agency argues that Aladjem can sue on the merits rather than compel agency action, but if he sues directly, the agency will claim that he has failed to exhaust his remedies. If this notional agency claim were enough to foreclose suit, this argument might impugn the adequacy of the alternative remedy. When carefully examined, however, it is apparent that Aladjem's situation is not the kind of insuperable double bind that Joseph Heller had in mind.

It is true that, as a general matter, administrative remedies must be exhausted before filing suit. _See, e.g._, _McKart v. United States_, 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); _Glisson v. United States Forest Service_, 55 F.3d 1325, 1326 (7th Cir.1995). Additionally, it has been held that, unlike Title VII, the ADEA did not allow a complainant who had invoked the administrative process to sue without exhausting the administrative process that he initiated, despite the lapse of 180 days after the filing of a complaint. _Purtill v. Harris_, 658 F.2d 134 (3d Cir.1981). If this issue arises, however, neither the exhaustion requirement nor the _Purtill_ decision, however, dooms petitioner's access to court to such an extent that this alternative remedy must be deemed inadequate. This is so for two reasons.

First, the _Purtill_ decision came before the 1992 revision of the statute's implementing regulations, which currently treat ADEA claims the same as Title VII claims with regard to the alternative of opting out of the administrative process after 180 days. _See_ 57 Fed.Reg. 12634 (April 10, 1992). The regulation now reads in relevant part:

> A complainant who has filed an initial complaint ... is authorized under Title VII, the ADEA, and the Rehabilitation Act to file a civil action in an appropriate United States District Court:
>
> ...
>
> (b) After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and a final decision has not been issued
>
> ....

29 C.F.R. § 1614.408. In holding that exhaustion was required under the regime prevailing prior to this 1992 revision, the _Purtill_ court had reasoned that there was nothing in the relevant section of the ADEA that was comparable to the Title VII provision allowing suit after 180 days, and that nothing in the legislative history explained the difference. 658 F.2d at 138. Given the administrative clarification of the statute, the exhaustion requirement would presumably no longer apply to Aladjem and therefore not vitiate his alternative remedy.

**\*3** Second, even if an exhaustion doctrine were to apply, it would hardly bar an adequate remedy, especially given the facts Aladjem has alleged. Aladjem's petition, the factual allegations of which are accepted as true for the purposes of this motion, states that, for what is now more than five years, he has been unable to secure a hearing for his claims. On the one hand, exhaustion may not be required since the facts recited in the petition tend to support any of the grounds for excusing exhaustion, including either (1) good-faith effort to exhaust coupled with unreasonable delay on the part of the agency (_see, e.g._, _McCarthy v. Madigan_, 503 U.S. 140, 147, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); _Gibson v. Berryhill_, 411 U.S. 564, 575 n. 14, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); _Allen v. Butz_, 390 F.Supp. 836 (E.D.Pa.1975)), or (2) the futility of exhausting remedies (_see, e.g._; _Bowen v. City of New York_, 476 U.S. 467, 485, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986)). On the other hand, if exhaustion is not excused, it is _ipso facto_ a requirement that Aladjem pursue a non-futile avenue of recourse, and thus the administrative process (followed, if necessary, by suit in federal court) provides an adequate alternative remedy.

In sum, the fact that HUD may proffer an exhaustion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 700511 (E.D.Pa.)
(Cite as: 1997 WL 700511 (E.D.Pa.))

Page 3

defense in no way renders Aladjem's option of suit in district court an inadequate alternative. Consequently, HUD's motion to dismiss the claim for mandamus relief will be granted without prejudice.

II. Review Under the Administrative Procedure Act
   As noted above, Aladjem's petition also invokes judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq. Although the petition conflates mandamus relief and judicial review under the APA, the court will, to give petitioner the benefit of a liberal construction of his pleading, analyze the two issues separately as distinct claims for relief. *See Davis Assocs., Inc. v. Secretary, Dept. of Housing and Urban Development, 498 F.2d 385 (1st Cir.1974)*(doing same).

   HUD argues that the petition should be dismissed because there is no final action to review and because Aladjem has an alternative remedy. Aladjem counters that the protracted delay allegedly perpetrated by HUD constitutes final action subject to judicial review. Although it is true that an agency's prolonged delay can sometimes amount to reviewable final action (*see, e.g., General Motors Corp. v. NTSB, 898 F.2d 165 (D.C.Cir.1990); Thompson v. United States, Dep't of Labor, 813 F.2d 48 (3d Cir.1987)*), finality is not the only jurisdictional prerequisite for review. APA § 704 also requires that there be "no other adequate remedy in a court." as well. [FN2] As the discussion in Part I above above has shown, Aladjem has an adequate remedy--a trial de novo in federal court--and accordingly cannot invoke judicial review. *See Ward v. EEOC, 719 F.2d 311, 313 (9th Cir.1983)*(APA does not authorize suit against EEOC for negligence in processing claims, as alternative remedy available); *Feldstein v. EEOC, 547 F.Supp. 97, 99-100 (D.Mass.1982)*(APA does not authorize action against the EEOC to compel investigation of discrimination claims).

   FN2. Aladjem also points to APA § 706, which states that a reviewing court is empowered to "compel agency action unlawfully withheld or unreasonably delayed," as a grant of power to the court to enjoin the agency. This section, however, is not a self-executing grant of jurisdiction. Rather, it is a statement of the *scope* of review, and thus presupposes that judicial review is available. So it is only in § 704-- entitled "Actions reviewable"--that we must look to see if the court may review the agency's action.

*4 *Thompson v. United States Dep't of Labor, 813 F.2d 48 (3d Cir.1987),* upon which petitioner places much weight, is not to the contrary. *Thompson* was a Rehabilitation Act case in which the Third Circuit reversed a trial court's determination that the APA gave it no authority to compel agency action that had been delayed. *Id.* at 52. Significantly, the statute under which the complainant in *Thompson* sought review was § 503 of the Rehabilitation Act, which section, in contrast to Title VII, the ADEA and other sections of the Rehabilitation Act, does not provide a private right of action. *See Beam v. Sun Shipping and Dry Dock, 679 F.2d 1077 (3d Cir.1982).* Therefore, unlike the instant case, the court was not confronted with a situation in which the complainant had an alternative remedy in court.

   Furthermore, the *Thompson* court held that the APA authorizes suit to compel agency action unlawfully withheld or unreasonably delayed "at least where judicial review of an agency's final action would be in the district court in the first instance." 813 F.2d at 52. Aladjem reasons that because the district courts can entertain Title VII and ADEA claims, the instant case is one in which judicial review would be in the district courts. This analysis confuses judicial review with the private right of action granted by Title VII and the ADEA. Neither Title VII nor the ADEA permits judicial review of agency actions on discrimination complaints; the statutes do, however, entitle the aggrieved party to try his or her claims de novo, an altogether different undertaking. *See 42 U.S.C.2000e-5(f); Stewart v. EEOC, 611 F.2d 679, 682 (7th Cir.1979).*

   Consequently, the APA does not afford petitioner review of the agency's action, and HUD's motion to dismiss Aladjem's claim under the APA, as well as his petition for mandamus relief, will be granted without prejudice. The court will grant Aladjem leave to amend his initial pleading to state a complaint on the merits of his discrimination claims.

   An appropriate order follows.

ORDER
   Upon consideration of respondent Cuomo's motion to dismiss for lack of subject-matter jurisdiction, and petitioner's response thereto, it is hereby ORDERED that respondent's motion to dismiss is GRANTED without prejudice. It is further ORDERED that petitioner has leave to file an amended complaint with the court within 30 days of the entry of this order.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1997 WL 700511 (E.D.Pa.)
**(Cite as: 1997 WL 700511 (E.D.Pa.))**

Not Reported in F.Supp., 1997 WL 700511
(E.D.Pa.)

**Motions, Pleadings and Filings** (Back to top)

• 2:96cv06576 (Docket) (Sep. 27, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 8**

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 2040502 (E.D.Pa.)
**(Cite as: 2004 WL 2040502 (E.D.Pa.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Michael E. MURPHY, Petitioner,
v.
PENNSYLVANIA BOARD OF PROBATION AND
PAROLE, et al., Respondents.
**No. Civ.A.04-2064.**

Sept. 13, 2004.
Micheal E. Murphy, Frackville, PA, pro se.

Alisa R. Hobart, Berks County Office of D.A. Berks
County Service Center, Reading, PA, Theodore E.
Lorenz, Office of Attorney General, Philadelphia,
PA, for Defendants.

*REPORT AND RECOMMENDATION*

RAPOPORT, Magistrate J.

**\*1** Presently before the Court is a *pro se* Petition for
Writ of Habeas Corpus filed by the Petitioner,
Micheal Murphy ("Petitioner"), pursuant to 28 U.S.C.
section 2254. The Petitioner is currently incarcerated
in the State Correctional Institution at Frackville,
Pennsylvania. For the reasons that follow, it is
recommended that the Petition should be denied with
prejudice and dismissed without an evidentiary
hearing.

I. *PROCEDURAL HISTORY.* [FN1]

> FN1. This information is taken from the
> Petition for Writ of Habeas Corpus, the
> Response, and the exhibits attached to those
> pleadings.

On January 20, 1995, Petitioner was sentenced to a
term of not less than seven nor more than fourteen
years imprisonment for an aggravated assault
conviction. Petitioner's minimum sentence date was
February 5, 2001, and his maximum sentence date is
February 5, 2008. Petitioner was denied parole by the
Pennsylvania Board of Probation and Parole

("PBPP") on November 22, 2000, [FN2] and
October 23, 2003. [FN3] The October 23, 2003
notice indicated that Petitioner would be reviewed in
or after September, 2004. The PBPP indicated that it
would consider at that September, 2004 review: (1)
whether Petitioner maintained a favorable
recommendation for parole from the Department of
Corrections; (2) whether Petitioner maintained a clear
conduct record and completed the Department of
Corrections' prescriptive program(s); (3) Petitioner's
efforts to secure an approved home plan; and (4) an
updated psychological evaluation. *See* Resp., Ex. C.

> FN2. The November 22, 2000 notice read:
> Following an interview and review of your
> file, the PBPP has determined that the fair
> administration of justice cannot be achieved
> through your release on parole. You are
> therefore refused parole and ordered to: Be
> reviewed in or after November, 2003. At
> your next interview, the Board will review
> your file and consider:
> whether you have successfully completed a
> treatment program for: substance abuse.
> whether you have received a favorable
> recommendation for parole from the
> Department of Corrections.
> whether you have maintained a clear
> conduct record and completed the
> Department of Corrections' prescriptive
> program(s).
> *See* Resp., Ex. B.

> FN3. The Notice related to the October 23,
> 2003 hearing stated:
> Following an interview with you and a
> review of your file, and having considered
> all matters required pursuant to the parole
> act of 1941, as amended, 61 P.S. § 331.1 et
> seq., the Board of Probation and Parole, in
> the exercise of its discretion, has determined
> at this time that: your best interests do not
> justify or require you being
> paroled/reparoled; and, the interests of the
> Commonwealth will be injured if you were
> paroled/reparoled. Therefore, you are
> refused parole/reparole at this time. The
> reasons for the Board's decision include the
> following:
> Your lack of remorse for the offense(s)
> committed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2040502 (E.D.Pa.)
(Cite as: 2004 WL 2040502 (E.D.Pa.))

Reports, evaluation and assessments concerning your physical, mental and behavior condition and history.
Your need to participate in and complete additional institutional programs.
Your failure to develop an approved release plan.
Your interview with the hearing examiner and/or Board member.
See Resp., Ex. C.

Petitioner filed a petition for writ of mandamus in the Commonwealth Court of Pennsylvania on May 14, 2003, following the November 22, 2000 denial of his first parole, but before the PBPP's denial of his second parole application on October 23, 2003. The mandamus petition alleged an ex post facto claim arising from the 1996 amendment to the policy statement of the Pennsylvania Parole Act. The Commonwealth Court granted Petitioner's motion to proceed in forma pauperis on May 21, 2003, and on July 1, 2003, the PBPP filed preliminary objections to the mandamus petition. On July 9, 2003, the Commonwealth Court sustained the PBPP's objections and ordered Petitioner to file an amended petition in conformity with the Pennsylvania Rules of Appellate Procedure, or the petition would be dismissed. On August 20, 2003, because Petitioner did not file an amended petition, the Commonwealth Court dismissed the petition. Petitioner did not appeal that order or take any further action in state court.

On May 13, 2004, Petitioner filed the instant *pro se* Petition. The Honorable Clarence C. Newcomer referred it to this Court for preparation of a Report and Recommendation on June 4, 2004. The Response was filed on July 29, 2004. Respondents contend that the claim in the Petition has not been exhausted in the state court, and, at a minimum, the Petition should be dismissed without prejudice. They also argue that, even if Petitioner has exhausted his state court remedies, his allegation that the PBPP violated the Ex Post Facto Clause is meritless and should be denied.

II. DISCUSSION.

*2 Petitioner must first exhaust his remedies in state court before this Court may grant habeas relief. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). It is the habeas petitioner's burden to show that all of the claims alleged have been "fairly presented" to the state courts, which demands that the federal court claims must be the "substantial equivalent" of the claims presented in state court. *Santana v. Fenton*, 685 F.2d

71, 73-74 (3d Cir.1982), *cert. denied*, 459 U.S. 1115, 103 S.Ct. 750, 74 L.Ed.2d 968 (1983). If a petition is unexhausted in the state courts, the federal court should dismiss the petition without prejudice or else risk depriving the state courts of the "opportunity to correct their own errors, if any." *Toulson v. Beyer*, 987 F.2d 984, 989 (3d Cir.1993).

Pursuant to 28 U.S.C. section 2254(b)(1)(B), exhaustion of state remedies may be excused when there is an absence of remedies available to the petitioner or circumstances exist that render such process ineffective to protect the rights of the applicant. *See* 28 U.S.C. § 2254(b)(1)(B). Here, Petitioner claims that the denial of his parole is in violation of the Ex Post Facto Clause of the United States Constitution, and that when the PBPP reviewed his parole application, it applied the parole policies formulated in 1996 which were different from and harsher than those in effect at the time of his offense and conviction. In order to circumvent his failure to fully exhaust his claim in the state courts, Petitioner argues that any pursuit of his claim in state court would be futile because of the Pennsylvania Supreme Court rulings in *Winklespecht v. Pa. Bd. of Prob. & Parole*, 571 Pa. 685, 813 A.2d 688 (Pa.2002), and *Finnegan v. Pa. Bd. of Prob. & Parole*, 576 Pa. 59, 838 A.2d 684 (Pa.2003). [FN4] Respondents contend that this argument is speculative at best and belies Petitioner's failure to amend his petition and then present it to the Commonwealth Court for disposition, as he was directed by that court.

> FN4. In *Winkelspecht v. Pa. Bd. of Prob. & Parole*, 571 Pa. 685, 813 A.2d 688 (Pa.2002), which was decided just prior to the Third Circuit's decision in *Mickens-Thomas*, the Pennsylvania Supreme Court held that the 1996 amendments to the parole policy did not change Pennsylvania policy regarding the criteria considered for parole eligibility. *Id.* at 692. The *Winklespecht* court stated that "[t]he rewording of 61 P.S. § 331.1 did not create a substantial risk that parole would be denied any more frequently than under the previous wording, nor did the addition of this language create a new offense or increase the penalty for an existing offense." *Id.* at 691.
> The Pennsylvania Supreme Court held in *Finnegan v. Pa. Bd. of Prob. & Parole*, 576 Pa. 59, 838 A.2d 684 (Pa.2003), that "the 1996 revision of § 331.1 of the Parole Act does not violate the ex post facto clause

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2040502 (E.D.Pa.)
(Cite as: 2004 WL 2040502 (E.D.Pa.))

when applied to a prisoner convicted prior to the revision." *Id.* at 690. The *Finnegan* court held that:

[a]lthough the phrases 'protect the safety of the public' and 'assist in the fair administration of justice' were added in 1996, these concepts have always been underlying concerns. Both versions of § 331.1 leave the grant of parole within the discretion of the Board. Adding language which clarified the policy underlying the parole process does not make appellant's punishment more severe; his maximum sentence remains the same.

*Id.* at 688 (citation omitted). The *Finnegan* court also held that the PBPP's guidelines are an aid to for the PBPP's exercise of its discretion. *Id.* at 690 (citation omitted).

A petition containing an unexhausted claim should not be denied on the merits unless "it is perfectly clear that the applicant does not raise even a colorable federal claim." *Lambert v. Blackwell,* 134 F.3d 506, 514-515 (3d Cir.1998), *cert. denied,* 532 U.S. 919, 121 S.Ct. 1353, 149 L.Ed.2d 284 (2001) (quoting *Granberry v. Greer,* 481 U.S. 129, 135, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987)). The Pennsylvania Supreme Court has "exclusive jurisdiction of appeals from final orders of the Commonwealth Court entered in any matter which was originally commenced in the Commonwealth Court." *See* 42 Pa.C.S.A. § 723(a). Under 42 Pa.C.S.A. section 5105(a) and Pennsylvania Rule of Appellate Procedure 1101(a), Petitioner maintains a right of appeal from the Commonwealth Court to the Pennsylvania Supreme Court. Despite the availability of this state remedy, Petitioner made no attempt to present his claims to the Pennsylvania Supreme Court. Thus, under *O'Sullivan,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1, this claim remains unexhausted.

Petitioner is most likely barred from procedural and substantive relief in state court, however, and dismissal of this Petition for the purpose of exhausting his claims would be futile. *Fripp v. Superintendent Meyers,* No. 03-4942, 2004 WL 1699071, at *5 (E.D.Pa. July 28, 2004) (citations omitted). Petitioner's claims are therefore procedurally defaulted in this Court. *See* 28 U.S.C. § 2254(b)(1)(A); *Coleman v. Thompson,* 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In order to excuse the procedural default and avoid dismissal of the Petition, Petitioner must meet the cause and prejudice requirement or must show that

this Court's failure to consider his claims will result in a fundamental **miscarriage of justice**. *See* 28 U.S.C. § 2254(b)(1)(B); *Coleman,* 501 U.S. at 750. Petitioner has provided no support for any theory that objective factors, external to the defense, prevented either his timely amendment of the dismissal of his **mandamus** petition or his timely appeal of the dismissal of his **mandamus** petition to the Pennsylvania Supreme Court. Thus, the Petition can be dismissed on procedural grounds.

*3 Requiring a prisoner to pursue all available state remedies is favored, but a prisoner's failure to do so "is not an absolute bar to appellate consideration of his claims." *Granberry v. Greer,* 481 U.S. 129, 131, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987). This Court can deny a meritless claim. *See Fripp,* 2004 WL 1699071, at *6 (citing 28 U.S.C. § 2254(b)(2) and *Burkett v. Love,* 89 F.3d 135, 138 (1996)). Thus, the merits of this Petition are hereafter addressed.

"To fall within the ex post facto prohibition," according to the United States Supreme Court, "a law must be retrospective --- that is it must apply to events occurring before its enactment --- and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 896, 137 L.Ed.2d 63 (1997) (citation and quotation omitted). Petitioner contends that the PBPP, in reviewing his parole applications, improperly and retroactively applied the 1996 amendment to the parole policy statement, thereby altering the criteria under which he, as an inmate convicted before 1996, had his parole application reviewed. Petitioner apparently challenges both of his parole denials. This Court, however, will focus solely on his October 2003 parole denial because any alleged problems with his November 2000 parole hearing and denial were rendered moot by the second parole review in October, 2003. Thus, the October 2003 decision is only ripe for consideration.

It appears that Petitioner relies on *Mickens-Thomas v. Vaughn,* 321 F.3d 374 (3d Cir.2003), to support his claim. Respondents contend that even if Petitioner had exhausted his state court remedies, his ex post facto claim is meritless. The *Mickens-Thomas* case involved an inmate who was serving a life sentence for the 1964 rape and murder of a twelve year-old who had his sentence commuted by the Pennsylvania Pardons Board and the governor. *Id.* at 376-377. The PBPP denied Mickens-Thomas' applications for parole, and he alleged the denial of his parole was based more upon the 1996 amendment to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

· Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2040502 (E.D.Pa.)
(Cite as: 2004 WL 2040502 (E.D.Pa.))

Page 4

introductory language of the parole statute which allegedly tightened the standards for parole, than the parole guidelines in effect when he was convicted. *Id.* at 383.

The United States Court of Appeals for the Third Circuit held that Mickens-Thomas was entitled to a parole hearing based upon the pre-1996 guidelines. *Id.* at 390-391, 393. The Third Circuit found that the PBPP's denial of the parole application violated the Ex Post Facto Clause since it appeared that the 1996 amendment to 61 P.S. section 331.1 had changed the standards under which parole is granted or denied in Pennsylvania, and the application had been evaluated under these new standards. [FN5] The court concluded "to retroactively apply changes in the parole laws made after conviction for a life sentence in Pennsylvania that adversely affect the release of prisoners whose sentences have been commuted, violates the Ex Post Facto clause." *Id.* at 393.

FN5. Section 1 of the Parole Act was amended in 1996, and the complete statute reads as follows:
The parole system provides several benefits to the criminal justice system, including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison. In providing these benefits to the criminal justice system, the board shall address input by crime victims and assist in the fair administration of justice by ensuring the custody, control, and treatment of paroled offenders.
61 P.S. § 331.1. From 1941 through 1996, the statute provided that:
The value of parole as a disciplinary and corrective influence and process is hereby recognized, and it is declared to be the public policy of this Commonwealth that persons subject or sentenced to imprisonment for crime shall, on release therefrom, be subjected to a period of parole during which their rehabilitation, adjustment, and restoration to social and economic life and activities shall be aided and facilitated by guidance and supervision under a competent and efficient parole administration, and to that end it is the intent of this act to create a uniform and exclusive system for the administration of parole in this Commonwealth.

61 P.S. § 331.1 (pre-1996 version).

**\*4** In *Mickens-Thomas*, the Third Circuit acknowledged *Winklespecht*, but explained that *Winklespecht* was decided after Mickens-Thomas' parole consideration. Therefore, the PBPP had the benefit of the 1996 amendments to the Parole Act following *Winklespecht*, and the knowledge that the Pennsylvania Supreme Court regarded the 1996 amendments to the Parole Act as having no change in the state's parole policies. *Mickens-Thomas* did not address the PBPP's powers to attach conditions to parole. The statute continues to state that the PBPP may attach special conditions "as it deems necessary." See 61 P.S. § 331.23.

PBPP decisions made after *Winkelspecht* continue to examine the various factors in the actual parole guidelines. *See Johnson v. Lavan*, No. 04-0860, 2004 WL 1291973 (E.D. Pa. June 11, 2004), *approved and adopted by* 2004 WL 1622051 (E.D.Pa. July 20, 2001); *Davis v. Pa. Bd. of Prob. & Parole*, No. 03-3997 (E.D.Pa. Mar. 11, 2004); and *Evans v. Pa. Bd of Prob. & Parole*, No. 03- 4849 (E.D.Pa. Feb. 4, 2004). In the instant case, the PBPP's most recent parole decision on October 23, 2003 post-dates *Winklespecht* and is presumed to include the pre-1996 criteria. The PBPP provided a list of specific reasons and requirements supporting denial of parole, including: (1) Petitioner's lack of remorse for the offense(s) committed; (2) Reports, evaluation and assessments concerning Petitioner's physical, mental and behavior condition and history; (3) Petitioner's need to participate in and complete additional institutional programs; (4) Petitioner's failure to develop an approved release plan; and (5) Petitioner's interview with the hearing examiner and/or Board member. *See* Resp., Ex. C.

In its decision denying parole, the PBPP stated that Petitioner would be reviewed again in September 2004 and that the PBPP would determine whether Petitioner had received a favorable recommendation from the DOC, and whether he maintained a clear conduct record and completed the DOC's prescriptive programs. In addition, Petitioner's efforts to secure an approved home plan and an updated psychological evaluation report would be submitted to the PBPP at the time of the review in or after September, 2004. *See* Resp., Ex. B. There is no indication that the PBPP placed undue weight on the interests of public safety in denying Petitioner parole in October, 2003. Thus, the PBPP's most recent consideration of Petitioner's parole does not violate the Ex Post Facto

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2040502 (E.D.Pa.)
(Cite as: 2004 WL 2040502 (E.D.Pa.))

Page 5

Clause, and this claim should be denied.

Therefore, I make the following:

### RECOMMENDATION

AND NOW, this 13th day of September, 2004, IT IS RESPECTFULLY RECOMMENDED that the Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. section 2254 should be DENIED with prejudice and DISMISSED without an evidentiary hearing. There are no grounds upon which to issue a certificate of appealability.

Not Reported in F.Supp.2d, 2004 WL 2040502 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:04cv02064 (Docket) (May. 13, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 9**

LEXSEE 1989 BANKR. LEXIS 2046

In re: BICOASTAL CORP., f/k/a The Singer Company, Debtor

Case No. 89-8198-8P1

UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT
OF FLORIDA, TAMPA DIVISION

*1989 Bankr. LEXIS 2046*

November 21, 1989, Decided

JUDGES: [*1]

ALEXANDER L. PASKAY, CHIEF UNITED
STATES BANKRUPTCY JUDGE

OPINIONBY:

PASKAY

OPINION:

ORDER ON PENDING MOTIONS

ALEXANDER L. PASKAY, CHIEF UNITED
STATES BANKRUPTCY JUDGE

THIS is a Chapter 11 case commenced by a Petition
for Relief filed by Bicoastal Corp, d/b/a Simuflite, f/k/a
The Singer Company (Bicoastal), which was filed on
November 10, 1989, just about ten days ago. The filing
immediately spawned a flurry of activity. However,
unlike the usual matters which surface in the initial
stages of a Chapter 11 case, such as matters relating to
the operation of the automatic stay, the debtor's right to
maintain the Chapter 11 case because it is alleged to
have been filed in bad faith, or matters relating to
debtor's right to use cash collateral or obtain credit, this
case generated a fullblown warfare between Bicoastal
and Mesa Holding Limited Partnership (Mesa) and, indi-
rectly, its ally, Leucadia National Corporation (Leu-
cadia). Neither of the Motions filed by the parties in-
volve the usual matters described. Rather, Mesa, together
with Leucadia, claims to have a right to designate a ma-
jority of the Board of Directors of Bicoastal, and in the
alternative, seeks a declaration that the automatic [*2]
stay does not apply and does not bar Mesa to designate
the majority of the Board of Directors, but in the event it
does, it also seeks relief from the stay.

Bicoastal promptly filed a response to the Motion of
Mesa and Leucadia vigorously opposing the relief sought

by them, which Motions are presented for this Court's
consideration on an emergency basis. In addition, the
sole common stockholder of Bicoastal, Bilzerian Partners
Limited Partnership I (BPLP), also filed its own Motion,
which also challenged the right to relief sought by Mesa
and Leucadia. Bicoastal also challenged the Motion of
Leucadia to join in a Motion filed by Mesa and filed a
Motion to Strike same. In addition, Bicoastal filed a Mo-
tion, again on an emergency basis, to obtain authority to
receive capital contribution for the redemption of junior
preferred stock. In light of the fact that both Mesa and
Leucadia and Bicoastal and BPLP sought a prompt reso-
lution of the issues, this Court scheduled a hearing on
short notice, but indicated it would only entertain oral
argument and would consider the written submission of
briefs, rather than to receive evidence. Inasmuch as this
Court is satisfied that the issues raised [*3] by the par-
ties can be disposed of based on the undisputed facts and
by applying the controlling legal principles, it shall suf-
fice to state that the following facts are basically without
dispute.

This entire controversy has its genesis in the lever-
age buy out by BPLP of the controlling interest in The
Singer Company. On November 2, 1987, BPLP made a
tender offer to purchase all of the issued and outstanding
shares of common stock of The Singer Company, a pub-
licly traded New Jersey Corporation. By February 3,
1989, pursuant to the tender offer, the BPLP acquired
approximately 90% of the outstanding shares of Singer's
common stock. Financing for the stock acquisition was
provided by a consortium of banks (the Banks), Shearson
Lehman Brothers Holdings, Inc., Mesa and BPLP. In
return for their contribution, the banks received notes
secured by a pledge of the Singer stock purchased by
Singer Acquisition Company, all of whose shares were
owned by BPLP. The consideration for Shearson's loan
consisted of 1) a senior subordinated note; 2) Singer

Class C common stock in exchange for Mesa's loan of $ 150 million, Singer issued to Mesa 1) a $ 149 million junior subordinated promissory note (the [*4] Junior note); 2) 1,000 shares of $ 185 junior cumulative redeemable preferred stock (the Redeemable preferred); and 3) 2,000 shares of Singer Class B common stock. The Junior Note, the Redeemable Preferred and the common stock were all issued to Mesa pursuant to the same paragraph of an agreement entered into by Mesa and Bicoastal on January 31, 1988 (the Junior Financing Agreement).

In addition to the foregoing, the loan agreement also provided that Shearson and Mesa would receive a share of any ultimate net profit realized as a result of the acquisition of the controlling interest in Singer by BPLP. The Redeemable Preferred issued to Mesa mirrored the Junior Note in all material financial terms. The Redeemable Preferred stock provided Mesa with voting rights to appoint the majority of the Board of Singer, thus to acquire control of the management of Singer and to elect members of Singer's Board of Directors in the event the Junior Note and Redeemable Referred were not paid on a timely basis.

Through a series of mergers in April of 1988, the notes and stock issued in connection with the acquisition became the obligations of Singer Acquisition Holdings Company which subsequently [*5] changed its name to "The Singer Company". On October 13, 1989, Singer changed its name to "Bicoastal Corporation", the Debtor who is involved in this Chapter 11 case.

The Redeemable Preferred stock issued to Mesa, described in the Restated Certificate of Incorporation of Bicoastal (the Certificate) calls for a fixed dividend of $ 185 per year, payable quarterly. The accumulation of dividends on any shares of the Redeemable Preferred bears interest at a rate of 18.5% per annum from the date payable until paid. The Redeemable Preferred have a liquidation preference of $ 1,000 per share and Bicoastal also has the right to redeem the Redeemable Preferred "at any time" for $ 1,000 per share. Under the applicable provision of the loan documents, Bicoastal was required to redeem the junior preferred shares of Mesa within twelve months of the merger or fifteen months from the date of issue. According to the loan documents, the redemption right could not be exercised "without the express written consent of the holders thereof" if the redemption would violate any covenant of Bicoastal set forth in any obligation of Bicoastal. Mesa's Junior Note contains a covenant, under which Bicoastal could [*6] not redeem the Redeemable Preferred without Mesa's consent until the Junior Note was paid in full. According to Mesa, it had the apparent power to acquire and maintain control of Bicoastal by appointing the majority for the Board of Directors by merely leaving the Junior Note payable to Mesa unsatisfied.

The significance of the covenant in the Junior Note preventing redemption of the Redeemable Preferred prior to the payment of the Junior Note is that such nonredemption triggers the voting rights contained in the Redeemable Preferred. Pursuant to the Certificate, Mesa can only vote the shares in the election of directors and upon the failure of Bicoastal to redeem the Redeemable Preferred for any reason by the mandatory redemption date. If the Redeemable Preferred were not redeemed by the mandatory redemption date, Mesa had the right to elect a majority of the Board of Directors of Bicoastal. Consequently, the Junior Note and Redeemable Preferred read together provide an additional remedy for nonpayment--the ability to elect a majority of the Board of Directors.

On May 25, 1989, United States District Court Judge Herbert F. Murray, sitting in the District of Maryland, entered an [*7] order in the case of United States of America v. Link Flight Simulation Corporation, CAE-Link Corporation and Singer Company, Case No. HM-88-3408 (the Maryland action). The District Court enjoined Bicoastal from, among other things, distributing any assets of Bicoastal except for payment of business debts incurred in the ordinary course of business. On May 30, 1989, Bicoastal filed a motion seeking authority to pay Mesa the $ 20.4 million due on the Mesa Note, the remaining principal balance of $ 49 million due under the Junior Note and the $ 1 million necessary to redeem the Redeemable Preferred. Mesa moved to intervene and supported the Motion of Bicoastal for authority to pay Mesa. The Motion to intervene was granted, but on June 30, 1989, the District Court denied Bicoastal's motion. The District Court in its order noted that its injunction would constitute a defense to any action by Mesa or Shearson against Bicoastal based on promissory notes executed by Bicoastal on the notes. Bicoastal has appealed from the District Court's orders, which appeal is still pending.

On November 6, 1989, Mesa notified Bicoastal that it would attempt to exercise its right to designate a majority [*8] of Bicoastal's Board of Directors. As noted earlier, on November 10, 1989, Bicoastal filed the Chapter 11 Petition. On November 17, 1989, Bicoastal filed an Emergency Motion for authority to receive capital contribution and redeem the junior preferred stock for the redemption or liquidation price of $ 1,000 a share, plus all accrued dividends and any interest thereon. Obviously, if this Motion is granted and Mesa accepts redemption payment, this would moot Mesa's Emergency Motion.

On November 17, 1989, Bicoastal also filed a Complaint requesting declaratory relief to the effect that the designation of the Board of Directors by Mesa is improper and should be enjoined. This Complaint just filed is not even at issue.

Stripping the rhetoric from the argument of counsel for respective parties and limiting one's focus to the real issues, this Court is satisfied that this controversy could be reduced to find answers to the following questions:

1) Does Bicoastal have a right to obtain capital - contribution from third party funds to be used for the redemption of the junior preferred stock?

2) Does Bicoastal have a right to redeem the preferred stock, thereby preventing Mesa and, [*9] in the event the assignment of Mesa to Leucadia is completed, to appoint the majority of the Board for Bicoastal?

3) If Bicoastal does not have a right to redeem the stock, does the automatic stay imposed by § 362 of the Bankruptcy Code apply and would Mesa and/or Leucadia be prohibited to exercise their voting rights as set forth in the Certificate of Incorporation and in the loan documents?

4) If the automatic stay does apply, is there a "cause" to modify the automatic stay to permit Mesa and/or Leucadia to immediately appoint the majority of the Board and permit Mesa and Leucadia to continue the litigation which is currently pending in the Chancery Court in the State of Delaware?

Considering first Bicoastal's right to obtain capital contribution, there is hardly any question that there is nothing in the Bankruptcy Code nor in the corporate charter of Bicoastal or loan documents, as far as it appears, to prohibit Bicoastal to obtain the funds from third parties, not as a loan, but as capital contribution. This, in turn, leads to the next question, which is whether or not Bicoastal has a right to redeem the junior preferred stock, thereby preventing Mesa and/or Leucadia [*10] to appoint the majority of the Board. To find the correct answer to this question is not without difficulty. At the outset, one should state the obvious, that the rights of Bicoastal to redeem the preferred stock or the prohibition to redeem the preferred stock must be found either in the Certificate of Incorporation or the loan documents.

The redemption provisions can be found in the restated Certificate of Incorporation under Paragraph 1 and 2, which provide for "Mandatory Redemption" and "Optional Redemption" of the junior preferred stock out of funds legally available. A restriction on that right can be found in Paragraph 4 which provides that the corporation shall not redeem any shares of junior preferred stock without the express written consent of the holders, if such redemption would violate any covenant of the corporation contained in any contract, agreement, obligation, or guarantee of the corporation, including any covenant of another person, the performance of which is guaranteed by the corporation. The covenants referred to can be found in the loan document itself under Paragraph 3 and it provides that except with the prior written consent of the holder or holders of [*11] 50% or more of the outstanding principal amount of the notes, the company will duly perform and observe each of the covenants and agreements. One of the covenants in Paragraph 3.3 states that neither the company nor any of its subsidiaries will make any restricted payment or restricted investment. Under the clear language of the loan document, the acquisition of the stock would be a restricted payment.

The loan documents set forth in detail the concept of restrictive or permissive payments and provides that the right to redeem cannot be exercised by restrictive payments. It is urged by Bicoastal that this simply means the provisions apply only if Bicoastal uses its own funds to redeem stock, but it does not apply if third party funds are used as in this instance where it seeks to obtain an investment. This Court having concluded, however, that the right to redeem was so closely tied to the repayment of the loan that it is clear that Bicoastal has no independent right to redeem the preferred stock and it was clearly the intention of the parties that the right to redeem would be applied only if the obligation represented by the junior promissory note is paid in full.

A careful [*12] reading of these provisions leaves no doubt that the issuance of a preferred stock was an integral part of the loan transaction and the right to redeem the junior preferred stock of Mesa was inextricably tied to the repayment of the promissory note. This Court is satisfied that Mesa never intended to remain a holder of the preferred stock permanently, but only so long as the obligation represented by the junior promissory note remained outstanding. Thus, there is hardly any question that the restriction placed on the right of Bicoastal to redeem the junior preferred stock was intended to be part and parcel of the loan transaction and it was never intended that Bicoastal would have an independent right separate and apart from its obligation to pay the balance on the note to redeem the junior preferred stock.

Based on the foregoing, it is clear and there is hardly any question that Mesa's interest in holding its preferred stock was not the interest of an ordinary stockholder in the orthodox sense, who has a genuine concern for the health, welfare and survival of a corporation, but is limited to assure that it would have control of the affairs of Bicoastal until the obligation of Bicoastal [*13] represented by a promissory note is satisfied in full. Bicoastal did what seldom occurs in this Court, to offer a payment

by a check in excess of million to pay the redemption price in full for the junior preferred stock. It is equally clear, however, that there is nothing in this record to find that Bioastal has the funds necessary to pay the balance due and owing on the promissory note to Mesa. However, it should be noted that counsel for Bicoastal stated that he intends to do the very unusual and file a Disclosure Statement and Plan of Reorganization within ten days, a plan which will not impair any parties in interest and will pay everybody in full. Of course, if the plan is confirmed, that would prevent Mesa or its assignee, Leucadia, from controlling the Board even if they would be permitted to nominate the majority at this time since the right to control the Board is limited and exists only until the obligation of Bicoastal to Mesa is satisfied and Mesa is paid the redemption price for the junior preferred stock.

This leads to the more troublesome question whether or not the automatic stay would prohibit Mesa and/or Leucadia to appoint a Board of Directors and if it does apply, [*14] is there a cause to justify lifting the automatic stay. It is the contention of Bicoastal and BPLP that the automatic stay imposed by § 362(a)(1) or (a)(2) would prohibit Mesa to appoint the majority. Section 362 (a)(1) provides:

§ 362. Automatic stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 *(18 U.S.C. 78eee(a)(3))*, operates as a stay, applicable to all entities, of--

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; . . .

It should be pointed out at the outset, considering these questions, what is and what is not involved in this case. This case does not involve matters of corporate governing in the orthodox sense. If this were the case, there is hardly any doubt that absent some [*15] showing of extraordinary circumstances, this Court has no jurisdictional power to interfere with corporate governance. *In re Bush Terminal Co., 78 F.2d 662; Saxon Industries, Inc. v. NKFW Partners, 39 B.R. 49, 50 S.D. NY 1984); In re The Lionel Corporation, 30 B.R. 327 (S.D. NY 1983); In re Johns Mansville, 801 F.2d 60, 65-67 (2d Cir. 1986);* and, In re Allegheny International, Slip.op.

88-1101, May 31, 1988. However, as noted earlier, Mesa is not a stockholder who desires to obtain control of the management of Bicoastal for the reason stockholders undertake such actions at all, but only to obtain control of the management in order to assure that this promissory note is repaid. Thus, it could be argued with some force that what Mesa and Leucadia are attempting to do is indirectly to force the repayment of the loan, which would be clearly prohibited by § 362(a)(1). One must concede that under the current status of this Chapter 11, Mesa would not be in a position to force the repayment of the balance due under the note even if it obtains control of the Board of Directors because they would clearly be charged with the duties of a fiduciary, a duty which is owed [*16] not only to creditors, but all the stockholders of every class, including the holders of the common stock. *Commodity Futures Trading Commission v. Weintraub, 105 S.Ct. 1986 (1985).* Of course, it is not far-fetched to surmise that once Mesa and/or Leucadia acquired control, they would elect to make provision for payments for the note, thereby preserving the control they have acquired and could conceivably wreck the entire reorganization process by frustrating even the attempt of other parties of interest, such as creditors, to effectuate a reorganization. Even assuming, but not admitting, that the automatic stay does not prohibit controversies relating to the governance of a corporation, *In re Bush Terminal Co., supra; Saxon Industries, Inc. v. NKFW Partners, supra; In re The Lionel Corporation, supra; In re Johns Mansville, supra;* and, In re Allegheny International, supra, a proposition which this Court is not prepared to accept, this Court is satisfied that Subclause 3 of § 362 would come into play and applies as set forth:

§ 362. Automatic stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, [*17] or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 *(15 U.S.C. 78eee(a)(3))*, operates as a stay, applicable to all entities, of--

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. . . .

One must always keep in mind the admonition of Congress in commenting on the operation of the automatic stay as a "powerful tool". As the notes of the Committee on the Judiciary state, it was Congress' intent that the automatic stay permit the debtor to attempt a repayment or reorganization or simply to be relieved of the financial pressures that drove him into bankruptcy by

granting the debtor a breathing spell from his creditors. Sen.Rep. No. 95-989.

It is without dispute that Mesa is a creditor of Bicoastal. It is equally without dispute if Mesa is permitted to control the Board, it will, in fact, obtain, possess and exercise full control over the operation of Bicoastal only subject to the jurisdiction of this Court. This Court is disinclined to interpret this clause narrowly and limit its application to situations where either a [*18] receiver or an assignee for benefit of creditors or some other party either with or without court authorization obtained possession and control of the properties of the estate. Having concluded that the automatic stay does apply and prohibits Mesa and/or Leucadia to proceed as they intend to do to appoint the majority of the Board, this leaves for consideration whether or not should the stay be modified for "cause" pursuant to § 362(d)(1). This Court has yet to be persuaded after having heard argument of counsel that there is a dire emergency and that Mesa and/or Leucadia would suffer irreparable and immediate harm unless they obtain the relief or they are permitted to do what they intended to do. This being the case, there is hardly any justification to grant the relief, especially in light of the fact that Bicoastal tendered the full amount of the redemption price which has now been refused. In addition, inasmuch as Bicoastal announced its intention to proceed without delay to confirmation, it would not be appropriate, nor warranted, to lift the automatic stay.

Based on the foregoing, it is

ORDERED, ADJUDGED AND DECREED that the Motion to Redeem the Junior Preferred Stock be, [*19] and the same is hereby, denied without prejudice. It is further

ORDERED, ADJUDGED AND DECREED that Bicoastal's Motion to Obtain Equity Infusion be, and the same is hereby, denied as currently moot. It is further

ORDERED, ADJUDGED AND DECREED that the Motion for the Right to Appoint the Majority to the Board be, and the same is hereby, denied without prejudice. It is further

ORDERED, ADJUDGED AND DECREED that Bicoastal shall be required from the date of the entry of this Order to file a Disclosure Statement and Plan of Reorganization and unless Bicoastal is able to obtain confirmation of its Plan of Reorganization by December 31, 1989, this Court will reconsider the Motion for Relief from Automatic Stay and authorize Mesa and/or Leucadia to proceed and obtain the majority control of Bicoastal.

DONE AND ORDERED at Tampa, Florida, on November 21, 1989.